UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
WESTON CAPITAL ADVISORS, INC.,

                       Plaintiff,               13-CV-6945 (PAC)

      v.

PT BANK MUTIARA, TBK,

                    Defendant.
--------------------------------------------------------x

**DECLARATION OF CHARLES B. MANUEL, JR.
IN SUPPORT OF MOTION TO SUPPLEMENT RECORD,
CONDUCT FURTHER PROCEEDINGS,
AND VACATE THE EXPANDED CONTEMPT ORDER AND SANCTIONS**

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Plaintiff
Weston Capital Advisors, Inc.

Daniel S. Goldstein (DG2500)
Shiboleth LLP
Of Counsel

December 2, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
WESTON CAPITAL ADVISORS, INC.,

                         Plaintiff,                       Civil Action No. 13-cv-6945 (PAC)

        - against -

PT BANK MUTIARA TBK

                         Defendant,
------------------------------------------------------------------x

**DECLARATION OF CHARLES B. MANUEL, JR.
IN SUPPORT OF MOTION TO SUPPLEMENT RECORD,
CONDUCT FURTHER PROCEEDINGS,
AND VACATE THE EXPANDED CONTEMPT ORDER AND SANCTIONS**

     Charles B. Manuel, Jr., an attorney admitted to practice before this Court, makes this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

<u>**INTRODUCTION**</u>

     1.   I submit this declaration in support of the application by Plaintiff Weston Capital Advisors, Inc. ("WCAI") to (i) supplement the record and to conduct further proceedings to address important documents and information discovered while the appeal of this case was pending and more recently, and (ii) vacate the expanded contempt order and sanctions. The recently discovered documents and information all relate to the application of, and the district court's award to, Quinn Emanuel Urquhart & Sullivan, LLP for approximately $600,000 of legal fees and to the expanded contempt and sanctions motion. The information we have received strongly indicates that, at the very time Quinn Emanuel was pursuing the expanded contempt motion and huge sanctions against WCAI and other contemnors, that law firm participated with Defendant PT Bank Mutiara TBK in a scheme of theft, money laundering and fraud in connection with an arbitration in London.  In that arbitration, Bank Mutiara paid Quinn Emanuel $8 million which (a) could have been frozen in London and then applied toward the partial satisfaction of WCAI's judgment against Bank Mutiara, and (b) would have enabled WCAI easily

to satisfy this Court's order for the return of $3,623,000 that had been paid to WCAI as a result of errors by WCAI's former counsel and the Court. The money laundering and fraud of Bank Mutiara and Quinn Emanuel directly defrauded WCAI and the judgment creditor for which it acted, First Global Funds Ltd., and prevented them from recovering partial or fullcollection of their judgments and satisfying the order for the return of the $3.623 million well before the expanded contempt and sanctions orders were entered.

2.    The key, previously unseen document in this matter, read in conjunction with fraudulent deception in the  financial statements of Bank Mutiara, evidences the participation of Quinn Emanuel in its client's surreptitious payment of $8 million of stolen, laundered money as a legal fee to Quinn Emanuel at precisely the time that (i) Bank Mutiara was liable to First Global Funds Limited and Weston International Asset Recovery Company Ltd. for over $120 million in judgments upon acknowledged, continuously reported liabilities of the bank, and (ii) Bank Mutiara and Quinn Emanuel were demanding contempt orders and sanctions against one party and nine non-parties for the non-return of $3.623 million of money that had been paid out upon this Court's order on a judgment that had been entered by this Court (later rescinded as the product of the Court' own error) upon a judgment that had been rendered in the courts of England's sister Commonwealth country of Mauritius.

3.   Because the proceedings in the case at bar are proceedings in equity, the doctrine of unclean hands is applicable, as the parties and the court acknowledge.  As demonstrated in this declaration, the report of expert witness Peter Barrie Brown, read in conjunction with the fraudulent financial statement of Bank Mutiara which is already in the record, shows that Bank Mutiara and its counsel have jointly engaged in illegal money laundering activity that has prevented FGFL and WIARCO from obtaining an $8 million partial recovery on their judgments – at exactly the time that Bank Mutiara was in the process of obtaining a contempt order, an expanded contempt order, and impossible sanctions against one party and nine non-parties for

the non-return of less than half the amount of the stolen, laundered money. Rarely has the doctrine of unclean hands been more directly on point.

I.   **Background.**

4.   At oral argument in the Second Circuit on June 7, 2016, in connection with the issue of Bank Mutiara's unclean hands, the Court inquired whether there are references in the record to illicit activities at Bank Mutiara. There are indeed a number of such references to illicit activities such as corruption, theft and embezzlement, one of which appeared in Bank Mutiara's appeal brief at page 3 (acknowledging that Bank Mutiara's "former management had embezzled millions of dollars of the bank's and its depositors' funds.").

5.   But we were surprised when Quinn Emanuel, counsel for Bank Mutiara, suggested in their answering brief that illicit activity and breaches of legal obligations by Bank Mutiara ceased when the bank was taken over by the Indonesian Deposit Insurance Corporation[1] in 2008. ("In November 2008, Bank Mutiara was taken over by the Indonesian Deposit Insurance Corporation after its former management had embezzled millions of dollars of the bank's and its depositors' funds. . . . [R]egulators and new management sought to unwind the prior misconduct and prepare Bank Mutiara to go forward . . . .")  (Bank Mutiara Appeal Br. 3.)  Far from it.  In reality, the regulators and new management have continued chiseling the bank's depositors and creditors (including Petitioner, its affiliates and its parent herein, which are the holders of by far the largest of the bank's debt obligations that had been recorded on the bank's books for eight years until they were simply erased from the books eighteen months ago), and the depositors and creditors of other institutions such as the Federal Bank of the Middle East; and they have perjured themselves and thumbed their noses at the courts of Mauritius, the United States and Indonesia throughout the bailout and post-bailout period:

---

[1] The Lembaga Penjamin Simpanan ("LPS").

- Liegey Declaration 11/13/13, ¶¶ 34-35 (A. 161-62)[2] ("The distribution of $720 million from [the Bank Mutiara] bailout has been viewed by many as a scandal unto itself with millions of dollars funneled to politically-favored people and companies, political cronies, and quasi-governmental entities." Large private depositors, senior note bond holders (especially WCAI and WIARCO) and $140 million of small defrauded depositors of Bank Mutiara (see Antaboga note below) received nothing.  See Exhibit C (March 2010 news report that the Indonesian "House of Representatives voted 325 to 312 that the [Bank Mutiara] bailout violated laws, directing law enforcement agencies to investigate further." (A. 173-75.)  See also Exhibit K (A. 202-03), criticizing lack of transparency in bailout and the unexplained doubling of the cost, and opining that the legislature, in retrospect, would likely have approved liquidation).

- See also Liegey Declaration 11/13/13 ¶¶ 47-61 (A. 164-67) and Exhibits M-P thereto (A. 218-52), setting forth details that put the lie to the two-page Declaration of Ahmad Fajar, Director of the Treasury and International Banking of Bank Mutiara (the only declaration ever submitted by Bank Mutiara in this case), who perjuriously asserted that Bank Mutiara [as of late 2013 – five years after the bailout] has "no foreign operations."

- In 2014, after orders and judgments had been issued at four levels of the Indonesian court system, including the Supreme Court, for the payment of $3.3 million of deposits stolen by the bank from 27 smaller Bank Mutiara customers in the Discretionary Fund issued by PT Antaboga Delta Sekuritas Indonesia, the bank simply thumbed its nose at the courts of its own country, refusing to pay the judgment. (See reports at A. 549-55.) In May 2015, the Jakarta Post reported that the Surakarta District Court had ordered a seizure and auction of Bank  Mutiara's assets to satisfy the judgment. (A. 1236.)  But Bank Mutiara continued to defy the law and flout court orders.  In its year-end 2015 financial statement, at pages 198-200, Bank Mutiara (now, PT Bank J Trust Indonesia) unilaterally declared that the "Supreme Court Decision is categorized as [a] Non-Executable Decision." (Financial Statement, which post-dates the district court decision herein, available upon request.)

- Plaintiffs' pursuit of $5,145,892.74 in Share Transfer Fee payment obligations and Capital Calls (recognized by Bank Mutiara in its audited financial statements as due and payable since December 17, 2014) for the FGFL delivery to Bank Mutiara of US$112,500,000 FGFL participating redeemable preference shares has been obstructed by Bank Mutiara/Bank JTrust Indonesia. (Liegey Decl. 4/17/15 [A. 772, 779], and Bank Mutiara 2014 Financial Statement (Exh. 5 to Liegey Decl.) Note 49(b) at 193 [A. 1060].) Far from challenging the claims or denying that it carries these senior liabilities on its books, Bank Mutiara has expanded the financial notes to its audited financial statements admitting to the liabilities. (Id.)

### II.  Bank Mutiara's Laundering Money Stolen by the Saab Brothers, And the Fraudulent Misreporting of the Transactions.

6.  Perhaps the most stunning example of continuing illegal activity at Bank Mutiara

arises from money laundering activity at the bank that began in 2006-2008 and continued

---

[2] Exhibit and record references are to the Second Circuit appendix, available on request.

through 2015 in the midst of proceedings in the district court in the case at bar, when Bank Mutiara and Quinn Emanuel placed themselves in the middle of a $40 million money laundering scheme in which the bank received $40 million from the Federal Bank of the Middle East and laundered $32 million of the money for FBME Cyprus and Saab Financial (Bermuda) Ltd., entities owned by the Saab brothers, who were also the co-owners of FBME.[3]

7.   The matter was initially falsely and fraudulently misreported in the Audited Financial Statement of Bank PT J Trust Indonesia (formerly Bank Mutiara) for the Fiscal Year Ended December 31, 2014 as the settlement of litigation before the London Court of International Arbitration involving repurchase transactions between FBME Bank Limited and Bank Mutiara:

> Based on Statement of Case . . . filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration.

(See Audited Financial Y/E 2014 Note 49(f)(A)(7), A. 768.)  The Audited Financial Statement further reported that:

> Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and Bank [Mutiara], both parties agreed that the Bank shall pay an amount of GBP5,000,000.

(*Id.*)

8.   Any reader would understand this to mean that Bank Mutiara was paying GBP5,000,000 (app'x. US$8,000,000) as the settlement amount to the Claimants, FBME Bank and Saab Financial (Bermuda) Limited. The Audited Financial Statement continues:

> On December 2, 2014, the Bank has transferred funds amounted to GBP5,000,000 *to Quinn Emanuel's bank account as the Bank's Lawyer*.  By receipt of such payment, therefore, this case has been closed.

(*Id.*, italics added.) Any reader would understand this to mean that the settlement money had been placed in an attorney escrow account for payment *to the Claimants*.

9.   Indeed, the deception worked like a charm: Bank Mutiara's FYE 2014 Audited Financial Statement actually was seen by Petitioner herein as a potentially positive

---

[3] Ayoub-Farid M Saab (50%) and Fady M Saab (50%).

development, indicating that J Trust Bank (Japan), the then-new owner of Bank Mutiara, might actually be acting responsibly to settle contractual obligations of the bank.  In his declaration dated May 5, 2015 as part of the record on the current motion, John Liegey cited and quoted from the section of the "recently issued" 2014 FYE Audited Financial Statement reporting on the settlement of the "repurchase transactions" as potentially "indicating that J Trust Japan and PT Bank J Trust Indonesia are desirous of resolving old legacy claims of Bank Mutiara . . . [and] may actually be prepared to bring this matter to a fair and just resolution."  (See Liegey Declaration 5/5/15 at 24 n.8, A. 767-68.)

10.  But over the ensuing two months we learned the shocking truth:  (1) the bank's FYE 2014 Financial Statement was another outright fraud by J Trust Japan and Bank Mutiara, renamed PT Bank J Trust Indonesia; (2) the "repo transactions" were in fact a thin disguise for the laundering of $40 million for the Saab brothers through the crooked Bank Mutiara, to be transferred to other Saab-owned entities, and (3) the payment of the GBP5 million/US$8 million "Settlement . . . amount" was in fact a payment of "Legal Fees" to Quinn Emanuel via the transfer of funds that had been stolen by the Saabs from FBME Bank Limited while it was under a global investigation, and then laundered by Bank Mutiara.

11.  Bank Mutiara knowingly brokered the laundering of $40 million that the Saab brothers extracted from their failing bank; Bank Mutiara retained $8 million of the laundered FBME money – 20% of the total amount of money it stole from FBME and then laundered – as its "fee" for the money transfers; and Bank Mutiara then transferred the $8 million of the laundered money to Quinn Emanuel – purportedly "as the Bank's Lawyer" handling the settlement payment to Claimants, but in fact as a "Legal Fee" for the law firm.  And as shown by the above-quoted passage from the Liegey Declaration, Bank Mutiara's audit fraud clearly deceived Petitioner herein, and presumably the rest of the community of Bank Mutiara's obligees, and it completely disguised the laundering and transfers by Bank Mutiara of $40

million of stolen funds, in which Quinn Emanuel was a direct participant as the arranger and recipient of $8 million of the stolen and laundered funds.

12.   Statutory audit fraud has been committed by Bank Mutiara each year since 2008 for non-disclosure of liabilities, illegal capital adequacy ratio reports, and unreported suspicious activity reports with respect to these money transfers.   ***And these latest acts of money laundering, theft and fraud upon Bank Mutiara's creditors and depositors continues to this day; indeed, it took place smack in the middle of preparation for the hearing of the present matter in the district court – a hearing NOT to punish the criminal enterprise Bank Mutiara (because all judgment enforcement, discovery[4] and other action by the judgment-creditor Petitioners WCAI and WIARCI had been stayed by the district court), but rather to annihilate these largest VICTIMS of Bank Mutiara's crimes.***

### III.   The Expert Report Commissioned by Bank Mutiara.

13.   In the course of the London Court of International Arbitration proceeding by FBME Bank Limited and Saab Financial (Bermuda) Limited against Bank Mutiara to recover $38.5 million of the money that had been stolen by the Saab brothers, an expert was retained for Bank Mutiara to analyze the purported repurchase transactions at issue in the case. The expert, Peter Barrie Brown, completed a detailed report dated August 15, 2014 that completely rejected Bank Mutiara's lie that the matter simply involved "repurchase transactions"; the report in fact amounts to a virtual indictment of Bank Mutiara as well as the Saab brothers for money laundering.[5] (The Brown Report is Exhibit 1 hereto.)

---

[4] It is most important to remember that, among several gross anomalies in this case, the aggrieved petitioner/judgment creditor was precluded from taking any discovery from the defrauding, crooked judgment debtor, while the judgment debtor was afforded unfettered discovery from the petitioner.  On remand, petitioner WCAI must be afforded discovery to further confirm the facts set forth herein.

[5] Since at least 2014, Quinn Emanuel has also represented Federal Bank of the Middle East (its purported adversary in the LCIA proceedings) in investigative, enforcement and penalty proceedings before the banking authorities and courts in Cyprus, Paris and the United States. Wikipedia reports:

14.   The findings of Bank Mutiara's expert include the following (with bracketed page references to the report):

- FBME transferred $40 million to Bank Mutiara and "affiliated third parties," which then retained $8 million as a "fee" for the transaction.  [30, 50]

- The transaction had "all of the hallmarks" [9] and "red flags" [32] of a money laundering transaction.

- "Both parties [FBME and Bank Mutiara] have been found by reliable institutions to have been associated with money laundering."  [9]

- "The economic effect of the transactions was for FBME to pass US$32 million to Saab Jersey at a cost of $8 million. . . . The purpose of the transaction was to launder FBME's money through bank accounts controlled by Bank Century [the prior name of Bank Mutiara], including accounts in the U.S. and Switzerland."  [55]

- "The $8 million is out of proportion with the [limited] risks it [Bank Century] undertook on the face of the documents, and more in line with the risks it was undertaking in facilitating a money laundering operation."  [56]

- Bank Century got an opinion letter from a law firm "highlighting several serious issues in relation to these transactions [which] would have been a very strong flag for Bank Century. . . . The fact that Bank Century nevertheless entered into the transactions the same day it received the opinion is a strong indicator . . . that the transactions were in fact for money laundering purposes." [51]

- "FBME, Saab Jersey and Bank Century may instead have used the opaque transactions to cover up the money laundering transactions for the transfer of $32 million for an $8 million fee." [51]

- "I do not believe the purpose of the transaction was an honest one; the true purpose behind these transactions, shared by all parties, was the laundering of money."  [56]

---

In 2014 the Financial Crimes Enforcement Network (FinCEN), a bureau of the United States Department of the Treasury, which collects financial transactional data and information in order to combat domestic and international money laundering, terrorist financing, and other financial crimes, accused FBME which operates primarily in Cyprus, of facilitating financial transactions for multinational organised crime organizations and Hezbollah. The Central Bank of Cyprus took over management of the bank . . . . The 21st of December 2015, the central bank of Cyprus revoked the branch license of FBME bank in Cyprus.

The FBME Limited website reports, as of May 27, 2016, a "ruling by Cyprus's Administrative Court to reject the application from FBME Bank Limited to suspend the planned moves of the Central Bank of Cyprus to revoke the license of FBME's local branch."

- "These transactions raise more red flags than any other arrangement I have encountered in my entire [48-year] career." [56]

**IV. The Effectuation of the Fraud Disguising Criminal Money Laundering.**

15.   Not surprisingly, the *FBME v. Bank Mutiara* case was settled in mid-October 2014, promptly after the expert report was issued. But Bank Mutiara retained the $8 million of laundered money that it had received as its "fee."   Then, less than two months later, on December 2, 2014 (soon after Bank Mutiara had been acquired by J Trust Bank of Japan, which has renamed it as PT Bank J Trust Indonesia Tbk), *Bank Mutiara and Quinn Emanuel took the remaining $8 million of stolen/laundered money and arranged for it to be wired to the account of Quinn Emanuel Urquhart & Sullivan LLP (UK) at Bank of America in London.*

16.   The payment of the $8 million as a "Legal Fee" to Quinn Emanuel rather than a settlement for FBME can be found through a forensic examination of the Statutory Audited Financial Statement of Bank Mutiara, FYE December 31, 2014.  Note 35 at page 118 of the Statement (see Exhibit 3-A hereto, which also appears at A. 992) shows the payment of total "Perkara/Legal Fees" by the bank in 2014 in the amount of IDR145,067,000,000, equal to US$11,713,120.71 at the then-current exchange rate (IDR12,385:US$1.00). This figure clearly included (but buried) the $8,000,000 payment to Quinn Emanuel. Average legal expenses for Bank Mutiara ran in the average amount of approximately IDR18-20 billion/US$1.5 million per year for the previous several years.   (Attached as Exhibit 3(A-D) are extracts of FYE 2014, 2013, 2012, 2011 with Note 35 on Non-Operating Fees, including Legal Fees.)

17.   The $8 million payment is shown nowhere else in Bank Mutiara's FYE 2014 Financial Statement (other than in the fraudulent Note 49), and in particular there is no entry anywhere on a balance sheet or income statement that shows a "settlement" payment of $8 million to FBME.   The $8 million was buried and undesignated in the "Legal Fees" shown in Note 35 so that no one (other than a determined litigation adversary) could discover that Bank

9

Mutiara had not paid the $8 million of laundered money in settlement with FBME but instead had paid the laundered money to Quinn Emanuel as a "Legal Fee."

18.   The Bank Mutiara FYE 2014 Financial Statement – as of just four weeks after the wiring of the legal fee – was thus a complete fraud.[6]  It falsely reported the original statement of claim in the arbitration as if the matter involved contractual "repo transaction[s]," even though the bank's own expert had reported and demonstrated unequivocally four months earlier that the repo transactions were simply a disguise for $40 million of money laundering by Bank Mutiara for the Saabs. The Financial Statement fraudulently reported a "Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and Bank [Mutiara], [under which] both parties agreed that the Bank shall pay an amount of GBP5,000,000" to the Claimants, when in fact there was no such settlement.  And the FYE 2014 Financial Statement fraudulently stated that, pursuant to the settlement, "the Bank has transferred funds amounted to GBP5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer," when in fact the payment was not to effectuate the settlement with FBME but was in fact the payment of GBP5,000,000/US$8,000,000 of laundered money as a "Legal Fee" to Quinn Emanuel.  (See Exhibit 2 at 204.)

19.   As I noted at oral argument on the main appeal before the Second Circuit, all of this occurred while Bank Mutiara was subject to two Mauritian judgments in favor of FGFL and WIARCO that now, with interest, total approximately $130 million, as well as an Indonesian judgment of $3.3 million in favor of the Antaboga Depositors – upon obligations which were recorded on the bank's books and records, and all of which have been dishonored by Bank Mutiara.

20.   Nowhere does Bank Mutiara's 2014 Audited Financial Statement, issued in the spring of 2015, mention the theft of $40 million from FBME, the laundering of the $40 million

---

[6] The Notes of Legal Proceedings in such financial statements are almost invariably written by counsel responsible for the case – in this instance, Quinn Emanuel.

through Bank Mutiara, the retention of $8 million of the stolen/laundered money as a "legal fee," or the payment of the stolen/laundered $8 million to Quinn Emanuel. Obviously, Bank Mutiara, in conjunction with its attorneys, sought to disguise the specifics of its continuing illegal activities from its judgment creditors – especially FGFL and WIARCO – and the legal authorities in various venues around the world.   Petitioners learned of this extraordinary, probably criminal conduct only when they recently received and reviewed the expert report, long after the opinion and judgment of the district court were issued in this case.

21. Had Petitioners known that Bank Mutiara had moved GBP5,000,000/US$8,000,000 into a London bank account, they would have instantly obtained a Mareva freeze order or other injunction, followed by a properly submitted turnover order from the courts there – which would have mooted the entire issue now before this Court. This additional, vital information of Bank Mutiara's continuing frauds and illegal activities – and the filthy hands with which it has acted for over a decade, most recently in conjunction with its attorneys – are of the utmost importance to the disposition of the matter at hand.

22.   The documents relating to Bank Mutiara and its counsel's central role in a $40 million money laundering scheme, and Bank Mutiara's retention and transfer to Quinn Emanuel, during the pendency of this enforcement action, of the $8 million fee that Bank Mutiara received for its money laundering services, should be part of the record herein.   And this unequivocal evidence of Bank Mutiara's unclean hands, fraud and money laundering merits the vacatur of the expanded contempt order and sanctions that it obtained under false pretenses from this Court.

**V. <u>Additional Evidence of the Fraud and Criminal Money Laundering</u>.**

23.   At the conference before this Court on November 3, 2016, Defendant's counsel sought to explain the matter in a manner that would absolve Quinn Emanuel and Bank Mutiara.[7]

---

[7] At the outset, counsel's statements at the November 3 conference are highly suspect because any such statement, if true, would certainly have been made when the undersigned first raised

We have previously examined the written record and history of the matter, and we have recently received further written confirmation, demonstrating that counsel's statements are false.

24.   Here is what Marc Greenwald said at the November 3, 2016 conference at pages 9-11, with boldface and bracketed numbers added to the statements referenced herein:

> So Bank Mutiara was sued by [FBME], a Middle Eastern bank, in a London private arbitration relating to a transaction done by the prior corrupt owner of Bank Mutiara. In that arbitration Quinn Emanuel's London office represented Bank Mutiara.  And one of the documents used in the arbitration was an expert opinion by a banking expert saying that the transaction between the Middle Eastern bank and the prior owner, corrupt owner had indicia of money laundering. That was the defense of Bank Mutiara.
>
> The case then settled. And **[1] the settlement was paid by Bank Mutiara sending the settlement proceeds to Quinn Emanuel's client trust account, the way settlements are frequently done, and then Quinn Emanuel paying the plaintiff in the arbitration**. **[2] Bank Mutiara then disclosed in its financials we had this arbitration, we settled it for $8 million, and we settled it by sending it to Quinn Emanuel's London office for payment.**

25.   To begin, Bank Mutiara and Quinn Emanuel's strategy regarding this matter has relied primarily upon obfuscation, in two respects. First, they have stated that the matter at issue focuses on activities that took place in 2006-2008.  But that statement is false; our focus is on the expert witness report of Peter Barrie Brown dated August 14, 2014 ("Brown Report"); the resulting settlement of the LCIA arbitration on October 16, 2014; the subsequent payment from Bank Mutiara to Quinn Emanuel of GB£5,000,000 (US$8,000,000) on December 2, 2014; and the fraudulent reporting used by Bank Mutiara in 2015 to disguise what happened. The sham "repo" transactions covering up the theft and the criminal laundering of $40,000,000 by Bank Mutiara simply provide important background and context for the matter at hand.

26.   Second, the assertion that Bank Mutiara's "defense" in the LCIA was that the "transaction … had indicia of money laundering" is highly deceptive. The passages from the Brown Report quoted in paragraph 14 above demonstrate beyond peradventure that Bank Mutiara was a full, active participant in the money laundering "shared by all parties," and that

---

this matter in filings and correspondence in the summer of 2016, culminating in a letter dated September 16, 2016, to which Quinn Emanuel did not respond. The adumbrated responses at the time were vague, evasive or non-existent, amounting to admissions by silence.

Bank Mutiara was equally responsible for the the repo cover-up of the theft and laundering of US$40,000,000.  We cannot fathom how Bank Mutiara could have used the Brown Report as a "defense" to show … what? … that the Bank was the co-perpetrator not of a breach of repo contracts but of the "intention[al] [and criminal] laundering of money" on behalf of the Saabs, who were obviously stealing the $40 million from FBME and its innocent creditors, depositors and other stakeholders. A plaintiff's lawyer would praise the heavens for the opportunity to cut through that "defense," and it is inconceivable that the Brown Report could have been the impetus for a supposedly arm's-length "settlement." The impetus for the settlement was that Bank Mutiara's criminal activities had been further exposed at just the time that the J Trust Limited acquisition of Bank Mutiara was being concluded at a purchase price exceeding US$360 million.

27.  In that context, we will examine counsel's two statements in court.

**[1] "The settlement was paid by Bank Mutiara sending the settlement proceeds to Quinn Emanuel's client trust account, the way settlements are frequently done, and then Quinn Emanuel paying the plaintiff in the arbitration**."

This depiction is inconsistent with the facts of which we have been informed, and part of it deviates from standard practice. First, we know that FBME Bank Limited – Cyprus Branch (the only legal counterparty to the TBMA/ISDA Master Repurchase Agreement) did not receive the money. The Special Administrator for FBME, Chris Iacovides, confirmed to us in a November, 2016 letter (Exhibit 4 hereto), stating:

> According to Mr. [Nigel] Brown, Quinn Emanuel Urquhart & Sullivan LLP stated that the Branch in Cyprus received on or about December 2014 the sum of £5.5 million, arising from a settlement in a legal action before the London Court of International Arbitration, case number 132447, where FBME Bank Ltd (Cyprus Branch) was a Claimant. In this regard, having reviewed the branch's records and discussing the matter with the branch's CFO, Mr. Anastasiou, I can confirm that **NO SUCH MONIES WERE RECEIVED BY THE BRANCH** in December 2014 or subsequently. [Caps in original; boldface added.]

28.  A letter from Dentons in London (attorneys for the FBME Bank Special Administrator) to the London office of Quinn Emanuel dated November 24, 2016 further

establishes that "[t]he Branch [FBME Bank Limited] was put into Special Administration on 21 July 2014 by the Resolution Authority in Cyprus [2-1/2 months before the settlement and 4-1/2 months before the funds transfer] and the Special Administrator is the only party with the authority to bring or permit proceedings on behalf of the Branch."[8] (See Exhibit 5 hereto.)

29.   Second, while defendants often put settlement funds into their attorneys' trust accounts, it is highly unusual (and something I have never seen) for the defense attorneys to then pay an attorney-represented party or non-party directly. Rather, the payment goes to the plaintiff's attorney's trust account.  Within minutes, Quinn Emanuel can easily address this part of the matter by showing us and the Court (1) the October 16, 2014 Settlement Agreement, (2) the documentation (on both sides) of the December 2, 2014 transfer of the £5,000,000 from Bank Mutiara to Quinn Emanuel's client funds trust account in London, (3) the transfer of the same amount from the Quinn Emanuel trust account to the account of the FBME Bank Limited Special Administrator its counsel, and (4) any subsequent transfer of the money by FBME Bank Limited to a third party, such as a Saab-controlled entity or a law firm.

**[2] Bank Mutiara then disclosed in its financials we had this arbitration, we settled it for $8 million, and we settled it by sending it to Quinn Emanuel's London office for payment.**

30.  In this statement Bank Mutiara and Quinn Emanuel are simply encapsulating the fraudulent misrepresentations contained in Bank Mutiara's financial report, which in all likelihood were co-authored by the law firm. The financial report is a fraudulent cover-up of Bank Mutiara's

---

[8] The Dentons letter cites Quinn Emanuel's bringing an action, based upon an alleged oral engagement and without authority from the Special Administrator, on behalf of FBME Bank Limited, against Nigel Brown and others. This merely reinforces another serious issue with respect to the "settlement" of the LCIA arbitration: namely, Quinn Emanuel's direct conflict of interest as attorneys for both parties to the arbitration. Quinn Emanuel has represented FBME in a range of matters since 2014, including the administrative proceedings before the Financial Crimes Enforcement Network of the Department of the Treasury and the companion litigation in the United States District Court for the District of Columbia.  We believe that Hogan Lovells's purported representation of FBME in the LCIA arbitration was a charade orchestrated by that firm and Quinn Emanuel, another chapter of which was the $100,000 fee-return "settlement" submitted by the two firms to Judge Crotty in 2015. Consistent with Judge Crotty's ruling, a separate action will soon be underway which will expose the joint actions, conflicts and other improprieties in which the two firms have engaged.

central role in a criminal theft and money laundering scheme, discussed above.   In brief summary:

- The FYE 2014 PT Bank Mutiara TBK Annual Report ("2014 Annual Report"), including the financial statements and notes, refers to the settlement of a contract case for the "payment of Repo transaction[s] amounted to USD38,500,000 and interest …."   In fact, however, the matter proved to be a case of criminal theft and money laundering, which was settled when the central role of Bank Mutiara as the key participant in and arranger of the Saabs' theft and laundering of US$40,000,000 from FBME's creditors, depositors and stakeholders was revealed by its own expert.

- The 2014 Annual Report fails to disclose that the US$8,000,000 "settlement" payment was part of the proceeds of, and constituted the "fee" payment for, Bank Mutiara's money laundering.

- The 2014 Annual Report states that Bank Mutiara "has transferred funds amounted to GBP5,000,000 *to Quinn Emanuel's bank account as the Bank's Lawyer*." (Italics added.)

- Nowhere does the 2014 Annual Report refer to a payment of GB£5,000,000 or US$8,000,000 to FBME Bank Limited. In fact, it refers only to Saab Financial (Bermuda) Ltd and Quinn Emanuel.

- The only reference in the financial statements in the 2014 Annual Report that would appear to encompass the US$8,000,000 is Footnote 35, which shows an increase in annual "*Legal Fees*" paid by the bank from the previous annual average of approximately US$1,500,000 to over US$11,000,000, without indication of the payees.

31.   On the basis of these facts, we are persuaded that counsel's statement regarding disclosures in Bank Mutiara's "financials" is as false, misleading and fraudulent as the 2014 Annual Report itself.

32.   Plaintiff is not obdurate about these matters. If the documentation relating to the funds transfers and financial reports would rebut Plaintiff's contentions in this declaration and the several letters and memoranda we have filed, it would only make sense for Bank Mutiara and Quinn Emanuel to present those documents now, as we would have expected them to do months ago in the Second Circuit if they had a sustainable position when these matters were first raised. The undersigned is willing to meet and confer with Bank Mutiara's counsel forthwith to review those documents.

Dated:    New York, New York
          December 2, 2016

Respectfully submitted,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Petitioner-Appellant
Weston Capital Advisors, Inc.

# Exhibit 1

Peter Barrie Brown Expert Report

Commissioned by PT Bank Mutiara and

Quinn Emanuel

August 15, 2014

<u>**IN THE MATTER OF AN LCIA ARBITRATION**</u>

<u>**LCIA Arbitration No. 132447**</u>

**B E T W E E N**

1.     **FBME BANK LIMITED**
2.     **SAAB FINANCIAL (BERMUDA) LIMITED**

<u>**Claimants**</u>

**-and-**

**PT BANK MUTIARA TBK**

<u>**Respondent**</u>

_____

**EXPERT REPORT**

**PETER BARRIE BROWN**
_____

**15 August 2014**

<u>Tribunal:</u>

Mr. Stephen Bond
Mr. Michael Brindle QC
Mr. Ken MacLean QC

**TABLE OF CONTENTS**

A.    INTRODUCTION..................................................................................4
1     Overview of the Proceedings Between FBME, Saab (Bermuda) and Mutiara.............4
      1.1    Issues Considered in This Report .................................................5
      1.2    My Expertise and My Duties as an Expert .......................................5
             1.2.1   Current Role...........................................................6
             1.2.2   Previous Roles ........................................................6
             1.2.3   My Duties as an Expert................................................6
B.    EXECUTIVE SUMMARY .......................................................................8
C.    ANTI-MONEY LAUNDERING FUNDAMENTALS.................................10
1     Overview Of Legislation and Regulations.............................................10
      1.1    English Law .............................................................10
      1.2    Cypriot and Indonesian Law .........................................11
2     The Money Laundering Regulations 2007 .....................................11
      2.1    Scope of the Money Laundering Regulations.........................11
3     The Joint Money Laundering Steering Group (JMLSG)...................12
4     UK Sanctions Compliance ......................................................13
5     The USA Patriot Act 2001 ......................................................14
6     The 'Money Laundering Process'...........................................14
7     Summary of Money Laundering Warning Signs ..........................15
D.    THE TRANSACTION ARRANGEMENTS ...................................17
1     Overview........................................................................17
2     The Repo Transactions ........................................................21
      2.1    Repo Definition.........................................................21
      2.2    The BPM Repo Transaction.........................................22
      2.3    The WLB Repo Transaction.........................................22
      2.4    The NAB Repo Transaction.........................................23
      2.5    The JPM Repo Transaction...........................................23
3     The Pledge Transaction.........................................................23
4     The Third Party Repo Transactions .........................................25
      4.1    The CMP Repo Transactions .......................................25
      4.2    The WWR Repo Transaction.........................................26
5     The Promissory Note Transactions ..........................................27
6     The Third Party Credit Agreements...........................................28
7     The JPM Repo Transaction.....................................................29
8     Economic Impact of the Contractual  Arrangements For Each Party as at Da y One .29
      8.1    Cash Transfer ...........................................................30
      8.2    Interest Amounts.......................................................30
      8.3    Securities................................................................32
E.    ADDITIONAL  INFORMATION  RELATING  TO  THE  TRANSACTION
      ARRANGEMENTS ...........................................................................33
1     Ongoing Transaction Arrangements .........................................33
      1.1    Change of Repo Rates.................................................33
      1.2    Unwind of the WLB Repo Transaction .........................34
      1.3    Replacement of Matured Securities under the Repo Transactions .................34
2     Information Relating to Actual Cash Movements ........................34
      2.1    SWIFT Statements .....................................................34
             2.1.1   The Repo Transactions ...........................................34
             2.1.2   The Promissory Note Transactions.....................................35
             2.1.3   Other .......................................................................38

        2.2    Saab (Jersey) Transaction Summary.................................................38
3      Execution of Documentation .................................................................40
        3.1    Back-dating of Sale and Purchase Agreements ...............................41
        3.2    Forward-dating of Sale and Purchase Agreements...........................41
        3.3    Back-dating of the Pledge Agreement ..............................................41
        3.4    Back-dating of the Promissory Notes ...............................................41
        3.5    Lack of Governing Documentation ...................................................41
**F.     OTHER CONSIDERATIONS..................................................................43**
1      Mr. Rizvi ................................................................................................43
2      Regulatory Interventions.........................................................................43
3      Other Relevant Matters Relating to the Transaction Arrangements...........44
        3.1    Lack of Evidence Relating to whether  the Securities were Actually Held
                in Relation to the Transaction Arrangements ...................................44
        3.2    Lack of Commerciality in the Positions Entered into by Certain of the
                Relevant Parties .............................................................................45
        3.3    Arbitrary Determination of Transaction Economics.........................45
                3.3.1   Cashflow Payments............................................................45
                3.3.2   The JPM Repo Transaction.................................................46
        3.4    Missing Documentation and Documentation Inconsistencies ........48
        3.5    The Earlier Proposed Structure of the Transactions and the Adverse Legal
                Opinion ...........................................................................................50
        3.6    The Purpose Alleged by the Claimants............................................51
**G.     MY    CONCLUSION    IN    RESPECT    OF    THE    TRANSACTION
        ARRANGEMENTS ..............................................................................54**
**H.     EXPERT'S DECLARATION..................................................................57**

**I.      Appendix I - Professional Experience and Qualifications.....................58**
**J.      Appendix II - Contracts and Documents Received.................................61**
**K.     Appendix III - Data Disclaimer .............................................................62**
**L.      Appendix IV – Material exhibited with this Report ...............................63**

## A.    INTRODUCTION

1.    I, Peter Brown, have been retained by Quinn Emanuel Urquhart & Sullivan UK LLP, solicitors acting for PT Bank Mutiara Tbk ("**Mutiara**") (formerly, PT Bank Century Tbk ("**Bank Century**")), as an expert in the field of anti-money laundering compliance, to provide my opinion on matters relating to relevant aspects of certain arrangements between FBME Bank Limited ("**FMBE**"), Bank Century and Saab Financial (Jersey) Limited ("**Saab (Jersey)**") arising out of arbitration proceedings which have been brought by FBME and Saab Financial (Bermuda) Limited ("**Saab (Bermuda)**") against Mutiara in the London Court of International Arbitration (the "**LCIA**").

2.    I set out the scope of this report in detail in Section A1.1 below.

3.    Capitalised terms used but not defined in this report have the meanings given to them in the documents listed in Appendix II.

## 1    OVERVIEW OF THE PROCEEDINGS BETWEEN FBME, SAAB (BERMUDA) AND MUTIARA

4.    FBME and Saab (Bermuda) are together claiming an aggregate payment under three repo transactions entered into between FBME and Bank Century. FBME and Saab (Bermuda) have calculated their claim on the basis that the securities, in respect of which FBME were the initial buyer, were 'held' by Bank Century on FBME's behalf as per the transaction confirmations.

5.    Accordingly, the amount claimed is either:

   i)    US$37,097,064 which corresponds to the aggregate repurchase price owed by Bank Century to FBME under the three repo transactions; or

   ii)    US$38,500,000, adjusted (if necessary) pursuant to the close-out mechanism under the governing master agreement, where US$38,500,000 corresponds to the proceeds of the securities (assuming a redemption price of 100%).

6.    Mutiara's response to the claim states that the transactions are invalid and/or unenforceable on the basis that the repo transactions were entered into as part of a

4

series of wider transaction arrangements which, in the absence of any explanation as to the commercial rationale, appear to be sham transactions designed to disguise transfers of money from FBME to Saab (Jersey).

## 1.1    Issues Considered in This Report

7.      In this report I consider whether the transactions bear the hallmarks of money laundering. I analyse certain aspects of the transaction arrangements entered into between FBME, Bank Century, Saab (Jersey) and other parties detailed further in Sections D and E below from November 2006 until November 2008 when the Indonesian Deposit Insurance Company ("**IDIC**"), an independent agency of the Indonesian Government, took control of Bank Century.

8.      In particular I provide my opinion of the following:

   i)     an overview of the nature of money laundering, including a summary of the relevant legal regimes and typical 'warning signs' of a transaction tainted by money laundering;

   ii)    the nature of the transactions (and connected arrangements) which are the subject of this arbitration (including the initial structure and subsequent dealings) to the extent that those matters bear warning signs of money laundering; and

   iii)   an analysis of other 'warning signs' of money laundering present in the evidence.

9.      I have based my analysis upon the documents that I have seen and which are listed in Appendix II.

10.     Based upon the analysis described above, I provide my opinion as to the extent to which the transactions (and connected arrangements) bear the hallmarks of money laundering.

## 1.2    My Expertise and My Duties as an Expert

11.     My CV is appended to this report as Appendix I.

### 1.2.1   CURRENT ROLE

12.    I am currently a Senior Consultant at the CCL Partnership ("**CCL**"). CCL is a consultancy and training firm which offers support and training in all aspects of compliance in a regulated regime for firms operating in and beyond the UK's financial services sector. In addition, I am acting as a Senior Advisor to Solum Financial Limited ("**Solum**") in relation to this matter. Solum is a consultancy firm which offers advisory services in all areas of capital markets.

### 1.2.2   PREVIOUS ROLES

13.    Before joining CCL in 2007, I was the Money Laundering Reporting Officer ("**MLRO**") for a Middle Eastern Bank's UK subsidiary company. This role followed working from 2001 for MHA Consulting, a firm with a business model similar in parts to CCL but with a narrower focus specifically on financial crime compliance matters. It was in that capacity that, for a number of years, I provided the help desk facility for a body called the Joint Money Laundering Steering Group ("**JMLSG**"), described in Appendix III.

14.    I began my career in 1968 as a graduate entrant to the bankers Glyn, Mills & Co., and subsequently worked in various other banking and fund management institutions before developing a specialism in anti-money laundering ("**AML**") compliance from the late 1980s. After gaining a broad basic knowledge of banks' services, I spent approximately 25 years undertaking internal audit work for my various employers in their offices in the UK, the Channel Islands, other European countries, the USA and the Bahamas.

15.    I hold a degree in Economics from the University of Essex, having graduated in 1968.

### 1.2.3   MY DUTIES AS AN EXPERT

16.    I have been assisted by members of the Solum team in the preparation of this report. All work has been carried out under my supervision and control and, as such, I can confirm that the opinions and conclusions that I express in this report are my own,

and are based on material facts that I have been made aware of in the course of preparing this report and on my expertise in money laundering compliance matters.

17.    I have, in the preparation of this report, been assisted by Thu-Uyen Nguyen (Partner), Susan Green (Senior Consultant), Kevin Liddy (Senior Advisor), Victoria Whiteman (Senior Consultant) and Dimitrios Giannarakis (Consultant) at Solum.

18.    I confirm that I am aware of my responsibilities to the Tribunal as an expert witness. The following documents regarding the duties and responsibilities of an expert have been provided to me and drawn to my attention and I have read them (although I understand that they are not all strictly applicable to an LCIA Arbitration):

  i)  the Protocol for the Instruction of Experts to give Evidence in Civil Claims;

  ii)  Part 35 of the Civil Procedure Rules;

  iii)  the Practice Direction to Part 35; and

  iv)  the Chartered Instituted of Arbitrators Protocol for the Use of Party-Appointed Expert Witnesses in International Arbitration.

## B.   EXECUTIVE SUMMARY

19.   In this report I have set out my opinions in relation to the hallmarks of money laundering that I have observed in respect of a series of transactions entered into between FBME, Bank Century and Saab (Jersey) (amongst others) in November 2006.

20.   For reference purposes, in Section C of my report, I provide:

    i)   an overview of the UK statutes and regulations relevant to money laundering, together with a brief comparison of those rules to the equivalent law in Indonesia and Cyprus;

    ii)   a description of the 'money laundering process'; and

    iii)   a summary of the obligations on firms and their staff.

21.   The UK's AML regime has many aspects to it, including drawing in sanctions compliance. Sources of authority are a mixture of statute, regulations, regulators' rules and market standards of best practice, all supported in the financial services sector by JMLSG Guidance.

22.   In my assessments and conclusions I have focused on all aspects of the UK's AML regime including statute law, regulations and best practice. I am not an expert in the equivalent Cypriot and Indonesian rules and regulations. However, on the basis of my brief perusal of those provisions, I believe that my conclusions are likely to be equally applicable in respect of those regimes.

23.   The information contained in Section C is referenced throughout my report, where I describe additional aspects relating to the transaction arrangements which support my opinion.

24.   In Section D of this report I have set out the facts relating to the contractual arrangements. Section E then deals with matters of an ongoing and operational nature. Together, these two Sections have enabled me to formulate my opinions on the structure and associated transaction and other arrangements.

25.     In summary, I have observed the following hallmarks of a money laundering structure (i.e. a structure put in place in order to obscure its real objective) in respect of these transactions:

    i)     the transaction arrangements are circular in nature and do not reflect genuine commercial transactions between commercial counterparties. The arrangements comprised a series of off-market transactions which did not take account of the underlying risks or otherwise reflect a commercial exchange of risks and rewards. Instead the economic terms of the underlying transactions appear to have been intentionally contrived to produce a particular overall economic impact for the counterparties;

    ii)     the arrangements are complex, opaque and are not in line with good practice based upon my experience;

    iii)     the arrangements were subject to missing, incomplete and inconsistent documentation;

    iv)     certain email exchanges that I have reviewed reference the back-dating and forward-dating of documentation;

    v)     both parties have been found, by reliable institutions, to have been associated with money laundering (albeit not specifically in respect of these transactions).

26.     In summary based upon all of the facts that I have been given, the transaction arrangements make no economic sense and bear all of the hallmarks of a structure that has been put in place in order to obscure the real objective.

27.     From what I have reviewed and based upon my experience in the area of anti-money laundering, I conclude that the fundamental arrangements and the ongoing operating arrangements create real suspicions that their true objective was money laundering.

28.     Indeed, the number of separate reasons for being suspicious are so many in total that I rate the whole arrangement and its operation to be the greatest collection of suspicious circumstances I have ever encountered in real life.

## C.       ANTI-MONEY LAUNDERING FUNDAMENTALS

## 1       OVERVIEW OF LEGISLATION AND REGULATIONS

### 1.1    English Law

29.    Money Laundering ("**ML**") is a criminal offence in the UK. The definition of money laundering is to be found in s340 (11) of the Proceeds of Crime Act 2002 (as amended) ("**PoCA**"), which establishes:

"*Money laundering is an act which*

*(a) constitutes an offence under section 327, 328 or 329,*

*(b) constitutes an attempt, conspiracy or incitement to commit an offence specified in paragraph (a),*

*(c) constitutes aiding, abetting, counselling or procuring the commission of an offence specified in paragraph (a), or*

*(d) would constitute an offence specified in paragraph (a), (b) or (c) if done in the United Kingdom.*"

30.    Section 7 of the Act embraces all of the basic, ongoing obligations for all persons, the potential offences that can arise, possible defences to them and possible penalties in the event of conviction.

31.    Sections 327, 328 and 329 of the Act each describe a money laundering offence. Because, collectively, they provide the crux of the UK's legal definition of money laundering, they are sometimes referred to informally as the 'three primary offences'. The opinion I reach in this report is therefore achieved against the substance of these three offences; there are other money laundering offences in the UK law which do not come into the definitional scope of s340 (11).

32.    S327 is entitled **Concealing etc** and the offence is defined as follows:

"*A person commits an offence if he:*

*(a) conceals criminal property;*

*(b) disguises criminal property;*

*(c) converts criminal property;*

*(d) transfers criminal property;*

10

*(e) removes criminal property from England and Wales or from Scotland or from Northern Ireland*".

33.    S328 is entitled **Arrangements** and the offence is defined as follows: "*A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person*".

34.    S329 is entitled **Acquisition, use and possession** and the offence is defined as follows:
"*A person commits an offence if he:*
*(a) acquires criminal property;*
*(b) uses criminal property;*
*(c) has possession of criminal property*".

## 1.2    Cypriot and Indonesian Law

35.    I have been provided with the *Prevention and Suppression of Money Laundering Activities Law 2007* (Cyprus) and the *Law Concerning the Crime of Money Laundering 2002* (Indonesia). I am informed by counsel that both statutes were in force when these transactions were put in place.

36.    I am not an expert in the AML regime in either Cyprus or Indonesia. However, on the basis of my perusal of these statutes, I am of the opinion that they define money laundering in a broadly similar way.

37.    I note that the AML regime in Cyprus is based upon the same Third Money Laundering Directive from the European Union as applies throughout all European Union member countries including the UK.

## 2    THE MONEY LAUNDERING REGULATIONS 2007

## 2.1    Scope of the Money Laundering Regulations

38.    In addition to PoCA, there are the statute-based Money Laundering Regulations 2007 ("**MLR**") which codify the day-to-day responsibilities of management in firms

11

whose business activities fall within the scope of the MLR; the MLR's scope, inter alia, embraces all financial services activities.

39.     Responsibilities for senior management, as the governing body in any type of firm, include putting in place a regime of risk assessments, policies, procedures and controls for the prevention and detection of money laundering.

40.     Detailed requirements include routine monitoring of the conduct of business for ML reasons and maintaining records of due diligence undertaken on all customers (the MLR use the word 'customer' for all types of business relationships, personal and impersonal, including those who would normally be referred to as clients and counterparties) and no business relationship is exempt from the obligation to undertake Customer Due Diligence to greater or lesser degrees.

41.     Senior management must also put in place, and train staff on, the arrangements whereby any member of staff can report, "*as soon as practicable*", when they have any knowledge or suspicion of money laundering or when there are reasonable grounds whereby they should have known or suspected.

42.     PoCA does not define suspicion; it is generally accepted that it would be impossible to do so for the purposes of law. However, cases precedent have led to industry guidance (see Section C3 below) indicating that suspicion must be more than fanciful or speculation and should be founded on facts. In financial services firms, those having suspicions will rarely be in a position to see and understand the totality of the ML situation. Rather, they will be identifying an incomplete picture, a 'slice' from somewhere in the middle of the money laundering process, described below. The lack of completeness must not prevent or preclude reporting; it would risk breaching the criminal failure to report offence. Staff training should help staff understand that their contribution through the suspicion reporting arrangements may be akin to a critical piece in a jigsaw puzzle, with law enforcement assembling the pieces of the jigsaw.

## 3       THE JOINT MONEY LAUNDERING STEERING GROUP (JMLSG)

43.     The JMLSG is an independent group of trade associations and professional bodies operating in the financial services sector of the UK.

44.    The role of the JMLSG is to produce detailed guidance (**R-89**), written in everyday language, to assist management and staff in relevant firms to comply with all of their statutory and regulatory obligations relating to money laundering and sanctions compliance.

45.    The current JMLSG carries 'approved status', meaning that it has been formally approved by HM Treasury as guidance that must be taken into account by courts and regulators when assessing whether or not firms and/or individuals have acted in a manner compliant with statutory and regulatory obligations.

46.    Sections 7.26 to 7.28 inclusive in Chapter 7 in Part I of the JMLSG Guidance address the sorts of situations that may arise in the course of conducting business and to which staff should be expected to react. Such situations may initially strike a member of staff/management as being merely curious but further probing may move the matter into the realms of ML suspicion and, as such, warranting internal reporting and potential suspension of the business transaction whilst awaiting the granting of consent by law enforcement to allow the business to continue.
The situations illustrated do not constitute an exhaustive list, nor is any reporting obligation limited to circumstances that are illustrated in the three sections.

47.    Customer due diligence and money laundering risk management oblige UK firms to create meaningful money laundering risk assessments of all countries with which there will be dealings or other connections. The research underlying this country risk assessment should be rigorous and comprehensive, bringing in factors like the Financial Action Task Force ("**FATF**") list of high risk jurisdictions, sanctioned jurisdictions and any other relevant information, particulate when of an adverse nature.

## 4    UK Sanctions Compliance

48.    The UK's various anti-terrorist laws create a separate but parallel regime with which all firms must comply. To fail to do so creates a 'strict liability offence'. Funding terrorist activities is also a money laundering offence. So all firms must undertake checks against official lists of all people involved in or connected with all business relationships.

13

## 5    THE USA PATRIOT ACT 2001

49.    The USA Patriot Act has extra-territorial scope and authority, effectively wherever business activity is being undertaken that involves the US$ as the currency concerned. Consequently, firms worldwide conducting US$ business must be able to demonstrate that they are conducting such business in a manner that is US compliant as well as locally compliant, wherever they may be.

## 6    THE 'MONEY LAUNDERING PROCESS'

50.    The title 'Money Laundering Process' is not to be found in statute or regulation but in ML training material where it is presented as a three-stage ML process with sectional titles of Placement, Layering and Integration.

51.    Placement, the first stage, is seen as the point where the underlying predicate crime has been committed with the proceeds of that crime being criminal assets. At this stage, by committing the predicate, criminal-asset yielding crime, the criminal has also committed a s329 ML offence of acquiring, using or possessing the criminal assets. By whatever means necessary, the criminal has probably 'converted' those criminal assets into a monetary form to make it easier for the layering stage then to be undertaken.

52.    The third and final stage, Integration, is, for the criminal, the objective, such that they can judge themselves to have been successful as money launderers. Reaching this stage does not annul the risk of being charged either with the predicate crime or money laundering since both are criminal offences and therefore not subject to any time limits within which a prosecution need be mounted.

53.    In between, the second, Layering stage is totally in the determination of the criminal money launderer. What happens through this stage is as much or as little, as short term or as long term, as simple or as complex as the criminal determines. This stage of the process concludes when the criminal decides that a stage has been reached where the (criminal) assets can be integrated back into the legitimate economy and respectable society without any suspicion being aroused. Additionally, the criminal will wish that an audit trail so long and complex has been created that law enforcement will either be unable to trail back to prove the provenance of the assets

or will at least be disinclined to attempt to do so even when money laundering is suspected.

54.     In financial services sector firms, other than those undertaking retail, cash-based banking business, the likelihood of suspicions arising will normally be when the criminals are already active at the layering stage. Suspicions are therefore likely to be truly only suspicions because it is not possible for those employees to see back to whatever actually was the predicate crime or how the Placement stage has already been accomplished. This reality does not negate the obligation to report suspicion and any stand-alone feature of business being undertaken generating suspicion needs to be recognised for what it is. It may prove to be the critical piece in the jigsaw puzzle being worked on by law enforcement. Nothing that is based at least on some fact(s) should ever be thought to be too insignificant to qualify for the reporting obligation.

## 7     SUMMARY OF MONEY LAUNDERING WARNING SIGNS

55.     I set out below, a number of excerpts from the JMLSG Guidance which are recognised warning signs in relation to money laundering and which I am of the opinion have relevance in this matter.

### *Excerpts from JMLSG Guidance - Section 7.26*

➢     *transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity*

➢     *the use of non-resident accounts, companies or structures in circumstances where the customer's needs do not appear to support such economic requirements*

➢     *where the transaction being requested by the customer, or the size or pattern of transactions, is, without reasonable explanation, out of the ordinary range of services normally requested or is inconsistent with the experience of the firm in relation to the particular customer*

➢     *dealing with customers not normally expected in that part of the business*

15

> ➢ *transfers to and from high-risk jurisdictions, without reasonable explanation, which are not consistent with the customer's declared foreign business dealings or interests*

> ➢ *unnecessary routing of funds through third party accounts*

> ➢ *unusual investment transactions without an apparently discernible profitable motive*

56. I note that the term 'red flag' is not officially defined but commonly used in the industry to describe any situation or circumstance to which people should be expected to react because of the potential for money laundering. In the following Sections I have highlighted any areas which would raise concern from a money laundering perspective as a potential red flag.

## D.     THE TRANSACTION ARRANGEMENTS

57.     In this Section, I provide:

    i)     a description of the transaction arrangements as per the contractual documentation; and

    ii)     a summary of the economic impact of the transaction arrangements for each party.

58.     As I explained above, these are important preliminary steps in an AML analysis.

## 1     OVERVIEW

59.     In November 2008, FMBE and Bank Century (as they were then known) entered into a series of transactions with each other, Saab (Jersey) and additional third parties including PT. Canting Mas Persada ("**CMP**"), PT. Wibhowo Wadah Rejeki ("**WWR**") and it appears also Mr. Rafat Rizvi ("**Mr. Rizvi**") (along with other entities with which he appears to have been associated), (together the "**Third Parties**").

60.     For the purposes of my analysis in this Section I have analysed the transaction arrangements in place on 'day one' since I believe this to be the most relevant information in determining the overall transaction economics at the outset. Nonetheless, in Section E1 below I also comment upon the ongoing nature of the arrangements and in Sections F and G below I provide my opinions and conclusions in this respect.

61.     My analysis in this Section is based strictly on the terms of the contractual documentation entered into by the relevant parties however, I note that the validity of the relevant documentation is also a matter of uncertainty and I comment on this further in Section E3 and F3 below.

62.     I set out below the individual transactions and accompanying documentation that comprise the transaction arrangements, as I refer to them:

i) the Global Master Repurchase Agreement ("**GMRA**") (between FBME and Bank Century dated 20 November 2006 (**C-1**)), the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (each dated 22 November 2006 between Bank Century and FBME (**C-36**)), (each defined in Section D2 below and together the "**Repo Transactions**");

ii) the Pledge Agreement (between FBME and Bank Century dated 20 November 2006 (**R-2**)) and the Transfer Authorisations (between FBME and Bank Century dated 29 November 2008 (**R-3**)), (together the "**Pledge Transaction**");

iii) the CMP Repo Transactions (each between Bank Century and CMP dated 28 November 2008 (**R-4** and **R-5**)) and the WWR Repo Transaction (between Bank Century and WWR dated 30 November 2008 (**R-6**)), (together the "**Third Party Repo Transactions**");

iv) the CMP Loan (between CMP and Saab (Jersey) dated 22 November 2006 (**R-34**)) and the WWR Loan (between WWR and Saab (Jersey) dated 22 November 2006 (**R-35**)), (each defined in Section D5 below and together the "**Promissory Note Transactions**").

63.   As I explain in Section E3 below, however, the dates on the face of these documents cannot be considered to be reliable.

64.   In addition, I note that on 3 December 2007, Bank Century entered into credit agreements with WWR and CMP (respectively the "**WWR Credit Agreement**" and the "**CMP Credit Agreement**" and together the "**Third Party Credit Agreements**" **R-7** and **R-8**). I understand that these Third Party Credit Agreements were intended to replace the Third Party Repo Transactions. I describe these further in Section D6 below.

65.   The transaction arrangements are summarised in Figure 1 and Figure 2 below with reference to:

i) the day one movement of cash and securities; and

ii)    the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison.

66.    I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis.   However, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis of interest amounts upon a one month equivalent calculation.   In my view, this is the best way of analysing the relative economic impact of the contracts despite their different terms.   My detailed analysis of the 'day one' relative economic impact of the contracts is at Section D8 below.   My analysis of the actual economic impact of the transactions – which is quite different – is at Section E2 below.

*Figure 1: Summary of Day One Cash and Securities Movements as a Result of the Transaction Arrangements*



19

*Figure 2: Summary of the One Month Equivalent Interest Amounts as a Result of the Transaction Arrangements* (based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison)



67. I note that I have not been provided with any contractual documentation relating to arrangements involving Mr. Rizvi however for reasons described in Section E2 below, I understand that Mr. Rizvi (and other entities with which he appears to have been associated) was involved in the transaction arrangements.

68. This is supported by information set out in the Claimants' Request for Arbitration (Paragraph 15.3), the Claimants' Reply (Paragraph 14.3) and a transaction summary provided in relation to Saab (Jersey) showing credits to Saab (Jersey) but involving Mr. Rizvi of US$12,180,000 (**R-50**).

69. I note that there is some confusion surrounding whether the credit amount of US$400,000 on 22 December 2006 should in fact have been reflected as a debit rather than a credit ( see Paragraph 48 of Mr. Wazzi's Witness Statement). For the purposes of my analysis I have assumed this to be a credit, because that is how it is reflected in the contemporaneous documents (**R-50**), and have therefore reflected an amount of US$12,180,000 in my analysis. The Saab (Jersey) transaction summary is described in more detail in Section E2.2 below.

20

70.     Mr. Rizvi's involvement is opaque and I understand involved numerous other third parties, however for the purposes of my analysis in Figure 1 and Figure 2 I have assumed that Mr. Rizvi's involvement was in a similar capacity to that of CMP and WWR. Such assumptions are highlighted using dotted lines in the relevant figures.

71.     I note that Mr. Rizvi's involvement in the arrangements in itself provides a red flag warning from a money laundering perspective, as it is unusual to have personal involvement by a senior official of a bank that is party to an agreement.

72.     In the following Sections I describe each of the four components of the transaction arrangements in detail based upon their contractual documentation.

## 2     THE REPO TRANSACTIONS

## 2.1     Repo Definition

73.     A repurchase agreement ('*repo*') is a short-term borrowing transaction between two parties comprising an agreement (i) for the seller to sell a security to the buyer (the '*near leg*') and (ii) for the seller to buy back that same security at an agreed price and date in the future (the '*far leg*'). The original buyer (seller) of the security effectively acts as a lender (borrower) of cash, and the underlying security serves as collateral for a secured cash loan for an agreed period of time at a pre-determined rate of interest (the '*repo rate*').

74.     The difference between the day one market value of the securities serving as collateral in respect of the borrowing and the amount of cash lent under the repo agreement is referred to as the '*haircut*'. It is typically expressed as a percentage of the day one market value of the securities.

75.     The date on which the near leg takes place can be referred to as the '*settlement date*' or the '*sale date*' and the date on which the far leg takes place is typically referred to as the '*repurchase date*'.

76.     It is customary under a repo agreement for a physical exchange of the securities to take place on the sale date, either directly to the buyer of securities or, in the case of a tri-party repo agreement, to a third party agent (such as a custodian or clearing

organisation) acting as an intermediary. The original seller of the securities remains the beneficial owner of the underlying securities.

77.   The Repo Transactions entered into by FBME and Bank Century comprised the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (defined below), each (allegedly) governed by a GMRA. (I say "allegedly" because, as I will explain below, the first repo transactions appear to have been entered into before the GMRA was put in place).

78.   In each case, FBME was the initial buyer and Bank Century was the initial seller of securities.

79.   I note that each of the sale confirmations forming part of the Repo Transactions states that the securities would be held by Bank Century on FBME's behalf, as such there was no physical exchange of securities.

## 2.2   The BPM Repo Transaction

80.   The "**BPM Repo Transaction**" was in respect of US$15,000,000 of Banco Popolare di Milano variable rate Certificates of Deposit with ISIN XS0179811616 (the "**BPM Securities**").

81.   The sale date was 22 November 2006 and the sale price was 98.50%, equal to US$14,775,000.

82.   The (re)purchase date was 22 December 2006 and the (re)purchase price was 98.9310%, equal to US$14,839,650, resulting in an equivalent repo rate of 5.25%.

## 2.3   The WLB Repo Transaction

83.   The "**WLB Repo Transaction**" was in respect of US$3,000,000 of Westdeutsche Landesbank Plc variable rate Certificates of Deposit with ISIN XS0177710356 (the "**WLB Securities**").

84.   The sale date was 22 November 2006 and the sale price was 100%, equal to US$3,000,000.

22

85. The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$3,013,125, resulting in an equivalent repo rate of 5.25%.

## 2.4 The NAB Repo Transaction

86. The "**NAB Repo Transaction**" was in respect of US$7,000,000 of National Australia Bank variable rate Certificates of Deposit with ISIN XS0179785190 (the "**NAB Securities**").

87. The sale date was 22 November 2006 and the sale price was 100%, equal to US$7,000,000.

88. The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$7,030,625, resulting in an equivalent repo rate of 5.25%.

## 2.5 The JPM Repo Transaction

89. The "**JPM Repo Transaction**" was in respect of US$15,000,000 of JP Morgan securities with ISIN XS0258843969 (the "**JPM Securities**").

90. The sale date was 22 November 2006 and the sale price was 101.5%, equal to US$15,225,000.

91. The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.994%, equal to US$15,291,600, resulting in an equivalent repo rate of 5.25%.

## 3 THE PLEDGE TRANSACTION

92. The Pledge Agreement between FBME and Bank Century was dated 20 November 2006 (although as I explain below, it appears to have been executed some time later).

93. The agreement specified that FBME as pledgor would pledge certain securities to Bank Century, the pledgee, by way of a Participation Agreement. It is stated in the agreement that FBME will simultaneously enter into a "*Bank Facility Agreement*" with Bank Century.

94. Schedule A to the Pledge Agreement states that:

i)    US$15,000,000 Banco Popolare di Milano variable rate Certificates of Deposit due 30 October 2008 and with ISIN XS017981616 will be pledged to WWR for the loan facility of $11,820,000 from Bank Century; and

ii)    US$3,000,000 Westdeutsche Landesbank Plc variable rate Certificates of Deposit due 4 November 2008 and with ISIN XS017710356 and US$7,000,000 National Australia Bank variable rate Certificates of Deposit due 3 November 2008 and with ISIN XS178785190 will be pledged to CMP for the loan facility of US$8,000,000 from Bank Century.

95.    I note that the Pledge Agreement itself contains a number of inconsistencies.

96.    Firstly, I note that I have not seen any documentation in respect of a "*Bank Facility Agreement*" or "*Participation Agreement*" between FBME and Bank Century, and I understand that FBME accepts that neither document exists (Paragraph 50 of Mr. Wazzi's Witness Statement).

97.    Secondly, whilst the parties to the agreement are specified as FBME and Bank Century, and the body of the agreement provides that the securities will be pledged to Bank Century, the details of the pledge specified in Schedule A provide that the securities will in fact be pledged to WWR and CMP, companies which are not party to the agreement.

98.    Such drafting renders the document potentially confusing and/or misleading which in my experience can be a red flag warning in relation to money laundering. It is particularly concerning because it appears to have been executed in late December 2008 (and then backdated, as I explain below), after the Third Party Repo Transactions had been entered into, and after the securities had been (apparently) transferred to WWR and CMP pursuant to the authorisations I describe below. This is a further red flag, in my view, because in that light it seems very unlikely to me that the parties could have intended to implement the Pledge Agreement on its terms.

99.    As I mentioned above, two transfer authorisation letters which were sent by FBME to Bank Century on 29 November 2006, authorising Bank Century to transfer free of payment:

i)      the BPM Securities to WWR; and

ii)     the WLB Securities and the NAB Securities to CMP.

100.    I note two issues with the arrangements above.

101.    Firstly, I note that in order for the terms of the Third Party Repo Transactions to have been fulfilled, CMP and WWR would have needed to be the legal owners of the securities and it is not clear to me that this would have been achieved under the Pledge Agreement, if this was its intended purpose. However, I note that this is a legal point.

102.    Secondly I note that the 'transfer authorisations' appear to be inconsistent with the overall transaction arrangements as they continued (described further in Section E1 below). In particular, FBME and Bank Century do not appear to have entered into any separate agreement governing how the transfer authorisations impact on their rights and obligations under subsequent rolls of the Repo Transactions. In fact, they appear to have continued to enter into rolling repo transactions with respect to these same securities, even though FBME appears to have transferred its interest in them to the Third Parties. This is one of the serious inconsistencies in or uncommercial aspects of the transactions which, in my view, can be a hallmark of money laundering.

## 4      THE THIRD PARTY REPO TRANSACTIONS

103.    In late November, Bank Century entered into additional repo transactions with third parties as described below.

## 4.1      The CMP Repo Transactions

104.    Two repo transactions were entered into between Bank Century and CMP. Under both repo transactions:

i)      Bank Century was the initial buyer and CMP was the initial seller of the securities;

ii)     the initial sale date was 29 November 2006; and

25

iii)   the repurchase date was 29 November 2007.

105.   One of the repo transactions specified an initial sale price of US$5,661,250 and a repurchase price of US$6,300,000, giving rise to an effective repo rate of 11.13%.

106.   Under Annex 1 of this repo transaction, details of the relevant securities and the associated repo price calculations were provided. The repo price is defined as the price multiplied by one minus the haircut. The securities referenced were the NAB Securities and the price was 100% which I note is consistent with the sale price under the NAB Repo Transaction. The haircut was 10%, giving rise to a repo price of 90% and hence a repurchase price of US$6,300,000.

107.   The other repo transaction specified an initial sale price of US$2,426,250 and a repurchase price of US$2,700,000 giving rise to an effective repo rate of 11.13%. No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

   i)    a notional of US$3,000,000, equivalent to that of the WLB Securities; and

   ii)   a price of 100%, consistent with the sale price under the WLB Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$2,300,000 which is consistent with the repurchase price specified under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the WLB Securities.

108.   I note that the agreements underlying the CMP Repo Transactions provide for a term of one year - they do not provide for monthly payments of interest.

## 4.2   The WWR Repo Transaction

109.   A repo transaction was entered into between Bank Century and WWR. The terms of the repo transaction were as follows:

   i)    Bank Century was the initial buyer and WWR the initial seller of the securities;

ii)     the initial sale date was 30 November 2006;

iii)    the repurchase date was 30 November 2007; and

iv)     the sale price was US$11,949,281.25 and the repurchase price was US$13,297,500 giving rise to an effective repo rate of 11.13%.

110.    No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

i)      a notional of US$15,000,000, equivalent to that of the BPM Securities; and

ii)     a price of 98.5%, consistent with the sale price under the BPM Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$13,297,500 which is consistent with the repurchase price under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the BPM Securities.

111.    Under the WWR Repo Transaction, the parties are initially defined as Bank Century and CMP however in the body of the document the parties referred to are Bank Century and WWR. I am of the opinion that the correct parties to the repo transaction should be Bank Century and WWR which is consistent with the Credit Agreement entered into by Bank Century and WWR upon the maturity of the WWR Repo Transaction, described further in Section D6.

112.    As with the CMP Repo Transactions, I note that the agreement underlying the WWR Repo Transactions provides for a term of one year - it does not provide for monthly payments of interest.

113.    I note that I have not seen any information in respect of similar arrangements relating to the JPM Securities.

## 5      THE PROMISSORY NOTE TRANSACTIONS

114.    On 22 November 2006, Saab (Jersey) entered into two promissory notes with CMP and WWR respectively (each the "**CMP Loan**" and the "**WWR Loan**"). I note,

however, that there are reasons to believe that the promissory notes were not in fact issued on 22 November 2006 which I discuss further in Section E3.4.

115.    Under the CMP Loan between Saab (Jersey) and CMP, Saab (Jersey) was the beneficiary of a loan from CMP for US$8,000,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

116.    Under the WWR Loan between Saab (Jersey) and WWR, Saab (Jersey) was the beneficiary of a loan from WWR for US$11,820,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

117.    I note that both the CMP Loan and the WWR Loan provide for interest to be payable upon maturity only – they do not provide for monthly payments.

118.    I note that I have not seen any additional information relating to the loans intended to be extended, or extended in respect of the JPM Securities.

## 6    THE THIRD PARTY CREDIT AGREEMENTS

119.    The Third Party Credit Agreements appear to have been entered into on 3 December 2007, apparently (as I explain in this section) to replace the Third Party Repo Transactions.

120.    The Third Party Credit Agreements extended a credit facility (in Indonesian rupiah) to WWR and CMP, at an interest rate of 12% per annum, in return for security. Based upon a US dollar Indonesian rupiah exchange rate of 0.107181[1] as of 3 December 2007, the credit facilities to WWR and CMP were equivalent to approximately US$13.0mm and US$8.8mm respectively, which are similar in size to the WWR Repo Transaction and the CMP Repo Transactions respectively. I note that the interest rate of 12% under the Third Party Credit Agreements compared to an effective repo rate of 11.13% under the Third Party Repo Transactions.

---

[1] Source: Bloomberg

121.    In the documentation that I have seen there is no explicit reference to the specific securities however, the notional amounts specified in Article 11 of each of the WWR Credit Agreement and the CMP Credit Agreement are US$15,000,000 and US$10,000,000 respectively, which, is consistent with the BPM Securities in respect of the WWR Credit Agreement and the NAB Securities and the WLB Securities in respect of the CMP Credit Agreement.

122.    In my opinion, the relevant securities were therefore, the BPM Securities, the WLB Securities and the NAB Securities.

123.    Given that the Third Party Repo Transactions had repurchase dates of 29 November 2007 and 30 November 2007, and that the economic effect of the Third Party Credit Agreements is similar in effect to the Third Party Repo Transactions, I believe that the Third Party Credit Agreements were executed to replace the Third Party Repo Transactions upon their termination (albeit with a small date mismatch).

## 7     THE JPM REPO TRANSACTION

124.    I note that no documentation has been provided in respect of the arrangements resulting from the JPM Repo Transaction. However, as described in Paragraph 67 above, I am of the opinion that these arrangements involved additional third parties and ultimately Mr. Rizvi (and other entities with which he was associated), who I understand to have been a director and shareholder of Bank Century in addition to numerous other business interests at the relevant time.

125.    Accordingly for the purposes of my analysis in Section D8 below I have focused upon the arrangements involving CMP and WWR however, I assume that similar arrangements to those entered into by CMP and WWR were entered into by Mr. Rizvi.

126.    The very absence of contractual documentation in respect of these arrangements is in itself a red flag warning in relation to money laundering.

## 8     ECONOMIC IMPACT OF THE CONTRACTUAL  ARRANGEMENTS FOR EACH PARTY AS AT DAY ONE

## 8.1    Cash Transfer

127.    The overall economic impact of the transaction arrangements appears to have been for FBME, to 'pay' US$8,000,000 in order to transfer US$32,000,000 of its cash to Saab (Jersey). I have shown this diagrammatically in Figure 3 below.

*Figure 3: Overview of Cash Movement as a Result of the Transaction Arrangements*



## 8.2    Interest Amounts

128.    In this section, I provide an overview of the impact of the transactions from the point of view of the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation, but using a one month interest calculation for the purposes of comparison. I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis.  However, as I explained above, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis upon a one month equivalent calculation for each leg of the transaction.  This enables me to compare 'apples with apples' in order to analyse the relative economic impact of the contractual arrangements for each party.  In Section E2 below, I analyse the *actual* economic impact, in terms of actual money flows.

129.    I note that the one month equivalent interest amounts due by Saab (Jersey) under the CMP Loan and the WWR Loan, effectively match the one month equivalent interest amounts owed to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and WLB Repo Transaction (corresponding to the WWR Loan). This is shown diagrammatically in Figure 2, and is summarised in Table 1 below.

*Table 1: Summary of One Month Equivalent Interest Amounts from FBME/ Saab (Jersey)'s*

*perspective (US$)*

|  | Repo Transactions | Promissory Notes |
|---|---|---|
| BPM Repo Transaction / WWR Loan | 64,641 | (65,577) |
| NAB and WLB Repo Transactions / CMP Loan | 43,750 | (44,384) |
| JPM Repo Transaction / Mr. Rizvi | 66,609 | (67,574) |

130.   Based upon the one month equivalent interest amounts summarised in Figure 2, the net position for each party relating to interest can be summarised as follows:

i)   taking FBME and Saab (Jersey) together – because they have common ultimate beneficial owners – the one month equivalent interest amount due by Saab (Jersey) under the CMP Loan and the WWR Loan, is effectively offset by the one month equivalent interest amount payable to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan). In other words, *all* of the money paid by FBME flows back to Saab (Jersey);

ii)   from Bank Century's perspective the one month equivalent interest amount due under the Third Party Repo Transactions (in respect of the CMP Repo Transaction and the WWR Repo Transaction only) and the one month equivalent interest amounts payable under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan) results in an apparent net gain for Bank Century of US$80,003 per month;

iii)   from CMP's perspective the one month equivalent interest amount due under the CMP Loan and the one month equivalent interest amount payable under the CMP Repo Transaction results in an apparent net loss for CMP of US$31,658 per month;

iv)   from WWR's perspective the one month equivalent interest due under the WWR Loan and the one month equivalent interest payable under the WWR Repo Transaction results in an apparent net loss for WWR of US$46,775 per month; and

31

v)    the combined impact for CMP and WWR together is an apparent net loss of US$78,433 per month.

131.   The resulting transaction economics described above raise concerns from a money laundering perspective due to the possible lack of commerciality, since FBME/Saab (Jersey) do not appear to have any profit motivation for entering into the arrangements.

132.   Furthermore, it appears that Saab (Jersey) actually made monthly payments to Bank Century and a company called PT Kuo Capital Raharja ("**Kuo Capital**") despite neither of these entities having a direct contractual relationship with Saab (Jersey).  I have also not seen any evidence of payments from Saab (Jersey) to WWR and CMP, as I would have expected to see at the end of term of the Promissory Notes.  This is discussed in Section E2.2 below. In my experience, such an arrangement is a classic example of a red flag situation in relation to money laundering.

## 8.3    Securities

133.   Based solely upon the contractual documentation, the securities were initially purchased by FBME under the Repo Transactions however rather than a physical transfer taking place, the securities were held by Bank Century on FBME's behalf.

134.   Subsequently, under the Transfer Authorisations, these securities were transferred, free of payment to CMP and WWR.

135.   Finally, under the Third Party Repo Transactions, the securities were (re)purchased by Bank Century.

136.   The overall effect of the transaction arrangements therefore is that the securities both started off and ended up with Bank Century which I discuss in Section F below.

# E.    ADDITIONAL INFORMATION RELATING TO THE TRANSACTION ARRANGEMENTS

## 1    ONGOING TRANSACTION ARRANGEMENTS

137.    My understanding is that the transaction arrangements in their broad form stayed in place from November 2006, when the transactions were initiated, until November 2008 when Bank Century was taken over by the IDIC, an independent agency of the Indonesian Government.

138.    I understand that certain elements of the underlying transactions changed, however, based upon my analysis, these changes did not affect the broad economic impact for the relevant parties. I describe the changes that I am aware of in Sections E1.1 to E1.3 below.

139.    I note however that in remaining in place until November 2008, the component transactions continued beyond the maturity of the relevant underlying agreements.

140.    I also note that, save for:

i)    sale and purchase confirmations relating to the Repo Transactions and subsequent 'rolls' thereof (**C-101**) (I note that many of the confirmations in C-101 are unreadable and as such I have not been able to verify the complete history of transactions. I also note that I have not seen supporting evidence (for example in the form of email requests) for each of the rolls documented in C-101); and

ii)    the WWR and CMP Credit Agreements described in Section D6 above, with maturities of 3 June 2008 and 3 February 2008 respectively,

I have not seen any documentation to support the roll of the transaction arrangements beyond their respective maturity dates. This absence of documentation is yet another red flag warning in relation to money laundering.

## 1.1    Change of Repo Rates

141.    I have reviewed several emails relating to a change of repo rates under the Repo Transactions in light of interest rate changes in the market (**R-73** to **R-77**). I note that each of these emails originate from Mr. Wazzi as opposed to Bank Century.

## 1.2      Unwind of the WLB Repo Transaction

142.    Based upon a repayment of US$2,400,000 made by Saab (Jersey) described in Section E2 below, I am of the opinion that the arrangements in respect of the WLB Securities were unwound.

## 1.3      Replacement of Matured Securities under the Repo Transactions

143.    On 27 October 2008, just prior to the maturity of the BPM Securities on 30 October 2008, I understand that a replacement repo transaction was entered into referencing US$16,000,000 August 2011 US treasury strips (**C-2**).

144.    On 6 November 2008, just after the maturity of the NAB Securities on 3 November 2008, I understand that a replacement repo transaction was entered into referencing US$7,500,000 August 2011 US treasury strips (**C-2**). I note that in this case the replacement repo transaction was subject to a 3 day delay after the maturity of the NAB Securities.

## 2      INFORMATION RELATING TO ACTUAL CASH MOVEMENTS

## 2.1      SWIFT Statements

145.    Below I set out the cash movements that I have been able to identify in relation to each of the components of the transaction arrangements.

### 2.1.1      THE REPO TRANSACTIONS

*Principal*

146.    In relation to the Repo Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

i)   a payment of US$15,225,000 from FBME to Bank Century on 22 November 2006 (**C-4**). I understand this to be the movement of cash associated with the near leg of the JPM Repo Transaction;

ii)  a payment of US$14,775,000 from FBME to Bank Century on 22 November 2006 (**C-5**). I understand this to be the movement of cash associated with the near leg of the BPM Repo Transaction;

iii) a payment of US$7,000,000 from FBME to Bank Century on 22 November 2006 (**C-7**). I understand this to be the movement of cash associated with the near leg of the NAB Repo Transaction; and

iv)  a payment of US$3,000,000 (**C-40**) from FBME to Bank Century on 22 November 2006. I understand this to be the movement of cash associated with the near leg of the WLB Repo Transaction.

*Interest*

147.  I have been provided with a series of SWIFT confirmations in respect of payments made by FBME to Bank Century (**R-70**). I have compared the SWIFT payments from January to September 2007 with the interest amounts under the corresponding repo transactions entered into in respect of the relevant dates (**C-101**) and I am able to reconcile these amounts. As such, on the basis of a preliminary analysis, these payments appear to be consistent with the payments of interest due under the relevant repo transactions, however, since I am unable to read certain of the SWIFT confirmations and/or the relevant repo agreements, I have not been able to perform a further analysis.

### 2.1.2   THE PROMISSORY NOTE TRANSACTIONS

*Principal*

148.  In relation to the Promissory Note Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

i)   a payment of US$8,050,000 from CMP to Kuo Capital on 30 November 2006 (**R-52**); and

ii)   a payment of US$11,882,000 from WWR to Kuo Capital on 1 December 2006 (**R-52**).

149.   I note that Kuo Capital is not a party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

*Interest*

150.   I have reviewed SWIFT confirmations setting out the following cash payments by Saab (Jersey) to various other parties (**R-63**). The amounts are consistent with the notional and interest rates specified under the Promissory Note Transactions however, I note below a series of important inconsistencies.

*Figure 4: Payments between Saab (Jersey) and Various Parties*

| Date | Sender | Beneficiary | Amount (US$) |
|---|---|---|---|
| 19-Jan-07 | Saab (Jersey)[1] | Bank Century | 256,942.50 |
| 21-Feb-07 | Saab (Jersey)[1] | Kuo Capital | 115,203.75 |
| 21-Feb-07 | Saab (Jersey)[1] | First Gulf Asia Holdings | 70,796.25 |
| 21-Mar-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.25 |
| 20-Apr-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.55 |
| 23-May-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 22-Jun-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 24-Jul-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 24-Aug-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 26-Sep-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 26-Oct-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 28-Nov-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Dec-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.11 |
| 28-Jan-08 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 27-Feb-08 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Mar-08 | Saab (Jersey)[1] | Kuo Capital | 177,222.22 |
| 24-Apr-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 27-May-08 | Saab (Jersey)[1] | Kuo Capital | 160,000.00 |
| 27-Jun-08 | Saab (Jersey)[1] | Kuo Capital | 176,000.00 |
| 30-Jul-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 29-Aug-08 | Saab (Jersey)[1] | Kuo Capital | 170,666.67 |
| 25-Sep-08 | Saab (Jersey)[1] | Kuo Capital | 131,733.33 |
| 24-Oct-08 | Saab (Jersey)[1] | Kuo Capital | 152,933.33 |

36

151.    I note several anomalies relating to the cash movements set out above.

152.    Firstly, as per Paragraph 149 above, I note that Kuo Capital is not party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

153.    Secondly, the payments appear to have been made from personal accounts of Mr. Farid and/or Fadi Saab as opposed to accounts held in the name of Saab (Jersey).

154.    Thirdly, the payments of interest appear to occur monthly however, according to the terms of the CMP Loan and the WWR Loan, the payment of interest is due at maturity, as opposed to on a monthly basis.

155.    Fourthly, I note that there is a payment directly to Bank Century of US$256,942.50 (highlighted in yellow) on 19 January 2007. Such a payment is not supported by any contractual documentation that I have seen and I note that according to an email dated 25 January 2007 from Bank Century to FBME, Bank Century request that a reference to Kuo Capital be made in the payment instructions in relation to this payment so as to "*comply with procedures*"(**R-61**).

156.    Finally, there is a payment of US$70,796.25 (highlighted in yellow) to First Gulf Asia Holdings Limited. This payment is also not supported by any contractual documentation that I have seen, however, I note that:

i)      in an email exchange between Mr. Rizvi and Mr. Wazzi dated 21 February 2007, Mr. Rizvi states "*[obscured] interest due to us should be paid to*" and bank details for First Gulf Asia Holdings Limited are detailed below (**R-62**);

ii)     in a letter to Federal Bank of Lebanon on 21 February 2007, Mr. Fadi Saab authorises the debit of his account to credit First Gulf Asia Holdings Limited for an amount of US$70,796.25 (**R-64**);

iii)    the amount of $US70,796.25 is equivalent to a one month interest payment (from 21 January 2007 to 21 February 2007) of 6.75% on a notional of US$12,180,000.

37

157.    Based upon the above, it is my opinion that Mr. Rizvi (and other entities with which he appears to have been associated), entered into arrangements similar to those entered into by CMP and WWR.

158.    I note that it appears that Saab (Jersey) made monthly payments to Bank Century and Kuo Capital, even though: i) there was no direct contractual relationship between Saab (Jersey) and Bank Century; ii) there was no direct contractual relationship between Saab (Jersey) and Kuo Capital and iii) even under the Third Party Credit Agreements and the Promissory Note Transactions, there was no obligation for Saab (Jersey) to make monthly payments.

159.    I consider all of the anomalies that I have noted above to be potential red flag warnings in relation to money laundering.

### 2.1.3    OTHER

160.    I have also reviewed SWIFT confirmations related to the following cash movements:

i)     a payment of US$2,400,000 from Mr. Farid Saab to Kuo Capital on 22 September 2008 (**C-90**). I understand that this purports to be a partial reimbursement of the CMP Loan in respect of the WLB Repo Transaction;

ii)    a payment of US$118,375 from FBME to Bank Century 27 October 2008. I understand that this purports to be a payment of interest on the NAB Repo Transaction (US$27,125) and JPM Repo Transaction (US$58,995) and net proceeds after the redemption of the BPM Securities and purchase of USD$16,000,000 of US Treasuries (US$32,255) (as per email (**C-6**));

iii)   a payment of US$71,250 from FBME to Bank Century 7 November 2008. I understand that this purports to be a payment of the net proceeds after the redemption of the NAB Securities and purchase of USD$7,500,000 of US Treasuries (as per email (**C-8**));

## 2.2    Saab (Jersey) Transaction Summary

161.    I have reviewed a transaction summary (**R-50**) purportedly setting our debits and credits to the account of Saab (Jersey). I note that the summary is undated and does not have any header relating to any relevant bank. As such I cannot be sure that this is an official reflection of the true accounts of Saab (Jersey), although I note that it was prepared by Mr. Wazzi (as he says at Paragraph 46 of his witness statement). In any case I have provided an analysis of certain of the entries below, where I feel that they may be relevant for the purposes of my report.

162.    The transaction summary relating to Saab (Jersey) shows the following credits:

   i)    a credit of US$8,000,000 from CMP on 1 December 2006. This is consistent with a drawdown under the CMP Loan;

   ii)   a credit of US$11,820,000 from WWR on 4 December 2006. This is consistent with a drawdown under the WWR Loan;

   iii)  a series of credits totalling US$12,180,000 from 13 December 2006 until 22 December 2006. The notes in relation to these credits specify the sender as Rafat by which I understand the reference to be to Mr. ***Rafat*** Rizvi.

163.    I note that the comment corresponding to the credit entry of US$400,000 on 22 December 2006 is "*deduction fees arrangement/rafat*". It is therefore unclear whether this has been entered as a credit in error and should in fact have been entered as a debit amount resulting in a total transfer value of US$11,780,000 as opposed to US$12,180,000. In the absence of any confirmation of this, I have assumed that the correct amount is US$12,180,000, however I note that this does not have any significant bearing on my analysis.

164.    I note that based upon a series of emails (**R53-R57**) it appears that the payments totalling US$12,180,00 originated from parties otherwise not mentioned in the transaction arrangements, including Mauritius International Trust Co (on behalf of Allied Convertibles) and Mr. Al Warraq. The rationale for certain of such payments, being apparently in respect of monies advanced to Saab (Jersey) is not substantiated and is not consistent with or supported by the remainder of the transaction arrangements. In any case it appears that the ultimate payment of the 'loan amount' of U$12,180,000 was arranged by Mr. Rizvi. Hence as per Paragraph 157 above, for

the purposes of my analysis of the transaction arrangements in Section D, I have assumed that Mr. Rizvi (and other entities with which he was associated) was involved in the transaction arrangements in a capacity similar to CMP and WWR.

165.    In addition, I note that there is conflicting information relating to where the proceeds of the CMP Loan and the WWR Loan were paid. According to the Statement of Account, Saab (Jersey) was the beneficiary however, according to a series of emails from Mr. Rizvi to Mr. Wazzi, 27 November 2006 (**R30-R32**) and as set out in Paragraph 14.2 of the Claimants' Reply, the intention was for the loan proceeds to be paid directly to Nature Secret Investment Inc. Furthermore as per Paragraph 148 above, I note that the payments under the Promissory Note Transactions were, in the event, made from CMP and WWR to Kuo Capital and not to either of Saab (Jersey) or Nature Secret Investment Inc.

166.    I note that in response to a request by Mutiara (in the context of this arbitration) regarding the final recipients of the US$12,180,000 'loan' to Saab (Jersey), FBME has produced a series of confirmations relating to payments made to various third parties totalling €18,925,470. Given that this is substantially more than the equivalent of US$12,180,000, it is difficult to understand how these are related to the "loan" amount of US$12,180,000.

167.    In addition, the third parties involved were Serdale Overseas Limited (with an address in Cyprus), Villa Bay Investments Ltd (with an address in Cyprus) and Pacific Property Investors Inc. (with an address in Russia).

168.    I note that the lack of background information in relation to these additional parties means that they must be considered to be red flag warnings, particularly due to the high risk nature of the jurisdictions involved from a money laundering perspective.

## 3    EXECUTION OF DOCUMENTATION

169.    I note that based upon certain email exchanges that I have reviewed, it appears that many of the documents themselves were not entered into on a timely basis. This is another red flag warning in relation to money laundering. I provide below a summary of the key issues that I have identified.

## 3.1    Back-dating of Sale and Purchase Agreements

170.    I have reviewed certain email exchanges between FBME and Bank Century which reference the rolling of the Repo Transactions however I note that these email exchanges post date the expiry of the previous repo purchase dates and reference agreements being entered into on a back-dated basis (**R-27** and **R-28**).

## 3.2    Forward-dating of Sale and Purchase Agreements

171.    In an email exchange dated 1 May 2008, a representative of Bank Century sent across to Mr. Wazzi trade confirmations with trade dates of 31 July 2008 (**R-29**).

## 3.3    Back-dating of the Pledge Agreement

172.    I have reviewed a number of email exchanges between FBME and Bank Century relating the execution of the Pledge Agreement. I note that the Pledge Agreement was finally executed on 27 December 2006 however the execution version was back dated to 20 November 2006 (**R-36** and **R-40**).

## 3.4    Back-dating of the Promissory Notes

173.    In an email exchange dated 28 November 2006, Mr. Rizvi and Mr. Wazzi were provided with instructions to issue promissory notes with the same details as the Promissory Note Transactions. As such I do not believe that the date of contractual documentation in respect of the Promissory Note Transactions is reliable (**R-33**).

## 3.5     Lack of Governing Documentation

174.    I note that the Repo Transactions were entered into without a governing GMRA.

175.    The lack of GMRA was only identified and rectified following an enquiry from the Central Bank of Cyprus (**R-42**).

176.    Despite the Repo Transactions having been entered into in November 2006, a GMRA governing such transactions was not entered into until 17 January 2007 when it was executed and back-dated to 20 November 2006 (**R-42** to **R-48**).

41

177.    The back-dating of documents can in itself be a red flag of money-laundering.  In
        my view, the warning signs are even stronger in this case because: i) the monies
        were advanced purportedly pursuant to repo transactions before a GMRA was put in
        place to govern those arrangements; and ii) the GMRA appears only to have been
        executed so as to have a document to provide to FBME's regulator to justify or
        explain the money transfers.

## F.      OTHER CONSIDERATIONS

178.    I have significant concerns from the many unsatisfactory features relating to the original business arrangement and the conduct of it as they manifest themselves during the 2 years of the arrangement's operation.  I have explained some of those concerns above.  Further matters that I have noted and that re-enforce my concerns in relation to the arrangement as it was initially established, include the following items. I consider that these factors increase the likelihood that the transactions were entered into for money laundering purposes.

179.    I note that the matters discussed in Sections F1 and F2 below are of importance when considering the potential money laundering implications of the transaction arrangements. This is because, in circumstances where a party is known to have been engaged in corruption and money laundering (particularly during the period under consideration) it becomes necessary to invoke enhanced monitoring to guard against the risks that the malpractices persisted through other and/or all of the business with which that party was connected.

## 1      MR. RIZVI

180.    I note that in 2010, Mr. Rizvi was convicted of corruption and money laundering. This is obviously relevant when forming an opinion in relation to the matter that is the subject of this report, given the nature and extent of his involvement in this matter.

## 2      REGULATORY INTERVENTIONS

181.    On 15 July 2014, the Financial Crimes Enforcement Network (FINCEN), an Agency of the US Treasury published a finding that "*FBME Bank Ltd.....is a Financial Institution of Primary Money Laundering Concern*". The Notice records the history of the Bank since it was founded in 1982, initially in Cyprus, from 1986 in the Cayman Islands and since 2003 in Tanzania but continuing to undertake more than 90% of its business from its branch in Cyprus.

182.    On 18 July 2014, the Central Bank of Cyprus announced that it had taken over the management of FBME's business in Cyprus.

43

183.   The Tanzanian Central bank took control of FBME in Tanzania on 24 July (**R-88**).

184.   FBME issued a response to the FIMCEN Notice on 18 July 2014. It claims to have had no forewarning of the notice nor knowledge of the circumstances underlying the allegations in the notice (**R-90**).

# 3   OTHER RELEVANT MATTERS RELATING TO THE TRANSACTION ARRANGEMENTS

185.   In my opinion there are a number of elements of the transaction arrangements which in the absence of any other information to the contrary, lead me to the conclusion that the transaction arrangements were unlikely to have been genuine commercial transactions. I have set these out below.

## 3.1   Lack of Evidence Relating to whether the Securities were Actually Held in Relation to the Transaction Arrangements

186.   As described in Paragraph 79, the securities were not transferred to FBME under the Repo Transactions as would be typical under a repo transaction, they were instead held by Bank Century on FBME's behalf.

187.   As a result, and in light of the matters I discussed above (in particular the transfer authorisations), it appears that the securities both started and ended up with Bank Century being the legal and beneficial owner as well as the custodian. It is therefore unclear as to whether the securities were actually held by Bank Century in relation to the transaction arrangements as they did not contribute to their theoretical function of being collateral under the Repo Transactions since they did not mitigate any credit risk.  As I observed above, it is also unclear why the parties continued to roll over the Repo Transactions when they had made other arrangements with respect to the same securities.

188.   I also note that according to Paragraphs 116 and 117 of Mr. Fajar's witness statement, Mutiara has found no trace of the JPM Securities or the US treasury strips (which formed part of the later transaction arrangements) being held on account of FBME.

## 3.2     Lack of Commerciality in the Positions Entered into by Certain of the Relevant Parties

189.    As set out in Section D8.2 above, based upon the contractual documentation and from the point of view of WWR and CMP, the one month equivalent interest amounts due under the Promissory Note Transactions versus the one month equivalent interest amounts due under the Third Party Repo Transactions resulted in a running loss of $46,775 and $31,658 per month for WWR and CMP respectively.

190.    In my opinion this is not commercially reasonable. The loss for WWR and CMP is mirrored by a gain for Bank Century which may indicate a potential connection between Bank Century and the Third Parties.

191.    I note that, in the event, no records have been provided to show that in fact WWR or CMP received or made any payments under the Promissory Note Transactions or the Third Party Repo Transactions.  Indeed, as I explained in Section E2 above, the money transfers appear to have moved from Saab (Jersey) (or in fact the Saab Brothers) to Bank Century/Kuo Capital directly.

## 3.3     Arbitrary Determination of Transaction Economics

### 3.3.1   CASHFLOW PAYMENTS

192.    As discussed in Paragraph 128 above, the one month equivalent interest amounts under the Promissory Note Transactions and the one month equivalent interest amounts under the Repo Transactions appear to have been matched, despite the use of different notionals and interest rates. In other words, it appears that the rates under the Promissory Note Transactions were set intentionally higher (to compensate for the lower cash notional amount under the loans versus the Repos Transactions) so that the one month equivalent interest amounts under each of the arrangements would be the same.

193.    Bearing in mind the common ownership of FBME and Saab (Jersey), this means that, essentially, the money entering and exiting the 'system' were in effect the same amounts, and were coming from and going to the same ultimate beneficial owners. Bank Century appears not to have taken a margin of any kind, and the Third Parties

45

appear to have been cut out of the 'system' altogether, despite their contractual role in it.

194.     This matching of cashflow payment amounts supports my opinion that neither the Repo Transactions nor the Promissory Note Transactions was executed for any legitimate commercial purpose, taking into account the risks and benefits associated to each set of transactions. I consider this to be suspicious from a money laundering perspective.

### 3.3.2   THE JPM REPO TRANSACTION

195.     In Figure 5 below, I attach a Bloomberg screenshot of the JPM Securities with ISIN XS0258843969 and note that this is described as a pass through of a Nomura Bank International 6.3% bond due 19 May 2009.

*Figure 5: Bloomberg Screenshot of the JPM Securities*



196.     Figure 6 below shows a Bloomberg screenshot of the only Nomura Bank International 6.3% bond due 19 May 2009 available on Bloomberg and which it follows is the relevant Nomura Bank International bond. I note that this bond is described as a European medium term note ("**EMTN**") credit linked to a basket of

reference entities (Series 94, Tranche 1). I have been unable to find any additional information in relation to this EMTN however such a description is usually associated with a structured credit transaction.

*Figure 6: Bloomberg Screenshot of Nomura Bank PLC 6.3% Bonds Due 19 May 2009*



197. I note that although repo transactions on structured credit transactions did occur in the market, typically these repo transactions would have been less common since they were less liquid. The terms of such repo transactions, including the haircut and the repo rate would have reflected this illiquidity.

198. I note that each of the Repo Transactions was executed at a repo rate of 5.25%. However, unlike the BPM Securities, the WLB Securities and the NAB Securities, the JPM Securities were structured notes and as such would have been more illiquid and potentially riskier than any of the other securities. Such additional risk should have been reflected in a higher repo rate. The fact that the JPM Repo Transaction was executed at the same repo rate as the other repo transactions indicates to me that they were not on-market transactions (i.e. they were not executed at levels reflecting prevailing market conditions).

47

199.   As such, in my opinion, the transaction terms did not reflect commercial trades between two commercial and independent parties but rather indicate potential collusion and engineering in order to create the perception of a commercial exchange of risks and rewards where no such exchange was envisaged.

## 3.4   Missing Documentation and Documentation Inconsistencies

200.   In my analysis in Sections D and E above, I noted a series of inconsistencies relating to the contractual documentation underlying the transaction arrangements. I summarise these inconsistencies below:

i)   as per Paragraph 124, I note that no contractual documentation has been provided in respect of the arrangements relating to the JPM Securities and involving Mr. Rizvi (and the other entities with which he appears to have been associated);

ii)   as per Paragraph 95, I note that the Pledge Agreement was fundamentally inconsistent and misleading; and

iii)   the documentation in respect of the Third Party Repo Transactions and the Loan Agreements is incomplete and does not include information with respect to the relevant underlying securities;

iv)   the Third Party Repo Transactions (and the subsequent Third Party Credit Agreements) and the Promissory Note Transactions do not provide for monthly payments to be made, and yet monthly payments were made (albeit by and to different parties).

201.   As described in Section E3 I also note that there are serious issues relating to the timing of the execution of the documentation with certain documents being back-dated and other documents being forward-dated.

202.   In my experience, the extent of the inconsistencies described above and the issues relating to the execution of documents are hallmarks of money laundering. The execution of documentation in an accurate and timely manner is imperative to the operation of any sophisticated commercial arrangements as the risk undertaken is ultimately determined by the contractual documentation.

48

203.    The documentation process within a bank is therefore typically overseen by a middle-office/back-office support function as well as a front office function and a commonly termed '*four-eyes*' verification process is employed in order to ensure that the risk booked by the trader is consistent with the documented risk.

204.    In my review of the materials relating to the transaction arrangements I have not seen evidence of any of these standard market functions and validation processes. Indeed, I would be surprised if they occurred at all, because I would expect such processes to have identified the issues I have raised, in which case the transactions would not have gone ahead, or at least would have been thoroughly investigated. The lack of such oversight in respect of the transaction arrangements supports my opinion that the transactions entered into did not reflect real commercial risk for the parties involved, and that the contracts were entered into to disguise the true (and probably illegal) purpose of the arrangement.

205.    In addition, as per Section E2 I note that the movement of cash relating to the transaction arrangements does not correspond to the theoretical cash movements set out in the documentation. I would expect a bank to have an operations function responsible for reconciling cashflows. Had the transaction arrangements been subject to the usual control processes of a bank, any divergence between the actual cash movements and the theoretical cash movements booked and documented would have been flagged.  The very fact that the cashflows continued for two years suggest that proper controls were not in place and/or operating effectively (or were bypassed in the case of these transactions).

206.    In general, I note that many of the email exchanges that I have reviewed make use of personal email addresses. In addition, I note that certain of the SWIFT confirmations that I have seen reference payments from personal accounts of the individuals involved.

207.    In my experience this is not standard practice and in my opinion raises suspicion that the arrangements entered did not reflect legitimate commercial banking activity between legitimate commercial counterparties. Furthermore, such a practice is likely to lead to incomplete records of the bank's activities which would be a criminal offence, at least under UK AML law and likely Cypriot law too.

## 3.5    The Earlier Proposed Structure of the Transactions and the Adverse Legal Opinion

208.    I have reviewed certain documents relating to what appears to be a proposed form of the transaction arrangements proposed as set out in (**R-21**), which were not ultimately executed. These proposed transaction arrangements comprised:

    i)    a loan agreement between FBME and Bank Century;

    ii)    a loan agreement between Bank Century and Saab (Jersey); and

    iii)    a guarantee in respect of Saab (Jersey)'s liabilities to Bank Century.

209.    There are elements of the proposed transaction arrangements that appear to me to be unusual:

    i)    each agreement provides for a fixed rate of interest over a potentially indefinite term. However, they do not contain additional terms I would expect in such an arrangement, such as the ability to reset the rate; and

    ii)    the loan agreement between FBME and Bank Century directly references the amounts owed to Bank Century by Saab (Jersey) and allows for their set-off in the repayment terms of that loan, clearly linking the different components of the transaction arrangements, the implication being that the arrangement could have been simpler; and

    iii)    any structure that involves additional parties and thereby creates a more opaque situation is a potential red flag in relation to money laundering.

210.    The effect of the proposed transaction arrangements is that FBME pays Bank Century US$40mm, and receives US$32mm through Saab (Jersey). As I explain below, it appears to me that the $8 million difference was intended to be retained by Bank Century as a fee.

211.    The economic impact of the proposed arrangements is the same as the economic impact of the actual transaction arrangements that were entered into.  However for a

reason that is not explicit in the documents that I have reviewed, the ultimate form of the transaction arrangements was as described in Section D.

212.   I note that Bank Century received a letter dated 22 November 2006 from an Indonesian law firm, Faisal and Panggabean, providing a legal opinion in relation to the transaction arrangements described in Paragraph 209 above which highlighted several serious issues in relation to these transaction arrangements (**R-23**). An opinion in these terms would have been a very strong red flag for Bank Century. To my mind, the fact that it nevertheless entered into the transactions on the same day it received the opinion (and in fact before the transactions were properly documented) is a strong indicator to me that the transactions were in fact for money laundering purposes.

213.   In my opinion, particularly in light of the legal opinion, it is likely that in fact the reason for FBME, Saab (Jersey) and Bank Century not entering into the proposed transaction arrangements as per Paragraph 209 above was because the circularity of the transactions was too transparent under those arrangements.

214.   In the event, I believe that FBME, Saab (Jersey) and Bank Century may have instead ultimately adopted a cosmetically more opaque transaction structure which achieved the same end, but using a more complex series of transactions, in order to conceal the real economic impact of the transaction arrangements, being essentially a transfer of US$32mm for a fee of US$8mm, in return for regular repayments of money washed through accounts in the US and Switzerland. Indeed, it may have been the case that the monthly 'interest' payments were simply the return of the original $32 million, in 'clean' instalments.

## 3.6    The Purpose Alleged by the Claimants

215.   I understand that the Claimants' explanation for these transactions is that FBME needed to arrange external funding for Saab (Jersey) (an institution effectively in common ownership and control) or its clients, due to its own lending restrictions as a financial institution.

216.   I note that it has been claimed that the source of the funds could not be FBME directly due to problems of limits relating to its lending portfolio. This in itself is not

necessarily implausible. It has long been the case that lending bankers have employed strategies in order to operate within exposure limits set. The fact that FBME clearly was not constrained by liquidity problems when the transactions first started does not preclude other limiting factors resulting in the need to enter into the arrangements that it did. These potential limiting factors could include total exposures to (i) a particular customer; (ii) a particular business sector; (iii) a particular currency and/or (iv) a particular maturity horizon. Jurisdictional issues can also be a relevant limiting factor.

217.    When good commercial relationships exist between two (or more) banks, it is by no means unknown for the first bank to pass the business opportunity to another 'friendly' institution. This will likely be coupled with the provision of funds at comparatively favourable rates. The bank receiving the opportunity will still undertake all of its own due diligence and credit risk assessments. What will always be the expected norm, both by the participating institutions and their regulator(s), is that the whole arrangement will be conducted on an arm's length basis in a visible and transparent manner.

218.    When entered into on a back-to-back basis as per Paragraph 217 above, the funding is likely to be matched to the period of the loan arrangement. Each party would obtain economic benefit from the transaction. The first bank would advance the necessary funds to the second bank and the second bank would ensure that it charged the ultimate borrower of the monies a greater sum in interest than it was liable to pay to the first bank. (It is notable, therefore, that the arrangement appears to have been 'revenue neutral' for Bank Century on an ongoing basis – see Section F3.3.1 above. This strongly suggests to me that transactions were not for the purpose alleged by the Claimants).

219.    When, as I note has been claimed in the current matter, there is not specific matching, then the lending institution should expect to enter the inter-bank market for loans and deposits and seek funds, potentially from a number of different sources, to meet their own liquidity requirements.

220.    This type of arrangement could have been achieved quite simply, however, in the transaction arrangements described in Section D above, neither of these two

comparatively simple and straight-forward methods were adopted. Instead a complex structure was created, involving repo transactions, and where one party (Bank Century) does not appear to have obtained any economic benefit at all (apart from the $8 million which I have speculated was intended to be its fee). As a result, the alleged relatively simple purpose, was achieved by way of an opaque and complex series of transactions (see Figure 3 in Section D above).

221.    Complexity per se is neither wrong nor unacceptable. However, the very first red flag in JMLSG Guidance Part I, 7.26, of matters to watch for and react to reads: "*...transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity;*".

222.    In the case of the transaction arrangements, the need for anything other than a straightforward loan arrangement is not explained, nor the need to bring three intermediary partners into the structure, especially when one is the owner/director of Bank Century who negotiated the arrangement. The very presence of the intermediaries in the structure as illustrated is, of itself, sufficient to raise doubt and suspicion; the declared purpose of the arrangement could normally have been achieved without such involvement and it is consequently difficult to believe that the arrangement has not been deliberately made obtuse and lacking in opacity, across a number of different jurisdictions, in an effort to disguise all that was actually happening.

223.    In summary, although the explanation given by the Claimants is plausible in the abstract, in light of all of the other red flags raised by the transactions, I am not persuaded that the Claimants' explanation is true.

53

## G.    MY CONCLUSION IN RESPECT OF THE TRANSACTION ARRANGEMENTS

224.    In this Section I provide my conclusion with respect to the transaction arrangements.

225.    In my opinion, a transaction structured in this way should have a clear economic benefit for each party, and any element of circularity should be treated with caution.

226.    I note that at the times which are of relevance in this matter, Mr. Farid and Fadi Saab were both co-owners of FBME and Saab (Jersey).

227.    I also note that Mr. Rizvi was an ultimate beneficial shareholder of Bank Century. He – or at least other companies with which he was associated – appear to have taken part in the transaction directly.

228.    In Section D above, I have set out each of the component parts of the transaction arrangements. Based upon the information available to me I have then summarised what in my opinion appear to be the overall transaction arrangements.

229.    Based upon my analysis and the clear relationship between FBME and Saab (Jersey), I believe that the transaction arrangements resulted in an effectively circular transaction.

230.    On day one Bank Century made a gain of US$8mm as a result of entering into the transaction arrangements. In the event that the transaction arrangements were to have terminated according to the contractual agreements this gain would have disappeared.  However, in my opinion, it is possible that the termination of this arrangement was not envisaged and instead the transactions were expected to be rolled *ad-infinitum* (or at least until the remaining $32 million had been washed back through the system). My opinion in that regard is strengthened by the fact that the one monthly equivalent interest amounts were essentially revenue-neutral for FBME and Saab (Jersey) when considered together (as I explained at Section D8.2 above) – in other words, it appears that Bank Century did not make any margin from these payments. Therefore, unless the US$8 million was intended to be retained by Bank Century (or Mr. Rizvi), then Bank Century did not benefit from the entire scheme in any way. I would find it very surprising if that were the case.

231.    The economic effect of the transaction arrangements was therefore for FBME to pass US$32mm to another entity with the same ownership at a cost to it of US$8mm. In my opinion, the magnitude of the costs involved was not commercial for a party with a legitimate business motivation and certainly not for the commercial motivation alleged by the Claimants. As such, without further information as to the commercial rationale for the transactions, I am of the opinion that the transaction arrangements were unlikely to have been genuine commercial transactions. As I explained above in Section F3.6, I am not persuaded that the explanation advanced by the Claimants is true.

232.    The likely purpose of the transaction, in my view, was to launder FBME's (or the Saab Brothers') money through bank accounts controlled by Bank Century, including accounts in the US and Switzerland (**R-62** and **R-64**). The fact that all of the monies paid by the Saab Brothers (on behalf of Saab (Jersey)) to the Bank were then passed straight on to FBME (and presumably the Saab Brothers) supports that contention in my opinion.

233.    In summary, in my opinion, the transactions bear the following warning signs of money laundering:

   i)    the unnecessary complexity and opacity of the structure, and the number of parties involved;

   ii)   the fact that the actual money flows did not match up with the parties' contractual obligations;

   iii)  the fact that all parties do not appear to have been operating purely on an arm's length basis. This is particularly relevant given the identity of interests between the Saab Brothers, FBME and Saab (Jersey) on the one hand, and Mr. Rizvi, Bank Century, and perhaps the other third parties on the other;

   iv)   the lack of clearly defined purpose, and the inconsistency of the final arrangements with the purpose alleged by the Claimants;

   v)    the circular nature of the arrangements;

vi)    the fact that it appears that Bank Century did not gain at all from the transactions – or, alternatively, was intended to retain the $8 million, which is out of proportion with the risks it undertook on the face of the documents (and is more in line with the risks it was undertaking in facilitating a money laundering operation);

vii)    the backdating of documents, and the fact that the transactions were executed before proper contracts were put in place, and after a law firm warned of the risk of facilitating money laundering;

viii)    the incomplete contractual framework;

ix)    the involvement of entities from Cyprus, Tanzania, Indonesia and Russia; and

x)    the established association of both sides to the transaction in other money laundering activities.

234.    In light of the sheer number of warning signs, it is totally implausible that this was a normal, legitimate business structure. I do not believe that the true purpose of the transaction was an honest one. It is my firm opinion that the true intention and practice behind these transactions, shared by all parties, was the laundering of money. As I noted at the outset, these transactions raise more red flags than any other arrangement I have previously encountered in my entire career.

## H.      EXPERT'S DECLARATION

235.    I, Peter Brown, declare that:

i)      I understand that my duty in giving evidence in this arbitration is to assist the arbitral tribunal decide the issues in respect of which expert evidence is adduced. I have complied with, and will continue to comply with, that duty.

ii)     I confirm that this is my own, impartial, objective, unbiased opinion which has not been influenced by the pressures of the dispute resolution process or by any party to the arbitration.

iii)    I confirm that all matters upon which I have expressed an opinion are within my area of expertise.

iv)     I confirm that I have referred to all matters which I regard as relevant to the opinions I have expressed and have drawn to the attention of the arbitral tribunal all matters, of which I am aware, which might adversely affect my opinion;

v)      I confirm that, at the time of providing this written opinion, I consider it to be complete and accurate and constitute my true, professional opinion.

vi)     I confirm that if, subsequently, I consider this opinion requires any correction, modification or qualification I will notify the parties to this arbitration and the arbitral tribunal forthwith.

**STATEMENT OF TRUTH**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

…………………………………………….

Peter Brown                                                          15 August 2014

57

# I.      Appendix I - Professional Experience and Qualifications

## PETER B. BROWN

**Work email: pbrown@cclcompliance.com**
**Work telephone: +44 20 7638 9830**

_____

### SUMMARY OF EXPERIENCE

A City of London based career that commenced in 1968 in domestic banking with a mixture of work experience until beginning a specialization in Internal Audit in 1976. Internal auditing was followed through domestic and international banks until 1991; experience from 1992 to 1999 in investment management. Experience in establishing a Compliance function in mid-1980s and facilitating Compliance and Internal Audit functions' co-operation and interaction. Qualifications gained in banking in 1970 and as an accountant in 1982.

Between 2000 and 2006, specialist consultant in anti-money laundering compliance, involving various assignments prior to joining MHA Consulting in September 2001. From that date until early 2006, duties included the day-to-day provision of the JMLSG Helpdesk, used by firms in the financial services sector and by members of the public referred on by the FSA. Participated in FSA ID Working Party through mid-2004. In 2006, using knowledge and experience gained, returned to the market as a Money Laundering Reporting Office with National Bank of Kuwait (International) PLC; headhunted back into training/consultancy work in mid-2007 with the CCL Partnership.

_____

### CAREER HISTORY

#### 2007 – Present Senior Consultant, the CCL Partnership, London. Senior Advisor to Solum
Solum offers advisory services provided by ex-practitioners in all areas of capital markets.
The firm is authorised and regulated by the Financial Conduct Authority. Website: www.solum-financial.com.
The CCL Partnership provides a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors.

#### 2006 – 2007      NATIONAL BANK OF KUWAIT (INTERNATIONAL) PLC
_Money Laundering Reporting Officer_

#### 2001 – 2006      MHA CONSULTING
_Senior Consultant_
Providing a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors. Includes lecturing in the UK and Crown Dependencies and for the ICA Diploma in Anti Money Laundering. Provision of the JMLSG Helpdesk facility as used by firms in the financial services sector and by members of the public referred on by the FSA. Assisting firms in remedial action projects and current client reviews.

#### 2001              NATIONAL BANK OF EGYPT (UK) LTD
_Consultant_
Consultant on Remedial Action Taskforce for Money Laundering compliance.

#### 2000 - 2001      HALIFAX plc (now HBOS) - Group Treasury & Wholesale Banking Division
_Internal Audit and Compliance Functions_
Assisting first in routine internal audit reviews then compliance monitoring work and Money Laundering Regulations training.

#### 1999 - 2000      HABIB ALLIED INTERNATIONAL BANK

58

*Compliance Department*
Providing advice and assistance for extended project to ensure fulfillment of regulatory obligations.

**1998 - 1999     FOREIGN & COLONIAL MANAGEMENT LIMITED**
*Head of Internal Audit*
Responsible for planning, leading and reporting on internal audits in London. Acted as Money Laundering Reporting Officer for F&C Group companies. Implemented Service Standards for Internal Audit Department. Introduced risk assessment basis for planning of Audit review programme and new format for Internal Audit Reports.

**1992– 1997     INVESCO EUROPE LIMITED**
*Head of Internal Audit*
Initially team member in INVESCO on project to review procedures and controls. Project undertaken jointly with KPMG and in conjunction with IMRO. Following appointment as Head of Internal Audit in 1993, responsible for planning, leading and reporting on internal audits in London, Paris and Jersey. Acted as Money Laundering Reporting Officer, establishing the function and meeting training needs.
Established Internal Audit function, developed Audit Programmes, report formats and service standards. Developed risk based planning techniques for use by Internal Audit and Compliance functions. Established good relations with external auditors of main company and of 10 investment trusts; commitments involved five of the then 'big six' firms.

**1991 – 1992     Sundry temporary assignments, including commission to write booklet**
*"Introduction to Internal Auditing in Banking" (revised and updated 2000).*

**1989 - 1991     COMMONWEALTH BANK OF AUSTRALIA**
*Senior Audit Manager*
Responsible for planning, undertaking and reporting on internal audits in London and Frankfurt. Assisted new Compliance Officer in proper establishment of Compliance function and rectification of earlier errors. Instituted revised operational approach for Audit reviews using a basis approved by the Bank of England.

***1986 – 1989    S.F.E. BANK LIMITED***
*Senior Audit Manager and Compliance Officer*
Established Internal Audit function in London and undertook internal audits in London, Nassau and New York.
Established Compliance function, produced Compliance Manual, undertook annual Compliance reviews and liaised as necessary with Regulator.

***1979 – 1985    BANKERS TRUST COMPANY***
*Audit Manager*
Undertook audits in London and throughout Europe. Experience covered a very wide range of banking activities including FX, Treasury, Money Market, Investment Management, Commercial Lending and Global Custody.

***1968 - 1978    GLYN, MILLS & CO/ WILLIAMS & GLYN'S BANK***
*Graduate entrant*
Broad banking training then specialising in Internal Audit.
_____
*QUALIFICATIONS*

**BA (Hons)**      Economics
**FCCA**           Fellow of the Association of Chartered Certified Accountants
**FCIB**           Fellow of the Chartered Institute of Bankers
**FSI**            Fellow of the Securities & Investment Institute

Accredited by the UK's Financial Services Skills Council as holding Recognised Trainer Status
_____
*OTHER*

Co-author of "Professional Standards for Compliance Officers" (published ACCA 1991) and Money Laundering – Prevention & Compliance 2001/2002 (published ACCA 2002).

**Languages:**    **W**orking knowledge of French and German
_____

60

## J.    Appendix II - Contracts and Documents Received

### 1.    *London Court of International Arbitration Documents*

i)    Claimants' Request for Arbitration under the Rules of the LCIA, 19 July 2013;

ii)    Respondent's Response in the LCIA Arbitration No. 132447, 1 October 2013;

iii)    Claimants' Statement of Case in the LCIA Arbitration No. 132447, 16 December 2013;

iv)    Respondent's Statement of Defence in the LCIA Arbitration No. 132447, 31 January 2014; and

v)    Claimants' Reply in the LCIA Arbitration No. 132447, 3 March 2014.

### 2.    *Witness Statements*

i)    Witness Statement of Ahmad Fajar, 25 July 2014;

ii)    Witness Statement of Fadi Michel Saab, 25 July 2014;

iii)    Witness Statement of Abdel Rahman Wazzi, 25 July 2014; and

iv)    Witness Statement of George Hinis, 25 July 2014.

### 3.    *Claimants' Exhibits*

i)    C-1 to C-104.

### 4.    *Respondent's Exhibits*

ii)    R-1 to R-87.

## K.        Appendix III - Data Disclaimer

The data used in this report is provided "*as is*" and "*as available*". To the maximum extent allowed by applicable law, the relevant data providers, their respective licensors and suppliers make no warranties, express or implied, including without limitation implied warranties of merchantability, fitness for a particular purpose, non-infringement, or any other matter. In no event shall any data provider or their respective licensors and suppliers have any liability (i) for any unauthorised modification of or misuse of any portion of the data, (ii) for any liability resulting from use of the data, (iii) with respect to the results which may be obtained from the use of the data or (iv) for any inaccuracies, errors or omissions in the data.

## L.     Appendix IV – Material exhibited with this Report

|  | DOCUMENT | EXHIBIT REF |
|---|---|---|
| 1. | Reuters Article, "*Tanzania Takes Control of Bank Accused of Money Laundering*" | **R-88** |
| 2. | Excerpt from Joint Money Laundering Steering Group Detailed Guidance | **R-89** |
| 3. | Response from FBME Bank Limited to FIMCEN Notice | **R-90** |

# Exhibit 2

Excerpts from PT Bank Mutiara

Audited Financial Statement FYE 12-31-2014*

*The complete financial statement appears at A.868-1095.

## TJAHJADI & TAMARA

Registered Public Accountants

# PT BANK MUTIARA Tbk

| | |
|---|---|
| Laporan Keuangan<br>Dengan Laporan Auditor Independen<br>Tanggal 31 Desember 2014 dan<br>Untuk Tahun yang Berakhir pada<br>Tanggal Tersebut<br>(Mata Uang Indonesia) | *Financial Statements*<br>*With Independent Auditor's Report*<br>*As of December 31, 2014 and*<br>*For The Year*<br>*Then Ended*<br>*(Indonesian Currency)* |



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| | |
|---|---|
| **PT BANK MUTIARA Tbk**<br>**CATATAN ATAS LAPORAN KEUANGAN**<br>**Tanggal 31 Desember 2014 dan**<br>**Untuk Tahun yang Berakhir pada Tanggal Tersebut**<br>**(Dinyatakan dalam jutaan Rupiah,**<br>**kecuali dinyatakan lain)** | ***PT BANK MUTIARA Tbk***<br>***NOTES TO THE FINANCIAL STATEMENTS***<br>***As of December 31, 2014 and***<br>***For The Year Then Ended***<br>***(Expressed in millions of Rupiah,***<br>***unless otherwise stated)*** |

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Desember 2014 adalah sebagai berikut: (lanjutan)

Kasus Perdata: (lanjutan)

A. Posisi Bank sebagai Tergugat: (lanjutan)

7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. The outstanding legal and fraud cases up to December 2014 as follows: (continued)

Civil Cases: (continued)

A. Bank as the defendant: (continued)

7. *Examination Request International Arbitration filed by FBME Bank and SAAB Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.*

*Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.*

*Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.*

*On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.*

*By the receipt of such payment, therefore this case has been closed.*

# PT BANK MUTIARA Tbk
## *LAPORAN KEUANGAN/FINANCIAL STATEMENT*

**Tanggal 31 Maret 2015 dan 2014**       *As of March 31, 2015 and 2014*
**Dan 31 Desember 2014**                         *And December 31, 2014*

*The original financial statements included herein are in the Indonesian language.*

| | |
|---|---|
| **PT BANK MUTIARA Tbk**<br>**CATATAN ATAS LAPORAN KEUANGAN**<br>**Tanggal 31 Maret 2015 dan 2014**<br>**Dan 31 Desember 2014**<br>**(Dinyatakan dalam jutaan Rupiah,**<br>**kecuali dinyatakan lain)** | ***PT BANK MUTIARA Tbk***<br>***NOTES TO THE FINANCIAL STATEMENTS***<br>***As of March 31, 2015 and 2014***<br>***And December 31, 2014***<br>***(Expressed in millions of Rupiah,***<br>***unless otherwise stated)*** |

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Maret 2015 adalah sebagai berikut: (lanjutan)

   Kasus Perdata: (lanjutan)

   A. Posisi Bank sebagai Tergugat: (lanjutan)

      7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

         Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

         Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

         Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

         Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. The outstanding legal and fraud cases up to March 2015 as follows: (continued)

   Civil Cases: (continued)

   A. Bank as the defendant: (continued)

      7. Examination Request International Arbitration filed by FBME Bank and SAAB and Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.

         Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.

         Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.

         On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.

         By the receipt of such payment, therefore this case has been closed.

Catatan atas laporan keuangan terlampir merupakan bagian yang tidak terpisahkan dari laporan keuangan secara keseluruhan.

*The accompanying notes to the financial statements form an integral part of these financial statements taken as a whole.*

204

# PT BANK JTRUST INDONESIA Tbk
## *LAPORAN KEUANGAN/FINANCIAL STATEMENT*

**Tanggal 30 Juni 2015 dan 2014**　　　　　*As of June 30, 2015 and 2014*
**Dan 31 Desember 2014**　　　　　　　　*And December 31, 2014*

*The original financial statements included herein are in the Indonesian language.*

| | |
|---|---|
| **PT BANK JTRUST INDONESIA Tbk**<br>**CATATAN ATAS LAPORAN KEUANGAN**<br>**Tanggal 30 Juni 2015 dan 2014**<br>**Dan 31 Desember 2014**<br>**(Dinyatakan dalam jutaan Rupiah,**<br>**kecuali dinyatakan lain)** | *PT BANK JTRUST INDONESIA Tbk*<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of June 30, 2015 and 2014*<br>*And December 31, 2014*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Juni 2015 adalah sebagai berikut: (lanjutan)

Kasus Perdata: (lanjutan)

A. Posisi Bank sebagai Tergugat: (lanjutan)

7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. The outstanding legal and fraud cases up to June 2015 as follows: (continued)

Civil Cases: (continued)

A. Bank as the defendant: (continued)

7. Examination Request International Arbitration filed by FBME Bank and SAAB and Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.

Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.

Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.

On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.

By the receipt of such payment, therefore this case has been closed.

Catatan atas laporan keuangan terlampir merupakan bagian yang tidak terpisahkan dari laporan keuangan secara keseluruhan.

*The accompanying notes to the financial statements form an integral part of these financial statements taken as a whole.*

206

# TJAHJADI & TAMARA
### Registered Public Accountants

# PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2014 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditor's Report*
*As of December 31, 2014 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



An Independent Member Firm of **Morison** International

The original financial statements included herein are in the Indonesian language.

| **PT BANK MUTIARA Tbk** | **PT BANK MUTIARA Tbk** |
|---|---|
| **CATATAN ATAS LAPORAN KEUANGAN** | **NOTES TO THE FINANCIAL STATEMENTS** |
| **Tanggal 31 Desember 2014 dan** | **As of December 31, 2014 and** |
| **Untuk Tahun yang Berakhir pada Tanggal Tersebut** | **For The Year Then Ended** |
| **(Dinyatakan dalam jutaan Rupiah,** | **(Expressed in millions of Rupiah,** |
| **kecuali dinyatakan lain)** | **unless otherwise stated)** |

**33. PENYISIHAN (PEMULIHAN) CADANGAN KERUGIAN PENURUNAN NILAI - NETO**

**33. ALLOWANCE FOR IMPAIRMENT LOSSES (RECOVERY) - NET**

| | 2014 | 2013 | |
|---|---|---|---|
| Kredit yang diberikan (Catatan 10) | 140.380 | 857.772 | *Loans (Note 10)* |
| Aset lain-lain (Catatan 17) | 606 | 70.604 | *Other assets (Note 17)* |
| Agunan yang diambil alih (Catatan 16) | (2.481) | 69.478 | *Foreclosed assets (Note 16)* |
| Giro pada bank lain (Catatan 6) | - | (192) | *Current accounts with other banks (Note 6)* |
| **Jumlah** | **138.505** | **997.662** | ***Total*** |

**34. PENDAPATAN NON-OPERASIONAL**

**34. NON-OPERATING INCOME**

| | 2014 | 2013 | |
|---|---|---|---|
| Keuntungan revaluasi valas | 10.701 | 104.536 | *Gain on foreign currency revaluation* |
| Laba (rugi) penjualan aset tetap (Catatan 14) | 1 | (95) | *Gain (loss) on sale of fixed assets (Note 14)* |
| Lain-lain | 4.582 | 10.268 | *Others* |
| **Jumlah** | **15.284** | **114.709** | ***Total*** |

**35. BEBAN NON-OPERASIONAL**

**35. NON-OPERATING EXPENSES**

| | 2014 | 2013 | |
|---|---|---|---|
| Perkara | 145.067 | 18.086 | *Legal fees* |
| Konsultan | 12.538 | 10.878 | *Consultant* |
| Perjalanan dinas | 4.514 | 5.118 | *Business travelling* |
| Sumbangan | 674 | 394 | *Donation* |
| Denda dan sanksi | 302 | 7.855 | *Fines and penalties* |
| Lain-lain | 22.313 | 15.692 | *Others* |
| **Jumlah** | **185.408** | **58.023** | ***Total*** |

**36. PERPAJAKAN**

**36. TAXATION**

a. Utang Pajak

*a. Taxes Payable*

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak Penghasilan: | | | *Income Tax:* |
| Pasal 4(2) | 17.813 | 20.343 | *Article 4(2)* |
| Pasal 21 | 1.211 | 2.916 | *Article 21* |
| Pasal 23 | 158 | 135 | *Article 23* |
| Lain-lain | 4 | 18 | *Others* |
| **Jumlah** | **19.186** | **23.412** | ***Total*** |

b. Pajak Penghasilan

*b. Income Tax*

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak kini | - | - | *Current tax* |
| Pajak tangguhan | 7.928 | (23.069) | *Deferred tax* |
| **Manfaat (beban)** | **7.928** | **(23.069)** | ***Benefit (expense)*** |

# Exhibit 3

Composite exhibit of Note 35

for FYEs 2011, 2012, 2013, 2014

Exhibit 3-A

## TJAHJADI & TAMARA

Registered Public Accountants

# PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2014 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditor's Report*
*As of December 31, 2014 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| **PT BANK MUTIARA Tbk**<br>**CATATAN ATAS LAPORAN KEUANGAN**<br>**Tanggal 31 Desember 2014 dan**<br>**Untuk Tahun yang Berakhir pada Tanggal Tersebut**<br>**(Dinyatakan dalam jutaan Rupiah,**<br>**kecuali dinyatakan lain)** | ***PT BANK MUTIARA Tbk***<br>***NOTES TO THE FINANCIAL STATEMENTS***<br>***As of December 31, 2014 and***<br>***For The Year Then Ended***<br>***(Expressed in millions of Rupiah,***<br>***unless otherwise stated)*** |

| **2. IKHTISAR KEBIJAKAN AKUNTANSI PENTING (lanjutan)** | **2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)** |
|---|---|
| **b. Penjabaran Mata Uang Asing (lanjutan)** | **b. Foreign Currency Translation (continued)** |
| **b) Transaksi dan Saldo dalam Mata Uang Asing (lanjutan)** | **b) Transaction and Balances in Foreign Currency (continued)** |
| Berikut ini adalah kurs mata uang asing utama yang digunakan untuk penjabaran pada tanggal 31 Desember 2014 dan 2013 (dalam nilai penuh): | *Below are the major exchange rates used for translation as of December 31, 2014 and 2013 (full amount):* |

| | **2014** | **2013** | |
|---|---|---|---|
| Poundsterling Inggris | 19.288,40 | 20.110,93 | *Great Britain Poundsterling* |
| Euro Eropa | 15.053,35 | 16.759,31 | *European Euro* |
| Franc Swiss | 12.515,80 | 13.674,16 | *Swiss Franc* |
| Dolar Amerika Serikat | 12.385,00 | 12.170,00 | *United States Dollar* |
| Dolar Kanada | 10.679,49 | 11.434,22 | *Canadian Dollar* |
| Dolar Australia | 10.148,27 | 10.855,65 | *Australian Dollar* |
| Dolar Selandia Baru | 9.709,23 | 9.995,83 | *New Zealand Dollar* |
| Dolar Singapura | 9.376,19 | 9.622,08 | *Singapore Dollar* |
| Dolar Hong Kong | 1.596,98 | 1.569,54 | *Hong Kong Dollar* |
| Yen Jepang | 103,56 | 115,75 | *Japanese Yen* |

| **c. Aset dan Liabilitas Keuangan** | **c. Financial Assets and Liabilities** |
|---|---|
| Bank menerapkan PSAK 50 (Revisi 2010), "Instrumen Keuangan: Penyajian", PSAK 55 (Revisi 2011), "Instrumen Keuangan: Pengakuan dan Pengukuran", dan PSAK 60 "Instrumen Keuangan: Pengungkapan". | *The Bank applied PSAK 50 (Revised 2010), "Financial Instruments: Presentation", PSAK 55 (Revised 2011), "Financial Instruments: Recognition and Measurement", and PSAK 60 "Financial Instruments: Disclosures".* |
| Aset keuangan diklasifikasikan sebagai aset keuangan yang diukur pada nilai wajar melalui laba rugi, pinjaman yang diberikan dan piutang, aset keuangan dimiliki hingga jatuh tempo dan aset keuangan tersedia untuk dijual. Klasifikasi ini tergantung dari tujuan perolehan aset keuangan tersebut. Manajemen menentukan klasifikasi aset keuangan tersebut pada saat pengakuan awal. | *Financial assets are classified as financial assets at fair value through profit or loss, loans and receivables, held-to-maturity financial assets and available-for-sale financial assets. The classification depends on the purpose for which the financial assets were acquired. Management determines the classification of its financial assets at initial recognition.* |
| Liabilitas keuangan diklasifikasikan sebagai liabilitas yang diukur pada nilai wajar melalui laba rugi dan liabilitas yang diukur pada biaya perolehan diamortisasi. | *Financial liabilities are classified as financial liabilities at fair value through profit or loss and financial liabilities at amortized cost.* |

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk | PT BANK MUTIARA Tbk |
|---|---|
| CATATAN ATAS LAPORAN KEUANGAN | NOTES TO THE FINANCIAL STATEMENTS |
| Tanggal 31 Desember 2014 dan | As of December 31, 2014 and |
| Untuk Tahun yang Berakhir pada Tanggal Tersebut | For The Year Then Ended |
| (Dinyatakan dalam jutaan Rupiah, | (Expressed in millions of Rupiah, |
| kecuali dinyatakan lain) | unless otherwise stated) |

**33. PENYISIHAN (PEMULIHAN) CADANGAN KERUGIAN PENURUNAN NILAI - NETO**

**33. ALLOWANCE FOR IMPAIRMENT LOSSES (RECOVERY) - NET**

| | 2014 | 2013 | |
|---|---|---|---|
| Kredit yang diberikan (Catatan 10) | 140.380 | 857.772 | Loans (Note 10) |
| Aset lain-lain (Catatan 17) | 606 | 70.604 | Other assets (Note 17) |
| Agunan yang diambil alih (Catatan 16) | (2.481) | 69.478 | Foreclosed assets (Note 16) |
| Giro pada bank lain (Catatan 6) | - | (192) | Current accounts with other banks (Note 6) |
| **Jumlah** | **138.505** | **997.662** | **Total** |

**34. PENDAPATAN NON-OPERASIONAL**

**34. NON-OPERATING INCOME**

| | 2014 | 2013 | |
|---|---|---|---|
| Keuntungan revaluasi valas | 10.701 | 104.536 | Gain on foreign currency revaluation |
| Laba (rugi) penjualan aset tetap (Catatan 14) | 1 | (95) | Gain (loss) on sale of fixed assets (Note 14) |
| Lain-lain | 4.582 | 10.268 | Others |
| **Jumlah** | **15.284** | **114.709** | **Total** |

**35. BEBAN NON-OPERASIONAL**

**35. NON-OPERATING EXPENSES**

| | 2014 | 2013 | |
|---|---|---|---|
| Perkara | 145.067 | 18.086 | Legal fees |
| Konsultan | 12.538 | 10.878 | Consultant |
| Perjalanan dinas | 4.514 | 5.118 | Business travelling |
| Sumbangan | 674 | 394 | Donation |
| Denda dan sanksi | 302 | 7.855 | Fines and penalties |
| Lain-lain | 22.313 | 15.692 | Others |
| **Jumlah** | **185.408** | **58.023** | **Total** |

**36. PERPAJAKAN**

**36. TAXATION**

a.  Utang Pajak

a.  Taxes Payable

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak Penghasilan: | | | Income Tax: |
| Pasal 4(2) | 17.813 | 20.343 | Article 4(2) |
| Pasal 21 | 1.211 | 2.916 | Article 21 |
| Pasal 23 | 158 | 135 | Article 23 |
| Lain-lain | 4 | 18 | Others |
| **Jumlah** | **19.186** | **23.412** | **Total** |

b.  Pajak Penghasilan

b.  Income Tax

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak kini | - | - | Current tax |
| Pajak tangguhan | 7.928 | (23.069) | Deferred tax |
| **Manfaat (beban)** | **7.928** | **(23.069)** | **Benefit (expense)** |

Exhibit 3-B

TJAHJADI & TAMARA
Registered Public Accountants

# PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2013 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditors' Report*
*As of December 31, 2013 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2013 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | *PT BANK MUTIARA Tbk*<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2013 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |
|---|---|

**2. IKHTISAR KEBIJAKAN AKUNTANSI PENTING (lanjutan)**

**b. Penjabaran Mata Uang Asing**

**a) Mata Uang Penyajian**

Laporan keuangan disajikan dalam mata uang Rupiah, yang merupakan mata uang fungsional Bank.

**b) Transaksi dan Saldo dalam Mata Uang Asing**

Kebijakan akuntansi atas transaksi dan saldo dalam mata uang asing didasarkan pada peraturan Bapepam dan LK No. VIII.G.7 dan Pedoman Akuntansi Perbankan Indonesia ("PAPI"). Bank mengacu pada Pedoman Akuntansi Perbankan Indonesia ("PAPI") dimana transaksi dalam mata uang asing dijabarkan ke mata uang Rupiah dengan menggunakan kurs laporan (penutupan) yang ditetapkan oleh Bank Indonesia yaitu kurs tengah yang merupakan rata-rata kurs beli dan kurs jual berdasarkan Reuters pada pukul 16.00 Waktu Indonesia Barat yang berlaku pada tanggal tersebut.

Keuntungan dan kerugian selisih kurs yang timbul dari transaksi dalam mata uang asing dan dari penjabaran aset dan liabilitas moneter dalam mata uang asing, diakui pada laporan laba rugi komprehensif, kecuali apabila ditangguhkan pada ekuitas karena memenuhi kualifikasi/kriteria sebagai lindung nilai arus kas (*hedging*).

Selisih penjabaran mata uang asing atas aset moneter keuangan lain yang diukur berdasarkan nilai wajar dicatat sebagai bagian dari keuntungan dan kerugian selisih kurs.

Berikut ini adalah kurs mata uang asing utama yang digunakan untuk penjabaran pada tanggal 31 Desember 2013 dan 2012 (dalam nilai penuh):

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

**b. Foreign Currency Translation**

**a) Presentation Currency**

*The financial statements are presented in Indonesian Rupiah (Rupiah), which is the functional currency of the Bank.*

**b) Transaction and Balances in Foreign Currency**

*Accounting policy for transactions and balances in foreign currency is based on Bapepam and LK rule No. VIII.G.7 and Guidelines of Accounting for Indonesian Bank ("PAPI"). The Bank refers to the Guidelines of Accounting for Indonesian Bank ("PAPI") where transactions denominated in a foreign currency are converted into Rupiah using the reporting (closing) rate set by Bank Indonesia that is middle rate which the average of bid rate and ask rate based on Reuters at 16.00 Western Indonesian Time prevailing at that time.*

*Exchange gains and losses arising on transactions in foreign currency and on the translation of foreign currency monetary assets and liabilities are recognized in the statement of comprehensive income, except when deferred in equity as qualifying cash flow hedges.*

*Translation differences on other monetary financial assets measured at fair value are included in foreign exchange gains and losses.*

*Below are the major exchange rates used for translation as of December 31, 2013 and 2012 (full amount):*

|  | **2013** | **2012** |  |
|---|---|---|---|
| Poundsterling Inggris | 20.110,93 | 15.514,93 | *Great Britain Poundsterling* |
| Euro Eropa | 16.759,31 | 12.731,62 | *European Euro* |
| Franc Swiss | 13.674,16 | 10.536,25 | *Swiss Franc* |
| Dolar Amerika Serikat | 12.170,00 | 9.637,50 | *United States Dollar* |
| Dolar Kanada | 11.434,22 | 9.686,91 | *Canadian Dollar* |
| Dolar Australia | 10.855,65 | 10.007,10 | *Australian Dollar* |
| Dolar Selandia Baru | 9.995,83 | 7.918,18 | *New Zealand Dollar* |
| Dolar Singapura | 9.622,08 | 7.878,61 | *Singapore Dollar* |
| Dolar Hong Kong | 1.569,54 | 1.243,27 | *Hong Kong Dollar* |
| Yen Jepang | 115,75 | 111,77 | *Japanese Yen* |

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2013 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | *PT BANK MUTIARA Tbk*<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2013 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |

**34. PENDAPATAN NON-OPERASIONAL**     *34.  NON-OPERATING INCOME*

|  | 2013 | 2012 |  |
|---|---|---|---|
| Pendapatan revaluasi valas | 104.536 | 33.677 | *Revenue of foreign currency revaluation* |
| Laba (rugi) penjualan aset tetap | | | *Gain (loss) on sale of fixed assets* |
| (Catatan 14) | (95) | 1.920 | *(Note 14)* |
| Lain-lain | 10.268 | 9.893 | *Others* |
| **Jumlah** | **114.709** | **45.490** | ***Total*** |

**35. BEBAN NON-OPERASIONAL**     *35.  NON-OPERATING EXPENSES*

|  | 2013 | 2012 |  |
|---|---|---|---|
| Perkara | 18.086 | 7.936 | *Court fees* |
| Konsultan | 10.878 | 5.221 | *Consultant* |
| Denda dan sanksi | 7.855 | 490 | *Fines and penalties* |
| Perjalanan dinas | 5.118 | 4.233 | *Business traveling* |
| Sumbangan | 394 | 579 | *Donation* |
| Lain-lain | 15.692 | 15.336 | *Others* |
| **Jumlah** | **58.023** | **33.795** | ***Total*** |

**36. PERPAJAKAN**     *36.  TAXATION*

    a.  Utang Pajak        *a.  Taxes Payable*

|  | 2013 | 2012 |  |
|---|---|---|---|
| Pajak Penghasilan: | | | *Income Tax:* |
| Pasal 4(2) | 20.343 | 13.256 | *Article 4(2)* |
| Pasal 21 | 2.916 | 3.163 | *Article 21* |
| Pasal 23 | 153 | 120 | *Article 23* |
| **Jumlah** | **23.412** | **16.539** | ***Total*** |

    b.  Pajak Penghasilan        *b.  Income Tax*

|  | 2013 | 2012 |  |
|---|---|---|---|
| Pajak kini | - | - | *Current tax* |
| Pajak tangguhan | (23.069) | 1.514 | *Deferred tax* |
| **Manfaat (Beban)** | **(23.069)** | **1.514** | ***Benefit (Expense)*** |

Pajak kini        *Current tax*

Rekonsiliasi antara laba (rugi) sebelum manfaat (beban) pajak penghasilan tangguhan yang disajikan dalam laporan laba rugi komprehensif dengan taksiran rugi fiskal Bank untuk tahun yang berakhir pada tanggal-tanggal 31 Desember 2013 dan 2012 adalah sebagai berikut:

*The reconciliation between income (loss) before deferred income tax benefit (expense) as stated in the statement of comprehensive income with the estimated tax loss of the Bank for the years ended December 31, 2013 and 2012 is as follows:*

Exhibit 3-C

## TJAHJADI & TAMARA
Registered Public Accountants

## PT BANK MUTIARA Tbk

**Laporan Keuangan
Dengan Laporan Auditor Independen
Tahun yang Berakhir pada Tanggal
31 Desember 2012
Dengan Angka Perbandingan
untuk Tahun 2011**



An Independent Member Firm of **Morison** International

PT BANK MUTIARA Tbk
CATATAN ATAS LAPORAN KEUANGAN
Tahun yang Berakhir pada Tanggal 31 Desember 2012
dengan Angka Perbandingan untuk Tahun 2011
(Dinyatakan dalam jutaan Rupiah,
kecuali dinyatakan lain)

*PT BANK MUTIARA Tbk*
*NOTES TO THE FINANCIAL STATEMENTS*
*Year Ended December 31, 2012*
*with Comparative Figures for 2011*
*(Expressed in millions of Rupiah,*
*unless otherwise stated)*

2.  IKHTISAR KEBIJAKAN AKUNTANSI PENTING (lanjutan)

    b.  Penjabaran Mata Uang Asing (lanjutan)

        • Transaksi dan saldo dalam mata uang asing (lanjutan)

        Keuntungan dan kerugian selisih kurs yang timbul dari transaksi dalam mata uang asing dan dari penjabaran aset dan liabilitas moneter dalam mata uang asing, diakui pada laporan laba rugi, kecuali apabila ditangguhkan pada ekuitas karena memenuhi kualifikasi/kriteria sebagai lindung nilai arus kas (hedging).

        Laba atau rugi kurs mata uang asing atas aset dan liabilitas moneter merupakan selisih antara biaya perolehan diamortisasi dalam Rupiah pada awal tahun, disesuaikan dengan suku bunga efektif dan pembayaran selama tahun berjalan, dan biaya perolehan diamortisasi dalam mata uang asing yang dijabarkan ke dalam Rupiah dengan menggunakan kurs pada akhir tahun

        Berikut ini adalah kurs mata uang asing utama yang digunakan pada tanggal-tanggal 31 Desember 2012 dan 2011 yang menggunakan kurs tengah Reuters pukul 16:00 Waktu Indonesia Barat (nilai penuh):

2.  *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)*

    b.  *Foreign Currency Translation (continued)*

        • *Transaction and balances in foreign currency (continued)*

        *Exchange gains and losses arising on transactions in foreign currency and on the translation of foreign currency monetary assets and liabilities are recognized in the statements of comprehensive income, except when deferred in equity as qualifying cash flow hedges.*

        *The foreign currency gain or loss on monetary assets and liabilities is the difference between amortized cost in Rupiah at the beginning of the year, adjusted for effective interest and payments during the year, and the amortized cost in foreign currency translated into Rupiah at the exchange rate at the end of the year.*

        *Below are the major exchange rates used as of December 31, 2012 and 2011 using the Reuters' middle rates at 16:00 Western Indonesian Time (full amount):*

|  | 2012 | 2011 |  |
|---|---|---|---|
| Poundsterling Inggris | 15.514,93 | 13.975,29 | *Great Britain Poundsterling* |
| Euro Eropa | 12.731,62 | 11.714,76 | *European Euro* |
| Franc Swiss | 10.536,25 | 9.631,94 | *Swiss Franc* |
| Dolar Australia | 10.007,10 | 9.205,78 | *Australian Dollar* |
| Dolar Kanada | 9.686,91 | 8.885,35 | *Canadian Dollar* |
| Dolar Amerika Serikat | 9.637,50 | 9.067,50 | *United States Dollar* |
| Dolar Selandia Baru | 7.918,18 | 7.000,57 | *New Zealand Dollar* |
| Dolar Singapura | 7.878,61 | 6.983,55 | *Singapore Dollar* |
| Dolar Hong Kong | 1.243,27 | 1.167,23 | *Hong Kong Dollar* |
| Yen Jepang | 111,77 | 116,82 | *Japanese Yen* |

    c.  Aset dan Liabilitas Keuangan

        Efektif tanggal 1 Januari 2012, Bank menerapkan PSAK 50 (Revisi 2010), "Instrumen Keuangan: Penyajian", PSAK 55 (Revisi 2011), "Instrumen Keuangan: Pengakuan dan Pengukuran", dan PSAK 60 (Revisi 2010), "Instrumen Keuangan: Pengungkapan".

    c.  *Financial Assets and Liabilities*

        *Effective January 1, 2012, the Bank applied PSAK 50 (Revised 2010), "Financial Instruments: Presentation", PSAK 55 (Revised 2011), Financial Instruments: Recognition and Measurement", and PSAK 60 (Revised 2010), "Financial Instruments: Disclosures".*

| PT BANK MUTIARA Tbk | PT BANK MUTIARA Tbk |
|---|---|
| CATATAN ATAS LAPORAN KEUANGAN | NOTES TO THE FINANCIAL STATEMENTS |
| Tahun yang Berakhir pada Tanggal 31 Desember 2012 | Year Ended December 31, 2012 |
| dengan Angka Perbandingan untuk Tahun 2011 | with Comparative Figures for 2011 |
| (Dinyatakan dalam jutaan Rupiah, | (Expressed in millions of Rupiah, |
| kecuali dinyatakan lain) | unless otherwise stated) |

## 32. BEBAN UMUM DAN ADMINISTRASI / 32. GENERAL AND ADMINISTRATIVE EXPENSES

| | 2012 | 2011 | |
|---|---|---|---|
| Penyusutan dan amortisasi | 30.591 | 17.904 | Depreciation and amortization |
| Sewa | 24.430 | 24.530 | Rent |
| Umum | 21.865 | 35.845 | General |
| Iklan dan promosi | 17.703 | 26.099 | Advertising and promotion |
| Komunikasi | 12.085 | 9.851 | Communication |
| Listrik, gas dan air | 5.914 | 6.798 | Electricity, gas, and water |
| Perbaikan dan pemeliharaan | 5.797 | 4.819 | Repairs and maintenance |
| Administrasi | 4.962 | 6.575 | Administration |
| Pendidikan dan pengembangan | 4.030 | 4.077 | Education and development |
| Kebersihan dan keamanan | 3.534 | 3.825 | Cleaning and security |
| Transportasi dan perjalanan dinas | 3.309 | 7.971 | Transportation and business travelling |
| Premi asuransi | 3.070 | 3.285 | Insurance premium |
| Cetakan dan alat tulis dan kebutuhan kantor | 2.908 | 4.179 | Printing and stationery |
| Iuran keanggotaan | 2.341 | 1.733 | Membership |
| Jasa profesional | 1.682 | 17.264 | Professional fees |
| Pajak dan izin | 1.393 | 655 | Taxes and licenses |
| Jamuan | 693 | 602 | Entertainments |
| Lain-lain | 920 | 1.025 | Others |
| **Jumlah** | **147.227** | **177.037** | **Total** |

## 33. BEBAN GAJI DAN TUNJANGAN / 33. SALARIES AND ALLOWANCE EXPENSES

| | 2012 | 2011 | |
|---|---|---|---|
| Gaji, upah, pensiun, dan tunjangan pajak | 125.884 | 107.798 | Salaries, wages, pension, and tax allowance |
| Kesejahteraan karyawan | 37.858 | 36.349 | Employes benefits |
| Tunjangan Hari Raya, cuti, dan | | | Allowance for Hari Raya, annual leaves, and |
| tunjangan terkait lainnya | 11.404 | 8.336 | other related benefits |
| Lainnya | 20.029 | 7.300 | Others |
| **Jumlah** | **195.175** | **159.783** | **Total** |

## 34. PENDAPATAN NON-OPERASIONAL / 34. NON-OPERATING INCOME

| | 2012 | 2011 | |
|---|---|---|---|
| Laba penjualan aset tetap | 1.911 | 3.526 | Gain on sale of fixed assets |
| Lain-lain | 43.579 | 5.556 | Others |
| **Jumlah** | **45.490** | **9.082** | **Total** |

## 35. BEBAN NON-OPERASIONAL / 35. NON-OPERATING EXPENSES

| | 2012 | 2011 | |
|---|---|---|---|
| Sumbangan | 579 | 278 | Donation |
| Denda dan sanksi | 490 | 300 | Fines and penalties |
| Lain-lain | 32.726 | 932 | Others |
| **Jumlah** | **33.795** | **1.510** | **Total** |

Exhibit 3-D



## PT BANK  PEARL     Tbk

LaporanKeuangan

For the Year -Year which Bcrakhir In

31 Desen1.ber  2011 and

**Tbk PT BANK PEARL**
**NOTES TO THE FINANCIAL STATEMENTS**
**(Continued)**
For the Years Ended December 31,
2011 and 2010

3.c.  **Transactions  and  Balances  in  Foreign
Currencies**
Transactions in foreign currencies are recorded in Rupiah based on the exchange rate prevailing at the
transaction date. On the statement of financial position, assets and liabilities denominated in foreign
currencies are adjusted to Rupiah by Reuters spot rates at
at 16:00 pm. Gains or losses from exchange rate adjustments are credited or charged to the income

As at December 31, 2011 and 2010, the exchange rate (the full amount) are as follows:

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Pounds | 13975.29 | 13941.18 |
| Euro | 11714.76 | 12017.99 |
| U.S. Dollar Swiss | 9067.50 | 9010.00 |
| Franc | 9631.94 | 9619.39 |
| Canadian Dollar | 8885.35 | 9024.89 |
| Singapore | 6983.55 | 7025.89 |
| Dollar | 9205.78 | 9169.48 |
| Australia Dollar | 7000.57 | 6970.14 |
| New Zealand Dollar | 1167.23 | 1159.08 |
| Hong Kong | 116.82 | 110.75 |

3.d.  **Transactions with related parties**
Related parties are persons or entities related to the Bank (the reporting entity):
(A)  The person or immediate family members have a relationship with the reporting entity    if the
are:
(I.)    has control or joint control over the reporting entity;
(Ii.)   has significant influence over the reporting entity; or
(Iii.)  key management personnel of the parent entity reporting entity or the
(B)  An entity related to the reporting entity if it meets one of the following:
(I)  The  entity  and  the  reporting  entity  are  members  of  the  same  business  group  (ie  a  parent,
subsidiaries, and entities associated with the next child of another entity).
(Ii)  One entity is an associate or joint venture of the other entity (or entities
associate or joint venture that is a member of a group of which the entity is a member).
(Iii.)  Both entities are joint ventures of the same third party.
(Iv.)  One entity is a joint venture of a third entity and the other entity is an associate of the third
entity.
(V.)  The  entity  is  a  post-employment  benefit  plan  for  the  benefit  of  employees  of  either  the
reporting entity or an entity related to the reporting entity. If the reporting entity is itself such a
plan, the sponsoring employers are also related entities to the reporting entity.
(Vi.)  The entity is controlled or jointly controlled by a person identified in (a).
(Vii.)  The person identified in subparagraph (a) (i) has significant influence over the entity or the
key management personnel of the entity (or the entity's parent entity).

3.e.  **Financial Assets and Financial Liabilities**
**Financial Assets**
Financial assets are classified as financial assets at fair value through profit or loss, loans and
receivables, financial assets held to maturity, and asset
finance available for sale. The classification depends on the purpose for which the financial asset.
Management determines the classification of its financial assets at initial recognition.

**Tbk PT BANK PEARL**
**NOTES TO THE FINANCIAL STATEMENTS**
**(Continued)**
For the Years Ended December 31,
2011 and 2010

## 36.   General and Administrative

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Umum | 35.845 | 16.697 |
| Sewa Gedung | 24.530 | 18.618 |
| Iklan dan Promosi | 26.099 | 23.610 |
| Penyusutan dan Amortisasi | 17.904 | 17.301 |
| Jasa Profesional | 17.264 | 15.908 |
| Komunikasi | 9.851 | 11.310 |
| Transportasi dan Perjalanan Dinas | 7.970 | 6.414 |
| Administrasi | 6.575 | 6.020 |
| Listrik, Gas dan Air | 6.798 | 5.732 |
| Pendidikan dan Pengembangan | 4.077 | 2.038 |
| Kebersihan dan Keamanan | 3.825 | 3.745 |
| Cetakan/Alat Tulis dan Kebutuhan Kantor | 4.180 | 3.226 |
| Premi Asuransi | 3.285 | 2.899 |
| Perbaikan dan Pemeliharaan | 4.819 | 6.355 |
| Iuran Keanggotaan | 1.733 | 1.448 |
| Pajak dan Izin | 655 | 804 |
| Jamuan | 602 | 830 |
| Lain-lain | 1.025 | 746 |
| **Jumlah** | **177.037** | **143.701** |

## 37.   Salaries and Allowances

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Salaries, Wages, Pensions and Tax Benefit | 107 798 | 107 463 |
| Employee Benefits | 36,349 | 21,171 |
| THR, Leave and Other Related Benefits | 8336 | 7663 |
| Other | 7300 | 13,824 |
|  | **159 783** | **150 121** |

## 38.   Non-Operating Income

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Fixed Income Asset Sales | 3526 | 26 |
| Other | 5556 | th |
| **Number** | **9082** | **3939** |

## 39.   Non-Operating

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Fines and | 300 | 7262 |
| Penalties | 278 | 204 |
| Other | 932 | 891 |
| Donation | **1510** | **8357** |

Exhibit 4



## FBME BANK

17th November 2016

## To whom it may concern

**FBME Bank Limited (Cyprus Branch) (in Special Administration) (FBME)**

I was appointed as Special Administrator of FBME by the Central Bank of Cyprus on 11 January 2016, in its capacity as Resolution Authority, in accordance with the provisions of the Resolution of Credit and Other Institutions Law.   I replaced the previous Special Administrator, Mr Andronikou, whose appointment expired on 31 December 2015.

In relation to my appointment and subsequent renewals, I attach documentary evidence.

In July 2014, an agency of the US Treasury, the Financial Crimes Enforcement Network (**FinCEN**) identified FBME as an institution of primary money laundering concern.

In August of this year I was sent a copy of a London High Court action titled:-

**FBME Bank Ltd (Cyprus address) & Others, -v- Dangate Consulting Ltd, Barrington London Ltd, Nigel Brown and Alec Leighton. Case Number CL-2016-000195.**

I can confirm that I was only made aware of this action by Mr Nigel Brown, the Third Defendant in that action. At no time have I authorised any legal action of this kind against any of the above named Defendants, nor have I ever instructed Quinn Emanuel Urquhart & Sullivan, LLP to represent FBME Bank, Cyprus Branch, in any matter.

According to Mr. Brown, Quinn Emanuel Urquhart & Sullivan LLP, stated that the Branch in Cyprus received on or about December 2014 the sum of £5.5 million, arising from a settlement in a legal action before the London Court of International Arbitration, case number 132447, where FBME Bank Ltd (Cyprus Branch) was a Claimant. In this regard, having reviewed the branch's records and discussing the matter with the branch's CFO, Mr. Anastasiou, I can confirm that NO SUCH MONIES WERE RECEIVED BY THE BRANCH in December 2014 or subsequently.

Yours faithfully,

Chris Iacovides
Special Administrator
FBME Bank Ltd (Cyprus Branch)

(translated from original Greek text)



**CENTRAL BANK OF CYPRUS**
EUROSYSTEM



**25 October 2016**

THE GOVERNOR

Mr. Christakis Iacovides                    **BY HAND**
Nicosia

Dear Mr. Iacovides

The Resolution Authority acting in accordance with the provisions of section 46(5) of the Resolution of Credit and Other Institutions Law of 2016, has decided to renew your appointment as Special Administrator of the Cyprus Branch of FBME Bank Ltd for a further period of six months, namely, until 10 May 2017.  The terms of your Deed of Appointment dated 11 January 2016 remain unchanged and apply accordingly.

With respect,
(sgd)
Chrystalla Georghadji

I hereby certify that this text is a true translation of the attached document

I hereby certify that the signature of the translator is that of
Stella J Stephani

D. Hasikos



(Sgd.)
for Acting Director                    0 3 NOV 2016
Press and Information Office
REPUBLIC OF CYPRUS
(total number of words translated: 493)

80 Kennedy Avenue, 1076 Nicosia, Cyprus – Telephone: +357 22714471 – Fax: +357 22378151
Electronic Address: governor@centralbank.gov.cy – Website: www.centralbank.gov.cy



ΚΕΝΤΡΙΚΗ ΤΡΑΠΕΖΑ ΤΗΣ ΚΥΠΡΟΥ

ΕΥΡΩΣΥΣΤΗΜΑ

Η ΔΙΟΙΚΗΤΗΣ

**25 Οκτωβρίου 2016**

Κύριο Χριστάκη Ιακωβίδη,
Λευκωσία.

**ΜΕ ΤΟ ΧΕΡΙ**

Αξιότιμε κύριε Ιακωβίδη,

Η Αρχή Εξυγίανσης, ενεργώντας σύμφωνα με τις διατάξεις του άρθρου 46(5) του περί Εξυγίανσης Πιστωτικών Ιδρυμάτων και Επενδυτικών Εταιρειών Νόμου του 2016, αποφάσισε όπως ανανεώσει το διορισμό σας στη θέση του Ειδικού Διαχειριστή του Υποκαταστήματος της FBME Bank Ltd στην Κύπρο για περίοδο έξι μηνών, ήτοι, μέχρι τις 10 Μαΐου 2017. Οι όροι της Πράξης Διορισμού σας ημερομηνίας 11 Ιανουαρίου 2016 παραμένουν αναλλοίωτοι και ισχύουν αναλογικά.

Με εκτίμηση,

Χρυστάλλα Γιωρκάτζη

Exhibit 5

大成 **DENTONS**

**Neil Griffiths**
Partner

neil.griffiths@dentons.com
D    +44 20 7320 6822
M   +44 7795 618281

Dentons UKMEA LLP
One Fleet Place
London EC4M 7WS
United Kingdom
DX 242

大成 **Salans FMC SNR Denton McKenna Long**
dentons.com

Quinn Emanuel Urquhart & Sullivan LLP
One Fleet Place
London
EC4M 7RA
FAO: Matthew Bunting and Gregory Pantlin

Our ref: NRG/036322.00003

**DELIVERED BY HAND**

24 November 2016

Dear Sirs

**(1) FBME Bank Limited; (2) Mr Ayoub-Farid Michel Saab; and (3) Mr  Fadi Saab v. (1) Dangate Consulting Limited; (2) Barrington London Limited; (3) Mr Nigel Brown; and (4) Mr Alec Leighton Claim Number: CL-2016-000195 (Proceedings)**

We act for Mr Iacovides, the Special Administrator of FBME Bank Limited, 90 Makarios III Avenue, 1077 Nicosia, Cyprus (the **Branch**).  We enclose a copy of the Deed of Appointment dated 11 January 2016, appointing Mr Iacovides as Special Administrator of the Branch, and the most recent extension of his appointment to 10 May 2017.

We write in relation to the Proceedings.

The First Claimant in the Proceedings is purported to be the Branch.  The Branch was put into Special Administration on 21 July 2014 by the Resolution Authority in Cyprus and the Special Administrator is the only party with the authority to bring or permit proceedings on behalf of the Branch.

Mr Iacovides was unaware of the Proceedings, which were issued on 1 April 2016, until they were recently brought to his attention.  Mr Iacovides did not consent to the Proceedings being issued.

Please respond by return, or in any event by 5pm on Monday 28 November 2016, to explain the following:

(a)    Paragraph 3 of the Proceedings states "in or about July 2014" one or more of the Claimants orally engaged one or more of the Defendants.  Please can you clarify:

(i)    Who purportedly orally engaged the Defendants on behalf of the Branch?

(ii)    On what date were the Defendants purportedly orally engaged?

(iii)    What was the basis of the authority for the purported oral engagement of the Defendants?

(iv)    What were the terms of the purported engagement?

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. Dentons UKMEA LLP is a limited liability partnership registered in England and Wales under no. OC322045. It is authorised and regulated by the Solicitors Regulation Authority. A list of its members is open for inspection at its registered office: One

(b)   Paragraph 4 of the Proceedings states that the terms on which the Defendants were purportedly engaged by the Branch were formalised through its solicitors, Hogan Lovells US LLP, by letter of engagement dated 18 November 2014.  Please can you:

    (i)   Send us a copy of this engagement letter.

    (ii)   Explain what was the basis of the authority for Hogan Lovells US LLP to appoint the Defendants on behalf of the Branch on 18 November 2014?

(c)   What was the basis of the authority for Quinn Emanuel Urquhart & Sullivan LLP to issue the Proceedings on behalf of the Branch on 1 April 2016?

We wish to make it clear that the Proceedings were not issued with the authority of the Special Administrator of the Branch, and that his position is that he has exclusive authority to represent the Branch.  In the circumstances, we are sending a copy of this letter to the other parties in the Proceedings and the Court.

Yours faithfully



**Dentons UKMEA LLP**

cc.

The Court Manager
High Court of Justice
Queen's Bench Division
Commercial Court
Royal Courts of Justice
The Rolls Building
7 Rolls Building
Fetter Lane
London EC2A 1NL
**Claim Number: CL-2016-000195**

Dangate Consulting Ltd
Ground Floor
1c Ocean House Business Centre Bentley Way
New Barnet
Barent
Hertfordshire EN5 5FP

Barrington London Limited
Winnington House
2 Woodberry Grove
North Finchley
London N12 0DR

Mr Ayoub-Farid Michael Saab
5 Michael Georgalla Street
Ayii Omoloyitae
1095 Nicosia
Cyprus

Mr Fadi Michael Saab
35 Marathonos Street
Makedonitissa
2413 Engomi
Nicosia
Cyprus

Mr Nigel Brown
4 Edgwarebury Court
Edgwarebury Lane
Edgware
Middlesex HA8 8LP

Mr Alec Leighton
Ash House
Oxshott Road
Leatherhead
Surrey KT22 9EN