# Manuel & Associates, LLP    ATTORNEYS AT LAW

One Penn Plaza • Suite 2527 • New York, New York 10119
T: 212.792.0044 • F: 212.792.0043

Charles B. Manuel, Jr.
C: 917.699.9559
cbm@manuel-law.net

December 15, 2016

Honorable Paul A. Crotty
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007
*By ECF*

### *Weston Capital Advisors, Inc. v. PT Bank Mutiara Tbk*
13-cv-6945 (PAC)

Dear Judge Crotty:

We are e-filing the Second Circuit papers which have been submitted in support of Plaintiff's motion to vacate the expanded contempt order and sanctions, supplement the record relating to Defendant's unclean hands, and conduct further proceedings relating thereto (Dkt. Nos. 166-168), hard copies of which were delivered to the Court and to Defendant's counsel at the conference on November 3, 2016.

Respectfully yours,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr.

| Tab | Document |
|---|---|
| | Second Circuit decision on Appellants' Petition for Rehearing and Appellee's Motion for Sanctions |
| **Motion to Supplement and Remand** | **T-1080** |
| 1 | Declaration Of Charles B. Manuel, Jr. in Support of Motion to Supplement Record and to Remand Case For Consideration of Additional Evidence |
| Ex 1 | Peter Barrie Brown Expert Report Commissioned by PT Bank Mutiara and Quinn Emanuel August 15, 2014 |
| Ex. 2 | Excerpts from PT Bank Mutiara Audited Financial Statement FYE 12-31-2014 |
| Ex. 3 | Composite exhibit of Note 35 for FYEs 2011, 2012, 2013, 2014 |
| 2 | Appellants' Memorandum of Law in Support of Motion to Supplement the Record and Remand. |
| 3 | Appellee's Memorandum of Law in Support of its Opposition to the Motion For Remand and Supplementation of the Record and its Cross-Motions to (A) Dismiss the Appeal, (B) Impose Sanctions on Opposing Counsel, and (C) Stay Bank Mutiara's Responsive Brief Until These Motions Are Resolved |
| Ex. A | Opinion and Order |
| Ex. B | Summary Order |
| 4 | Reply Memorandum of Law in Support of Motion to Supplement Record and to Remand Case For Consideration of Additional Evidence |
| | |
| | |
| **Motion to Dismiss and Impose Sanctions** | **T-1080** |
| [See Tab 3 above] | Appellee's Memorandum of Law in Support of its Opposition to the Motion For Remand and Supplementation of the Record and its Cross-Motions to (A) Dismiss the Appeal, (B) Impose Sanctions on Opposing Counsel, and (C) Stay Bank Mutiara's Responsive Brief Until These Motions Are Resolved [See Tab 3] |
| 5 | Appellants' Memorandum of Law in Opposition to Appellee's Motion to Dismiss and For Sanctions |
| Ex. 1 | Order of United States Magistrate Judge Paul S. Grewal dated Jan. 29, 2014 awarding sanctions against Samsung Electronics Co. and Quinn Emanuel. |
| Ex. 2 | Order of United States Magistrate Judge Paul S. Grewal dated June. 20, 2014 setting sanctions against Samsung Electronics Co. and Quinn Emanuel totaling approx. $2.04 million. |
| Ex. 3 | Order of United States District Judge Lucy H. Koh dated Sep. 19, 2014 upholding sanctions award of the Magistrate Judge. |
| 6 | Appellee's Reply Memorandum of Law in Support of its Motions to (A) Dismiss The Appeal And (B) Sanction Opposing Counsel |
| 7 | Declaration Of Andrew P. Marks |

# Motion to Supplement and Remand

Tab 1

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 15-3158; 16-1178                                  Caption [use short title]

**Motion for:** Supplementation of the record and remand

to the district court for further proceedings.

Weston Capital Advisors, Inc., Petitioner-Appellant

v

PT Bank Mutiara Tbk, Respondent-Appellee

Set forth below precise, complete statement of relief sought:

Petitioner-Appellant requests that the record be

supplemented to include an expert report of Peter

Barrie Brown dated August 15, 2014 and that the

case be remanded to the district court for further

proceedings and reconsideration of the award of

approx. $600,000 of legal fees to Bank Mutiara and Quinn Emanuel.

**MOVING PARTY:** Weston Capital Advisors, Inc.          **OPPOSING PARTY:** PT Bank Mutiara Tbk

☐ Plaintiff                    ☐ Defendant
☑ Appellant/Petitioner         ☐ Appellee/Respondent

**MOVING ATTORNEY:** Charles B. Manuel, Jr.          **OPPOSING ATTORNEY:** Marc Greenwald

[name of attorney, with firm, address, phone number and e-mail]

Manuel & Associates, LLP

Quinn Emanuel Urquhart & Sullivan, LLP

1 Penn Plaza, Ste 2527, NY, NY 10119

51 Madison Ave., 27th Fl., NY, NY 10010

561-613-3960 -- cbm@manuel-law.net

212-849-7000 -- marcgreenwald@quinnemanuel.com

Court-Judge/Agency appealed from: S.D.N.Y. - Hon. Paul A. Crotty - 12-cv-6945

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?         ☐ Yes ☐ No
Has this relief been previously sought in this Court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

Is oral argument on motion requested?   ☑ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**
/s/ Charles B. Manuel, Jr.   **Date:** 6/29/16          Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Case No. 15-3198

-----------------------------------------------------------

WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,

v.

PT BANK MUTIARA TBK,
Respondent-Appellee.

-----------------------------------------------------------

## DECLARATION OF CHARLES B. MANUEL, JR.
## IN SUPPORT OF MOTION TO SUPPLEMENT RECORD AND TO
## REMAND CASE FOR CONSIDERATION OF ADDITIONAL EVIDENCE

I, Charles B. Manuel, Jr., an attorney admitted to practice before this Court,

make this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

### Introduction

1.  I submit this declaration in support of the application by Appellant

Weston Capital Advisors, Inc. to supplement the record on appeal and the

appendix, and to remand the case to the district court for further proceedings to

address the recently discovered document described below, which relates to the

application of, and the district court's award to, Quinn Emanuel Urquhart &

Sullivan, LLP for approximately $600,000 of legal fees. The document, read in

conjunction with fraudulent deception in the concurrent financial statement of

Bank Mutiara, evidences the participation of Quinn Emanuel in its client's

1

surreptitious payment of $8 million of stolen, laundered money as a legal fee to Quinn Emanuel at precisely the time that (i) Bank Mutiara was liable to First Global Funds Limited and Weston International Asset Recovery Company Ltd. for over $120 million in judgments upon acknowledged, continuously reported liabilities of the bank, and (ii) Bank Mutiara and Quinn Emanuel were demanding contempt orders and sanctions against one party and nine non-parties for the non-return of $3.623 million of money that had been paid upon an enforcement judgment that had been entered by the district court (which later rescinded its order as the product of its own error and that of former counsel). We are prepared to show upon remand that the disclosure of the payment of the money-laundered $8 million in London would have permitted FGFL to obtain an immediate Mareva freeze order upon its judgment that had been rendered in the courts of England's sister Commonwealth country of Mauritius.

2. Because the proceedings in the case at bar are proceedings in equity, the doctrine of unclean hands is applicable, as the parties and the court acknowledge. As demonstrated in this declaration, the report of Peter Barrie Brown, read in conjunction with the fraudulent financial statement of Bank Mutiara which is already in the record, unequivocally shows that Bank Mutiara and its counsel have jointly engaged in illegal money laundering activity that has prevented FGFL and WIARCO from obtaining an $8 million partial recovery on their judgments – at

exactly the time that Bank Mutiara was in the process of obtaining a contempt order, an expanded contempt order, and impossible sanctions against one party and nine non-parties herein for the non-return of less than half the amount of the stolen, laundered money. Rarely has the doctrine of unclean hands been more directly on point.

## I.    <u>Background</u>.

3.    At oral argument on June 7, 2016, in connection with the issue of Respondent's unclean hands, the Court inquired whether there are references in the record to illicit activities at Bank Mutiara. There are indeed a number of such references to illicit activities such as corruption, theft and embezzlement, one of which appears in Bank Mutiara's brief at page 3 (acknowledging that Bank Mutiara's "former management had embezzled millions of dollars of the bank's and its depositors' funds."). Additional details are cited in the cover letter of the undersigned accompanying this motion.

4.    But we were surprised when Quinn Emanuel, counsel for Bank Mutiara, suggested in their answering brief that illicit activity and breaches of legal obligations by Bank Mutiara ceased when the bank was taken over by the Indonesian Deposit Insurance Corporation[1] in 2008. ("In November 2008, Bank Mutiara was taken over by the Indonesian Deposit Insurance Corporation after its

---

[1] The Lembaga Penjamin Simpanan ("LPS").

former management had embezzled millions of dollars of the bank's and its depositors' funds. . . . [R]egulators and new management sought to unwind the prior misconduct and prepare Bank Mutiara to go forward . . . ." (Bank Mutiara Br. 3.)) Far from it. In reality, the regulators and new management have continued chiseling the bank's depositors and creditors (including Petitioner, its affiliates and its parent herein, which are the holders of by far the largest of the bank's debt obligations that had been recorded on the bank's books for eight years until they were simply erased from the books eighteen months ago), and they have perjured themselves and thumbed their noses at the courts of Mauritius, the United States and Indonesia throughout the bailout and post-bailout period:

- Liegey Declaration 11/13/13, ¶¶ 34-35 (A. 161-62) ("The distribution of $720 million from [the Bank Mutiara] bailout has been viewed by many as a scandal unto itself with millions of dollars funneled to politically-favored people and companies, political cronies, and quasi-governmental entities." Large private depositors, senior note bond holders (especially WCAI and WIARCO) and $140 million of small defrauded depositors of Bank Mutiara (see Antaboga note below) received nothing. See Exhibit C (March 2010 news report that the Indonesian "House of Representatives voted 325 to 312 that the [Bank Mutiara] bailout violated laws, directing law enforcement agencies to investigate further." (A. 173-75.) See also Exhibit K (A. 202-03), criticizing lack of transparency in bailout and the unexplained doubling of the cost, and opining that the legislature, in retrospect, would likely have approved liquidation).

- See also Liegey Declaration 11/13/13 ¶¶ 47-61 (A. 164-67) and Exhibits M-P thereto (A. 218-52), setting forth details that put the lie to the two-page Declaration of Ahmad Fajar, Director of the Treasury and International Banking of Bank Mutiara (the only declaration ever submitted by Bank Mutiara in this case), who perjuriously asserted that Bank Mutiara [as of late 2013 – five years after the bailout] has "no foreign operations."

- In 2014, after orders and judgments had been issued at four levels of the Indonesian court system, including the Supreme Court, for the payment of $3.3 million of deposits stolen by the bank from 27 smaller Bank Mutiara customers in the Discretionary Fund issued by PT Antaboga Delta Sekuritas Indonesia, the bank simply thumbed its nose at the courts of its own country, refusing to pay the judgment. (See reports at A. 549-55.) In May 2015, the Jakarta Post reported that the Surakarta District Court had ordered a seizure and auction of Bank Mutiara's assets to satisfy the judgment. (A. 1236.) But Bank Mutiara continued to defy the law and flout court orders. In its year-end 2015 financial statement, at pages 198-200, Bank Mutiara (now, PT Bank J Trust Indonesia) unilaterally declared that the "Supreme Court Decision is categorized as [a] Non-Executable Decision." (Financial Statement, which post-dates the district court decision herein, available upon request.)

- Plaintiffs' pursuit of $5,145,892.74 in Share Transfer Fee payment obligations and Capital Calls (recognized by Bank Mutiara in its audited financial statements as due and payable since December 17, 2014) for the FGFL delivery to Bank Mutiara of US$112,500,000 FGFL participating redeemable preference shares has been obstructed by Bank Mutiara/Bank JTrust Indonesia. (Liegey Decl. 4/17/15 [A. 772, 779], and Bank Mutiara 2014 Financial Statement (Exh. 5 to Liegey Decl.) Note 49(b) at 193 [A. 1060].) Far from challenging the claims or denying that it carries these senior liabilities on its books, Bank Mutiara has expanded the financial notes to its audited financial statements admitting to the liabilities. (Id.)

**II. Bank Mutiara's Laundering Money Stolen by the Saab Brothers, And the Fraudulent Misreporting of the Transactions.**

5. Perhaps the most stunning example of continuing illegal activity at Bank Mutiara arises from money laundering activity at the bank that began in 2006-2008 and continued through 2015 in the midst of proceedings in the district court in the case at bar, when Bank Mutiara and Quinn Emanuel placed themselves in the middle of a $40 million money laundering scheme in which the bank received $40

million from the Federal Bank of the Middle East and laundered $32 million of the money for FBME Cyprus and Saab Financial (Bermuda) Ltd., entities owned by the Saab brothers, who were also the co-owners of FBME.[2]

6. The matter was initially falsely and fraudulently misreported in the Audited Financial Statement of Bank PT J Trust Indonesia (formerly Bank Mutiara) for the Fiscal Year Ended December 31, 2014 as the settlement of litigation before the London Court of International Arbitration involving repurchase transactions between FBME Bank Limited and Bank Mutiara:

> Based on Statement of Case . . . filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration.

(See Audited Financial Y/E 2014 Note 49(f)(A)(7), A. 768.) The Audited Financial Statement further reported that:

> Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and Bank [Mutiara], both parties agreed that the Bank shall pay an amount of GBP5,000,000.

(*Id.*) Any reader would understand this to mean that Bank Mutiara was paying GBP5,000,000 (app'x. US$8,000,000) as the settlement amount to the Claimants, FBME Bank and Saab Financial (Bermuda) Limited. The Audited Financial Statement continues:

---

[2] Ayoub-Farid M Saab (50%) and Fady M Saab (50%).

> On December 2, 2014, the Bank has transferred funds amounted to GBP5,000,000 *to Quinn Emanuel's bank account as the Bank's Lawyer*. By receipt of such payment, therefore, this case has been closed.

(*Id.*, italics added.) Any reader would understand this to mean that the settlement money had been placed in an attorney escrow account for payment *to the Claimants*.

7.   Indeed, the deception worked like a charm: Bank Mutiara's FYE 2014 Audited Financial Statement actually was seen by Petitioner herein as a potentially positive development, indicating that J Trust Bank (Japan), the then-new owner of Bank Mutiara, might actually be acting responsibly to settle contractual obligations of the bank.  In his declaration dated May 5, 2015 as part of the record on the current motion, John Liegey cited and quoted from the section of the "recently issued" 2014 FYE Audited Financial Statement reporting on the settlement of the "repurchase transactions" as potentially "indicating that J Trust Japan and PT Bank J Trust Indonesia are desirous of resolving old legacy claims of Bank Mutiara . . . [and] may actually be prepared to bring this matter to a fair and just resolution." (See Liegey Declaration 5/5/15 at 24 n.8, A. 767-68.)

8.   But over the past two months we have learned the shocking truth:  (1) the bank's FYE 2014 Financial Statement was another outright fraud by J Trust Japan and Bank Mutiara, renamed PT Bank J Trust Indonesia; (2) the "repo transactions" were in fact a thin disguise for the laundering of $40 million for the Saab brothers

through the crooked Bank Mutiara, to be transferred to other Saab-owned entities, and (3) the payment of the GBP5 million/US$8 million "Settlement . . . amount" was in fact a payment of "Legal Fees" to Quinn Emanuel via the transfer of funds that had been stolen by the Saabs from FBME Bank Limited while it was under a global investigation, and then laundered by Bank Mutiara.

9.   Bank Mutiara knowingly brokered the laundering of $40 million that the Saab brothers extracted from their failing bank; Bank Mutiara retained $8 million of the laundered FBME money – 20% of the total amount of money it stole from FBME and then laundered – as its "fee" for the money transfers; and Bank Mutiara then transferred the $8 million of the laundered money to Quinn Emanuel – purportedly "as the Bank's Lawyer" handling the settlement payment to Claimants, but in fact as a "Legal Fee" for the law firm.  And as shown by the above-quoted passage from the Liegey Declaration, Bank Mutiara's audit fraud clearly deceived Petitioner herein, and presumably the rest of the community of Bank Mutiara's obligees, and it completely disguised the laundering and transfers by Bank Mutiara of $40 million of stolen funds, in which Quinn Emanuel was a direct participant as the arranger and recipient of $8 million of the stolen and laundered funds. Statutory audit fraud has been committed by Bank Mutiara each year since 2008 for non-disclosure of liabilities, illegal capital adequacy ratio reports, and unreported suspicious activity reports with respect to these money transfers. ***And***

*these latest acts of money laundering, theft and fraud upon Bank Mutiara's*

*creditors and depositors continues to this day; indeed, it took place smack in the*

*middle of preparation for the hearing of the present matter in the district court –*

*a hearing NOT to punish the criminal enterprise Bank Mutiara (because all*

*judgment enforcement, discovery[3] and other action by the judgment-creditor*

*Petitioners WCAI and WIARCI had been stayed by the district court), but rather*

*to annihilate these largest VICTIMS of Bank Mutiara's crimes.*

### III. <u>The Expert Report Commissioned by Bank Mutiara</u>.

10.     In the course of the London Court of International Arbitration

proceeding by FBME Bank Limited and Saab Financial (Bermuda) Limited against

Bank Mutiara to recover $38.5 million of the money that had been stolen by the

Saab brothers, an expert was retained for Bank Mutiara to analyze the purported

repurchase transactions at issue in the case. The expert, Peter Barrie Brown,

completed a detailed report dated August 15, 2014 that completely rejected Bank

Mutiara's lie that the matter simply involved "repurchase transactions"; the report

---

[3] It is most important to remember that, among several gross anomalies in this case, the aggrieved petitioner/judgment creditor was precluded from taking any discovery from the defrauding, crooked judgment debtor, while the judgment debtor was afforded unfettered discovery from the petitioner. On remand, petitioner must be afforded discovery to further confirm the facts set forth herein, and we respectfully submit that the current application may not rightfully be denied because the record is not entirely complete.

in fact amounts to a virtual indictment of Bank Mutiara as well as the Saab brothers for money laundering.[4]

11.    The findings of Bank Mutiara's expert include the following (with bracketed page references to the report):

- FBME transferred $40 million to Bank Mutiara and "affiliated third parties," which then retained $8 million as a "fee" for the transaction.  [30, 50]

- The transaction had "all of the hallmarks" [9] and "red flags" [32] of a money laundering transaction.

- "Both parties [FBME and Bank Mutiara] have been found by reliable institutions to have been associated with money laundering."  [9]

- "The economic effect of the transactions was for FBME to pass US$32 million to Saab Jersey at a cost of $8 million. . . . The purpose of the transaction was to launder FBME's money through bank accounts controlled by Bank Century [the prior name of Bank Mutiara], including accounts in the U.S. and Switzerland."  [55]

---

[4] For several years, Quinn Emanuel has also represented Federal Bank of the Middle East (its purported adversary in the LCIA proceedings) in investigative, enforcement and penalty proceedings before the banking authorities and courts in Cyprus, Paris and the United States.  Wikipedia reports:

> In 2014 the Financial Crimes Enforcement Network (FinCEN), a bureau of the United States Department of the Treasury, which collects financial transactional data and information in order to combat domestic and international money laundering, terrorist financing, and other financial crimes, accused FBME which operates primarily in Cyprus, of facilitating financial transactions for multinational organised crime organizations and Hezbollah. The Central Bank of Cyprus took over management of the bank . . . . The 21st of December 2015, the central bank of Cyprus revoked the branch license of FBME bank in Cyprus.

The FBME Limited website reports, as of May 27, 2016, a "ruling by Cyprus's Administrative Court to reject the application from FBME Bank Limited to suspend the planned moves of the Central Bank of Cyprus to revoke the license of FBME's local branch."

- "The $8 million is out of proportion with the [limited] risks it [Bank Century] undertook on the face of the documents, and more in line with the risks it was undertaking in facilitating a money laundering operation." [56]

- Bank Century got an opinion letter from a law firm "highlighting several serious issues in relation to these transactions [which] would have been a very strong flag for Bank Century. . . . The fact that Bank Century nevertheless entered into the transactions the same day it received the opinion is a strong indicator . . . that the transactions were in fact for money laundering purposes." [51]

- "FBME, Saab Jersey and Bank Century may instead have used the opaque transactions to cover up the money laundering transactions for the transfer of $32 million for an $8 million fee." [51]

- "I do not believe the purpose of the transaction was an honest one; the true purpose behind these transactions, shared by all parties, was the laundering of money." [56]

- "These transactions raise more red flags than any other arrangement I have encountered in my entire [48-year] career." [56]

## IV.  The Effectuation of the Fraud Disguising Criminal Money Laundering.

12.  Not surprisingly, the *FBME v. Bank Mutiara* case was settled in mid-October 2014, promptly after the expert report was issued. But Bank Mutiara retained the $8 million of laundered money that it had received as its "fee."  Then, less than two months later, on December 2, 2014 (soon after Bank Mutiara had been acquired by J Trust Bank of Japan, which has renamed it as PT Bank J Trust Indonesia Tbk), *Bank Mutiara and Quinn Emanuel took the remaining $8 million*

*of stolen/laundered money and arranged for it to be wired it to the account of Quinn Emanuel Urquhart & Sullivan LLP (UK) at Bank of America in London.*

13.   The payment of the $8 million as a "Legal Fee" to Quinn Emanuel rather than a settlement for FBME can be found through a forensic examination of the Statutory Audited Financial Statement of Bank Mutiara, FYE December 31, 2014.  Note 35 at page 118 of the Statement (see Exhibit 3-A hereto, which also appears at A. 992) shows the payment of total "Perkara/Legal Fees" by the bank in 2014 in the amount of IDR145,067,000,000, equal to US$11,713,120.71 at the then-current exchange rate (IDR12,385:US$1.00). This figure clearly included (but buried) the $8,000,000 payment to Quinn Emanuel. Average legal expenses for Bank Mutiara ran in the average amount of approximately IDR18-20 billion/US$1.5 million per year for the previous several years.  (Attached as Exhibit 3(A-D) are extracts of FYE 2014, 2013, 2012, 2011 with Note 35 on Non-Operating Fees, including Legal Fees.)

14.   The $8 million payment is shown nowhere else in BM's FYE 2014 Financial Statement (other than in the fraudulent Note 49), and in particular there is no entry anywhere on a balance sheet or income statement that shows a "settlement" payment of $8 million to FBME.  The $8 million was buried and undesignated in the "Legal Fees" shown in Note 35 so that no one (other than a determined litigation adversary) could discover that Bank Mutiara had not paid the

$8 million of laundered money in settlement with FBME but instead had paid the laundered money to Quinn Emanuel as a "Legal Fee."

15.   The Bank Mutiara FYE 2014 Financial Statement – as of just four weeks after the wiring of the legal fee – was thus a complete fraud.[5]  It falsely reported the original statement of claim in the arbitration as if the matter involved contractual "repo transaction[s]," even though the bank's own expert had reported and demonstrated unequivocally four months earlier that the repo transactions were simply a disguise for $40 million of money laundering by Bank Mutiara for the Saabs. The Financial Statement fraudulently reported a "Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and Bank [Mutiara], [under which] both parties agreed that the Bank shall pay an amount of GBP5,000,000" to the Claimants, when in fact there was no such settlement.   And the FYE 2014 Financial Statement fraudulently stated that, pursuant to the settlement, "the Bank has transferred funds amounted to GBP5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer," when in fact the payment was not to effectuate the settlement with FBME but was in fact the payment of GBP5,000,000/US$8,000,000 of laundered money as a "Legal Fee" to Quinn Emanuel.  (See Exhibit 2 at 204.)

---

[5]  The Notes of Legal Proceedings in such financial statements are almost invariably written by counsel responsible for the case – in this instance, Quinn Emanuel.

16.   As I noted at oral argument on the main appeal, all of this occurred while Bank Mutiara was subject to two Mauritian judgments in favor of FGFL and WIARCO that now, with interest, total approximately $130 million, as well as an Indonesian judgment of $3.3 million in favor of the Antaboga Depositors – upon obligations which were recorded on the bank's books and records, and all of which have been dishonored by Bank Mutiara.

17.   Nowhere does Bank Mutiara's 2014 Audited Financial Statement, issued in the spring of 2015, mention the theft of $40 million from FBME, the laundering of the $40 million through Bank Mutiara, the retention of $8 million of the stolen/laundered money as a "legal fee," or the payment of the stolen/laundered $8 million to Quinn Emanuel. Obviously, Bank Mutiara, in conjunction with its attorneys, sought to disguise the specifics of its continuing illegal activities from its judgment creditors – especially FGFL and WIARCO – and the legal authorities in various venues around the world.   Petitioners learned of this extraordinary, probably criminal conduct only when they recently received and reviewed the expert report, long after the opinion and judgment of the district court were issued in this case.

18.   Had Petitioners known that Bank Mutiara had moved GBP5,000,000/US$8,000,000 into a London bank account, they would have instantly obtained a Mareva freeze order, followed by a properly submitted

turnover order from the courts there – which would have mooted the entire issue now before this Court. This additional, vital information of Bank Mutiara's continuing frauds and illegal activities – and the filthy hands with which it has acted for over a decade, most recently in conjunction with its attorneys – are of the utmost importance to the disposition of the matter at hand.

19.  The documents relating to Bank Mutiara and its counsel's central role in a $40 million money laundering scheme, and Bank Mutiara's retention and transfer to Quinn Emanuel, during the pendency of this enforcement action, of the $8 million fee that Bank Mutiara received for its money laundering services, should be part of the record herein.    Accordingly, we respectfully submit the accompanying motion to expand the record and remand the action for further proceedings.

Dated:   New York, New York
         June 29, 2016

Respectfully submitted,

*<u>Charles B. Manuel, Jr.</u>*

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Petitioner-Appellant
Weston Capital Advisors, Inc.

15

# Exhibit 1

Peter Barrie Brown Expert Report

Commissioned by PT Bank Mutiara and

Quinn Emanuel

August 15, 2014

**IN THE MATTER OF AN LCIA ARBITRATION**

**LCIA Arbitration No. 132447**

**B E T W E E N**

### 1. FBME BANK LIMITED
### 2. SAAB FINANCIAL (BERMUDA) LIMITED

**Claimants**

**-and-**

### PT BANK MUTIARA TBK

**Respondent**

_____

**EXPERT REPORT**

**PETER BARRIE BROWN**
_____

**15 August 2014**

Tribunal:

Mr. Stephen Bond

Mr. Michael Brindle QC

Mr. Ken MacLean QC

**TABLE OF CONTENTS**

A.      **INTRODUCTION**................................................................**4**
1      Overview of the Proceedings Between FBME, Saab (Bermuda) and Mutiara.............4
      1.1     Issues Considered in This Report ....................................5
      1.2     My Expertise and My Duties as an Expert ............................5
            1.2.1   Current Role ....................................................6
            1.2.2   Previous Roles ..................................................6
            1.2.3   My Duties as an Expert ...........................................6
B.      **EXECUTIVE SUMMARY** ............................................**8**
C.      **ANTI-MONEY LAUNDERING FUNDAMENTALS**...................**10**
1      Overview Of Legislation and Regulations.................................10
      1.1     English Law ....................................................10
      1.2     Cypriot and Indonesian Law ......................................11
2      The Money Laundering Regulations 2007 ................................11
      2.1     Scope of the Money Laundering Regulations........................11
3      The Joint Money Laundering Steering Group (JMLSG)......................12
4      UK Sanctions Compliance ............................................13
5      The USA Patriot Act 2001 ............................................14
6      The 'Money Laundering Process'.......................................14
7      Summary of Money Laundering Warning Signs ...........................15
D.      **THE TRANSACTION ARRANGEMENTS** .......................**17**
1      Overview............................................................17
2      The Repo Transactions ...............................................21
      2.1     Repo Definition.................................................21
      2.2     The BPM Repo Transaction.......................................22
      2.3     The WLB Repo Transaction.......................................22
      2.4     The NAB Repo Transaction.......................................23
      2.5     The JPM Repo Transaction.......................................23
3      The Pledge Transaction...............................................23
4      The Third Party Repo Transactions .....................................25
      4.1     The CMP Repo Transactions......................................25
      4.2     The WWR Repo Transaction......................................26
5      The Promissory Note Transactions......................................27
6      The Third Party Credit Agreements .....................................28
7      The JPM Repo Transaction............................................29
8      Economic Impact of the Contractual  Arrangements For Each Party as at Da y One .29
      8.1     Cash Transfer ...................................................30
      8.2     Interest Amounts................................................30
      8.3     Securities......................................................32
E.      **ADDITIONAL INFORMATION RELATING TO THE TRANSACTION ARRANGEMENTS**...........................................**33**
1      Ongoing Transaction Arrangements ....................................33
      1.1     Change of Repo Rates............................................33
      1.2     Unwind of the WLB Repo Transaction..............................34
      1.3     Replacement of Matured Securities under the Repo Transactions .........34
2      Information Relating to Actual Cash Movements ..........................34
      2.1     SWIFT Statements ..............................................34
             2.1.1   The Repo Transactions ...........................................34
            2.1.2   The Promissory Note Transactions..................................35
            2.1.3   Other ..........................................................38

|   | 2.2 | Saab (Jersey) Transaction Summary | 38 |
| 3 | | Execution of Documentation | 40 |
|   | 3.1 | Back-dating of Sale and Purchase Agreements | 41 |
|   | 3.2 | Forward-dating of Sale and Purchase Agreements | 41 |
|   | 3.3 | Back-dating of the Pledge Agreement | 41 |
|   | 3.4 | Back-dating of the Promissory Notes | 41 |
|   | 3.5 | Lack of Governing Documentation | 41 |

**F.** **OTHER CONSIDERATIONS** ........................................................**43**
1 Mr. Rizvi ....................................................................................43
2 Regulatory Interventions..............................................................43
3 Other Relevant Matters Relating to the Transaction Arrangements ...........44
    3.1 Lack of Evidence Relating to whether the Securities were Actually Held in Relation to the Transaction Arrangements ...................................44
    3.2 Lack of Commerciality in the Positions Entered into by Certain of the Relevant Parties ....................................................................45
    3.3 Arbitrary Determination of Transaction Economics.......................45
        3.3.1 Cashflow Payments....................................................45
        3.3.2 The JPM Repo Transaction..........................................46
    3.4 Missing Documentation and Documentation Inconsistencies ...........48
    3.5 The Earlier Proposed Structure of the Transactions and the Adverse Legal Opinion .........................................................................50
    3.6 The Purpose Alleged by the Claimants.......................................51

**G.** **MY CONCLUSION IN RESPECT OF THE TRANSACTION ARRANGEMENTS** ...........................................................**54**
**H.** **EXPERT'S DECLARATION** ...................................................**57**

**I.** **Appendix I - Professional Experience and Qualifications**.................**58**
**J.** **Appendix II - Contracts and Documents Received**.........................**61**
**K.** **Appendix III - Data Disclaimer** ................................................**62**
**L.** **Appendix IV – Material exhibited with this Report** ......................**63**

## A.     INTRODUCTION

1.      I, Peter Brown, have been retained by Quinn Emanuel Urquhart & Sullivan UK LLP, solicitors acting for PT Bank Mutiara Tbk ("**Mutiara**") (formerly, PT Bank Century Tbk ("**Bank Century**")), as an expert in the field of anti-money laundering compliance, to provide my opinion on matters relating to relevant aspects of certain arrangements between FBME Bank Limited ("**FMBE**"), Bank Century and Saab Financial (Jersey) Limited ("**Saab (Jersey)**") arising out of arbitration proceedings which have been brought by FBME and Saab Financial (Bermuda) Limited ("**Saab (Bermuda)**") against Mutiara in the London Court of International Arbitration (the "**LCIA**").

2.      I set out the scope of this report in detail in Section A1.1 below.

3.      Capitalised terms used but not defined in this report have the meanings given to them in the documents listed in Appendix II.

## 1    OVERVIEW OF THE PROCEEDINGS BETWEEN FBME, SAAB (BERMUDA) AND MUTIARA

4.      FBME and Saab (Bermuda) are together claiming an aggregate payment under three repo transactions entered into between FBME and Bank Century. FBME and Saab (Bermuda) have calculated their claim on the basis that the securities, in respect of which FBME were the initial buyer, were 'held' by Bank Century on FBME's behalf as per the transaction confirmations.

5.      Accordingly, the amount claimed is either:

i)      US$37,097,064 which corresponds to the aggregate repurchase price owed by Bank Century to FBME under the three repo transactions; or

ii)     US$38,500,000, adjusted (if necessary) pursuant to the close-out mechanism under the governing master agreement, where US$38,500,000 corresponds to the proceeds of the securities (assuming a redemption price of 100%).

6.      Mutiara's response to the claim states that the transactions are invalid and/or unenforceable on the basis that the repo transactions were entered into as part of a

series of wider transaction arrangements which, in the absence of any explanation as to the commercial rationale, appear to be sham transactions designed to disguise transfers of money from FBME to Saab (Jersey).

## 1.1 Issues Considered in This Report

7. In this report I consider whether the transactions bear the hallmarks of money laundering. I analyse certain aspects of the transaction arrangements entered into between FBME, Bank Century, Saab (Jersey) and other parties detailed further in Sections D and E below from November 2006 until November 2008 when the Indonesian Deposit Insurance Company ("**IDIC**"), an independent agency of the Indonesian Government, took control of Bank Century.

8. In particular I provide my opinion of the following:

   i) an overview of the nature of money laundering, including a summary of the relevant legal regimes and typical 'warning signs' of a transaction tainted by money laundering;

   ii) the nature of the transactions (and connected arrangements) which are the subject of this arbitration (including the initial structure and subsequent dealings) to the extent that those matters bear warning signs of money laundering; and

   iii) an analysis of other 'warning signs' of money laundering present in the evidence.

9. I have based my analysis upon the documents that I have seen and which are listed in Appendix II.

10. Based upon the analysis described above, I provide my opinion as to the extent to which the transactions (and connected arrangements) bear the hallmarks of money laundering.

## 1.2 My Expertise and My Duties as an Expert

11. My CV is appended to this report as Appendix I.

5

### 1.2.1 CURRENT ROLE

12.  I am currently a Senior Consultant at the CCL Partnership ("**CCL**"). CCL is a consultancy and training firm which offers support and training in all aspects of compliance in a regulated regime for firms operating in and beyond the UK's financial services sector. In addition, I am acting as a Senior Advisor to Solum Financial Limited ("**Solum**") in relation to this matter. Solum is a consultancy firm which offers advisory services in all areas of capital markets.

### 1.2.2 PREVIOUS ROLES

13.  Before joining CCL in 2007, I was the Money Laundering Reporting Officer ("**MLRO**") for a Middle Eastern Bank's UK subsidiary company. This role followed working from 2001 for MHA Consulting, a firm with a business model similar in parts to CCL but with a narrower focus specifically on financial crime compliance matters. It was in that capacity that, for a number of years, I provided the help desk facility for a body called the Joint Money Laundering Steering Group ("**JMLSG**"), described in Appendix III.

14.  I began my career in 1968 as a graduate entrant to the bankers Glyn, Mills & Co., and subsequently worked in various other banking and fund management institutions before developing a specialism in anti-money laundering ("**AML**") compliance from the late 1980s. After gaining a broad basic knowledge of banks' services, I spent approximately 25 years undertaking internal audit work for my various employers in their offices in the UK, the Channel Islands, other European countries, the USA and the Bahamas.

15.  I hold a degree in Economics from the University of Essex, having graduated in 1968.

### 1.2.3 MY DUTIES AS AN EXPERT

16.  I have been assisted by members of the Solum team in the preparation of this report. All work has been carried out under my supervision and control and, as such, I can confirm that the opinions and conclusions that I express in this report are my own,

and are based on material facts that I have been made aware of in the course of preparing this report and on my expertise in money laundering compliance matters.

17.     I have, in the preparation of this report, been assisted by Thu-Uyen Nguyen (Partner), Susan Green (Senior Consultant), Kevin Liddy (Senior Advisor), Victoria Whiteman (Senior Consultant) and Dimitrios Giannarakis (Consultant) at Solum.

18.     I confirm that I am aware of my responsibilities to the Tribunal as an expert witness. The following documents regarding the duties and responsibilities of an expert have been provided to me and drawn to my attention and I have read them (although I understand that they are not all strictly applicable to an LCIA Arbitration):

i)      the Protocol for the Instruction of Experts to give Evidence in Civil Claims;

ii)     Part 35 of the Civil Procedure Rules;

iii)    the Practice Direction to Part 35; and

iv)     the Chartered Instituted of Arbitrators Protocol for the Use of Party-Appointed Expert Witnesses in International Arbitration.

7

## B.    EXECUTIVE SUMMARY

19.    In this report I have set out my opinions in relation to the hallmarks of money laundering that I have observed in respect of a series of transactions entered into between FBME, Bank Century and Saab (Jersey) (amongst others) in November 2006.

20.    For reference purposes, in Section C of my report, I provide:

    i)    an overview of the UK statutes and regulations relevant to money laundering, together with a brief comparison of those rules to the equivalent law in Indonesia and Cyprus;

    ii)    a description of the 'money laundering process'; and

    iii)    a summary of the obligations on firms and their staff.

21.    The UK's AML regime has many aspects to it, including drawing in sanctions compliance. Sources of authority are a mixture of statute, regulations, regulators' rules and market standards of best practice, all supported in the financial services sector by JMLSG Guidance.

22.    In my assessments and conclusions I have focused on all aspects of the UK's AML regime including statute law, regulations and best practice. I am not an expert in the equivalent Cypriot and Indonesian rules and regulations. However, on the basis of my brief perusal of those provisions, I believe that my conclusions are likely to be equally applicable in respect of those regimes.

23.    The information contained in Section C is referenced throughout my report, where I describe additional aspects relating to the transaction arrangements which support my opinion.

24.    In Section D of this report I have set out the facts relating to the contractual arrangements. Section E then deals with matters of an ongoing and operational nature. Together, these two Sections have enabled me to formulate my opinions on the structure and associated transaction and other arrangements.

25.     In summary, I have observed the following hallmarks of a money laundering structure (i.e. a structure put in place in order to obscure its real objective) in respect of these transactions:

    i)    the transaction arrangements are circular in nature and do not reflect genuine commercial transactions between commercial counterparties. The arrangements comprised a series of off-market transactions which did not take account of the underlying risks or otherwise reflect a commercial exchange of risks and rewards. Instead the economic terms of the underlying transactions appear to have been intentionally contrived to produce a particular overall economic impact for the counterparties;

    ii)    the arrangements are complex, opaque and are not in line with good practice based upon my experience;

    iii)    the arrangements were subject to missing, incomplete and inconsistent documentation;

    iv)    certain email exchanges that I have reviewed reference the back-dating and forward-dating of documentation;

    v)    both parties have been found, by reliable institutions, to have been associated with money laundering (albeit not specifically in respect of these transactions).

26.     In summary based upon all of the facts that I have been given, the transaction arrangements make no economic sense and bear all of the hallmarks of a structure that has been put in place in order to obscure the real objective.

27.     From what I have reviewed and based upon my experience in the area of anti-money laundering, I conclude that the fundamental arrangements and the ongoing operating arrangements create real suspicions that their true objective was money laundering.

28.     Indeed, the number of separate reasons for being suspicious are so many in total that I rate the whole arrangement and its operation to be the greatest collection of suspicious circumstances I have ever encountered in real life.

## C.     ANTI-MONEY LAUNDERING FUNDAMENTALS

## 1     OVERVIEW OF LEGISLATION AND REGULATIONS

## 1.1     English Law

29.     Money Laundering ("**ML**") is a criminal offence in the UK. The definition of money laundering is to be found in s340 (11) of the Proceeds of Crime Act 2002 (as amended) ("**PoCA**"), which establishes:

"*Money laundering is an act which*

*(a) constitutes an offence under section 327, 328 or 329,*

*(b) constitutes an attempt, conspiracy or incitement to commit an offence specified in paragraph (a),*

*(c) constitutes aiding, abetting, counselling or procuring the commission of an offence specified in paragraph (a), or*

*(d) would constitute an offence specified in paragraph (a), (b) or (c) if done in the United Kingdom.*"

30.     Section 7 of the Act embraces all of the basic, ongoing obligations for all persons, the potential offences that can arise, possible defences to them and possible penalties in the event of conviction.

31.     Sections 327, 328 and 329 of the Act each describe a money laundering offence. Because, collectively, they provide the crux of the UK's legal definition of money laundering, they are sometimes referred to informally as the 'three primary offences'. The opinion I reach in this report is therefore achieved against the substance of these three offences; there are other money laundering offences in the UK law which do not come into the definitional scope of s340 (11).

32.     S327 is entitled **Concealing etc** and the offence is defined as follows:

"*A person commits an offence if he:*

*(a) conceals criminal property;*

*(b) disguises criminal property;*

*(c) converts criminal property;*

*(d) transfers criminal property;*

10

*(e) removes criminal property from England and Wales or from Scotland or from Northern Ireland*".

33.  S328 is entitled **Arrangements** and the offence is defined as follows: "*A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person*".

34.  S329 is entitled **Acquisition, use and possession** and the offence is defined as follows:

    "*A person commits an offence if he:*

    *(a) acquires criminal property;*

    *(b) uses criminal property;*

    *(c) has possession of criminal property*".

## 1.2  Cypriot and Indonesian Law

35.  I have been provided with the *Prevention and Suppression of Money Laundering Activities Law 2007* (Cyprus) and the *Law Concerning the Crime of Money Laundering 2002* (Indonesia). I am informed by counsel that both statutes were in force when these transactions were put in place.

36.  I am not an expert in the AML regime in either Cyprus or Indonesia. However, on the basis of my perusal of these statutes, I am of the opinion that they define money laundering in a broadly similar way.

37.  I note that the AML regime in Cyprus is based upon the same Third Money Laundering Directive from the European Union as applies throughout all European Union member countries including the UK.

## 2  THE MONEY LAUNDERING REGULATIONS 2007

## 2.1  Scope of the Money Laundering Regulations

38.  In addition to PoCA, there are the statute-based Money Laundering Regulations 2007 ("**MLR**") which codify the day-to-day responsibilities of management in firms

11

whose business activities fall within the scope of the MLR; the MLR's scope, inter alia, embraces all financial services activities.

39. Responsibilities for senior management, as the governing body in any type of firm, include putting in place a regime of risk assessments, policies, procedures and controls for the prevention and detection of money laundering.

40. Detailed requirements include routine monitoring of the conduct of business for ML reasons and maintaining records of due diligence undertaken on all customers (the MLR use the word 'customer' for all types of business relationships, personal and impersonal, including those who would normally be referred to as clients and counterparties) and no business relationship is exempt from the obligation to undertake Customer Due Diligence to greater or lesser degrees.

41. Senior management must also put in place, and train staff on, the arrangements whereby any member of staff can report, "*as soon as practicable*", when they have any knowledge or suspicion of money laundering or when there are reasonable grounds whereby they should have known or suspected.

42. PoCA does not define suspicion; it is generally accepted that it would be impossible to do so for the purposes of law. However, cases precedent have led to industry guidance (see Section C3 below) indicating that suspicion must be more than fanciful or speculation and should be founded on facts. In financial services firms, those having suspicions will rarely be in a position to see and understand the totality of the ML situation. Rather, they will be identifying an incomplete picture, a 'slice' from somewhere in the middle of the money laundering process, described below. The lack of completeness must not prevent or preclude reporting; it would risk breaching the criminal failure to report offence. Staff training should help staff understand that their contribution through the suspicion reporting arrangements may be akin to a critical piece in a jigsaw puzzle, with law enforcement assembling the pieces of the jigsaw.

## 3    THE JOINT MONEY LAUNDERING STEERING GROUP (JMLSG)

43. The JMLSG is an independent group of trade associations and professional bodies operating in the financial services sector of the UK.

44.     The role of the JMLSG is to produce detailed guidance (**R-89**), written in everyday language, to assist management and staff in relevant firms to comply with all of their statutory and regulatory obligations relating to money laundering and sanctions compliance.

45.     The current JMLSG carries 'approved status', meaning that it has been formally approved by HM Treasury as guidance that must be taken into account by courts and regulators when assessing whether or not firms and/or individuals have acted in a manner compliant with statutory and regulatory obligations.

46.     Sections 7.26 to 7.28 inclusive in Chapter 7 in Part I of the JMLSG Guidance address the sorts of situations that may arise in the course of conducting business and to which staff should be expected to react. Such situations may initially strike a member of staff/management as being merely curious but further probing may move the matter into the realms of ML suspicion and, as such, warranting internal reporting and potential suspension of the business transaction whilst awaiting the granting of consent by law enforcement to allow the business to continue.
The situations illustrated do not constitute an exhaustive list, nor is any reporting obligation limited to circumstances that are illustrated in the three sections.

47.     Customer due diligence and money laundering risk management oblige UK firms to create meaningful money laundering risk assessments of all countries with which there will be dealings or other connections. The research underlying this country risk assessment should be rigorous and comprehensive, bringing in factors like the Financial Action Task Force ("**FATF**") list of high risk jurisdictions, sanctioned jurisdictions and any other relevant information, particulate when of an adverse nature.

## 4      UK SANCTIONS COMPLIANCE

48.     The UK's various anti-terrorist laws create a separate but parallel regime with which all firms must comply. To fail to do so creates a 'strict liability offence'. Funding terrorist activities is also a money laundering offence. So all firms must undertake checks against official lists of all people involved in or connected with all business relationships.

## 5     THE USA PATRIOT ACT 2001

49.    The USA Patriot Act has extra-territorial scope and authority, effectively wherever business activity is being undertaken that involves the US$ as the currency concerned. Consequently, firms worldwide conducting US$ business must be able to demonstrate that they are conducting such business in a manner that is US compliant as well as locally compliant, wherever they may be.

## 6     THE 'MONEY LAUNDERING PROCESS'

50.    The title 'Money Laundering Process' is not to be found in statute or regulation but in ML training material where it is presented as a three-stage ML process with sectional titles of Placement, Layering and Integration.

51.    Placement, the first stage, is seen as the point where the underlying predicate crime has been committed with the proceeds of that crime being criminal assets. At this stage, by committing the predicate, criminal-asset yielding crime, the criminal has also committed a s329 ML offence of acquiring, using or possessing the criminal assets. By whatever means necessary, the criminal has probably 'converted' those criminal assets into a monetary form to make it easier for the layering stage then to be undertaken.

52.    The third and final stage, Integration, is, for the criminal, the objective, such that they can judge themselves to have been successful as money launderers. Reaching this stage does not annul the risk of being charged either with the predicate crime or money laundering since both are criminal offences and therefore not subject to any time limits within which a prosecution need be mounted.

53.    In between, the second, Layering stage is totally in the determination of the criminal money launderer. What happens through this stage is as much or as little, as short term or as long term, as simple or as complex as the criminal determines. This stage of the process concludes when the criminal decides that a stage has been reached where the (criminal) assets can be integrated back into the legitimate economy and respectable society without any suspicion being aroused. Additionally, the criminal will wish that an audit trail so long and complex has been created that law enforcement will either be unable to trail back to prove the provenance of the assets

14

or will at least be disinclined to attempt to do so even when money laundering is suspected.

54.     In financial services sector firms, other than those undertaking retail, cash-based banking business, the likelihood of suspicions arising will normally be when the criminals are already active at the layering stage. Suspicions are therefore likely to be truly only suspicions because it is not possible for those employees to see back to whatever actually was the predicate crime or how the Placement stage has already been accomplished. This reality does not negate the obligation to report suspicion and any stand-alone feature of business being undertaken generating suspicion needs to be recognised for what it is. It may prove to be the critical piece in the jigsaw puzzle being worked on by law enforcement. Nothing that is based at least on some fact(s) should ever be thought to be too insignificant to qualify for the reporting obligation.

## 7     SUMMARY OF MONEY LAUNDERING WARNING SIGNS

55.     I set out below, a number of excerpts from the JMLSG Guidance which are recognised warning signs in relation to money laundering and which I am of the opinion have relevance in this matter.

### Excerpts from JMLSG Guidance - Section 7.26

➢     *transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity*

➢     *the use of non-resident accounts, companies or structures in circumstances where the customer's needs do not appear to support such economic requirements*

➢     *where the transaction being requested by the customer, or the size or pattern of transactions, is, without reasonable explanation, out of the ordinary range of services normally requested or is inconsistent with the experience of the firm in relation to the particular customer*

➢     *dealing with customers not normally expected in that part of the business*

15

➢ *transfers to and from high-risk jurisdictions, without reasonable explanation, which are not consistent with the customer's declared foreign business dealings or interests*

➢ *unnecessary routing of funds through third party accounts*

➢ *unusual investment transactions without an apparently discernible profitable motive*

56. I note that the term 'red flag' is not officially defined but commonly used in the industry to describe any situation or circumstance to which people should be expected to react because of the potential for money laundering. In the following Sections I have highlighted any areas which would raise concern from a money laundering perspective as a potential red flag.

## D.    THE TRANSACTION ARRANGEMENTS

57.    In this Section, I provide:

    i)    a description of the transaction arrangements as per the contractual documentation; and

    ii)    a summary of the economic impact of the transaction arrangements for each party.

58.    As I explained above, these are important preliminary steps in an AML analysis.

## 1    OVERVIEW

59.    In November 2008, FMBE and Bank Century (as they were then known) entered into a series of transactions with each other, Saab (Jersey) and additional third parties including PT. Canting Mas Persada ("**CMP**"), PT. Wibhowo Wadah Rejeki ("**WWR**") and it appears also Mr. Rafat Rizvi ("**Mr. Rizvi**") (along with other entities with which he appears to have been associated), (together the "**Third Parties**").

60.    For the purposes of my analysis in this Section I have analysed the transaction arrangements in place on 'day one' since I believe this to be the most relevant information in determining the overall transaction economics at the outset. Nonetheless, in Section E1 below I also comment upon the ongoing nature of the arrangements and in Sections F and G below I provide my opinions and conclusions in this respect.

61.    My analysis in this Section is based strictly on the terms of the contractual documentation entered into by the relevant parties however, I note that the validity of the relevant documentation is also a matter of uncertainty and I comment on this further in Section E3 and F3 below.

62.    I set out below the individual transactions and accompanying documentation that comprise the transaction arrangements, as I refer to them:

i)   the Global Master Repurchase Agreement ("**GMRA**") (between FBME and Bank Century dated 20 November 2006 (**C-1**)), the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (each dated 22 November 2006 between Bank Century and FBME (**C-36**)), (each defined in Section D2 below and together the "**Repo Transactions**");

ii)  the Pledge Agreement (between FBME and Bank Century dated 20 November 2006 (**R-2**)) and the Transfer Authorisations (between FBME and Bank Century dated 29 November 2008 (**R-3**)), (together the "**Pledge Transaction**");

iii) the CMP Repo Transactions (each between Bank Century and CMP dated 28 November 2008 (**R-4** and **R-5**)) and the WWR Repo Transaction (between Bank Century and WWR dated 30 November 2008 (**R-6**)), (together the "**Third Party Repo Transactions**");

iv)  the CMP Loan (between CMP and Saab (Jersey) dated 22 November 2006 (**R-34**)) and the WWR Loan (between WWR and Saab (Jersey) dated 22 November 2006 (**R-35**)), (each defined in Section D5 below and together the "**Promissory Note Transactions**").

63.  As I explain in Section E3 below, however, the dates on the face of these documents cannot be considered to be reliable.

64.  In addition, I note that on 3 December 2007, Bank Century entered into credit agreements with WWR and CMP (respectively the "**WWR Credit Agreement**" and the "**CMP Credit Agreement**" and together the "**Third Party Credit Agreements**" **R-7** and **R-8**). I understand that these Third Party Credit Agreements were intended to replace the Third Party Repo Transactions. I describe these further in Section D6 below.

65.  The transaction arrangements are summarised in Figure 1 and Figure 2 below with reference to:

i)   the day one movement of cash and securities; and

18

ii) the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison.

66. I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis. However, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis of interest amounts upon a one month equivalent calculation. In my view, this is the best way of analysing the relative economic impact of the contracts despite their different terms. My detailed analysis of the 'day one' relative economic impact of the contracts is at Section D8 below. My analysis of the actual economic impact of the transactions – which is quite different – is at Section E2 below.

*Figure 1: Summary of Day One Cash and Securities Movements as a Result of the Transaction Arrangements*



19

*Figure 2: Summary of the One Month Equivalent Interest Amounts as a Result of the Transaction Arrangements* (based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison)



67.     I note that I have not been provided with any contractual documentation relating to arrangements involving Mr. Rizvi however for reasons described in Section E2 below, I understand that Mr. Rizvi (and other entities with which he appears to have been associated) was involved in the transaction arrangements.

68.     This is supported by information set out in the Claimants' Request for Arbitration (Paragraph 15.3), the Claimants' Reply (Paragraph 14.3) and a transaction summary provided in relation to Saab (Jersey) showing credits to Saab (Jersey) but involving Mr. Rizvi of US$12,180,000 (**R-50**).

69.     I note that there is some confusion surrounding whether the credit amount of US$400,000 on 22 December 2006 should in fact have been reflected as a debit rather than a credit ( see Paragraph 48 of Mr. Wazzi's Witness Statement). For the purposes of my analysis I have assumed this to be a credit, because that is how it is reflected in the contemporaneous documents (**R-50**), and have therefore reflected an amount of US$12,180,000 in my analysis. The Saab (Jersey) transaction summary is described in more detail in Section E2.2 below.

20

70.    Mr. Rizvi's involvement is opaque and I understand involved numerous other third
       parties, however for the purposes of my analysis in Figure 1 and Figure 2 I have
       assumed that Mr. Rizvi's involvement was in a similar capacity to that of CMP and
       WWR. Such assumptions are highlighted using dotted lines in the relevant figures.

71.    I note that Mr. Rizvi's involvement in the arrangements in itself provides a red flag
       warning from a money laundering perspective, as it is unusual to have personal
       involvement by a senior official of a bank that is party to an agreement.

72.    In the following Sections I describe each of the four components of the transaction
       arrangements in detail based upon their contractual documentation.

## 2    THE REPO TRANSACTIONS

### 2.1    Repo Definition

73.    A repurchase agreement ('*repo*') is a short-term borrowing transaction between two
       parties comprising an agreement (i) for the seller to sell a security to the buyer (the
       '*near leg*') and (ii) for the seller to buy back that same security at an agreed price
       and date in the future (the '*far leg*'). The original buyer (seller) of the security
       effectively acts as a lender (borrower) of cash, and the underlying security serves as
       collateral for a secured cash loan for an agreed period of time at a pre-determined
       rate of interest (the '*repo rate*').

74.    The difference between the day one market value of the securities serving as
       collateral in respect of the borrowing and the amount of cash lent under the repo
       agreement is referred to as the '*haircut*'. It is typically expressed as a percentage of
       the day one market value of the securities.

75.    The date on which the near leg takes place can be referred to as the '*settlement date*'
       or the '*sale date*' and the date on which the far leg takes place is typically referred to
       as the '*repurchase date*'.

76.    It is customary under a repo agreement for a physical exchange of the securities to
       take place on the sale date, either directly to the buyer of securities or, in the case of
       a tri-party repo agreement, to a third party agent (such as a custodian or clearing

organisation) acting as an intermediary. The original seller of the securities remains the beneficial owner of the underlying securities.

77. The Repo Transactions entered into by FBME and Bank Century comprised the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (defined below), each (allegedly) governed by a GMRA. (I say "allegedly" because, as I will explain below, the first repo transactions appear to have been entered into before the GMRA was put in place).

78. In each case, FBME was the initial buyer and Bank Century was the initial seller of securities.

79. I note that each of the sale confirmations forming part of the Repo Transactions states that the securities would be held by Bank Century on FBME's behalf, as such there was no physical exchange of securities.

## 2.2    The BPM Repo Transaction

80. The "**BPM Repo Transaction**" was in respect of US$15,000,000 of Banco Popolare di Milano variable rate Certificates of Deposit with ISIN XS0179811616 (the "**BPM Securities**").

81. The sale date was 22 November 2006 and the sale price was 98.50%, equal to US$14,775,000.

82. The (re)purchase date was 22 December 2006 and the (re)purchase price was 98.9310%, equal to US$14,839,650, resulting in an equivalent repo rate of 5.25%.

## 2.3    The WLB Repo Transaction

83. The "**WLB Repo Transaction**" was in respect of US$3,000,000 of Westdeutsche Landesbank Plc variable rate Certificates of Deposit with ISIN XS0177710356 (the "**WLB Securities**").

84. The sale date was 22 November 2006 and the sale price was 100%, equal to US$3,000,000.

22

85.     The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$3,013,125, resulting in an equivalent repo rate of 5.25%.

## 2.4     The NAB Repo Transaction

86.     The "**NAB Repo Transaction**" was in respect of US$7,000,000 of National Australia Bank variable rate Certificates of Deposit with ISIN XS0179785190 (the "**NAB Securities**").

87.     The sale date was 22 November 2006 and the sale price was 100%, equal to US$7,000,000.

88.     The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$7,030,625, resulting in an equivalent repo rate of 5.25%.

## 2.5     The JPM Repo Transaction

89.     The "**JPM Repo Transaction**" was in respect of US$15,000,000 of JP Morgan securities with ISIN XS0258843969 (the "**JPM Securities**").

90.     The sale date was 22 November 2006 and the sale price was 101.5%, equal to US$15,225,000.

91.     The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.994%, equal to US$15,291,600, resulting in an equivalent repo rate of 5.25%.

## 3     THE PLEDGE TRANSACTION

92.     The Pledge Agreement between FBME and Bank Century was dated 20 November 2006 (although as I explain below, it appears to have been executed some time later).

93.     The agreement specified that FBME as pledgor would pledge certain securities to Bank Century, the pledgee, by way of a Participation Agreement. It is stated in the agreement that FBME will simultaneously enter into a "*Bank Facility Agreement*" with Bank Century.

94.     Schedule A to the Pledge Agreement states that:

23

i)    US$15,000,000 Banco Popolare di Milano variable rate Certificates of Deposit due 30 October 2008 and with ISIN XS017981616 will be pledged to WWR for the loan facility of $11,820,000 from Bank Century; and

ii)    US$3,000,000 Westdeutsche Landesbank Plc variable rate Certificates of Deposit due 4 November 2008 and with ISIN XS017710356 and US$7,000,000 National Australia Bank variable rate Certificates of Deposit due 3 November 2008 and with ISIN XS178785190 will be pledged to CMP for the loan facility of US$8,000,000 from Bank Century.

95.    I note that the Pledge Agreement itself contains a number of inconsistencies.

96.    Firstly, I note that I have not seen any documentation in respect of a "*Bank Facility Agreement*" or "*Participation Agreement*" between FBME and Bank Century, and I understand that FBME accepts that neither document exists (Paragraph 50 of Mr. Wazzi's Witness Statement).

97.    Secondly, whilst the parties to the agreement are specified as FBME and Bank Century, and the body of the agreement provides that the securities will be pledged to Bank Century, the details of the pledge specified in Schedule A provide that the securities will in fact be pledged to WWR and CMP, companies which are not party to the agreement.

98.    Such drafting renders the document potentially confusing and/or misleading which in my experience can be a red flag warning in relation to money laundering. It is particularly concerning because it appears to have been executed in late December 2008 (and then backdated, as I explain below), after the Third Party Repo Transactions had been entered into, and after the securities had been (apparently) transferred to WWR and CMP pursuant to the authorisations I describe below. This is a further red flag, in my view, because in that light it seems very unlikely to me that the parties could have intended to implement the Pledge Agreement on its terms.

99.    As I mentioned above, two transfer authorisation letters which were sent by FBME to Bank Century on 29 November 2006, authorising Bank Century to transfer free of payment:

i)    the BPM Securities to WWR; and

ii)    the WLB Securities and the NAB Securities to CMP.

100.    I note two issues with the arrangements above.

101.    Firstly, I note that in order for the terms of the Third Party Repo Transactions to have been fulfilled, CMP and WWR would have needed to be the legal owners of the securities and it is not clear to me that this would have been achieved under the Pledge Agreement, if this was its intended purpose. However, I note that this is a legal point.

102.    Secondly I note that the 'transfer authorisations' appear to be inconsistent with the overall transaction arrangements as they continued (described further in Section E1 below). In particular, FBME and Bank Century do not appear to have entered into any separate agreement governing how the transfer authorisations impact on their rights and obligations under subsequent rolls of the Repo Transactions. In fact, they appear to have continued to enter into rolling repo transactions with respect to these same securities, even though FBME appears to have transferred its interest in them to the Third Parties. This is one of the serious inconsistencies in or uncommercial aspects of the transactions which, in my view, can be a hallmark of money laundering.

# 4    THE THIRD PARTY REPO TRANSACTIONS

103.    In late November, Bank Century entered into additional repo transactions with third parties as described below.

## 4.1    The CMP Repo Transactions

104.    Two repo transactions were entered into between Bank Century and CMP. Under both repo transactions:

i)    Bank Century was the initial buyer and CMP was the initial seller of the securities;

ii)    the initial sale date was 29 November 2006; and

iii)   the repurchase date was 29 November 2007.

105.   One of the repo transactions specified an initial sale price of US$5,661,250 and a repurchase price of US$6,300,000, giving rise to an effective repo rate of 11.13%.

106.   Under Annex 1 of this repo transaction, details of the relevant securities and the associated repo price calculations were provided. The repo price is defined as the price multiplied by one minus the haircut. The securities referenced were the NAB Securities and the price was 100% which I note is consistent with the sale price under the NAB Repo Transaction. The haircut was 10%, giving rise to a repo price of 90% and hence a repurchase price of US$6,300,000.

107.   The other repo transaction specified an initial sale price of US$2,426,250 and a repurchase price of US$2,700,000 giving rise to an effective repo rate of 11.13%. No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

i)   a notional of US$3,000,000, equivalent to that of the WLB Securities; and

ii)   a price of 100%, consistent with the sale price under the WLB Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$2,300,000 which is consistent with the repurchase price specified under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the WLB Securities.

108.   I note that the agreements underlying the CMP Repo Transactions provide for a term of one year - they do not provide for monthly payments of interest.

## 4.2   The WWR Repo Transaction

109.   A repo transaction was entered into between Bank Century and WWR. The terms of the repo transaction were as follows:

i)   Bank Century was the initial buyer and WWR the initial seller of the securities;

26

ii)    the initial sale date was 30 November 2006;

iii)   the repurchase date was 30 November 2007; and

iv)    the sale price was US$11,949,281.25 and the repurchase price was US$13,297,500 giving rise to an effective repo rate of 11.13%.

110.    No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

i)     a notional of US$15,000,000, equivalent to that of the BPM Securities; and

ii)    a price of 98.5%, consistent with the sale price under the BPM Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$13,297,500 which is consistent with the repurchase price under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the BPM Securities.

111.    Under the WWR Repo Transaction, the parties are initially defined as Bank Century and CMP however in the body of the document the parties referred to are Bank Century and WWR. I am of the opinion that the correct parties to the repo transaction should be Bank Century and WWR which is consistent with the Credit Agreement entered into by Bank Century and WWR upon the maturity of the WWR Repo Transaction, described further in Section D6.

112.    As with the CMP Repo Transactions, I note that the agreement underlying the WWR Repo Transactions provides for a term of one year - it does not provide for monthly payments of interest.

113.    I note that I have not seen any information in respect of similar arrangements relating to the JPM Securities.

## 5    THE PROMISSORY NOTE TRANSACTIONS

114.    On 22 November 2006, Saab (Jersey) entered into two promissory notes with CMP and WWR respectively (each the "**CMP Loan**" and the "**WWR Loan**"). I note,

however, that there are reasons to believe that the promissory notes were not in fact issued on 22 November 2006 which I discuss further in Section E3.4.

115.    Under the CMP Loan between Saab (Jersey) and CMP, Saab (Jersey) was the beneficiary of a loan from CMP for US$8,000,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

116.    Under the WWR Loan between Saab (Jersey) and WWR, Saab (Jersey) was the beneficiary of a loan from WWR for US$11,820,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

117.    I note that both the CMP Loan and the WWR Loan provide for interest to be payable upon maturity only – they do not provide for monthly payments.

118.    I note that I have not seen any additional information relating to the loans intended to be extended, or extended in respect of the JPM Securities.

## 6    THE THIRD PARTY CREDIT AGREEMENTS

119.    The Third Party Credit Agreements appear to have been entered into on 3 December 2007, apparently (as I explain in this section) to replace the Third Party Repo Transactions.

120.    The Third Party Credit Agreements extended a credit facility (in Indonesian rupiah) to WWR and CMP, at an interest rate of 12% per annum, in return for security. Based upon a US dollar Indonesian rupiah exchange rate of 0.107181[1] as of 3 December 2007, the credit facilities to WWR and CMP were equivalent to approximately US$13.0mm and US$8.8mm respectively, which are similar in size to the WWR Repo Transaction and the CMP Repo Transactions respectively. I note that the interest rate of 12% under the Third Party Credit Agreements compared to an effective repo rate of 11.13% under the Third Party Repo Transactions.

---

[1] Source: Bloomberg

28

121. In the documentation that I have seen there is no explicit reference to the specific securities however, the notional amounts specified in Article 11 of each of the WWR Credit Agreement and the CMP Credit Agreement are US$15,000,000 and US$10,000,000 respectively, which, is consistent with the BPM Securities in respect of the WWR Credit Agreement and the NAB Securities and the WLB Securities in respect of the CMP Credit Agreement.

122. In my opinion, the relevant securities were therefore, the BPM Securities, the WLB Securities and the NAB Securities.

123. Given that the Third Party Repo Transactions had repurchase dates of 29 November 2007 and 30 November 2007, and that the economic effect of the Third Party Credit Agreements is similar in effect to the Third Party Repo Transactions, I believe that the Third Party Credit Agreements were executed to replace the Third Party Repo Transactions upon their termination (albeit with a small date mismatch).

## 7 THE JPM REPO TRANSACTION

124. I note that no documentation has been provided in respect of the arrangements resulting from the JPM Repo Transaction. However, as described in Paragraph 67 above, I am of the opinion that these arrangements involved additional third parties and ultimately Mr. Rizvi (and other entities with which he was associated), who I understand to have been a director and shareholder of Bank Century in addition to numerous other business interests at the relevant time.

125. Accordingly for the purposes of my analysis in Section D8 below I have focused upon the arrangements involving CMP and WWR however, I assume that similar arrangements to those entered into by CMP and WWR were entered into by Mr. Rizvi.

126. The very absence of contractual documentation in respect of these arrangements is in itself a red flag warning in relation to money laundering.

## 8 ECONOMIC IMPACT OF THE CONTRACTUAL ARRANGEMENTS FOR EACH PARTY AS AT DAY ONE

### 8.1 Cash Transfer

127. The overall economic impact of the transaction arrangements appears to have been for FBME, to 'pay' US$8,000,000 in order to transfer US$32,000,000 of its cash to Saab (Jersey). I have shown this diagrammatically in Figure 3 below.

*Figure 3: Overview of Cash Movement as a Result of the Transaction Arrangements*



### 8.2 Interest Amounts

128. In this section, I provide an overview of the impact of the transactions from the point of view of the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation, but using a one month interest calculation for the purposes of comparison. I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis. However, as I explained above, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis upon a one month equivalent calculation for each leg of the transaction. This enables me to compare 'apples with apples' in order to analyse the relative economic impact of the contractual arrangements for each party. In Section E2 below, I analyse the *actual* economic impact, in terms of actual money flows.

129. I note that the one month equivalent interest amounts due by Saab (Jersey) under the CMP Loan and the WWR Loan, effectively match the one month equivalent interest amounts owed to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and WLB Repo Transaction (corresponding to the WWR Loan). This is shown diagrammatically in Figure 2, and is summarised in Table 1 below.

*Table 1: Summary of One Month Equivalent Interest Amounts from FBME/ Saab (Jersey)'s*

30

*perspective (US$)*

| | Repo Transactions | Promissory Notes |
|---|---|---|
| **BPM Repo Transaction / WWR Loan** | 64,641 | (65,577) |
| **NAB and WLB Repo Transactions / CMP Loan** | 43,750 | (44,384) |
| **JPM Repo Transaction / Mr. Rizvi** | 66,609 | (67,574) |

130. Based upon the one month equivalent interest amounts summarised in Figure 2, the net position for each party relating to interest can be summarised as follows:

i) taking FBME and Saab (Jersey) together – because they have common ultimate beneficial owners – the one month equivalent interest amount due by Saab (Jersey) under the CMP Loan and the WWR Loan, is effectively offset by the one month equivalent interest amount payable to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan). In other words, *all* of the money paid by FBME flows back to Saab (Jersey);

ii) from Bank Century's perspective the one month equivalent interest amount due under the Third Party Repo Transactions (in respect of the CMP Repo Transaction and the WWR Repo Transaction only) and the one month equivalent interest amounts payable under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan) results in an apparent net gain for Bank Century of US$80,003 per month;

iii) from CMP's perspective the one month equivalent interest amount due under the CMP Loan and the one month equivalent interest amount payable under the CMP Repo Transaction results in an apparent net loss for CMP of US$31,658 per month;

iv) from WWR's perspective the one month equivalent interest due under the WWR Loan and the one month equivalent interest payable under the WWR Repo Transaction results in an apparent net loss for WWR of US$46,775 per month; and

31

v)   the combined impact for CMP and WWR together is an apparent net loss of US$78,433 per month.

131.   The resulting transaction economics described above raise concerns from a money laundering perspective due to the possible lack of commerciality, since FBME/Saab (Jersey) do not appear to have any profit motivation for entering into the arrangements.

132.   Furthermore, it appears that Saab (Jersey) actually made monthly payments to Bank Century and a company called PT Kuo Capital Raharja ("**Kuo Capital**") despite neither of these entities having a direct contractual relationship with Saab (Jersey).  I have also not seen any evidence of payments from Saab (Jersey) to WWR and CMP, as I would have expected to see at the end of term of the Promissory Notes.  This is discussed in Section E2.2 below. In my experience, such an arrangement is a classic example of a red flag situation in relation to money laundering.

## 8.3   Securities

133.   Based solely upon the contractual documentation, the securities were initially purchased by FBME under the Repo Transactions however rather than a physical transfer taking place, the securities were held by Bank Century on FBME's behalf.

134.   Subsequently, under the Transfer Authorisations, these securities were transferred, free of payment to CMP and WWR.

135.   Finally, under the Third Party Repo Transactions, the securities were (re)purchased by Bank Century.

136.   The overall effect of the transaction arrangements therefore is that the securities both started off and ended up with Bank Century which I discuss in Section F below.

# E. ADDITIONAL INFORMATION RELATING TO THE TRANSACTION ARRANGEMENTS

## 1 ONGOING TRANSACTION ARRANGEMENTS

137. My understanding is that the transaction arrangements in their broad form stayed in place from November 2006, when the transactions were initiated, until November 2008 when Bank Century was taken over by the IDIC, an independent agency of the Indonesian Government.

138. I understand that certain elements of the underlying transactions changed, however, based upon my analysis, these changes did not affect the broad economic impact for the relevant parties. I describe the changes that I am aware of in Sections E1.1 to E1.3 below.

139. I note however that in remaining in place until November 2008, the component transactions continued beyond the maturity of the relevant underlying agreements.

140. I also note that, save for:

i) sale and purchase confirmations relating to the Repo Transactions and subsequent 'rolls' thereof (**C-101**) (I note that many of the confirmations in C-101 are unreadable and as such I have not been able to verify the complete history of transactions. I also note that I have not seen supporting evidence (for example in the form of email requests) for each of the rolls documented in C-101); and

ii) the WWR and CMP Credit Agreements described in Section D6 above, with maturities of 3 June 2008 and 3 February 2008 respectively,

I have not seen any documentation to support the roll of the transaction arrangements beyond their respective maturity dates. This absence of documentation is yet another red flag warning in relation to money laundering.

## 1.1 Change of Repo Rates

141. I have reviewed several emails relating to a change of repo rates under the Repo Transactions in light of interest rate changes in the market (**R-73** to **R-77**). I note that each of these emails originate from Mr. Wazzi as opposed to Bank Century.

## 1.2 Unwind of the WLB Repo Transaction

142. Based upon a repayment of US$2,400,000 made by Saab (Jersey) described in Section E2 below, I am of the opinion that the arrangements in respect of the WLB Securities were unwound.

## 1.3 Replacement of Matured Securities under the Repo Transactions

143. On 27 October 2008, just prior to the maturity of the BPM Securities on 30 October 2008, I understand that a replacement repo transaction was entered into referencing US$16,000,000 August 2011 US treasury strips (**C-2**).

144. On 6 November 2008, just after the maturity of the NAB Securities on 3 November 2008, I understand that a replacement repo transaction was entered into referencing US$7,500,000 August 2011 US treasury strips (**C-2**). I note that in this case the replacement repo transaction was subject to a 3 day delay after the maturity of the NAB Securities.

## 2 INFORMATION RELATING TO ACTUAL CASH MOVEMENTS

### 2.1 SWIFT Statements

145. Below I set out the cash movements that I have been able to identify in relation to each of the components of the transaction arrangements.

#### 2.1.1 THE REPO TRANSACTIONS

*Principal*

146. In relation to the Repo Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

34

i)      a payment of US$15,225,000 from FBME to Bank Century on 22 November 2006 (**C-4**). I understand this to be the movement of cash associated with the near leg of the JPM Repo Transaction;

ii)     a payment of US$14,775,000 from FBME to Bank Century on 22 November 2006 (**C-5**). I understand this to be the movement of cash associated with the near leg of the BPM Repo Transaction;

iii)    a payment of US$7,000,000 from FBME to Bank Century on 22 November 2006 (**C-7**). I understand this to be the movement of cash associated with the near leg of the NAB Repo Transaction; and

iv)     a payment of US$3,000,000 (**C-40**) from FBME to Bank Century on 22 November 2006. I understand this to be the movement of cash associated with the near leg of the WLB Repo Transaction.

### *Interest*

147.    I have been provided with a series of SWIFT confirmations in respect of payments made by FBME to Bank Century (**R-70**). I have compared the SWIFT payments from January to September 2007 with the interest amounts under the corresponding repo transactions entered into in respect of the relevant dates (**C-101**) and I am able to reconcile these amounts. As such, on the basis of a preliminary analysis, these payments appear to be consistent with the payments of interest due under the relevant repo transactions, however, since I am unable to read certain of the SWIFT confirmations and/or the relevant repo agreements, I have not been able to perform a further analysis.

### 2.1.2   THE PROMISSORY NOTE TRANSACTIONS

### *Principal*

148.    In relation to the Promissory Note Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

i)      a payment of US$8,050,000 from CMP to Kuo Capital on 30 November 2006 (**R-52**); and

ii)    a payment of US$11,882,000 from WWR to Kuo Capital on 1 December 2006 (**R-52**).

149.    I note that Kuo Capital is not a party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

*Interest*

150.    I have reviewed SWIFT confirmations setting out the following cash payments by Saab (Jersey) to various other parties (**R-63**). The amounts are consistent with the notional and interest rates specified under the Promissory Note Transactions however, I note below a series of important inconsistencies.

*Figure 4: Payments between Saab (Jersey) and Various Parties*

| Date | Sender | Beneficiary | Amount (US$) |
|------|--------|-------------|--------------|
| 19-Jan-07 | Saab (Jersey)[1] | Bank Century | 256,942.50 |
| 21-Feb-07 | Saab (Jersey)[1] | Kuo Capital | 115,203.75 |
| 21-Feb-07 | Saab (Jersey)[1] | First Gulf Asia Holdings | 70,796.25 |
| 21-Mar-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.25 |
| 20-Apr-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.55 |
| 23-May-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 22-Jun-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 24-Jul-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 24-Aug-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 26-Sep-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 26-Oct-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 28-Nov-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Dec-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.11 |
| 28-Jan-08 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 27-Feb-08 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Mar-08 | Saab (Jersey)[1] | Kuo Capital | 177,222.22 |
| 24-Apr-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 27-May-08 | Saab (Jersey)[1] | Kuo Capital | 160,000.00 |
| 27-Jun-08 | Saab (Jersey)[1] | Kuo Capital | 176,000.00 |
| 30-Jul-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 29-Aug-08 | Saab (Jersey)[1] | Kuo Capital | 170,666.67 |
| 25-Sep-08 | Saab (Jersey)[1] | Kuo Capital | 131,733.33 |
| 24-Oct-08 | Saab (Jersey)[1] | Kuo Capital | 152,933.33 |

[1] Payments made by Mr. Farid and/or Fadi Saab

151. I note several anomalies relating to the cash movements set out above.

152. Firstly, as per Paragraph 149 above, I note that Kuo Capital is not party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

153. Secondly, the payments appear to have been made from personal accounts of Mr. Farid and/or Fadi Saab as opposed to accounts held in the name of Saab (Jersey).

154. Thirdly, the payments of interest appear to occur monthly however, according to the terms of the CMP Loan and the WWR Loan, the payment of interest is due at maturity, as opposed to on a monthly basis.

155. Fourthly, I note that there is a payment directly to Bank Century of US$256,942.50 (highlighted in yellow) on 19 January 2007. Such a payment is not supported by any contractual documentation that I have seen and I note that according to an email dated 25 January 2007 from Bank Century to FBME, Bank Century request that a reference to Kuo Capital be made in the payment instructions in relation to this payment so as to "*comply with procedures*"(**R-61**).

156. Finally, there is a payment of US$70,796.25 (highlighted in yellow) to First Gulf Asia Holdings Limited. This payment is also not supported by any contractual documentation that I have seen, however, I note that:

    i)   in an email exchange between Mr. Rizvi and Mr. Wazzi dated 21 February 2007, Mr. Rizvi states "*[obscured] interest due to us should be paid to*" and bank details for First Gulf Asia Holdings Limited are detailed below (**R-62**);

    ii)  in a letter to Federal Bank of Lebanon on 21 February 2007, Mr. Fadi Saab authorises the debit of his account to credit First Gulf Asia Holdings Limited for an amount of US$70,796.25 (**R-64**);

    iii) the amount of $US70,796.25 is equivalent to a one month interest payment (from 21 January 2007 to 21 February 2007) of 6.75% on a notional of US$12,180,000.

37

157. Based upon the above, it is my opinion that Mr. Rizvi (and other entities with which he appears to have been associated), entered into arrangements similar to those entered into by CMP and WWR.

158. I note that it appears that Saab (Jersey) made monthly payments to Bank Century and Kuo Capital, even though: i) there was no direct contractual relationship between Saab (Jersey) and Bank Century; ii) there was no direct contractual relationship between Saab (Jersey) and Kuo Capital and iii) even under the Third Party Credit Agreements and the Promissory Note Transactions, there was no obligation for Saab (Jersey) to make monthly payments.

159. I consider all of the anomalies that I have noted above to be potential red flag warnings in relation to money laundering.

### 2.1.3 OTHER

160. I have also reviewed SWIFT confirmations related to the following cash movements:

    i)    a payment of US$2,400,000 from Mr. Farid Saab to Kuo Capital on 22 September 2008 (**C-90**). I understand that this purports to be a partial reimbursement of the CMP Loan in respect of the WLB Repo Transaction;

    ii)    a payment of US$118,375 from FBME to Bank Century 27 October 2008. I understand that this purports to be a payment of interest on the NAB Repo Transaction (US$27,125) and JPM Repo Transaction (US$58,995) and net proceeds after the redemption of the BPM Securities and purchase of USD$16,000,000 of US Treasuries (US$32,255) (as per email (**C-6**));

    iii)    a payment of US$71,250 from FBME to Bank Century 7 November 2008. I understand that this purports to be a payment of the net proceeds after the redemption of the NAB Securities and purchase of USD$7,500,000 of US Treasuries (as per email (**C-8**));

## 2.2    Saab (Jersey) Transaction Summary

161. I have reviewed a transaction summary (**R-50**) purportedly setting our debits and credits to the account of Saab (Jersey). I note that the summary is undated and does not have any header relating to any relevant bank. As such I cannot be sure that this is an official reflection of the true accounts of Saab (Jersey), although I note that it was prepared by Mr. Wazzi (as he says at Paragraph 46 of his witness statement). In any case I have provided an analysis of certain of the entries below, where I feel that they may be relevant for the purposes of my report.

162. The transaction summary relating to Saab (Jersey) shows the following credits:

   i) a credit of US$8,000,000 from CMP on 1 December 2006. This is consistent with a drawdown under the CMP Loan;

   ii) a credit of US$11,820,000 from WWR on 4 December 2006. This is consistent with a drawdown under the WWR Loan;

   iii) a series of credits totalling US$12,180,000 from 13 December 2006 until 22 December 2006. The notes in relation to these credits specify the sender as Rafat by which I understand the reference to be to Mr. **Rafat** Rizvi.

163. I note that the comment corresponding to the credit entry of US$400,000 on 22 December 2006 is "*deduction fees arrangement/rafat*". It is therefore unclear whether this has been entered as a credit in error and should in fact have been entered as a debit amount resulting in a total transfer value of US$11,780,000 as opposed to US$12,180,000. In the absence of any confirmation of this, I have assumed that the correct amount is US$12,180,000, however I note that this does not have any significant bearing on my analysis.

164. I note that based upon a series of emails (**R53-R57**) it appears that the payments totalling US$12,180,00 originated from parties otherwise not mentioned in the transaction arrangements, including Mauritius International Trust Co (on behalf of Allied Convertibles) and Mr. Al Warraq. The rationale for certain of such payments, being apparently in respect of monies advanced to Saab (Jersey) is not substantiated and is not consistent with or supported by the remainder of the transaction arrangements. In any case it appears that the ultimate payment of the 'loan amount' of U$12,180,000 was arranged by Mr. Rizvi. Hence as per Paragraph 157 above, for

39

the purposes of my analysis of the transaction arrangements in Section D, I have assumed that Mr. Rizvi (and other entities with which he was associated) was involved in the transaction arrangements in a capacity similar to CMP and WWR.

165.  In addition, I note that there is conflicting information relating to where the proceeds of the CMP Loan and the WWR Loan were paid. According to the Statement of Account, Saab (Jersey) was the beneficiary however, according to a series of emails from Mr. Rizvi to Mr. Wazzi, 27 November 2006 (**R30-R32**) and as set out in Paragraph 14.2 of the Claimants' Reply, the intention was for the loan proceeds to be paid directly to Nature Secret Investment Inc. Furthermore as per Paragraph 148 above, I note that the payments under the Promissory Note Transactions were, in the event, made from CMP and WWR to Kuo Capital and not to either of Saab (Jersey) or Nature Secret Investment Inc.

166.  I note that in response to a request by Mutiara (in the context of this arbitration) regarding the final recipients of the US\$12,180,000 'loan' to Saab (Jersey), FBME has produced a series of confirmations relating to payments made to various third parties totalling €18,925,470. Given that this is substantially more than the equivalent of US\$12,180,000, it is difficult to understand how these are related to the "loan" amount of US\$12,180,000.

167.  In addition, the third parties involved were Serdale Overseas Limited (with an address in Cyprus), Villa Bay Investments Ltd (with an address in Cyprus) and Pacific Property Investors Inc. (with an address in Russia).

168.  I note that the lack of background information in relation to these additional parties means that they must be considered to be red flag warnings, particularly due to the high risk nature of the jurisdictions involved from a money laundering perspective.

## 3    EXECUTION OF DOCUMENTATION

169.  I note that based upon certain email exchanges that I have reviewed, it appears that many of the documents themselves were not entered into on a timely basis. This is another red flag warning in relation to money laundering. I provide below a summary of the key issues that I have identified.

40

### 3.1 Back-dating of Sale and Purchase Agreements

170. I have reviewed certain email exchanges between FBME and Bank Century which reference the rolling of the Repo Transactions however I note that these email exchanges post date the expiry of the previous repo purchase dates and reference agreements being entered into on a back-dated basis (**R-27** and **R-28**).

### 3.2 Forward-dating of Sale and Purchase Agreements

171. In an email exchange dated 1 May 2008, a representative of Bank Century sent across to Mr. Wazzi trade confirmations with trade dates of 31 July 2008 (**R-29**).

### 3.3 Back-dating of the Pledge Agreement

172. I have reviewed a number of email exchanges between FBME and Bank Century relating the execution of the Pledge Agreement. I note that the Pledge Agreement was finally executed on 27 December 2006 however the execution version was back dated to 20 November 2006 (**R-36** and **R-40**).

### 3.4 Back-dating of the Promissory Notes

173. In an email exchange dated 28 November 2006, Mr. Rizvi and Mr. Wazzi were provided with instructions to issue promissory notes with the same details as the Promissory Note Transactions. As such I do not believe that the date of contractual documentation in respect of the Promissory Note Transactions is reliable (**R-33**).

### 3.5 Lack of Governing Documentation

174. I note that the Repo Transactions were entered into without a governing GMRA.

175. The lack of GMRA was only identified and rectified following an enquiry from the Central Bank of Cyprus (**R-42**).

176. Despite the Repo Transactions having been entered into in November 2006, a GMRA governing such transactions was not entered into until 17 January 2007 when it was executed and back-dated to 20 November 2006 (**R-42** to **R-48**).

41

177.    The back-dating of documents can in itself be a red flag of money-laundering.  In my view, the warning signs are even stronger in this case because: i) the monies were advanced purportedly pursuant to repo transactions before a GMRA was put in place to govern those arrangements; and ii) the GMRA appears only to have been executed so as to have a document to provide to FBME's regulator to justify or explain the money transfers.

## F.   OTHER CONSIDERATIONS

178.   I have significant concerns from the many unsatisfactory features relating to the original business arrangement and the conduct of it as they manifest themselves during the 2 years of the arrangement's operation.  I have explained some of those concerns above.  Further matters that I have noted and that re-enforce my concerns in relation to the arrangement as it was initially established, include the following items. I consider that these factors increase the likelihood that the transactions were entered into for money laundering purposes.

179.   I note that the matters discussed in Sections F1 and F2 below are of importance when considering the potential money laundering implications of the transaction arrangements. This is because, in circumstances where a party is known to have been engaged in corruption and money laundering (particularly during the period under consideration) it becomes necessary to invoke enhanced monitoring to guard against the risks that the malpractices persisted through other and/or all of the business with which that party was connected.

## 1   MR. RIZVI

180.   I note that in 2010, Mr. Rizvi was convicted of corruption and money laundering. This is obviously relevant when forming an opinion in relation to the matter that is the subject of this report, given the nature and extent of his involvement in this matter.

## 2   REGULATORY INTERVENTIONS

181.   On 15 July 2014, the Financial Crimes Enforcement Network (FINCEN), an Agency of the US Treasury published a finding that "*FBME Bank Ltd…..is a Financial Institution of Primary Money Laundering Concern*". The Notice records the history of the Bank since it was founded in 1982, initially in Cyprus, from 1986 in the Cayman Islands and since 2003 in Tanzania but continuing to undertake more than 90% of its business from its branch in Cyprus.

182.   On 18 July 2014, the Central Bank of Cyprus announced that it had taken over the management of FBME's business in Cyprus.

43

183. The Tanzanian Central bank took control of FBME in Tanzania on 24 July (**R-88**).

184. FBME issued a response to the FIMCEN Notice on 18 July 2014. It claims to have had no forewarning of the notice nor knowledge of the circumstances underlying the allegations in the notice (**R-90**).

## 3 OTHER RELEVANT MATTERS RELATING TO THE TRANSACTION ARRANGEMENTS

185. In my opinion there are a number of elements of the transaction arrangements which in the absence of any other information to the contrary, lead me to the conclusion that the transaction arrangements were unlikely to have been genuine commercial transactions. I have set these out below.

### 3.1 Lack of Evidence Relating to whether the Securities were Actually Held in Relation to the Transaction Arrangements

186. As described in Paragraph 79, the securities were not transferred to FBME under the Repo Transactions as would be typical under a repo transaction, they were instead held by Bank Century on FBME's behalf.

187. As a result, and in light of the matters I discussed above (in particular the transfer authorisations), it appears that the securities both started and ended up with Bank Century being the legal and beneficial owner as well as the custodian. It is therefore unclear as to whether the securities were actually held by Bank Century in relation to the transaction arrangements as they did not contribute to their theoretical function of being collateral under the Repo Transactions since they did not mitigate any credit risk. As I observed above, it is also unclear why the parties continued to roll over the Repo Transactions when they had made other arrangements with respect to the same securities.

188. I also note that according to Paragraphs 116 and 117 of Mr. Fajar's witness statement, Mutiara has found no trace of the JPM Securities or the US treasury strips (which formed part of the later transaction arrangements) being held on account of FBME.

## 3.2 Lack of Commerciality in the Positions Entered into by Certain of the Relevant Parties

189. As set out in Section D8.2 above, based upon the contractual documentation and from the point of view of WWR and CMP, the one month equivalent interest amounts due under the Promissory Note Transactions versus the one month equivalent interest amounts due under the Third Party Repo Transactions resulted in a running loss of $46,775 and $31,658 per month for WWR and CMP respectively.

190. In my opinion this is not commercially reasonable. The loss for WWR and CMP is mirrored by a gain for Bank Century which may indicate a potential connection between Bank Century and the Third Parties.

191. I note that, in the event, no records have been provided to show that in fact WWR or CMP received or made any payments under the Promissory Note Transactions or the Third Party Repo Transactions. Indeed, as I explained in Section E2 above, the money transfers appear to have moved from Saab (Jersey) (or in fact the Saab Brothers) to Bank Century/Kuo Capital directly.

## 3.3 Arbitrary Determination of Transaction Economics

### 3.3.1 CASHFLOW PAYMENTS

192. As discussed in Paragraph 128 above, the one month equivalent interest amounts under the Promissory Note Transactions and the one month equivalent interest amounts under the Repo Transactions appear to have been matched, despite the use of different notionals and interest rates. In other words, it appears that the rates under the Promissory Note Transactions were set intentionally higher (to compensate for the lower cash notional amount under the loans versus the Repos Transactions) so that the one month equivalent interest amounts under each of the arrangements would be the same.

193. Bearing in mind the common ownership of FBME and Saab (Jersey), this means that, essentially, the money entering and exiting the 'system' were in effect the same amounts, and were coming from and going to the same ultimate beneficial owners. Bank Century appears not to have taken a margin of any kind, and the Third Parties

appear to have been cut out of the 'system' altogether, despite their contractual role in it.

194. This matching of cashflow payment amounts supports my opinion that neither the Repo Transactions nor the Promissory Note Transactions was executed for any legitimate commercial purpose, taking into account the risks and benefits associated to each set of transactions. I consider this to be suspicious from a money laundering perspective.

### 3.3.2 THE JPM REPO TRANSACTION

195. In Figure 5 below, I attach a Bloomberg screenshot of the JPM Securities with ISIN XS0258843969 and note that this is described as a pass through of a Nomura Bank International 6.3% bond due 19 May 2009.

*Figure 5: Bloomberg Screenshot of the JPM Securities*



196. Figure 6 below shows a Bloomberg screenshot of the only Nomura Bank International 6.3% bond due 19 May 2009 available on Bloomberg and which it follows is the relevant Nomura Bank International bond. I note that this bond is described as a European medium term note ("**EMTN**") credit linked to a basket of

reference entities (Series 94, Tranche 1). I have been unable to find any additional information in relation to this EMTN however such a description is usually associated with a structured credit transaction.

*Figure 6: Bloomberg Screenshot of Nomura Bank PLC 6.3% Bonds Due 19 May 2009*

197. I note that although repo transactions on structured credit transactions did occur in the market, typically these repo transactions would have been less common since they were less liquid. The terms of such repo transactions, including the haircut and the repo rate would have reflected this illiquidity.

198. I note that each of the Repo Transactions was executed at a repo rate of 5.25%. However, unlike the BPM Securities, the WLB Securities and the NAB Securities, the JPM Securities were structured notes and as such would have been more illiquid and potentially riskier than any of the other securities. Such additional risk should have been reflected in a higher repo rate. The fact that the JPM Repo Transaction was executed at the same repo rate as the other repo transactions indicates to me that they were not on-market transactions (i.e. they were not executed at levels reflecting prevailing market conditions).

47

199.    As such, in my opinion, the transaction terms did not reflect commercial trades between two commercial and independent parties but rather indicate potential collusion and engineering in order to create the perception of a commercial exchange of risks and rewards where no such exchange was envisaged.

### 3.4    Missing Documentation and Documentation Inconsistencies

200.    In my analysis in Sections D and E above, I noted a series of inconsistencies relating to the contractual documentation underlying the transaction arrangements. I summarise these inconsistencies below:

i)      as per Paragraph 124, I note that no contractual documentation has been provided in respect of the arrangements relating to the JPM Securities and involving Mr. Rizvi (and the other entities with which he appears to have been associated);

ii)     as per Paragraph 95, I note that the Pledge Agreement was fundamentally inconsistent and misleading; and

iii)    the documentation in respect of the Third Party Repo Transactions and the Loan Agreements is incomplete and does not include information with respect to the relevant underlying securities;

iv)     the Third Party Repo Transactions (and the subsequent Third Party Credit Agreements) and the Promissory Note Transactions do not provide for monthly payments to be made, and yet monthly payments were made (albeit by and to different parties).

201.    As described in Section E3 I also note that there are serious issues relating to the timing of the execution of the documentation with certain documents being back-dated and other documents being forward-dated.

202.    In my experience, the extent of the inconsistencies described above and the issues relating to the execution of documents are hallmarks of money laundering. The execution of documentation in an accurate and timely manner is imperative to the operation of any sophisticated commercial arrangements as the risk undertaken is ultimately determined by the contractual documentation.

48

203.  The documentation process within a bank is therefore typically overseen by a middle-office/back-office support function as well as a front office function and a commonly termed '*four-eyes*' verification process is employed in order to ensure that the risk booked by the trader is consistent with the documented risk.

204.  In my review of the materials relating to the transaction arrangements I have not seen evidence of any of these standard market functions and validation processes. Indeed, I would be surprised if they occurred at all, because I would expect such processes to have identified the issues I have raised, in which case the transactions would not have gone ahead, or at least would have been thoroughly investigated. The lack of such oversight in respect of the transaction arrangements supports my opinion that the transactions entered into did not reflect real commercial risk for the parties involved, and that the contracts were entered into to disguise the true (and probably illegal) purpose of the arrangement.

205.  In addition, as per Section E2 I note that the movement of cash relating to the transaction arrangements does not correspond to the theoretical cash movements set out in the documentation. I would expect a bank to have an operations function responsible for reconciling cashflows. Had the transaction arrangements been subject to the usual control processes of a bank, any divergence between the actual cash movements and the theoretical cash movements booked and documented would have been flagged. The very fact that the cashflows continued for two years suggest that proper controls were not in place and/or operating effectively (or were bypassed in the case of these transactions).

206.  In general, I note that many of the email exchanges that I have reviewed make use of personal email addresses. In addition, I note that certain of the SWIFT confirmations that I have seen reference payments from personal accounts of the individuals involved.

207.  In my experience this is not standard practice and in my opinion raises suspicion that the arrangements entered did not reflect legitimate commercial banking activity between legitimate commercial counterparties. Furthermore, such a practice is likely to lead to incomplete records of the bank's activities which would be a criminal offence, at least under UK AML law and likely Cypriot law too.

49

### 3.5    The Earlier Proposed Structure of the Transactions and the Adverse Legal Opinion

208.    I have reviewed certain documents relating to what appears to be a proposed form of the transaction arrangements proposed as set out in (**R-21**), which were not ultimately executed. These proposed transaction arrangements comprised:

    i)    a loan agreement between FBME and Bank Century;

    ii)    a loan agreement between Bank Century and Saab (Jersey); and

    iii)    a guarantee in respect of Saab (Jersey)'s liabilities to Bank Century.

209.    There are elements of the proposed transaction arrangements that appear to me to be unusual:

    i)    each agreement provides for a fixed rate of interest over a potentially indefinite term. However, they do not contain additional terms I would expect in such an arrangement, such as the ability to reset the rate; and

    ii)    the loan agreement between FBME and Bank Century directly references the amounts owed to Bank Century by Saab (Jersey) and allows for their set-off in the repayment terms of that loan, clearly linking the different components of the transaction arrangements, the implication being that the arrangement could have been simpler; and

    iii)    any structure that involves additional parties and thereby creates a more opaque situation is a potential red flag in relation to money laundering.

210.    The effect of the proposed transaction arrangements is that FBME pays Bank Century US$40mm, and receives US$32mm through Saab (Jersey). As I explain below, it appears to me that the $8 million difference was intended to be retained by Bank Century as a fee.

211.    The economic impact of the proposed arrangements is the same as the economic impact of the actual transaction arrangements that were entered into. However for a

50

reason that is not explicit in the documents that I have reviewed, the ultimate form of the transaction arrangements was as described in Section D.

212. I note that Bank Century received a letter dated 22 November 2006 from an Indonesian law firm, Faisal and Panggabean, providing a legal opinion in relation to the transaction arrangements described in Paragraph 209 above which highlighted several serious issues in relation to these transaction arrangements (**R-23**). An opinion in these terms would have been a very strong red flag for Bank Century. To my mind, the fact that it nevertheless entered into the transactions on the same day it received the opinion (and in fact before the transactions were properly documented) is a strong indicator to me that the transactions were in fact for money laundering purposes.

213. In my opinion, particularly in light of the legal opinion, it is likely that in fact the reason for FBME, Saab (Jersey) and Bank Century not entering into the proposed transaction arrangements as per Paragraph 209 above was because the circularity of the transactions was too transparent under those arrangements.

214. In the event, I believe that FBME, Saab (Jersey) and Bank Century may have instead ultimately adopted a cosmetically more opaque transaction structure which achieved the same end, but using a more complex series of transactions, in order to conceal the real economic impact of the transaction arrangements, being essentially a transfer of US$32mm for a fee of US$8mm, in return for regular repayments of money washed through accounts in the US and Switzerland. Indeed, it may have been the case that the monthly 'interest' payments were simply the return of the original $32 million, in 'clean' instalments.

## 3.6    The Purpose Alleged by the Claimants

215. I understand that the Claimants' explanation for these transactions is that FBME needed to arrange external funding for Saab (Jersey) (an institution effectively in common ownership and control) or its clients, due to its own lending restrictions as a financial institution.

216. I note that it has been claimed that the source of the funds could not be FBME directly due to problems of limits relating to its lending portfolio. This in itself is not

necessarily implausible. It has long been the case that lending bankers have employed strategies in order to operate within exposure limits set. The fact that FBME clearly was not constrained by liquidity problems when the transactions first started does not preclude other limiting factors resulting in the need to enter into the arrangements that it did. These potential limiting factors could include total exposures to (i) a particular customer; (ii) a particular business sector; (iii) a particular currency and/or (iv) a particular maturity horizon. Jurisdictional issues can also be a relevant limiting factor.

217. When good commercial relationships exist between two (or more) banks, it is by no means unknown for the first bank to pass the business opportunity to another 'friendly' institution. This will likely be coupled with the provision of funds at comparatively favourable rates. The bank receiving the opportunity will still undertake all of its own due diligence and credit risk assessments. What will always be the expected norm, both by the participating institutions and their regulator(s), is that the whole arrangement will be conducted on an arm's length basis in a visible and transparent manner.

218. When entered into on a back-to-back basis as per Paragraph 217 above, the funding is likely to be matched to the period of the loan arrangement. Each party would obtain economic benefit from the transaction. The first bank would advance the necessary funds to the second bank and the second bank would ensure that it charged the ultimate borrower of the monies a greater sum in interest than it was liable to pay to the first bank. (It is notable, therefore, that the arrangement appears to have been 'revenue neutral' for Bank Century on an ongoing basis – see Section F3.3.1 above. This strongly suggests to me that transactions were not for the purpose alleged by the Claimants).

219. When, as I note has been claimed in the current matter, there is not specific matching, then the lending institution should expect to enter the inter-bank market for loans and deposits and seek funds, potentially from a number of different sources, to meet their own liquidity requirements.

220. This type of arrangement could have been achieved quite simply, however, in the transaction arrangements described in Section D above, neither of these two

comparatively simple and straight-forward methods were adopted. Instead a complex structure was created, involving repo transactions, and where one party (Bank Century) does not appear to have obtained any economic benefit at all (apart from the $8 million which I have speculated was intended to be its fee). As a result, the alleged relatively simple purpose, was achieved by way of an opaque and complex series of transactions (see Figure 3 in Section D above).

221.    Complexity per se is neither wrong nor unacceptable. However, the very first red flag in JMLSG Guidance Part I, 7.26, of matters to watch for and react to reads: "*...transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity;*".

222.    In the case of the transaction arrangements, the need for anything other than a straightforward loan arrangement is not explained, nor the need to bring three intermediary partners into the structure, especially when one is the owner/director of Bank Century who negotiated the arrangement. The very presence of the intermediaries in the structure as illustrated is, of itself, sufficient to raise doubt and suspicion; the declared purpose of the arrangement could normally have been achieved without such involvement and it is consequently difficult to believe that the arrangement has not been deliberately made obtuse and lacking in opacity, across a number of different jurisdictions, in an effort to disguise all that was actually happening.

223.    In summary, although the explanation given by the Claimants is plausible in the abstract, in light of all of the other red flags raised by the transactions, I am not persuaded that the Claimants' explanation is true.

### G. MY CONCLUSION IN RESPECT OF THE TRANSACTION ARRANGEMENTS

224. In this Section I provide my conclusion with respect to the transaction arrangements.

225. In my opinion, a transaction structured in this way should have a clear economic benefit for each party, and any element of circularity should be treated with caution.

226. I note that at the times which are of relevance in this matter, Mr. Farid and Fadi Saab were both co-owners of FBME and Saab (Jersey).

227. I also note that Mr. Rizvi was an ultimate beneficial shareholder of Bank Century. He – or at least other companies with which he was associated – appear to have taken part in the transaction directly.

228. In Section D above, I have set out each of the component parts of the transaction arrangements. Based upon the information available to me I have then summarised what in my opinion appear to be the overall transaction arrangements.

229. Based upon my analysis and the clear relationship between FBME and Saab (Jersey), I believe that the transaction arrangements resulted in an effectively circular transaction.

230. On day one Bank Century made a gain of US$8mm as a result of entering into the transaction arrangements. In the event that the transaction arrangements were to have terminated according to the contractual agreements this gain would have disappeared. However, in my opinion, it is possible that the termination of this arrangement was not envisaged and instead the transactions were expected to be rolled *ad-infinitum* (or at least until the remaining $32 million had been washed back through the system). My opinion in that regard is strengthened by the fact that the one monthly equivalent interest amounts were essentially revenue-neutral for FBME and Saab (Jersey) when considered together (as I explained at Section D8.2 above) – in other words, it appears that Bank Century did not make any margin from these payments. Therefore, unless the US$8 million was intended to be retained by Bank Century (or Mr. Rizvi), then Bank Century did not benefit from the entire scheme in any way. I would find it very surprising if that were the case.

54

231. The economic effect of the transaction arrangements was therefore for FBME to pass US$32mm to another entity with the same ownership at a cost to it of US$8mm. In my opinion, the magnitude of the costs involved was not commercial for a party with a legitimate business motivation and certainly not for the commercial motivation alleged by the Claimants. As such, without further information as to the commercial rationale for the transactions, I am of the opinion that the transaction arrangements were unlikely to have been genuine commercial transactions. As I explained above in Section F3.6, I am not persuaded that the explanation advanced by the Claimants is true.

232. The likely purpose of the transaction, in my view, was to launder FBME's (or the Saab Brothers') money through bank accounts controlled by Bank Century, including accounts in the US and Switzerland (**R-62** and **R-64**). The fact that all of the monies paid by the Saab Brothers (on behalf of Saab (Jersey)) to the Bank were then passed straight on to FBME (and presumably the Saab Brothers) supports that contention in my opinion.

233. In summary, in my opinion, the transactions bear the following warning signs of money laundering:

    i)    the unnecessary complexity and opacity of the structure, and the number of parties involved;

    ii)    the fact that the actual money flows did not match up with the parties' contractual obligations;

    iii)    the fact that all parties do not appear to have been operating purely on an arm's length basis. This is particularly relevant given the identity of interests between the Saab Brothers, FBME and Saab (Jersey) on the one hand, and Mr. Rizvi, Bank Century, and perhaps the other third parties on the other;

    iv)    the lack of clearly defined purpose, and the inconsistency of the final arrangements with the purpose alleged by the Claimants;

    v)    the circular nature of the arrangements;

vi)   the fact that it appears that Bank Century did not gain at all from the transactions – or, alternatively, was intended to retain the $8 million, which is out of proportion with the risks it undertook on the face of the documents (and is more in line with the risks it was undertaking in facilitating a money laundering operation);

vii)  the backdating of documents, and the fact that the transactions were executed before proper contracts were put in place, and after a law firm warned of the risk of facilitating money laundering;

viii) the incomplete contractual framework;

ix)   the involvement of entities from Cyprus, Tanzania, Indonesia and Russia; and

x)    the established association of both sides to the transaction in other money laundering activities.

234.  In light of the sheer number of warning signs, it is totally implausible that this was a normal, legitimate business structure. I do not believe that the true purpose of the transaction was an honest one. It is my firm opinion that the true intention and practice behind these transactions, shared by all parties, was the laundering of money. As I noted at the outset, these transactions raise more red flags than any other arrangement I have previously encountered in my entire career.

## H.     EXPERT'S DECLARATION

235.     I, Peter Brown, declare that:

i)      I understand that my duty in giving evidence in this arbitration is to assist the arbitral tribunal decide the issues in respect of which expert evidence is adduced. I have complied with, and will continue to comply with, that duty.

ii)     I confirm that this is my own, impartial, objective, unbiased opinion which has not been influenced by the pressures of the dispute resolution process or by any party to the arbitration.

iii)    I confirm that all matters upon which I have expressed an opinion are within my area of expertise.

iv)     I confirm that I have referred to all matters which I regard as relevant to the opinions I have expressed and have drawn to the attention of the arbitral tribunal all matters, of which I am aware, which might adversely affect my opinion;

v)      I confirm that, at the time of providing this written opinion, I consider it to be complete and accurate and constitute my true, professional opinion.

vi)     I confirm that if, subsequently, I consider this opinion requires any correction, modification or qualification I will notify the parties to this arbitration and the arbitral tribunal forthwith.

**STATEMENT OF TRUTH**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

……………………………………….

Peter Brown                                                          15 August 2014

57

# I. Appendix I - Professional Experience and Qualifications

## PETER B. BROWN

**Work email: pbrown@cclcompliance.com**
**Work telephone: +44 20 7638 9830**

---

### *SUMMARY OF EXPERIENCE*

A City of London based career that commenced in 1968 in domestic banking with a mixture of work experience until beginning a specialization in Internal Audit in 1976. Internal auditing was followed through domestic and international banks until 1991; experience from 1992 to 1999 in investment management. Experience in establishing a Compliance function in mid-1980s and facilitating Compliance and Internal Audit functions' co-operation and interaction. Qualifications gained in banking in 1970 and as an accountant in 1982.

Between 2000 and 2006, specialist consultant in anti-money laundering compliance, involving various assignments prior to joining MHA Consulting in September 2001. From that date until early 2006, duties included the day-to-day provision of the JMLSG Helpdesk, used by firms in the financial services sector and by members of the public referred on by the FSA. Participated in FSA ID Working Party through mid-2004. In 2006, using knowledge and experience gained, returned to the market as a Money Laundering Reporting Office with National Bank of Kuwait (International) PLC; headhunted back into training/consultancy work in mid-2007 with the CCL Partnership.

---

### CAREER HISTORY

***2007 – Present Senior Consultant, the CCL Partnership, London. Senior Advisor to Solum***
Solum offers advisory services provided by ex-practitioners in all areas of capital markets.
The firm is authorised and regulated by the Financial Conduct Authority. Website: www.solum-financial.com.
The CCL Partnership provides a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors.

***2006 – 2007      NATIONAL BANK OF KUWAIT (INTERNATIONAL) PLC***
*Money Laundering Reporting Officer*

***2001 – 2006      MHA CONSULTING***
*Senior Consultant*
Providing a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors. Includes lecturing in the UK and Crown Dependencies and for the ICA Diploma in Anti Money Laundering. Provision of the JMLSG Helpdesk facility as used by firms in the financial services sector and by members of the public referred on by the FSA. Assisting firms in remedial action projects and current client reviews.

***2001            NATIONAL BANK OF EGYPT (UK) LTD***
*Consultant*
Consultant on Remedial Action Taskforce for Money Laundering compliance.

***2000 - 2001      HALIFAX plc (now HBOS) - Group Treasury & Wholesale Banking Division***
*Internal Audit and Compliance Functions*
Assisting first in routine internal audit reviews then compliance monitoring work and Money Laundering Regulations training.

***1999 - 2000      HABIB ALLIED INTERNATIONAL BANK***

*Compliance Department*
Providing advice and assistance for extended project to ensure fulfillment of regulatory obligations.

### 1998 - 1999     FOREIGN & COLONIAL MANAGEMENT LIMITED
*Head of Internal Audit*
Responsible for planning, leading and reporting on internal audits in London. Acted as Money Laundering Reporting Officer for F&C Group companies. Implemented Service Standards for Internal Audit Department. Introduced risk assessment basis for planning of Audit review programme and new format for Internal Audit Reports.

### 1992– 1997     INVESCO EUROPE LIMITED
*Head of Internal Audit*
Initially team member in INVESCO on project to review procedures and controls. Project undertaken jointly with KPMG and in conjunction with IMRO. Following appointment as Head of Internal Audit in 1993, responsible for planning, leading and reporting on internal audits in London, Paris and Jersey. Acted as Money Laundering Reporting Officer, establishing the function and meeting training needs.
Established Internal Audit function, developed Audit Programmes, report formats and service standards. Developed risk based planning techniques for use by Internal Audit and Compliance functions. Established good relations with external auditors of main company and of 10 investment trusts; commitments involved five of the then 'big six' firms.

### 1991 – 1992     Sundry temporary assignments, including commission to write booklet
*"Introduction to Internal Auditing in Banking" (revised and updated 2000).*

### 1989 - 1991     COMMONWEALTH BANK OF AUSTRALIA
*Senior Audit Manager*
Responsible for planning, undertaking and reporting on internal audits in London and Frankfurt. Assisted new Compliance Officer in proper establishment of Compliance function and rectification of earlier errors. Instituted revised operational approach for Audit reviews using a basis approved by the Bank of England.

*1986 – 1989    S.F.E. BANK LIMITED*
*Senior Audit Manager and Compliance Officer*
Established Internal Audit function in London and undertook internal audits in London, Nassau and New York.
Established Compliance function, produced Compliance Manual, undertook annual Compliance reviews and liaised as necessary with Regulator.

*1979 – 1985    BANKERS TRUST COMPANY*
*Audit Manager*
Undertook audits in London and throughout Europe. Experience covered a very wide range of banking activities including FX, Treasury, Money Market, Investment Management, Commercial Lending and Global Custody.

*1968 - 1978    GLYN, MILLS & CO/ WILLIAMS & GLYN'S BANK*
*Graduate entrant*
Broad banking training then specialising in Internal Audit.

_____

*QUALIFICATIONS*

**BA (Hons)**    Economics
**FCCA**         Fellow of the Association of Chartered Certified Accountants
**FCIB**         Fellow of the Chartered Institute of Bankers
**FSI**          Fellow of the Securities & Investment Institute

Accredited by the UK's Financial Services Skills Council as holding Recognised Trainer Status

_____

*OTHER*

Co-author of "Professional Standards for Compliance Officers" (published ACCA 1991) and Money Laundering – Prevention & Compliance 2001/2002 (published ACCA 2002).

**Languages:**    **W**orking knowledge of French and German

_____

## J.       Appendix II - Contracts and Documents Received

### 1.       *London Court of International Arbitration Documents*

i)      Claimants' Request for Arbitration under the Rules of the LCIA, 19 July 2013;

ii)     Respondent's Response in the LCIA Arbitration No. 132447, 1 October 2013;

iii)    Claimants' Statement of Case in the LCIA Arbitration No. 132447, 16 December 2013;

iv)     Respondent's Statement of Defence in the LCIA Arbitration No. 132447, 31 January 2014; and

v)      Claimants' Reply in the LCIA Arbitration No. 132447, 3 March 2014.

### 2.       *Witness Statements*

i)      Witness Statement of Ahmad Fajar, 25 July 2014;

ii)     Witness Statement of Fadi Michel Saab, 25 July 2014;

iii)    Witness Statement of Abdel Rahman Wazzi, 25 July 2014; and

iv)     Witness Statement of George Hinis, 25 July 2014.

### 3.       *Claimants' Exhibits*

i)      C-1 to C-104.

### 4.       *Respondent's Exhibits*

ii)     R-1 to R-87.

**K.** **Appendix III - Data Disclaimer**

The data used in this report is provided "*as is*" and "*as available*". To the maximum extent allowed by applicable law, the relevant data providers, their respective licensors and suppliers make no warranties, express or implied, including without limitation implied warranties of merchantability, fitness for a particular purpose, non-infringement, or any other matter. In no event shall any data provider or their respective licensors and suppliers have any liability (i) for any unauthorised modification of or misuse of any portion of the data, (ii) for any liability resulting from use of the data, (iii) with respect to the results which may be obtained from the use of the data or (iv) for any inaccuracies, errors or omissions in the data.

**L.** **Appendix IV – Material exhibited with this Report**

| | DOCUMENT | EXHIBIT REF |
|---|---|---|
| 1. | Reuters Article, "*Tanzania Takes Control of Bank Accused of Money Laundering*" | **R-88** |
| 2. | Excerpt from Joint Money Laundering Steering Group Detailed Guidance | **R-89** |
| 3. | Response from FBME Bank Limited to FIMCEN Notice | **R-90** |

# Exhibit 2

Excerpts from PT Bank Mutiara

Audited Financial Statement FYE 12-31-2014*

*The complete financial statement appears at A.868-1095.

# TJAHJADI & TAMARA
Registered Public Accountants

## PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2014 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditor's Report*
*As of December 31, 2014 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk | PT BANK MUTIARA Tbk |
|---|---|
| CATATAN ATAS LAPORAN KEUANGAN | *NOTES TO THE FINANCIAL STATEMENTS* |
| Tanggal 31 Desember 2014 dan | *As of December 31, 2014 and* |
| Untuk Tahun yang Berakhir pada Tanggal Tersebut | *For The Year Then Ended* |
| (Dinyatakan dalam jutaan Rupiah, | *(Expressed in millions of Rupiah,* |
| kecuali dinyatakan lain) | *unless otherwise stated)* |

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Desember 2014 adalah sebagai berikut: (lanjutan)

Kasus Perdata: (lanjutan)

A. Posisi Bank sebagai Tergugat: (lanjutan)

7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. *The outstanding legal and fraud cases up to December 2014 as follows: (continued)*

*Civil Cases: (continued)*

A. *Bank as the defendant: (continued)*

7. *Examination Request International Arbitration filed by FBME Bank and SAAB and Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.*

*Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.*

*Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.*

*On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.*

*By the receipt of such payment, therefore this case has been closed.*

# PT BANK MUTIARA Tbk
*LAPORAN KEUANGAN/FINANCIAL STATEMENT*

**Tanggal 31 Maret 2015 dan 2014**　　　*As of March 31, 2015 and 2014*
**Dan 31 Desember 2014**　　　　　　　　　*And December 31, 2014*

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Maret 2015 dan 2014<br>Dan 31 Desember 2014<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | PT BANK MUTIARA Tbk<br>NOTES TO THE FINANCIAL STATEMENTS<br>As of March 31, 2015 and 2014<br>And December 31, 2014<br>(Expressed in millions of Rupiah,<br>unless otherwise stated) |
|---|---|

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Maret 2015 adalah sebagai berikut: (lanjutan)

Kasus Perdata: (lanjutan)

A. Posisi Bank sebagai Tergugat: (lanjutan)

7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. The outstanding legal and fraud cases up to March 2015 as follows: (continued)

Civil Cases: (continued)

A. Bank as the defendant: (continued)

7. Examination Request International Arbitration filed by FBME Bank and SAAB and Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.

Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.

Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.

On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.

By the receipt of such payment, therefore this case has been closed.

Catatan atas laporan keuangan terlampir merupakan bagian yang tidak terpisahkan dari laporan keuangan secara keseluruhan.

The accompanying notes to the financial statements form an integral part of these financial statements taken as a whole.

204



# PT BANK JTRUST INDONESIA Tbk
## *LAPORAN KEUANGAN/FINANCIAL STATEMENT*

**Tanggal 30 Juni 2015 dan 2014**         *As of June 30, 2015 and 2014*
**Dan 31 Desember 2014**               *And December 31, 2014*

*The original financial statements included herein are in the Indonesian language.*

| PT BANK JTRUST INDONESIA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 30 Juni 2015 dan 2014<br>Dan 31 Desember 2014<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | PT BANK JTRUST INDONESIA Tbk<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of June 30, 2015 and 2014*<br>*And December 31, 2014*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |
|---|---|

**49. PERIKATAN, PERJANJIAN DAN INFORMASI PENTING (lanjutan)**

f. Kasus-kasus hukum dan *fraud* yang masih belum selesai sampai bulan Juni 2015 adalah sebagai berikut: (lanjutan)

Kasus Perdata: (lanjutan)

A. Posisi Bank sebagai Tergugat: (lanjutan)

7. Pemeriksaan Permohonan Arbitrase Internasional yang diajukan oleh FBME Bank dan SAAB Finance melalui *The London Court of International Arbitration* (LCIA) kepada Bank sehubungan adanya transaksi antara FBME Bank Ltd dan Bank (dahulu PT Bank Century Tbk) melalui TBMA/ISMA *Global Master Repurchase Agreement* tanggal 20 November 2006.

Berdasarkan *Statement of Case* yang disampaikan oleh FBME Bank pada tanggal 16 Desember 2013, FBME Bank meminta pemenuhan pembayaran transaksi Repo sebesar USD 38.500.000 ditambah dengan bunga serta segala biaya terkait dengan pemeriksaan arbitrase.

Berdasarkan *Settlement Agreement* tanggal 16 Oktober 2014 antara FBME Bank, Saab Financial (Bermuda) Limited, dan Bank, kedua belah pihak menyetujui bahwa Bank akan melakukan pembayaran sebesar GBP 5.000.000.

Pada tanggal 2 Desember 2014, Bank telah melakukan transfer dana sejumlah GBP 5.000.000 ke rekening Quinn Emanuel selaku Kuasa Hukum Bank.

Dengan telah diterimanya pembayaran tersebut, maka kasus ini telah selesai.

**49. COMMITMENTS, AGREEMENTS AND OTHER IMPORTANT INFORMATION (continued)**

f. The outstanding legal and fraud cases up to June 2015 as follows: (continued)

Civil Cases: (continued)

A. Bank as the defendant: (continued)

7. Examination Request International Arbitration filed by FBME Bank and SAAB and Finance through the London Court of International Arbitration (LCIA) to the Bank in respect of a potential transaction between FBME Bank Ltd and Bank (formerly PT Bank Century Tbk) through the TBMA/ISMA Global Master Repurchase Agreement dated November 20, 2006.

Based on Statement of Case which filed by FBME Bank on December 16, 2013, FBME Bank demanded the payment of Repo transaction amounted to USD 38,500,000 and interest and all cost relating to the arbitration examination.

Based on Settlement Agreement dated October 16, 2014 between FBME Bank, Saab Financial (Bermuda) Limited, and the Bank, both parties agreed that the Bank shall pay an amount of GBP 5,000,000.

On December 2, 2014, the Bank has transferred funds amounted to GBP 5,000,000 to Quinn Emanuel's bank account as the Bank's Lawyer.

By the receipt of such payment, therefore this case has been closed.

Catatan atas laporan keuangan terlampir merupakan bagian yang tidak terpisahkan dari laporan keuangan secara keseluruhan.

*The accompanying notes to the financial statements form an integral part of these financial statements taken as a whole.*

206

## TJAHJADI & TAMARA
Registered Public Accountants

# PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2014 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditor's Report*
*As of December 31, 2014 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2014 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | PT BANK MUTIARA Tbk<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2014 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |

**33. PENYISIHAN (PEMULIHAN) CADANGAN KERUGIAN PENURUNAN NILAI - NETO**
**33. *ALLOWANCE FOR IMPAIRMENT LOSSES (RECOVERY) - NET***

|  | 2014 | 2013 |  |
|---|---|---|---|
| Kredit yang diberikan (Catatan 10) | 140.380 | 857.772 | *Loans (Note 10)* |
| Aset lain-lain (Catatan 17) | 606 | 70.604 | *Other assets (Note 17)* |
| Agunan yang diambil alih<br>(Catatan 16) | (2.481) | 69.478 | *Foreclosed assets<br>(Note 16)* |
| Giro pada bank lain<br>(Catatan 6) | - | (192) | *Current accounts with other banks<br>(Note 6)* |
| **Jumlah** | **138.505** | **997.662** | ***Total*** |

**34. PENDAPATAN NON-OPERASIONAL**
**34. *NON-OPERATING INCOME***

|  | 2014 | 2013 |  |
|---|---|---|---|
| Keuntungan revaluasi valas | 10.701 | 104.536 | *Gain on foreign currency revaluation* |
| Laba (rugi) penjualan aset tetap<br>(Catatan 14) | 1 | (95) | *Gain (loss) on sale of fixed assets<br>(Note 14)* |
| Lain-lain | 4.582 | 10.268 | *Others* |
| **Jumlah** | **15.284** | **114.709** | ***Total*** |

**35. BEBAN NON-OPERASIONAL**
**35. *NON-OPERATING EXPENSES***

|  | 2014 | 2013 |  |
|---|---|---|---|
| Perkara | 145.067 | 18.086 | *Legal fees* |
| Konsultan | 12.538 | 10.878 | *Consultant* |
| Perjalanan dinas | 4.514 | 5.118 | *Business travelling* |
| Sumbangan | 674 | 394 | *Donation* |
| Denda dan sanksi | 302 | 7.855 | *Fines and penalties* |
| Lain-lain | 22.313 | 15.692 | *Others* |
| **Jumlah** | **185.408** | **58.023** | ***Total*** |

**36. PERPAJAKAN**
**36. *TAXATION***

a. Utang Pajak
a. *Taxes Payable*

|  | 2014 | 2013 |  |
|---|---|---|---|
| Pajak Penghasilan: |  |  | *Income Tax:* |
| Pasal 4(2) | 17.813 | 20.343 | *Article 4(2)* |
| Pasal 21 | 1.211 | 2.916 | *Article 21* |
| Pasal 23 | 158 | 135 | *Article 23* |
| Lain-lain | 4 | 18 | *Others* |
| **Jumlah** | **19.186** | **23.412** | ***Total*** |

b. Pajak Penghasilan
b. *Income Tax*

|  | 2014 | 2013 |  |
|---|---|---|---|
| Pajak kini | - | - | *Current tax* |
| Pajak tangguhan | 7.928 | (23.069) | *Deferred tax* |
| **Manfaat (beban)** | **7.928** | **(23.069)** | ***Benefit (expense)*** |

# Exhibit 3

Composite exhibit of Note 35

for FYEs 2011, 2012, 2013, 2014

Exhibit 3-A

# Tjahjadi & Tamara
## Registered Public Accountants

# PT BANK MUTIARA Tbk

Laporan Keuangan
Dengan Laporan Auditor Independen
Tanggal 31 Desember 2014 dan
Untuk Tahun yang Berakhir pada
Tanggal Tersebut
(Mata Uang Indonesia)

*Financial Statements*
*With Independent Auditor's Report*
*As of December 31, 2014 and*
*For The Year*
*Then Ended*
*(Indonesian Currency)*



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk | PT BANK MUTIARA Tbk |
|---|---|
| CATATAN ATAS LAPORAN KEUANGAN | *NOTES TO THE FINANCIAL STATEMENTS* |
| Tanggal 31 Desember 2014 dan | *As of December 31, 2014 and* |
| Untuk Tahun yang Berakhir pada Tanggal Tersebut | *For The Year Then Ended* |
| (Dinyatakan dalam jutaan Rupiah, | *(Expressed in millions of Rupiah,* |
| kecuali dinyatakan lain) | *unless otherwise stated)* |

**2. IKHTISAR KEBIJAKAN AKUNTANSI PENTING (lanjutan)**

**2. *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)***

**b. Penjabaran Mata Uang Asing (lanjutan)**

**b. *Foreign Currency Translation (continued)***

**b) Transaksi dan Saldo dalam Mata Uang Asing (lanjutan)**

**b) *Transaction and Balances in Foreign Currency (continued)***

Berikut ini adalah kurs mata uang asing utama yang digunakan untuk penjabaran pada tanggal 31 Desember 2014 dan 2013 (dalam nilai penuh):

*Below are the major exchange rates used for translation as of December 31, 2014 and 2013 (full amount):*

| | **2014** | **2013** | |
|---|---|---|---|
| Poundsterling Inggris | 19.288,40 | 20.110,93 | *Great Britain Poundsterling* |
| Euro Eropa | 15.053,35 | 16.759,31 | *European Euro* |
| Franc Swiss | 12.515,80 | 13.674,16 | *Swiss Franc* |
| Dolar Amerika Serikat | 12.385,00 | 12.170,00 | *United States Dollar* |
| Dolar Kanada | 10.679,49 | 11.434,22 | *Canadian Dollar* |
| Dolar Australia | 10.148,27 | 10.855,65 | *Australian Dollar* |
| Dolar Selandia Baru | 9.709,23 | 9.995,83 | *New Zealand Dollar* |
| Dolar Singapura | 9.376,19 | 9.622,08 | *Singapore Dollar* |
| Dolar Hong Kong | 1.596,98 | 1.569,54 | *Hong Kong Dollar* |
| Yen Jepang | 103,56 | 115,75 | *Japanese Yen* |

**c. Aset dan Liabilitas Keuangan**

**c. *Financial Assets and Liabilities***

Bank menerapkan PSAK 50 (Revisi 2010), "Instrumen Keuangan: Penyajian", PSAK 55 (Revisi 2011), "Instrumen Keuangan: Pengakuan dan Pengukuran", dan PSAK 60 "Instrumen Keuangan: Pengungkapan".

*The Bank applied PSAK 50 (Revised 2010), "Financial Instruments: Presentation", PSAK 55 (Revised 2011), "Financial Instruments: Recognition and Measurement", and PSAK 60 "Financial Instruments: Disclosures".*

Aset keuangan diklasifikasikan sebagai aset keuangan yang diukur pada nilai wajar melalui laba rugi, pinjaman yang diberikan dan piutang, aset keuangan dimiliki hingga jatuh tempo dan aset keuangan tersedia untuk dijual. Klasifikasi ini tergantung dari tujuan perolehan aset keuangan tersebut. Manajemen menentukan klasifikasi aset keuangan tersebut pada saat pengakuan awal.

*Financial assets are classified as financial assets at fair value through profit or loss, loans and receivables, held-to-maturity financial assets and available-for-sale financial assets. The classification depends on the purpose for which the financial assets were acquired. Management determines the classification of its financial assets at initial recognition.*

Liabilitas keuangan diklasifikasikan sebagai liabilitas yang diukur pada nilai wajar melalui laba rugi dan liabilitas yang diukur pada biaya perolehan diamortisasi.

*Financial liabilities are classified as financial liabilities at fair value through profit or loss and financial liabilities at amortized cost.*

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2014 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | *PT BANK MUTIARA Tbk*<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2014 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |
|---|---|

**33. PENYISIHAN (PEMULIHAN) CADANGAN KERUGIAN PENURUNAN NILAI - NETO**

*33. ALLOWANCE FOR IMPAIRMENT LOSSES (RECOVERY) - NET*

| | 2014 | 2013 | |
|---|---|---|---|
| Kredit yang diberikan (Catatan 10) | 140.380 | 857.772 | *Loans (Note 10)* |
| Aset lain-lain (Catatan 17) | 606 | 70.604 | *Other assets (Note 17)* |
| Agunan yang diambil alih (Catatan 16) | (2.481) | 69.478 | *Foreclosed assets (Note 16)* |
| Giro pada bank lain (Catatan 6) | - | (192) | *Current accounts with other banks (Note 6)* |
| **Jumlah** | **138.505** | **997.662** | ***Total*** |

**34. PENDAPATAN NON-OPERASIONAL**

*34. NON-OPERATING INCOME*

| | 2014 | 2013 | |
|---|---|---|---|
| Keuntungan revaluasi valas | 10.701 | 104.536 | *Gain on foreign currency revaluation* |
| Laba (rugi) penjualan aset tetap (Catatan 14) | 1 | (95) | *Gain (loss) on sale of fixed assets (Note 14)* |
| Lain-lain | 4.582 | 10.268 | *Others* |
| **Jumlah** | **15.284** | **114.709** | ***Total*** |

**35. BEBAN NON-OPERASIONAL**

*35. NON-OPERATING EXPENSES*

| | 2014 | 2013 | |
|---|---|---|---|
| Perkara | 145.067 | 18.086 | *Legal fees* |
| Konsultan | 12.538 | 10.878 | *Consultant* |
| Perjalanan dinas | 4.514 | 5.118 | *Business travelling* |
| Sumbangan | 674 | 394 | *Donation* |
| Denda dan sanksi | 302 | 7.855 | *Fines and penalties* |
| Lain-lain | 22.313 | 15.692 | *Others* |
| **Jumlah** | **185.408** | **58.023** | ***Total*** |

**36. PERPAJAKAN**

*36. TAXATION*

a. Utang Pajak

*a. Taxes Payable*

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak Penghasilan: | | | *Income Tax:* |
| Pasal 4(2) | 17.813 | 20.343 | *Article 4(2)* |
| Pasal 21 | 1.211 | 2.916 | *Article 21* |
| Pasal 23 | 158 | 135 | *Article 23* |
| Lain-lain | 4 | 18 | *Others* |
| **Jumlah** | **19.186** | **23.412** | ***Total*** |

b. Pajak Penghasilan

*b. Income Tax*

| | 2014 | 2013 | |
|---|---|---|---|
| Pajak kini | - | - | *Current tax* |
| Pajak tangguhan | 7.928 | (23.069) | *Deferred tax* |
| **Manfaat (beban)** | **7.928** | **(23.069)** | ***Benefit (expense)*** |

Exhibit 3-B

# TJAHJADI & TAMARA
### Registered Public Accountants

# PT BANK MUTIARA Tbk

| Laporan Keuangan | Financial Statements |
|---|---|
| Dengan Laporan Auditor Independen | With Independent Auditors' Report |
| Tanggal 31 Desember 2013 dan | As of December 31, 2013 and |
| Untuk Tahun yang Berakhir pada | For The Year |
| Tanggal Tersebut | Then Ended |
| (Mata Uang Indonesia) | (Indonesian Currency) |



**Morison** International

An Independent Member Firm of **Morison** International

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2013 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | PT BANK MUTIARA Tbk<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2013 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |

**2. IKHTISAR KEBIJAKAN AKUNTANSI PENTING (lanjutan)**

**2. *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)***

**b. Penjabaran Mata Uang Asing**

**b. *Foreign Currency Translation***

**a) Mata Uang Penyajian**

**a) *Presentation Currency***

Laporan keuangan disajikan dalam mata uang Rupiah, yang merupakan mata uang fungsional Bank.

*The financial statements are presented in Indonesian Rupiah (Rupiah), which is the functional currency of the Bank.*

**b) Transaksi dan Saldo dalam Mata Uang Asing**

**b) *Transaction and Balances in Foreign Currency***

Kebijakan akuntansi atas transaksi dan saldo dalam mata uang asing didasarkan pada peraturan Bapepam dan LK No. VIII.G.7 dan Pedoman Akuntansi Perbankan Indonesia ("PAPI"). Bank mengacu pada Pedoman Akuntansi Perbankan Indonesia ("PAPI") dimana transaksi dalam mata uang asing dijabarkan ke mata uang Rupiah dengan menggunakan kurs laporan (penutupan) yang ditetapkan oleh Bank Indonesia yaitu kurs tengah yang merupakan rata-rata kurs beli dan kurs jual berdasarkan Reuters pada pukul 16.00 Waktu Indonesia Barat yang berlaku pada tanggal tersebut.

*Accounting policy for transactions and balances in foreign currency is based on Bapepam and LK rule No. VIII.G.7 and Guidelines of Accounting for Indonesian Bank ("PAPI"). The Bank refers to the Guidelines of Accounting for Indonesian Bank ("PAPI") where transactions denominated in a foreign currency are converted into Rupiah using the reporting (closing) rate set by Bank Indonesia that is middle rate which the average of bid rate and ask rate based on Reuters at 16.00 Western Indonesian Time prevailing at that time.*

Keuntungan dan kerugian selisih kurs yang timbul dari transaksi dalam mata uang asing dan dari penjabaran aset dan liabilitas moneter dalam mata uang asing, diakui pada laporan laba rugi komprehensif, kecuali apabila ditangguhkan pada ekuitas karena memenuhi kualifikasi/kriteria sebagai lindung nilai arus kas (*hedging*).

*Exchange gains and losses arising on transactions in foreign currency and on the translation of foreign currency monetary assets and liabilities are recognized in the statement of comprehensive income, except when deferred in equity as qualifying cash flow hedges.*

Selisih penjabaran mata uang asing atas aset moneter keuangan lain yang diukur berdasarkan nilai wajar dicatat sebagai bagian dari keuntungan dan kerugian selisih kurs.

*Translation differences on other monetary financial assets measured at fair value are included in foreign exchange gains and losses.*

Berikut ini adalah kurs mata uang asing utama yang digunakan untuk penjabaran pada tanggal 31 Desember 2013 dan 2012 (dalam nilai penuh):

*Below are the major exchange rates used for translation as of December 31, 2013 and 2012 (full amount):*

|  | 2013 | 2012 |  |
|---|---|---|---|
| Poundsterling Inggris | 20.110,93 | 15.514,93 | *Great Britain Poundsterling* |
| Euro Eropa | 16.759,31 | 12.731,62 | *European Euro* |
| Franc Swiss | 13.674,16 | 10.536,25 | *Swiss Franc* |
| Dolar Amerika Serikat | 12.170,00 | 9.637,50 | *United States Dollar* |
| Dolar Kanada | 11.434,22 | 9.686,91 | *Canadian Dollar* |
| Dolar Australia | 10.855,65 | 10.007,10 | *Australian Dollar* |
| Dolar Selandia Baru | 9.995,83 | 7.918,18 | *New Zealand Dollar* |
| Dolar Singapura | 9.622,08 | 7.878,61 | *Singapore Dollar* |
| Dolar Hong Kong | 1.569,54 | 1.243,27 | *Hong Kong Dollar* |
| Yen Jepang | 115,75 | 111,77 | *Japanese Yen* |

*The original financial statements included herein are in the Indonesian language.*

| PT BANK MUTIARA Tbk<br>CATATAN ATAS LAPORAN KEUANGAN<br>Tanggal 31 Desember 2013 dan<br>Untuk Tahun yang Berakhir pada Tanggal Tersebut<br>(Dinyatakan dalam jutaan Rupiah,<br>kecuali dinyatakan lain) | PT BANK MUTIARA Tbk<br>*NOTES TO THE FINANCIAL STATEMENTS*<br>*As of December 31, 2013 and*<br>*For The Year Then Ended*<br>*(Expressed in millions of Rupiah,*<br>*unless otherwise stated)* |
|---|---|

## 34. PENDAPATAN NON-OPERASIONAL / 34. NON-OPERATING INCOME

| | 2013 | 2012 | |
|---|---|---|---|
| Pendapatan revaluasi valas | 104.536 | 33.677 | Revenue of foreign currency revaluation |
| Laba (rugi) penjualan aset tetap | | | Gain (loss) on sale of fixed assets |
| (Catatan 14) | (95) | 1.920 | (Note 14) |
| Lain-lain | 10.268 | 9.893 | Others |
| **Jumlah** | **114.709** | **45.490** | **Total** |

## 35. BEBAN NON-OPERASIONAL / 35. NON-OPERATING EXPENSES

| | 2013 | 2012 | |
|---|---|---|---|
| Perkara | 18.086 | 7.936 | Court fees |
| Konsultan | 10.878 | 5.221 | Consultant |
| Denda dan sanksi | 7.855 | 490 | Fines and penalties |
| Perjalanan dinas | 5.118 | 4.233 | Business traveling |
| Sumbangan | 394 | 579 | Donation |
| Lain-lain | 15.692 | 15.336 | Others |
| **Jumlah** | **58.023** | **33.795** | **Total** |

## 36. PERPAJAKAN / 36. TAXATION

a. Utang Pajak / a. Taxes Payable

| | 2013 | 2012 | |
|---|---|---|---|
| Pajak Penghasilan: | | | Income Tax: |
| Pasal 4(2) | 20.343 | 13.256 | Article 4(2) |
| Pasal 21 | 2.916 | 3.163 | Article 21 |
| Pasal 23 | 153 | 120 | Article 23 |
| **Jumlah** | **23.412** | **16.539** | **Total** |

b. Pajak Penghasilan / b. Income Tax

| | 2013 | 2012 | |
|---|---|---|---|
| Pajak kini | - | - | Current tax |
| Pajak tangguhan | (23.069) | 1.514 | Deferred tax |
| **Manfaat (Beban)** | **(23.069)** | **1.514** | **Benefit (Expense)** |

Pajak kini

Rekonsiliasi antara laba (rugi) sebelum manfaat (beban) pajak penghasilan tangguhan yang disajikan dalam laporan laba rugi komprehensif dengan taksiran rugi fiskal Bank untuk tahun yang berakhir pada tanggal-tanggal 31 Desember 2013 dan 2012 adalah sebagai berikut:

Current tax

*The reconciliation between income (loss) before deferred income tax benefit (expense) as stated in the statement of comprehensive income with the estimated tax loss of the Bank for the years ended December 31, 2013 and 2012 is as follows:*

Exhibit 3-C

## TJAHJADI & TAMARA
Registered Public Accountants

**PT BANK MUTIARA Tbk**

Laporan Keuangan
Dengan Laporan Auditor Independen
Tahun yang Berakhir pada Tanggal
31 Desember 2012
Dengan Angka Perbandingan
untuk Tahun 2011



Morison International

An Independent Member Firm of **Morison** International

<table>
<tr><td>

**PT BANK MUTIARA Tbk**
**CATATAN ATAS LAPORAN KEUANGAN**
**Tahun yang Berakhir pada Tanggal 31 Desember 2012**
**dengan Angka Perbandingan untuk Tahun 2011**
**(Dinyatakan dalam jutaan Rupiah,**
**kecuali dinyatakan lain)**

</td><td>

*PT BANK MUTIARA Tbk*
*NOTES TO THE FINANCIAL STATEMENTS*
*Year Ended December 31, 2012*
*with Comparative Figures for 2011*
*(Expressed in millions of Rupiah,*
*unless otherwise stated)*

</td></tr>
</table>

| | |
|---|---|
| **2. IKHTISAR KEBIJAKAN AKUNTANSI PENTING** (lanjutan) | *2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)* |
| **b. Penjabaran Mata Uang Asing (lanjutan)** | *b. Foreign Currency Translation (continued)* |
| • **Transaksi dan saldo dalam mata uang asing (lanjutan)** | • *Transaction and balances in foreign currency (continued)* |
| Keuntungan dan kerugian selisih kurs yang timbul dari transaksi dalam mata uang asing dan dari penjabaran aset dan liabilitas moneter dalam mata uang asing, diakui pada laporan laba rugi, kecuali apabila ditangguhkan pada ekuitas karena memenuhi kualifikasi/kriteria sebagai lindung nilai arus kas (*hedging*). | *Exchange gains and losses arising on transactions in foreign currency and on the translation of foreign currency monetary assets and liabilities are recognized in the statements of comprehensive income, except when deferred in equity as qualifying cash flow hedges.* |
| Laba atau rugi kurs mata uang asing atas aset dan liabilitas moneter merupakan selisih antara biaya perolehan diamortisasi dalam Rupiah pada awal tahun, disesuaikan dengan suku bunga efektif dan pembayaran selama tahun berjalan, dan biaya perolehan diamortisasi dalam mata uang asing yang dijabarkan ke dalam Rupiah dengan menggunakan kurs pada akhir tahun | *The foreign currency gain or loss on monetary assets and liabilities is the difference between amortized cost in Rupiah at the beginning of the year, adjusted for effective interest and payments during the year, and the amortized cost in foreign currency translated into Rupiah at the exchange rate at the end of the year.* |
| Berikut ini adalah kurs mata uang asing utama yang digunakan pada tanggal-tanggal 31 Desember 2012 dan 2011 yang menggunakan kurs tengah Reuters pukul 16:00 Waktu Indonesia Barat (nilai penuh): | *Below are the major exchange rates used as of December 31, 2012 and 2011 using the Reuters' middle rates at 16:00 Western Indonesian Time (full amount):* |

| | **2012** | **2011** | |
|---|---|---|---|
| Poundsterling Inggris | 15.514,93 | 13.975,29 | *Great Britain Poundsterling* |
| Euro Eropa | 12.731,62 | 11.714,76 | *European Euro* |
| Franc Swiss | 10.536,25 | 9.631,94 | *Swiss Franc* |
| Dolar Australia | 10.007,10 | 9.205,78 | *Australian Dollar* |
| Dolar Kanada | 9.686,91 | 8.885,35 | *Canadian Dollar* |
| Dolar Amerika Serikat | 9.637,50 | 9.067,50 | *United States Dollar* |
| Dolar Selandia Baru | 7.918,18 | 7.000,57 | *New Zealand Dollar* |
| Dolar Singapura | 7.878,61 | 6.983,55 | *Singapore Dollar* |
| Dolar Hong Kong | 1.243,27 | 1.167,23 | *Hong Kong Dollar* |
| Yen Jepang | 111,77 | 116,82 | *Japanese Yen* |

| | |
|---|---|
| **c. Aset dan Liabilitas Keuangan** | *c. Financial Assets and Liabilities* |
| Efektif tanggal 1 Januari 2012, Bank menerapkan PSAK 50 (Revisi 2010), "Instrumen Keuangan: Penyajian", PSAK 55 (Revisi 2011), "Instrumen Keuangan: Pengakuan dan Pengukuran", dan PSAK 60 (Revisi 2010), "Instrumen Keuangan: Pengungkapan". | *Effective January 1, 2012, the Bank applied PSAK 50 (Revised 2010), "Financial Instruments: Presentation", PSAK 55 (Revised 2011), Financial Instruments: Recognition and Measurement", and PSAK 60 (Revised 2010), "Financial Instruments: Disclosures".* |

| PT BANK MUTIARA Tbk | PT BANK MUTIARA Tbk |
|---|---|
| CATATAN ATAS LAPORAN KEUANGAN | NOTES TO THE FINANCIAL STATEMENTS |
| Tahun yang Berakhir pada Tanggal 31 Desember 2012 | Year Ended December 31, 2012 |
| dengan Angka Perbandingan untuk Tahun 2011 | with Comparative Figures for 2011 |
| (Dinyatakan dalam jutaan Rupiah, | (Expressed in millions of Rupiah, |
| kecuali dinyatakan lain) | unless otherwise stated) |

### 32. BEBAN UMUM DAN ADMINISTRASI / 32. GENERAL AND ADMINISTRATIVE EXPENSES

|  | 2012 | 2011 |  |
|---|---|---|---|
| Penyusutan dan amortisasi | 30.591 | 17.904 | Depreciation and amortization |
| Sewa | 24.430 | 24.530 | Rent |
| Umum | 21.865 | 35.845 | General |
| Iklan dan promosi | 17.703 | 26.099 | Advertising and promotion |
| Komunikasi | 12.085 | 9.851 | Communication |
| Listrik, gas dan air | 5.914 | 6.798 | Electricity, gas, and water |
| Perbaikan dan pemeliharaan | 5.797 | 4.819 | Repairs and maintenance |
| Administrasi | 4.962 | 6.575 | Administration |
| Pendidikan dan pengembangan | 4.030 | 4.077 | Education and development |
| Kebersihan dan keamanan | 3.534 | 3.825 | Cleaning and security |
| Transportasi dan perjalanan dinas | 3.309 | 7.971 | Transportation and business travelling |
| Premi asuransi | 3.070 | 3.285 | Insurance premium |
| Cetakan dan alat tulis dan kebutuhan kantor | 2.908 | 4.179 | Printing and stationery |
| Iuran keanggotaan | 2.341 | 1.733 | Membership |
| Jasa profesional | 1.682 | 17.264 | Professional fees |
| Pajak dan izin | 1.393 | 655 | Taxes and licenses |
| Jamuan | 693 | 602 | Entertainments |
| Lain-lain | 920 | 1.025 | Others |
| **Jumlah** | **147.227** | **177.037** | **Total** |

### 33. BEBAN GAJI DAN TUNJANGAN / 33. SALARIES AND ALLOWANCE EXPENSES

|  | 2012 | 2011 |  |
|---|---|---|---|
| Gaji, upah, pensiun, dan tunjangan pajak | 125.884 | 107.798 | Salaries, wages, pension, and tax allowance |
| Kesejahteraan karyawan | 37.858 | 36.349 | Employes benefits |
| Tunjangan Hari Raya, cuti, dan tunjangan terkait lainnya | 11.404 | 8.336 | Allowance for Hari Raya, annual leaves, and other related benefits |
| Lainnya | 20.029 | 7.300 | Others |
| **Jumlah** | **195.175** | **159.783** | **Total** |

### 34. PENDAPATAN NON-OPERASIONAL / 34. NON-OPERATING INCOME

|  | 2012 | 2011 |  |
|---|---|---|---|
| Laba penjualan aset tetap | 1.911 | 3.526 | Gain on sale of fixed assets |
| Lain-lain | 43.579 | 5.556 | Others |
| **Jumlah** | **45.490** | **9.082** | **Total** |

### 35. BEBAN NON-OPERASIONAL / 35. NON-OPERATING EXPENSES

|  | 2012 | 2011 |  |
|---|---|---|---|
| Sumbangan | 579 | 278 | Donation |
| Denda dan sanksi | 490 | 300 | Fines and penalties |
| Lain-lain | 32.726 | 932 | Others |
| **Jumlah** | **33.795** | **1.510** | **Total** |

Exhibit 3-D



**mut1arabank**

value, because You're special

# PT BANK  PEARL      Tbk

LaporanKeuangan

For the Year -Year which Bcrakhir In

31 Desen1.ber  2011 and

**Tbk PT BANK PEARL**
**NOTES TO THE FINANCIAL STATEMENTS**
**(Continued)**
For the Years Ended December 31,
2011 and 2010

3.c.   Transactions and Balances in Foreign
       Currencies
       Transactions in foreign currencies are recorded in Rupiah based on the exchange rate prevailing at the
       transaction date. On the statement of financial position, assets and liabilities denominated in foreign
       currencies are adjusted to Rupiah by Reuters spot rates at
       at 16:00 pm. Gains or losses from exchange rate adjustments are credited or charged to the income

       As at December 31, 2011 and 2010, the exchange rate (the full amount) are as follows:

|  | 2011 Rp | 2010 Rp |
|---|---|---|
| Pounds | 13975.29 | 13941.18 |
| Euro | 11714.76 | 12017.99 |
| U.S. Dollar Swiss | 9067.50 | 9010.00 |
| Franc | 9631.94 | 9619.39 |
| Canadian Dollar | 8885.35 | 9024.89 |
| Singapore | 6983.55 | 7025.89 |
| Dollar | 9205.78 | 9169.48 |
| Australia Dollar | 7000.57 | 6970.14 |
| New Zealand Dollar | 1167.23 | 1159.08 |
| Hong Kong | 116.82 | 110.75 |

3.d.   Transactions with related parties
       Related parties are persons or entities related to the Bank (the reporting entity):
       (A)  The person or immediate family members have a relationship with the reporting entity      if the
            are:
            (I.)   has control or joint control over the reporting entity;
            (Ii)   has significant influence over the reporting entity; or
            (Iii.) key management personnel of the parent entity reporting entity or the
       (B)  An entity related to the reporting entity if it meets one of the following:
            (I)   The entity and the reporting entity are members of the same business group (ie a parent,
                  subsidiaries, and entities associated with the next child of another entity).
            (Ii)  One entity is an associate or joint venture of the other entity (or entities
                  associate or joint venture that is a member of a group of which the other entity is a member).
            (Iii.) Both entities are joint ventures of the same third party.
            (Iv.) One entity is a joint venture of a third entity and the other entity is an associate of the third
                  entity.
            (V.)  The entity is a post-employment benefit plan for the benefit of employees of either the
                  reporting entity or an entity related to the reporting entity. If the reporting entity is itself such a
                  plan, the sponsoring employers are also related entities to the reporting entity.
            (Vi.) The entity is controlled or jointly controlled by a person identified in (a).
            (Vii.) The person identified in subparagraph (a) (i) has significant influence over the entity or the
                  key management personnel of the entity (or the entity's parent entity).

3.e.   Financial Assets and Financial Liabilities
       <u>Financial Assets</u>
       Financial assets are classified as financial assets at fair value through profit or loss, loans and
       receivables, financial assets held to maturity, and asset
       finance available for sale. The classification depends on the purpose for which the financial asset.
       Management determines the classification of its financial assets at initial recognition.

18

**Tbk PT BANK PEARL**
**NOTES TO THE FINANCIAL STATEMENTS**
**(Continued)**
For the Years Ended December 31,
2011 and 2010

### 36. General and Administrative

| | 2011 Rp | 2010 Rp |
|---|---|---|
| Umum | 35.845 | 16.697 |
| Sewa Gedung | 24.530 | 18.618 |
| Iklan dan Promosi | 26.099 | 23.610 |
| Penyusutan dan Amortisasi | 17.904 | 17.301 |
| Jasa Profesional | 17.264 | 15.908 |
| Komunikasi | 9.851 | 11.310 |
| Transportasi dan Perjalanan Dinas | 7.970 | 6.414 |
| Administrasi | 6.575 | 6.020 |
| Listrik, Gas dan Air | 6.798 | 5.732 |
| Pendidikan dan Pengembangan | 4.077 | 2.038 |
| Kebersihan dan Keamanan | 3.825 | 3.745 |
| Cetakan/Alat Tulis dan Kebutuhan Kantor | 4.180 | 3.226 |
| Premi Asuransi | 3.285 | 2.899 |
| Perbaikan dan Pemeliharaan | 4.819 | 6.355 |
| Iuran Keanggotaan | 1.733 | 1.448 |
| Pajak dan Izin | 655 | 804 |
| Jamuan | 602 | 830 |
| Lain-lain | 1.025 | 746 |
| **Jumlah** | **177.037** | **143.701** |

### 37. Salaries and Allowances

| | 2011 Rp | 2010 Rp |
|---|---|---|
| Salaries, Wages, Pensions and Tax | 107 798 | 107 463 |
| Benefit | 36,349 | 21,171 |
| Employee Benefits | 8336 | 7663 |
| THR, Leave and Other Related Benefits | 7300 | 13,824 |
| Other | **159 783** | **150 121** |

### 38. Non-Operating Income

| | 2011 Rp | 2010 Rp |
|---|---|---|
| Fixed Income Asset Sales | 3526 | 26 |
| Other | 5556 | th |
| **Number** | **9082** | **3939** |

### 39. Non-Operating

| | 2011 Rp | 2010 Rp |
|---|---|---|
| Fines and | 300 | 7262 |
| Penalties | 278 | 204 |
| Other | 932 | 891 |
| Donation | **1510** | **8357** |

Tab 2

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
Case Nos. 15-3158 and 16-1178
------------------------------------------------------------
WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,
v.
PT BANK MUTIARA TBK,
Respondent-Appellee.
------------------------------------------------------------

## APPELLANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND REMAND

Appellant Weston Capital Advisors, Inc. ("WCAI") submits this memorandum of law in support of its motion to supplement the record and for remand of the case for further proceedings.[1]

### PRELIMINARY STATEMENT

The detailed factual background pertaining to this motion to supplement the record is set forth in the accompanying declaration of Charles B. Manuel, Jr.

### ARGUMENT

A federal court of appeals exercises its inherent equitable authority to supplement the record when: (1) changes in the pertinent law affect the outcome, or (2) changes in the facts alter either the suitability of the relief rendered by the district court or the court's subject-matter jurisdiction. The Supreme Court has

---

[1] This application specifically relates to the award of approximately $600,000 of legal fees of Quinn Emanuel Urquhart & Sullivan, LLP. However, the issues raised here also have a bearing on the matters that will be raised in Petitioner-Appellant's motion for reconsideration or for *en banc* review, to be filed next week.

thus held that courts of appeals are required to consider any change, either in fact or in law, which has supervened since the disputed decision of the district court was issued. *Patterson v. Ala.*, 294 U.S. 600, 607 (1935); *Watts, Watts & Co. v. Unione Austriaca Di Navigazione*, 248 U.S. 9, 21 (1918). In a case in which these changes alter the suitability of the outcome or of equitable relief, the court of appeals may remand the case to the district court to supplement the record. *See Gomez v. Wilson*, 477 F.2d 411, 416-17 (D.C. Cir. 1973) ("Since this new information was brought to light after this case had left the District Court, it is outside the record on appeal. We think, however, that it constitutes enough of a showing to entitle appellant to an opportunity to update his lawsuit as a predicate for possible further relief.")

The Second Circuit in *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972) stated that, "[i]n a situation . . . where circumstances have changed between the ruling below and the decision on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances."[2] In the case at bar, we respectfully submit that remand and supplementation of the record is the appropriate relief.

---

[2] The court in *Korn* held that the new circumstances that had arisen after the decision of the court below were so drastic that the circuit court could consider the new matter itself and reverse the lower court decision.

Two federal courts of appeals have permitted supplementation when misconduct by the non-proffering party directly caused the proffered materials to be absent from the district court record. In *Ross v. Kemp*, 785 F.2d 1467 (11th Cir. 1986), the Eleventh Circuit remanded for supplementation when state officials misrepresented their custody of the evidence in question, thereby preventing its earlier discovery and introduction into the state trial court and federal district court records. In *Mangini v. United States*, 314 F.3d 1158 (9th Cir. 2003), the Ninth Circuit permitted supplementation because the non-proffering party's failure to provide all the relevant facts when a district court judge's impartiality was called into question deprived the district court judge "of the opportunity to exercise informed discretion" in determining whether he should have disqualified himself from adjudicating the case.

Here, a strong case is made for supplementing the record and remand for further proceedings because including the newly discovered information of participation by Quinn Emanuel in the fraud and money laundering of its client bears heavily on the equities, demonstrating the unclean hands of the applicant, in concert with its client, at precisely the time that it was pursuing action against WCAI and nine non-parties. Concerted-action liability under New York law is based on the principle that "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation

or request, or who lend aid or encouragement to the wrongdoer ... are equally liable with him." *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 580, 450 N.Y.S.2d 776, 780, 436 N.E.2d 182 (1982) (internal quotation marks omitted); *see, e.g., Vanacore v. Teigue,* 664 N.Y.S.2d 604, 605 (2d Dep't 1997) (mem.). The elements of concerted-action liability are (1) an express or tacit agreement "to participate in a common plan or design to commit a tortious act," (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort. *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d at 295, 582 N.Y.S.2d at 375, 591 N.E.2d 222 (internal quotation marks omitted). Conspiracy and aiding and abetting are varieties of concerted-action liability: conspiracy requires an agreement to commit a tortious act, *see, e.g., Lindsay v. Lockwood,* 163 Misc.2d 228, 234, 625 N.Y.S.2d 393, 397 (1994); *Restatement (Second) of Torts* § 876(a), aiding and abetting requires that the defendant have given " 'substantial assistance or encouragement' " to the primary wrongdoer, *Lindsay v. Lockwood,* 163 Misc. 2d at 232, 625 N.Y.S.2d at 396 (quoting *Restatement (Second) of Torts* § 876(b)).

## CONCLUSION

Plaintiff-Appellant respectfully requests that the Court order supplementation of the record to include the expert report of Peter Barrie Brown; and further order the remand of this action for discovery related to the matters

regarding the participation of Quinn Emanuel in the money laundering and fraud discussed in the Manuel Declaration; and further order reconsideration of the award of attorneys' fees to Appellee Bank Mutiara and Quinn Emanuel.

Dated:   New York, New York
         June 29, 2016

Respectfully submitted,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Petitioner-Appellant
Weston Capital Advisors, Inc.

Tab 3

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| WESTON CAPITAL ADVISORS, INC., <br><br> Petitioner-Appellant, <br><br> v. <br><br> PT BANK MUTIARA, TBK, <br><br> Respondent-Appellee. | No. 16-1178 |

**RESPONDENT-APPELLEE PT BANK MUTIARA, TBK'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO THE MOTION FOR REMAND AND SUPPLEMENTATION OF THE RECORD AND ITS CROSS-MOTIONS TO (A) DISMISS THE APPEAL, (B) IMPOSE SANCTIONS ON OPPOSING COUNSEL, AND (C) STAY BANK MUTIARA'S RESPONSIVE BRIEF <u>UNTIL THESE MOTIONS ARE RESOLVED</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS .........................................................................3

    A.    Contempt Proceedings At The District Court And Fee Award ...........3

    B.    Appeals From Contempt Order And Fee Award ................................5

    C.    Dismissal For Lack Of Jurisdiction And Affirmance In Contempt Appeal.............................................................................6

    D.    The Present Motions In The Fee Appeal.............................................7

ARGUMENT .............................................................................................8

I.    THIS COURT LACKS JURISDICTION OVER WCAI'S INTERLOCUTORY APPEAL.....................................................................8

II.    WESTON'S MOTION TO REMAND SHOULD BE DENIED ...................8

    A.    Weston's Allegations Are Untrue And Irrelevant...............................9

    B.    Remand Is Legally Unavailable .......................................................11

III.    WESTON'S APPEAL SHOULD BE DISMISSED .....................................12

    A.    Weston Has Waived Its Right To Appeal The Fee Award.................12

    B.    The Law Of The Case Mandates Dismissal.......................................13

    C.    The Fee Appeal Is Based On The Same Untrue And Irrelevant Evidence Underlying Its Motion to Remand ......................................13

IV.    THE COURT SHOULD SANCTION WESTON'S ATTORNEY, CHARLES B. MANUEL, JR. ...................................................................14

    A.    Mr. Manuel Signed Pleadings Advancing Baseless Attacks Against Opposing Counsel.............................................................15

    B.    Mr. Manuel Was Aware That The Fee Appeal Was Frivolous When He Signed And Filed It.........................................................17

    C.    Mr. Manuel Seeks Improperly To Delay Resolution Of This Case ...............................................................................................19

V.    THE COURT SHOULD STAY BANK MUTIARA'S RESPONSIVE BRIEF UNTIL THE INSTANT MOTIONS ARE RESOLVED..................20

CONCLUSION .........................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Drexel Burnham Lambert Grp. Inc.*,
　995 F.2d 1138 (2d Cir. 1993) ...........................................................17

*Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*,
　149 F.3d 85 (2d Cir. 1998) ..........................................................10, 18

*Gallop v. Cheney*,
　642 F.3d 364 (2d Cir. 2011) .......................................................17, 19

*Matter of Hartford Textile Corp.*,
　613 F.2d 384 (2d Cir. 1979) ...........................................................17

*Henderson v. United States*,
　135 S. Ct. 1780 (2015) ....................................................................10

*Keystone Driller Co. v. Gen. Excavator Co.*,
　290 U.S. 240 (1933) ...................................................................10, 18

*Korn v. Franchard Corp.*,
　456 F.2d 1206 (2d Cir. 1972) ...........................................................11

*Marasa v. Atl. Sounding Co.*,
　557 F. App'x 14 (2d Cir. 2014) ........................................................11

*Mayes v. Kollman*,
　560 F. App'x 389 (5th Cir. 2014) .....................................................16

*Neitzke v. Williams*,
　490 U.S. 319 (1989) ........................................................................17

*O'Brien v. Alexander*,
　898 F. Supp. 162 (S.D.N.Y. 1995) *aff'd in part*,
　101 F.3d 1479 (2d Cir. 1996) ...........................................................17

*Phoenix Aktiengesellschaft v. Ecoplas, Inc.*,
　391 F.3d 433 (2d Cir. 2004) ............................................................14

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)............................................................................18

*Ransmeier v. Mariani*,
    486 F. App'x 890 (2d Cir. 2012)........................................................16

*Ransmeier v. Mariani*,
    718 F.3d 64 (2d Cir. 2013) ..........................................................15, 16

*In re Siemon*,
    421 F.3d 167 (2d Cir. 2005) ........................................................17, 19

*Stearman v. C.I.R.*,
    436 F.3d 533 (5th Cir. 2006) .............................................................19

*Thomas v. Tenneco Packaging Co., Inc.*,
    293 F.3d 1306 (11th Cir. 2002) .........................................................16

*United States ex rel. Keshner v. Nursing Pers. Home Care*,
    794 F.3d 232 (2d Cir. 2015) ..............................................................12

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009) ................................................................13

*United States v. Young*,
    470 U.S. 1 (1985)...............................................................................16

*Weston Capital Advisors, Inc. v. P.T. Bank Mutiara, Tbk*,
    No. 15-3158-cv, 2016 WL 3472375 (2d Cir. June 24, 2016) ..........3, 6, 8, 13, 14

### Statutes

28 U.S.C. § 1291 ..................................................................................6, 7, 8

28 U.S.C. § 1912....................................................................................15

28 U.S.C. § 1927..............................................................................14, 19

Fed. R. Civ. P. 11............................................................................16, 19

Fed. R. App. P. 38......................................................................15, 17, 19

Local Second Circuit Rule 40.1 ..............................................................15

Respondent-Appellee PT Bank Mutiara, TBK ("Bank Mutiara") respectfully submits this memorandum of law (a) in opposition to the motion of Petitioner-Appellant Weston Capital Advisors, Inc. ("WCAI"), its eleven affiliated corporate entities (the "Weston Affiliates"), and John R. Liegey (collectively, with WCAI and the Weston Affiliates, "Weston") for remand to the district court and supplementation of the record, and (b) in support of Bank Mutiara's cross-motions to (i) dismiss this appeal, (ii) impose sanctions against Weston's counsel, Charles B. Manuel, Jr. and (iii) stay Bank Mutiara's responsive brief until these motions have been ruled upon.[1]

## PRELIMINARY STATEMENT

Weston's appeal of the district court's contempt order was rejected last month in a summary affirmance by this Court. *Weston Capital Advisors, Inc. v. P.T. Bank Mutiara, Tbk*, No. 15-3158-cv, 2016 WL 3472375 (2d Cir. June 24, 2016). That summary affirmance disposes of Weston's appeal of the fee award associated with the contempt order. But Weston refuses to accept the decision of

---

[1]    As described in further detail herein, this appeal arises from the same district court order recently affirmed by this Court in *Weston Capital Advisors, Inc. v. P.T. Bank Mutiara, Tbk*, No. 15-3158-cv, 2016 WL 3472375 (2d Cir. June 24, 2016). Weston has filed a Petition for Reconsideration of this decision, which relies on similar arguments to those advanced by Weston here. *Weston Capital Advisors, Inc. v. P.T. Bank Mutiara, Tbk*, No. 15-3158-cv, Dkt. 176. Bank Mutiara respectfully requests that the same panel, which is already familiar with the relevant facts, consider the instant motions and cross-motions.

1

this Court, and instead seeks to multiply these proceedings by seeking a remand to the district court to "supplement" the record with untrue and irrelevant allegations. Weston's counsel also adds false and baseless attacks on defense counsel that not only lack any basis in fact or evidence, but are also irrelevant to the issues before this Court.

This Court should reject Weston's motion. It should also end Weston's vexatious campaign in this Court by granting Bank Mutiara's cross-motion to dismiss the instant Fee Appeal and to impose sanctions on Weston's counsel. Because none of WCAI, the Weston Affiliates, or Mr. Liegey even opposed the fee award in the district court, and because this Court has already affirmed the contempt award, there is nothing for Weston to appeal. In addition, Weston's counsel's filings are sanctionable because they contain unjustifiable *ad hominem* attacks and advance a frivolous appeal. Bank Mutiara respectfully requests that the same panel that heard argument and ruled on Weston's appeal of the contempt order last month also consider Weston's motion and Bank Mutiara's cross-motion to dismiss and for sanctions.

## STATEMENT OF FACTS

### A.    Contempt Proceedings At The District Court And Fee Award[2]

On October 1, 2013, WCAI filed an *ex parte* "petition" for recognition of a Mauritian default judgment rendered against Bank Mutiara.  Dist. Ct. Dkt. 1.  On October 3, notwithstanding the lack of notice to Bank Mutiara, the district court (Crotty, J.) granted the "petition" and directed that judgment be entered. Dist. Ct. Dkts. 5, 7.  On October 24, WCAI filed an *ex parte* application requesting an order to Standard Chartered Bank to turn over to WCAI all funds in Bank Mutiara's account up to the maximum amount of the judgment, Dist. Ct. Dkt. 9, and on October 28, the district court granted the application and entered the order, Dist. Ct. Dkt. 15.  On October 31, 2013, Standard Chartered Bank complied with the turnover order and transferred $3,623,037.83 to WCAI.  *See* Dist. Ct. Dkt. 57, at ¶ 18.

Bank Mutiara learned of the district court's judgment from the banks that received turnover orders and then hired New York counsel to appear.  Bank Mutiara moved to halt turnover by seeking a temporary restraining order via order to show cause, Dist. Ct. Dkts. 19, 22, and on November 19, 2013, the district court

---

[2]  "Dist. Ct. Dkt." refers to the docket in *Weston Cap. Advisors, Inc. v. PT Bank Mutiara, Tbk*, No. 13-cv-6945 (PAC) (S.D.N.Y.).  A more detailed description of the proceedings at the district court is available at *Weston Cap. Advisors, Inc. v. PT Bank Mutiara, Tbk*, No. 15-3158-cv, (2d Cir.), Dkt. 113 (Appellee's Br.), at 4-22.

granted Bank Mutiara's motion to vacate the judgment and the turnover orders because Weston's *ex parte* application deprived Bank Mutiara of due process, Dist. Ct. Dkt. 36. The district court ordered WCAI "to return to their original source within three (3) business days of the date of this Order any amounts previously recovered by Plaintiff in connection with the enforcement of the October 4, 2013 Judgment." Dist. Ct. Dkt. 37, at 1.

WCAI never returned the funds. On March 19, 2014, the district court held WCAI in contempt, Dist. Ct. Dkt. 63, and on July 16, 2014, it granted Bank Mutiara discovery regarding WCAI's ongoing failure to return Bank Mutiara's money, including "any complicit role that John Liegey or other Weston affiliates have played in WCAI's contempt." Dist. Ct. Dkt. 85, at 2.

On September 8, 2015, after considering a renewed contempt motion, the evidence obtained in discovery, and the live testimony of Mr. Liegey and another Weston employee, the district court entered an order piercing the veil among each of WCAI, the Weston Affiliates, and Mr. Liegey, holding each in contempt, and imposing escalating fines for failing to return the $3.6 million to Bank Mutiara. Dist. Ct. Dkt. 147 (attached as Exhibit A).

The district court also directed Bank Mutiara "to submit further briefing regarding the legal fees it incurred in pursuing the contempt motions . . . ." Dist. Ct. Dkt. 147, at 10. On September 24, 2015, Bank Mutiara submitted briefing

requesting attorneys' fees and attaching its counsel's contemporaneous time records. *See* Dist. Ct. Dkts. 148, 149. Weston never opposed Bank Mutiara's request for attorneys' fees. On March 16, 2016, the district court granted Bank Mutiara's motion for attorneys' fees in the amount of $598,519.50. Dist. Ct. Dkt. 155 (attached as Exhibit B).

### B. Appeals From Contempt Order And Fee Award

On October 7, 2015, Weston filed a notice of appeal regarding the district court's contempt order and the escalating fines it imposed (the "Contempt Appeal"; No. 15-3158-cv). On April 15, 2016, Weston filed a notice of appeal of the district court's order granting attorneys' fees (the "Fee Appeal"; No. 16-1178-cv). On April 20, 2016, Bank Mutiara moved to expedite the Contempt Appeal. Contempt Appeal Dkt. 126. On April 22, 2016, Weston objected to expediting, Contempt Appeal Dkt. 129, and moved to consolidate the Fee Appeal with the Contempt Appeal, *see* Contempt Appeal Dkt. 128-2 ¶ 7, and for supplemental briefing of the issues presented by the Fee Appeal, *id.* at ¶ 6. Mr. Manuel, on behalf of Weston, claimed that: "[t]he grant of legal fees was part [of] the expanded contempt order currently on appeal . . . [i]f the expanded contempt order is sustained, the legal fees follow [and i]f the expanded contempt order is reversed, the legal fees fail . . . ." *Id.*

On April 25, 2016, this Court: (a) granted Weston's request to consolidate the Fee Appeal with the Contempt Appeal; (b) ordered expedited briefing and hearing on the consolidated appeals; and (c) ordered Weston to file a "supplemental letter brief . . . on or before close of business May 9, 2016." Contempt Appeal Dkt. 137; Fee Appeal Dkt. 12. This Court set oral argument for the consolidated appeals for June 7, 2016. Contempt Appeal Dkt. 141; Fee Appeal Dkt. 16. Weston never filed an opening letter brief in the Fee Appeal. On May 20, 2016, this Court ordered the Fee Appeal and Contempt Appeal unconsolidated and set the Fee Appeal to be heard by the panel on the previously scheduled date. Contempt Appeal Dkt. 164; Fee Appeal Dkt. 37.

### C. Dismissal For Lack Of Jurisdiction And Affirmance In Contempt Appeal

This Court (Sack, Pooler, and Lynch, JJ.) heard oral argument on the Contempt Appeal on June 7, 2016. On June 24, 2016, this Court dismissed the appeal filed by WCAI for lack of jurisdiction and affirmed the district court's September 8, 2015 order with respect to the Weston Affiliates and their principal, John Liegey. *Weston Capital Advisors, Inc. v. PT Bank Mutiara, Tbk,* No. 15-3158-cv, 2016 WL 3472375, at *1–*3 (2d Cir. June 24, 2016). The Court reasoned that it lacked jurisdiction over WCAI because WCAI is a party and "appeals over civil contempt orders issued against parties are not final orders within the meaning of 28 U.S.C. § 1291." *Id.* at *1 (citation omitted). The Court

6

affirmed the district court's (i) finding that Liegey and the Weston Affiliates do not operate as separate entities and aided and abetted WCAI's contempt; and (ii) imposition of contempt and escalating fines on Weston. *Id.* at \*2–\*3. The Court rejected "the remainder of the arguments set forth by the Weston Entities and Liegey . . . find[ing] them to be without merit." *Id.* at \*3.

### D.  The Present Motions In The Fee Appeal

On June 30, 2016, Weston moved in the Fee Appeal for "a supplementation of the record and a remand to the district court for further proceedings" ostensibly "in light of newly discovered evidence of Quinn Emanuel's unclean hands in participating with Bank Mutiara in $8 million of money laundering." Fee Appeal Dkts. 44, 46, 49 ("June 30 Filings"). Mr. Manuel declared under penalty of perjury that "Quinn Emanuel was a direct participant [in money laundering] as the arranger and recipient of $8 million of the stolen and laundered funds." Fee Appeal Dkt. 44-2 (the "Manuel Decl.") ¶ 9. In purported support of these accusations, Mr. Manuel submitted an expert report prepared in a separate and confidential arbitration proceeding concerning Bank Mutiara, Manuel Decl., Ex. 1, ¶ 19, and cited to Bank Mutiara's public financial statements.[3]

---

[3] It is unclear how Weston came into possession of the confidential Brown report.

## **ARGUMENT**

## I. **THIS COURT LACKS JURISDICTION OVER WCAI'S INTERLOCUTORY APPEAL**

WCAI's appeal should dismissed because this Court lacks jurisdiction over an appeal from a non-final order. In the Contempt Appeal, *Weston Capital Advisors*, 2016 WL 3472375, this Court dismissed WCAI's appeal from the September 8, 2015 contempt order because "civil contempt orders issued against parties are not final orders within the meaning of 28 U.S.C. § 1291, and thus [parties] must await a final order before an appeal may be taken." *Id.* at *1 (citation omitted). Weston has conceded that "[t]he grant of legal fees" at issue in this Fee Appeal "was part [of] the expanded contempt order . . . on appeal" in the Contempt Appeal. Contempt Appeal Dkt. 128-2 ¶ 6. This Court's conclusion that it is without jurisdiction to consider WCAI's Contempt Appeal applies equally to WCAI's Fee Appeal.

## II. **WESTON'S MOTION TO REMAND SHOULD BE DENIED**

Weston's motion to remand relies on untrue and irrelevant allegations, which in any event do not constitute a "change in circumstances" sufficient to warrant remand.

8

## A.    Weston's Allegations Are Untrue And Irrelevant

Weston's allegations regarding both Bank Mutiara and its counsel, Quinn Emanuel, are untrue and unsupported by the sparse evidence submitted and also irrelevant to this appeal.

Weston claims that "the report of Peter Barrie Brown, read in conjunction with the fraudulent financial statement of Bank Mutiara which is already in the record, unequivocally shows that Bank Mutiara and its counsel[, Quinn Emanuel,] have jointly engaged in illegal money laundering activity." Manuel Decl., ¶ 2. It argues that the documents show that "Bank Mutiara knowingly brokered the laundering of $40 million that [third parties] extracted from their failing bank; . . . retained $8 million of the laundered [funds] as its 'fee' for the money transfers; and . . . then transferred the $8 million of the laundered money to Quinn Emanuel—purportedly as the 'Bank's Lawyer' . . . but in fact as a 'Legal Fee' for the law firm." Manuel Decl., ¶ 9.

These allegations are baseless. Weston's claims about the "fee" transaction—rife with conspiracy theories and non-sequiturs—are all but impossible to follow. But they certainly are not true. The arbitration and the Brown report concerned "a series of transactions entered into . . . in November 2006," Manuel Decl., Ex. 1, ¶ 19, which in no way involved either Quinn Emanuel or Weston. This decade-old activity cannot support Weston's contention that

"money laundering activity at the bank . . . began in 2006-2008 *and continued through 2015*," or its assertion that the funds transferred to Quinn Emanuel was somehow a "fee" for executing those transactions. Manuel Decl. ¶ 5 (emphasis added). Weston's characterization of certain transactions in Bank Mutiara's publicly available FY 2014 financial report (filed under the accounting rules and law of Indonesia) does not remotely approach evidence of "money laundering." *Id.*, ¶¶ 5–9, 12–15, 17.

These documents are also entirely irrelevant to this appeal. "The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'" *Henderson v. United States*, 135 S. Ct. 1780, 1783 n.1 (2015) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)). "[M]isconduct . . . unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) (citation and quotation marks omitted). The November 2006 transactions described in the Brown report, Manuel Decl., ¶ 11; the purported "fraudulent misreport[ing]" in Bank Mutiara's FY 2014 financial statements, *id.*, ¶ 6, and the alleged "joint[] . . . money laundering activity," *id.*, ¶ 2, bear *no* relation—let alone an "immediate and necessary" one—to these proceedings. Even if the allegations regarding Bank Mutiara and Quinn Emanuel were true

(which they are not), they are irrelevant to both the contempt order against Weston at issue in the Contempt Appeal, and the unopposed order granting attorneys' fees at issue in this Fee Appeal.

### B.    Remand Is Legally Unavailable

Remand is also legally unavailable here.   Weston argues that "where circumstances have changed between the ruling below and the decision on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances."   Fee Appeal Dkt. 59, at 4–5 (citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972)).   But this Court has held that the *Korn* doctrine is of narrow application and does not permit, e.g., a remand for recalculation of damages upon "changed circumstances."   *See, e.g.*, *Marasa v. Atl. Sounding Co.*, 557 F. App'x 14, 19–20 (2d Cir. 2014) (summary order), *as amended* (Jan. 29, 2014).   Weston cites no authority permitting remand to the district court for the reconsideration of attorneys' fees in light of "changed circumstances," and we are aware of none.

There are also no "changed circumstances" warranting remand to the district court here.   The Brown report and Bank Mutiara's FY 2014 financial statements are each more than a year old, and could have been brought to the district court's attention in the first instance.   Weston argues that it only learned of the information "when [it] recently received and reviewed the expert report, long after the opinion

11

and judgment of the district court were issued in this case," Manuel Decl. ¶ 17, but does not explain how Weston came into possession of the Brown report at the time that it did. This cannot excuse presentation of two-year-old information as "new."

## III.  WESTON'S APPEAL SHOULD BE DISMISSED

Weston's appeal should be dismissed for at least three independent reasons. *First*, Weston waived its right to appeal the fee award to this Court by failing to object to the entry of the order granting fees before the district court. *Second*, the law of the case as established by this Court's decision in the Contempt Appeal requires that the Fee Appeal should also be dismissed. *Third*, Weston's appeal depends on the same untrue and irrelevant "evidence" as its motion to remand.

### A.  Weston Has Waived Its Right To Appeal The Fee Award

The Fee Appeal should be dismissed because Weston failed to oppose the fee award in the district court. Bank Mutiara moved for attorneys' fees on September 24, 2015, Dist. Ct. Dkts. 148, 149, and Weston failed to object in any manner before (or after) the district court granted Bank Mutiara's motion on March 16, 2016, Dist. Ct. Dkt. 155. Having failed to object at the district court, Weston cannot contest the fee award before this Court. *See United States ex rel. Keshner v. Nursing Pers. Home Care*, 794 F.3d 232, 234–35 (2d Cir. 2015) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (citation and quotation marks omitted)).

B.  **The Law Of The Case Mandates Dismissal**

The Fee Appeal should also be dismissed pursuant to the law of the case. *See United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," except in "compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice" (citation and quotation marks omitted)).  Weston argued in the Contempt Appeal that the "Motion for Contempt Should Have Been Denied Because of Bank Mutiara's Unclean Hands."  Contempt Appeal Dkt. 115, at 26–29; Contempt Appeal Dkt. 116, at 15 (similar); *see also* Manuel Decl. ¶ 3-4 (citing to the record in the Contempt Appeal for purported evidence of Bank Mutiara's purported wrongdoing).  This Court has already rejected those arguments when it affirmed the district court's decision in the Contempt Appeal.  *See Weston Capital Advisors*, 2016 WL 3472375, at *3.  Weston does not even attempt to show compelling circumstances sufficient to justify departing from that decision.

C.  **The Fee Appeal Is Based On The Same Untrue And Irrelevant Evidence Underlying Its Motion to Remand**

This Court should also dismiss the Fee Appeal for the same reasons as it should deny Weston's motion to remand and supplement the record.  Weston concedes that unclean hands is its sole issue presented in the Fee Appeal, Fee

Appeal Dkt. 59, at 3, and admits the argument "is the same as that in the concurrently filed Memorandum of Law in Support of Appellants' Motion to Supplement the Record and for Remand," *id.* at 4 n.4. Weston has waived any other arguments by failing to raise them in its opening brief. *See Phoenix Aktiengesellschaft v. Ecoplas, Inc.*, 391 F.3d 433, 438 n.4 (2d Cir. 2004) ("[W]e 'ordinarily will not consider arguments that an appellant has failed to make in his opening brief.'") (quoting *Mitchell v. Fishbein*, 377 F.3d 157, 164–65 (2d Cir. 2004)).

## IV. THE COURT SHOULD SANCTION WESTON'S ATTORNEY, CHARLES B. MANUEL, JR.

This Court should impose sanctions on Weston's counsel, Mr. Charles B. Manuel, Jr. for submitting the June 30 Filings, which pose unjustifiable *ad hominem* attacks against opposing counsel, advance a frivolous appeal, and seek to delay resolution of these proceedings, in an amount at least double Bank Mutiara's costs in defending against the Fee Appeal. Notably, Weston, Mr. Manuel's client, currently owes over $30 million in fines to the district court; it is unlikely that sanctions of even several hundred thousand dollars will deter Weston from future improper filings. Imposing sanctions on Mr. Manuel directly is necessary and appropriate. This Court may impose sanctions against an attorney pursuant to (i) its "inherent power to sanction . . . an attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"; (ii) 28 U.S.C. § 1927, which

14

permits the Court to require "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct"); and Fed. R. App. P. 38, which permits the Court to "award just damages and single or double costs if it determines that an appeal is frivolous." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (internal citations and quotation marks omitted). This Court also has the power to apportion costs. *See* 28 U.S.C. § 1912 ("Where a judgment is affirmed by the Supreme Court or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs."). Here, Mr. Manuel should be sanctioned for the submission of the June 30 Filings at least in an amount equal to double Bank Mutiara's costs in defending against the Fee Appeal.[4]

### A. Mr. Manuel Signed Pleadings Advancing Baseless Attacks Against Opposing Counsel

Mr. Manuel signed pleadings that advance unjustifiable *ad hominem* attacks on opposing counsel, Quinn Emanuel. "[I]nflammatory attacks on the opposing advocate" have "no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach [of this

---

[4]   Mr. Manuel raises similar arguments in a petition for reconsideration in the Contempt Appeal.  Contempt Appeal Dkt. 176.  Bank Mutiara reserves the right to seek further sanctions, including under Local Rule 40.1(d) (sanctions for frivolous petitions for panel rehearing), with respect to this filing.

rule] by either counsel." *United States v. Young*, 470 U.S. 1, 9 (1985). Failure to follow this basic rule of professional conduct can and should result in sanctions. *See Ransmeier*, 718 F.3d at 68 (describing "*ad hominem* attacks on opposing counsel" as "offensive" and as a potential basis for sanctions); *see also* Fed. R. Civ. P. 11(b)(1), (c)(1) (sanctions may be imposed by the district court against an attorney who falsely certifies that a filing "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"); *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306, 1308 (11th Cir. 2002) (per curiam) ("[A]n attorney who submits documents to the district court that contain *ad hominem* attacks directed at opposing counsel is subject to sanction under the court's inherent power to oversee attorneys practicing before it."); *Mayes v. Kollman*, 560 F. App'x 389, 394–95 (5th Cir. 2014) ("Indeed, it is highly inappropriate for a lawyer to make personal attacks on opposing counsel during any stage of litigation."); *see also Ransmeier v. Mariani*, 486 F. App'x 890, 893 (2d Cir. 2012) (summary order) ("[Attorneys'] defiant motion to supplement the record, which supposedly identifies 'newly discovered' evidence of the district court's partiality . . . is in fact nothing more than a vehicle for asserting deeply troubling personal slurs against Judge Hellerstein and his family.").

Here, Mr. Manuel charges Quinn Emanuel with serious wrongdoing without any basis. Mr. Manuel has been sanctioned previously for making statements

lacking evidentiary support. *See O'Brien v. Alexander*, 898 F. Supp. 162, 174–76 (S.D.N.Y. 1995) (sanctioning Mr. Manuel for making statements to the court that "were materially misleading and were without evidentiary or other support"), *aff'd in part*, 101 F.3d 1479, 1490 (2d Cir. 1996) (affirming imposition of sanctions for statement that was "totally lacking in evidentiary support"). Yet here, he accuses, under penalty of perjury, Quinn Emanuel of being a "direct participant" and playing a "central role" in a "money laundering scheme" Fee Appeal Dkt. 44-2, ¶¶ 9, 19; *see also* Fee Appeal Dkt. 59, at 3; Fee Appeal Dkt. 49, at 3. Mr. Manuel provides no evidence of Quinn Emanuel's participation in money laundering; this extremely serious accusation is supported only by his say-so.

### B.    Mr. Manuel Was Aware That The Fee Appeal Was Frivolous When He Signed And Filed It

Mr. Manuel should also be sanctioned for knowingly submitting a frivolous appeal. An appeal is frivolous where it was "brought without the slightest chance of success," *Gallop v. Cheney*, 642 F.3d 364, 370 (2d Cir. 2011) (citation omitted), and "lacks an arguable basis either in law or in fact," *In re Siemon*, 421 F.3d 167, 169 (2d Cir. 2005) (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)). Imposing sanctions for filing a frivolous appeal does not require a finding of "bad faith." *In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1147 (2d Cir. 1993) (citation omitted). Submission of a frivolous appeal can result in the imposition of double costs. *See* Fed. R. App. Proc. 38; *see, e.g.*, *Matter of*

17

*Hartford Textile Corp.*, 613 F.2d 384, 386 (2d Cir. 1979) ("We consider the present appeal, as well as [appellant's other appeals], to be entirely frivolous, and we award appellees double their costs in connection with these matters.")

As Mr. Manuel knows, the unclean hands doctrine is inapplicable where the alleged misconduct is "unrelated to the claim to which it is asserted as a defense." *Dunlop-McCullen*, 149 F.3d at 90; *see, e.g.*, Contempt Appeal Dkt. 113, Bank Mutiara's Br. at 43–44 & n.6 (citing *Dunlop-McCullen*, 149 F.3d at 90, and explaining same); Contempt Appeal Dkt. 115, Weston's Br. at 27 (acknowledging that the party seeking equity "shall have acted fairly and without fraud or deceit as to the controversy in issue") (citing *Keystone Driller Co.*, 290 U.S. at 245); *id.* at 26–27 ("[T]he 'unclean hands' doctrine 'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief'") (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

Mr. Manuel signed a brief in this Fee Appeal which relies entirely on allegations of Bank Mutiara and Quinn Emanuel's wrongdoing in matters unrelated to this action. *See* Fee Appeal Dkt. 59 (discussing allegations against Bank Mutiara and Quinn Emanuel springing from November 2006 transactions, late 2014 fund transfers, and early 2015 financial reporting). Mr. Manuel does not explain why the unclean hands doctrine would apply here, and cites no authorities

18

permitting this Court to sidestep the limits on the doctrine. This frivolous appeal "brought without the slightest chance of success," *Gallop*, 642 F.3d at 370, and lacking "basis in law or fact," *In re Siemon*, 421 F.3d at 169, justifies sanctions. *See* Fed. R. App. Proc. 38 (providing for "just damages and single or double costs" if an appeal is "frivolous"); *Stearman v. C.I.R.*, 436 F.3d 533, 538 (5th Cir. 2006) ("[A] party who continues to advance long-defunct arguments invites sanctions").

### C. Mr. Manuel Seeks Improperly To Delay Resolution Of This Case

Mr. Manuel's submission of filings that he knows to be frivolous in an attempt to delay proceedings is both unreasonable and vexatious. *See* 28 U.S.C. § 1927. His apparent reason for the delay—to postpone the date when Weston must pay Bank Mutiara's fees (and return funds as ordered in the Contempt Appeal)—is sanctionable. *Cf.* Fed. R. Civ. P. 11(b)(1), (c)(1) (sanctions may be imposed by the district court against an attorney who falsely certifies that a filing "is not being presented for any improper purpose, such as to . . . cause unnecessary delay, or needlessly increase the cost of litigation"). Moreover, this is only the latest of Mr. Manuel's delaying tactics. *See, e.g.*, Contempt Appeal Dkt. 126-2 (detailing Weston's failure to seek a stay of the Contempt Appeal despite the rapid accrual of fines, which forced Bank Mutiara to seek to expedite its resolution); Contempt Appeal Dkt. 129-1 (Weston opposes expediting the Contempt Appeal). The Court should sanction Mr. Manuel for wasting the Court's and Bank Mutiara's

time and resources in pursuit of an impermissible goal and to deter him from using such improper tactics in the future.

## V. THE COURT SHOULD STAY BANK MUTIARA'S RESPONSIVE BRIEF UNTIL THE INSTANT MOTIONS ARE RESOLVED

Resolution of the instant motions will likely moot this appeal either through remand to the district court or dismissal of this appeal. Accordingly, Bank Mutiara requests that its responsive brief be stayed pending resolution of these motions.

## CONCLUSION

Bank Mutiara respectfully requests that the Court (i) deny Weston's motion for remand and supplementation of the record, (ii) dismiss Weston's appeal, (iii) sanction Weston's attorney, Charles B. Manuel, Jr. for his improper filings, and (iv) stay Bank Mutiara's responsive brief until the motions comprising (i) through (iii) have been resolved.

Dated: July 11, 2016
     New York, New York     Respectfully submitted,

          /s/ *Marc L. Greenwald*
          Marc L. Greenwald
          Andrew P. Marks
          Daniel R. Koffmann
          QUINN EMANUEL URQUHART &
            SULLIVAN, LLP
          51 Madison Avenue, 22nd Floor
          New York, New York 10010
          Telephone: (212) 849-7000

          *Counsel for Respondent-Appellee*
          *PT Bank Mutiara, Tbk*

20

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
WESTON CAPITAL ADVISORS, INC.,                             :
                                                           :
                    *Plaintiff,*                           :
                                                           :
         *-against-*                                       :
                                                           :
PT BANK MUTIARA, TKB,                                      :
                                                           :
                    *Defendant.*                           :
                                                           :
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9-8-15_

13 Civ. 6945 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendant PT Bank Mutiara TBK ("Bank Mutiara") moves to (1) expand the Court's prior contempt order to cover non-parties John Liegey and the remaining Weston entities,[1] and (2) impose sanctions on the contemnors. Since March 19, 2014, Plaintiff Weston Capital Advisors, Inc. ("WCAI") has been in contempt of the Court's November 19, 2013 order for failing to return approximately $3.6 million. The Court determines that there is no distinction between WCAI, John Liegey ("Liegey"), and the remaining Weston entities. Accordingly, Bank Mutiara's request to expand the contempt order is GRANTED and the Court imposes escalating sanctions to secure compliance with the Court's November 19, 2013 order.

**BACKGROUND**

In October 2013, the Court granted WCAI's *ex parte* petition to recognize a Mauritian judgment against Bank Mutiara under Article 53 of the New York Civil Practice Law and Rules.

---

[1] The remaining Weston entities are: Weston International Capital Management (Luxembourg) S.A.; Weston International Capital (Mauritius) Ltd.; Weston International Capital Ltd.; Weston Capital Services Ltd.; First Capital Management Ltd.; First Global Funds Ltd. PCC; Weston International Investments Limited; Arlington Assets Investments Ltd.; Weston International Asset Recovery Co. Ltd.; and Weston International Asset Recovery Corporation Inc.

1

*See* Dkt. No. 1. The Court froze Bank Mutiara's assets in Wells Fargo and Standard Chartered and issued a turn-over order, allowing WCAI to collect $3.6 million in satisfaction of the Mauritian judgment. *See* Dkt. Nos. 15 & 16.

On November 19, 2013, the Court vacated its order recognizing the Mauritian judgment because WCAI failed to notify Bank Mutiara of its Article 53 petition. *See* Dkt. No. 37. The Court ordered WCAI to return all funds collected within three days and noted that when the funds were returned WCAI could renew its petition to recognize the Mauritian judgment and Bank Mutiara could oppose the petition. *See id.* But WCAI failed to return the funds and its attempts to modify the order and repay the funds with bonds were rejected by the Court. *See* Dkt. No. 52, 1 ("Weston's proposal falls well short of satisfying the Court's order to remit $3.6 million that Weston recovered.").

On March 19, 2014, the Court held WCAI in contempt of the Court's "clear and unambiguous" November 19, 2013 order directing the return of funds. Dkt. No. 63, 2; *see Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995). The Court, however, declined to hold non-parties Liegey and the Weston entities in contempt. *See* Dkt No. 63. Following a hearing on July 15, 2014, the Court granted Bank Mutiara's discovery request for an "investigation into any complicit role that John Liegey or other Weston affiliates have played in WCAI's contempt." Dkt. No. 85, 2.

Bank Mutiara now moves for an order expanding WCAI's contempt to include Liegey and the remaining Weston entities and requests that the Court impose escalating sanctions on the contemnors. On June 17, 2015, the Court had an evidentiary hearing and heard testimony from Liegey, the majority shareholder and director of the Weston entities, and Jabir Udhin, a minority shareholder of the Weston entities.

2

## **DISCUSSION**

## **1. The Court expands the contempt order to include non-parties Liegey and the remaining Weston entities**

"A nonparty respondent may be held in contempt of a court order if the respondent abets the party named in the order in its noncompliance or if it is legally identified with that party." *Spectacular Venture, L.P. v. World Star Int'l, Inc.*, 927 F. Supp. 683, 684 (S.D.N.Y. 1996). Here, Liegey and the remaining Weston entities both abetted WCAI's noncompliance and also legally identify with WCAI.

*A. Liegey and the Weston entities abetted WCAI's noncompliance with the Court's order*

While WCAI was incorporated in Delaware and licensed to do business in New York, it is in fact little more than a name Liegey and his foreign Weston entities use to litigate in the United States. Its purpose was to petition the Court to recognize Weston's Mauritian judgment. Although it obtained a favorable judgment from the Court, WCAI never took possession of the attached funds for it does not have a bank account. *See* Tr. 95:03–09. Instead, the funds were directed to Weston International Capital Limited ("WICL") in Mauritius. *See* Tr. 85:14–16 ("[The Order] said, 'pay as directed.' Kelley Drye asked us who to pay, and we said pay WICL in Mauritius. WCAI didn't have a bank account here."). From there, the funds were dispersed throughout the Weston network before vanishing, leaving WCAI—the only party before the Court—claiming an inability to comply with the Court's order to return the funds.

Liegey, at the helm of all Weston entities, was the instigator of this "now you see it; now you don't" act. He was fully aware of the Court's order to return the funds, but instead considered the funds to be "absolutely designated for bills that were already in place," Tr. 91:08–09, and simply ignored the Court's order. *See* Tr. 100:17–18 ("I knew that there was an order,

3

yes, sir, and I did not return the funds."). The calculated decision not to comply with the Court's order was also confirmed by testimony from Jabir Udhin:

| Mr. Marks: | So you think that [Weston International Investments Limited] should have to return the funds to the court? |
|---|---|
| Mr. Udhin: | Yes. |
| Mr. Marks: | But it didn't, did it? |
| Mr. Udhin: | No, it did not. As I said, we had -- there was a bankruptcy risk. So we had to pay its operation to stay in formation. |
| Mr. Marks: | So you chose to survive rather than repay the court? |
| Mr. Udhin: | Correct. It's a hardship. |

Tr. 45:07–15. After the funds were fully dispersed and spent, the Weston entities returned to their "extremely illiquid position," Tr. 81:11. *See* Tr. 18:06 ("In Mauritius [the Weston entities] all have less than $100.").

Liegey used the amorphous structure of the Weston entities to keep the funds out of WCAI's control. Liegey and, thereby, the entire Weston group facilitated WCAI's noncompliance with the Court's order. Accordingly, the Court's contempt order is expanded to cover Liegey and the remaining Weston entities.

*B. Liegey and the Weston entities also legally identify with WCAI*

The Court has no hesitation piercing the Weston corporate veil and concluding that WCAI, Liegey, and the remaining Weston entities are single entity under New York law. *See New York State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (veil-piercing is appropriate where the moving party shows: "(1) the parent corporation dominates the subsidiary in such a way as to make it a 'mere instrumentality' of the parent; (2)

4

the parent company exploits its control to 'commit fraud or other wrong'; and (3) the [moving party] suffers an unjust loss or injury as a result of the fraud or wrong" (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991))).

First, all Weston entities are "mere instrumentalities" of Liegey. *See Passalacqua*, 933 F.2d at 139. Corporate formalities are typically ignored:[2] each entity has "the same board of directors[] [s]o for each individual company it was not a requirement . . . to have separate board meetings for each entity." DEX J, 53:02–06. Furthermore, all Mauritius-based Weston entities operate from the same office at First Floor, Cyber Tower 1, Ebene, Republic of Mauritius. Tr. 33:02–11. The financial situation of the Weston entities also demonstrates that they are instrumentalities of Liegey. As noted above, the American-based entities do not have bank accounts and the Mauritian-based entities each have under $100. *See* Tr. 18:06. The only entity with funds is Weston Capital Services ("WCS"), "the operating company in England personally for Mr. John Liegey." Tr. 46:10–11. But WCS funds are not just for Liegey's personal expenses; Liegey uses WCS funds to pay for Weston's legal fees, Weston's employee salaries, and Weston's expenses. Tr. 45:19–49:20. In addition to the undercapitalization and mixing of funds, Liegey and the Weston entities also guarantee one another's debts. *See, e.g.*, PEX 7 (a loan term sheet listing Weston International Asset Recovery Company Limited as "Obligor"; Weston International Capital Limited as "Guarantor"; and John R. Liegey as "Limited Guarantor"). Finally, Liegey's business practices illustrate that all of the Weston entities are Liegey's instrumentalities. There has never been a business dispute between the Weston entities and at no point has a Weston entity made a suggestion or a business proposition to another Weston entity that was rejected. Tr. 34:15–35:12. Moreover, the Weston entities do not operate at arm's

---

[2] However, some Weston entities observe the limited financial formalities necessary to avail of the 3% tax-rate in Mauritius. *See* Tr. 8:03–22.

5

length—Liegey frequently represents both sides in inter-Weston—or, *intra*-Weston—
transactions and has never sought a fairness opinion from an independent party. *See, e.g.*, PEX 7
(Liegey providing an "Authorized Signature" on behalf of Weston International Asset Recovery
Company Limited, Weston International Capital Limited, and in his personal capacity); *see also*
Tr. 104:15 (despite advising \$2.2 billion of portfolios, Liegey "[didn't] think [he] could afford a
fairness opinion").

Next, Liegey and the remaining Weston entities exploited their amorphous corporate
structure to ensure WCAI never had control of Bank Mutiara's funds, enabling WCAI to resist or
avoid any judgment from the Court. *See Passalacqua*, 933 F.2d at 138 ("[T]he control must be
used to commit a fraud or other wrong that causes plaintiff's loss" (citation omitted)). While
WCAI spent over a year challenging the Court's orders (knowing full-well that it lacked the
capacity to ever comply), WCS spent over \$800,000 of Bank Mutiara funds on Liegey's
\$10,000-a-month Manhattan apartment, Tr. 110:11–12; his \$20,000-a-month London apartment,
DEX J, 18:07–08; his \$18,000-a-month salary, Tr. 102:17–19; as well as almost \$200,000 in
payments to his family, *see* DEX S. Liegey, therefore, exploited his control over the Weston
entities to enable him to reap the benefits of the \$3.6 million windfall while thumbing his nose at
the Court's orders.

Finally, the injury here is obvious. *See Morris v. New York State Dept. of Taxation and
Fin.*, 82 N.Y. 2d 135, 141–42 (N.Y. 1993) ("[D]omination, standing alone, is not enough; some
showing of a wrongful or unjust act toward plaintiff is required"). On November 19, 2013, the
Court ordered WCAI to refund approximately \$3.6 million to Bank Mutiara since the funds were
obtained in violation of Bank Mutiara's due process rights. Over 20 months later, WCAI has yet
to comply with the Court's order and Bank Mutiara's funds remain missing.

Accordingly, the Court pierces the Weston corporate veil, treats Liegey and the entire Weston group as a single entity, and expands the contempt order to cover these non-parties.[3]

*C. WCAI's arguments against expanding the contempt have no merit*

WCAI opposes Bank Mutiara's motion to expand the contempt order on two grounds; neither have merit. First, WCAI argues that the equitable maxim of unclean hands prevents the relief sought by Bank Mutiara. *See Brennan v. Nassau Co.*, 352 F.3d 60, 63 (2d Cir. 2003) (finding that contempt is "subject to equitable defenses"). Since the Weston entities have an unsatisfied Mauritian judgment against Bank Mutiara, they argue that Bank Mutiara is undeserving of equitable relief. Moreover, WCAI raises concerns about J Trust Co.'s recent acquisition of Bank Mutiara and notes that its attempts to satisfy the underlying judgment in multiple jurisdictions remain frustrated. But Bank Mutiara's status as a creditor in Mauritius does not prevent the Court from expanding the contempt order based on the role Liegey and the remaining Weston entities played in WCAI's contempt.

Next, WCAI argues that Liegey and the remaining Weston entities cannot be held in contempt since the Court's November 19, 2013 order directing WCAI to return the funds did not apply to them. WCAI claims that expanding this order to the non-parties would render the order ambiguous since "[a] clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed who must be able to ascertain from the four corners of the order precisely what acts are forbidden," *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)

---

[3] The Court has personal jurisdiction over Liegey and the remaining Weston entities based on WCAI's contact with New York. *See Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989) ("Under New York law, where a corporate subsidiary is essentially a 'separately incorporated department or instrumentality' of a foreign corporation, the activities of the subsidiary will be attributed to the foreign parent for purposes of determining the parent's amenability to personal jurisdiction in New York." (citing *TACA Int'l Airlines, S.A. v. Rolls Royce, Ltd.*, 15 N.Y. 2d 97 (N.Y. 1965))).

(internal quotation marks and citations omitted). But the Court is not expanding its November 19, 2013 order to the non-parties as they were plainly not covered by the order; rather, the Court expands its March 19, 2014 contempt order to the non-parties because they abetted WCAI's noncompliance and legally identify with WCAI.

### 2. Sanctions are appropriate

"When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) (citation omitted).

First, the character and magnitude of the harm is significant: $3.2 million of Bank Mutiara's funds were attached in violation of its due process rights. And when the Court vacated the attachment and ordered the return of the funds, the contemnors willfully and knowingly declined to comply with the Court's order. Instead, WCAI—a shell entity with little more than a United States address—litigated the matter over the course of 20 months by challenging the order, moving for the Court to reconsider the order, resisting Court-ordered discovery, and initiating a parallel suit in this District against Bank Mutiara (using another shell entity, Weston International Asset Recovery Corporation, Inc.). Moreover, throughout this litigation, WCAI has employed the same rhetoric concerning Bank Mutiara's business practices in Mauritius to steer the Court's attention away from WCAI's noncompliance:

> The Court:  Mr. Greenwald has moved for contempt, and I would like to know why you shouldn't be held in contempt and directed to further again pay the money. Now it's interesting about all these offsets in Mauritius, but, you know, that is not the question here. Go ahead.

8

Mr. Manuel: Your Honor, we respectfully disagree.

The Court: I know you do, but I get to define the issues.

Mr. Manual: I understand. But there most certainly is an issue of unclean hands in this case, and Bank Mutiara is and has been widely recognized as a corrupt institution that has systematically defrauded and corrupted creditors and other entities that it has dealt with.

The Court: Not in this matter.

Tr. 59:16–60:05. Such conduct poses severe harm, not just to Bank Mutiara, which was wrongfully deprived of $3.2 million, but to the effectiveness of the Court's orders in general.

Next, the probable effectiveness of a sanction in bringing about compliance is high. The contemnors' continued failure to return the funds is a calculated decision premised on Liegey's view that any sanction imposed "will be in a relatively nominal amount" because:

> the entry of the WCAI judgment against Bank Mutiara was exclusively an error on the part of Kelley Drye, which erroneously proceeded *ex parte* to have the judgment entered by the court. Judge Crotty will be very reluctant to enter a large sanction that would likely run against Kelley Drye, where his brother is a partner.

PEX 8, 10. Based on the evidence obtained through discovery and based on the testimony of Liegey and Udhin, the Court determines that escalating monetary sanctions—imposed jointly and severally on all Weston entities and on Liegey, personally—will bring about compliance with the Court's order. The Court, therefore, imposes sanctions of $1,000 per day, with the daily fine doubling each month until the contemnors comply with the Court's March 19, 2014 order.

Finally, based on the amount of funds still outstanding to Bank Mutiara, the expenses accrued by Liegey and the Weston entities, and the plethora of suits the Weston entities continue to litigate worldwide, the burden imposed by this sanction is not excessive. *See Terry*, 886 F.2d

9

at 1353 (noting that "[a] sanction may, of course, be both coercive and compensatory" and vacating a sanction because it was imposed without any showing of injury or compensable loss). Moreover, Bank Mutiara is directed to submit further briefing regarding the legal fees it incurred in pursing the contempt motions as well as an updated calculation of the amount outstanding, including the interest accrued. *See Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) ("Since the plaintiff should be made whole for the harm he has suffered, it is appropriate for the court also to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful." (citation omitted)).

## CONCLUSION

For the reasons above, the Court expands its March 19, 2014 contempt order to non-parties Liegey; Weston International Capital Management (Luxembourg) S.A.; Weston International Capital (Mauritius) Ltd.; Weston International Capital Ltd.; Weston Capital Services Ltd.; First Capital Management Ltd.; First Global Funds Ltd. PCC; Weston International Investments Limited; Arlington Assets Investments Ltd.; Weston International Asset Recovery Co. Ltd.; and Weston International Asset Recovery Corporation Inc. The Court also imposes sanctions of $1,000 per day jointly and severally on the contemnors, with the daily fine doubling each month until the contemnors comply with the Court's March 19, 2014 order.

Dated: New York, New York
    September 8, 2015

SO ORDERED

PAUL A. CROTTY
United States District Judge

# EXHIBIT B

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3 - 16 - 16_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
WESTON CAPITAL ADVISORS, INC. :
PENSION FUND :
:
    *Plaintiff,* :
:    13 Civ. 6945 (PAC)
    *- against -* :
:    **SUMMARY ORDER**
PT BANK MUTIARA TBK :
:
    *Defendant.* :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

The Court grants defendant PT Bank Mutiara Tbk's motion for attorney fees in the

amount of $598,519.50. The Clerk of Court is directed to terminate the motion at Docket No.

148.

Dated: March 16, 2016                SO ORDERED
      New York, New York

                                PAUL A. CROTTY
                                United States District Judge

Tab 4

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Case Nos. 16-1178

-------------------------------------------------------------

WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,

v.

PT BANK MUTIARA TBK,
Respondent-Appellee.

-------------------------------------------------------------

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO SUPPLEMENT RECORD AND TO REMAND
<u>CASE FOR CONSIDERATION OF ADDITIONAL EVIDENCE.</u>**

.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................1

ARGUMENT ....................................................................................2

I.    THE MOTION FOR REMAND AND SUPPLEMENTATION
      IS BASED UPON DIRECTLY RELEVANT FACTS,
      FRAUDULENTLY HIDDEN BY BANK MUTIARA AND
      RECENTLY UNCOVERED, NOT ONE OF WHICH IS
      DENIED BY BANK MUTIARA OR QUINN EMANUEL ..........................4

      A.    THE LEGAL STANDARD FOR APPLICATION OF THE
            DOCTRINE OF UNCLEAN HANDS IS MET IN THIS
            CASE .............................................................................4

      B.    BANK MUTIARA AND QUINN EMANUEL HAVE NOT
            REBUTTED A SINGLE FACT PROFFERED BY
            APPELLANTS ...................................................................4

      C.   THE RECENTLY UNCOVERED EVIDENCE  IS DIRECTLY
            RELEVANT TO THE DISPOSITION OF THIS CASE ...............5

II.   REMAND IS AVAILABLE IN THIS CASE .................................6

CONCLUSION ....................................................................................9

i

# TABLE OF AUTHORITIES

**Cases**                                                             **Page**

*Keystone Driller Co. v. General Excavator Co*,
    290 U.S. 240 (1933) ...........................................................................1

*Amico v. County of Monroe*,
    03-cv-6097, 2004 WL 2966950 (W.D.N.Y. 2004) ...........................4

*United States v. Flecha*,
    539 F.2d 874 (2d Cir.1976) ...............................................................2

*ENH, Inc. v. International Diffusion SRL*,
    97-cv-3202, 1997 WL 294388 (S.D.N.Y. 1997) .............................2

*United States v. Aponte*,
    31 F.3d 86 (2d Cir.1994) ...................................................................4

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
Case Nos. 15-3158 and 16-1178
------------------------------------------------------------
WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,
v.
PT BANK MUTIARA TBK,
Respondent-Appellee.
------------------------------------------------------------

## APPELLANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND REMAND

Appellants submit this reply memorandum of law in support of their motion to supplement the record and for remand of the case for further proceedings, and in reply to the answering memorandum of PT Bank Mutiara Tbk ("Bank Mutiara") filed July 11, 2016.[1]

## PRELIMINARY STATEMENT

Appellants have made a compelling presentation here, even as they have been barred from taking discovery, for the supplementation of the record and the remand of this case to the district court for the taking of additional evidence regarding the filthy hands of the most corrupt bank in the most corrupt country in South East Asia. Appellee Bank Mutiara and Quinn Emanuel have not rebutted a single fact set forth in the motion derived directly from the Brown Report.

---

[1] This application specifically relates to the award of approximately $600,000 of legal fees of Quinn Emanuel Urquhart & Sullivan, LLP. However, the issues raised here also have a bearing on the matters that have been raised in Appellants' pending motion for rehearing and reconsideration.

1

## ARGUMENT

## POINT I

## THE MOTION FOR REMAND AND SUPPLEMENTATION IS BASED UPON DIRECTLY RELEVANT FACTS, FRAUDULENTLY HIDDEN BY BANK MUTIARA AND RECENTLY UNCOVERED, NOT ONE OF WHICH IS DENIED BY BANK MUTIARA OR QUINN EMANUEL.

### A. The Legal Standard for Application of the Doctrine of Unclean Hands Is Met in This Case.

The decision of the Supreme Court of the United States in *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S. Ct. 146 (1933), cited by Bank Mutiara, correctly frames the issue now before this Court, and it demonstrates exactly why the relief requested on this motion should be granted:

> The question presented is whether the Circuit Court of Appeals rightly applied the maxim, He who comes into equity must come with clean hands. . . . .
>
> The meaning and proper application of the maxim are to be considered. As authoritatively expounded, the words and the reasons upon which it rests extend to the party seeking relief in equity. 'It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, *nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court.*' Story's Equity Jurisprudence (14th Ed.) s 98. *The governing principle is 'that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.*' Pomeroy, Equity Jurisprudence (4th Ed.) s 397. This court has declared: 'It is a principle in chancery that he who asks relief

2

must have acted in good faith. *The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.* To aid a party in such a case would make this court the abetter of iniquity.' Bein v. Heath, 6 How. 228, 247, 12 L.Ed. 416. And again: *'A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.'* Deweese v. Reinhard, 165 U.S. 386, 390, 17 S.Ct. 340, 341, 41 L. Ed. 757.

But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only *where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.* They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but *only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.* Story, Id., s 100. Pomeroy, Id., s 399. They apply the maxim, not by way of punishment for extraneous transgressions, but *upon considerations that make for the advancement of right and justice.* They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.

*Keystone*, 290 U.S. 240, 244-47 (italics added).

Bank Mutiara and Quinn Emanuel refer only to wrongful conduct that bears an "immediate and necessary relation to the equity that he seeks" while ignoring the very next sentences which elaborate on the concept "violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication" . . . based "upon considerations that make for the advancement of right and justice." *Keystone*, like the case at bar, involved wrongful conduct in one case that had a clear relation to

the case before the district court. And in the case at bar, the unlawful conduct of Bank Mutiara and Quinn Emanuel in the London proceedings had the direct purpose and effect of depriving FGFL and WIARCO of the recoveries, part of which would then have been applied to return the $3.623 million to Standard Chartered Bank, followed by the enforcement hearing which would have led to the turnover of the money back to the judgment creditors.  Without question this case meets the *Keystone* standards of "immediate and necessary relation to the equity that [Bank Mutiara] seeks"; "violations of conscience as in some measure affect the equitable relations between the parties in respect of [the matter] brought before the court for adjudication"; and "considerations that make for the advancement of right and justice."

**B. Bank Mutiara and Quinn Emanuel Have Not Rebutted a Single Fact Proffered by Appellants.**

Bank Mutiara and Quinn Emanuel have not even attempted to refute a single statement that appears in the moving declaration and the Brown Report appended thereto.  They have not said a single word – other than the vapid word "baseless" – in response to the Brown Report's detailed recitation that the LCIA proceeding was based upon sham repo transactions, when in reality it was a cover up of money

4

laundering. All of this, and much more set forth in the declaration of the undersigned, is simply untouched by Appellee.[2]

In this Circuit, silence may be deemed an admission under Rule 801(d)(2)(B) of the Federal Rules of Evidence when one would reasonably expect that a party would have denied statements if they were untrue. *Amico v. County of Monroe*, 03-cv-6097, 2004 WL 2966950, at *7 (W.D.N.Y. 2004) (*citing U.S. v. Flecha,* 539 F.2d 874, 877 (2d Cir.1976) (Silence may be considered evidence of an admission when "there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not."). *See also ENH, Inc. v. International Diffusion SRL,* 97-cv-3202, 1997 WL 294388, at *2 (S.D.N.Y. 1997) (holding that affiant's failure to deny that endorsements were forged, given his vehement protestations on other issues, was telling, and citing *United States v. Aponte,* 31 F.3d 86, 87 (2d Cir.1994) for the admissibility of an "admission by silence" where circumstances "render it more

---

[2] Appellee asserts that Appellants never opposed the legal fees in this case. This, too, is false. We stated that legal fees would abide the final outcome of the expanded contempt and sanctions determinations. We in fact moved to consolidate the fee appeal with the contempt appeal. (See contempt appeal, Dkt. 128-2, ¶ 7.) Our current application is specifically designed to reopen the record and have this matter reexamined from the standpoint of unclean hands.

reasonably probable that a man would answer the charge made against him than that he would not.").[3]

---

[3] Quinn Emanuel inquires where Appellees obtained the Expert Report of Peter Barrie Brown. We are happy to respond, but we note that in the weeks since the undersigned first saw the Report – during which (i) Weston International wrote a letter describing the serious issues regarding the Report, (ii) the undersigned discussed the matter at oral argument, and (iii) the current motion was made, Bank Mutiara and Quinn Emanuel have not made any effort to claim any privilege for or otherwise suppress the Report.

The Brown Report was obtained after communication with the Special Administrator of FBME Bank, Cyprus, who is the representative of the Central Bank of Cyprus dealing with FBME Bank under a "Special Resolution" following the U.S. Treasury Section 311 Notice of Finding specifying FBME Bank Cyprus and Tanzania as an "institution of primary money laundering concern pursuant to Section 311 of the USA Patriot Act" dated July 22, 2014. There is nothing to indicate that the document is or was confidential, and we note that neither PT Bank Mutiara Tbk ("Bank Mutiara") nor FBME Bank has made any application anywhere for the suppression, destruction, return or sealing of the document. The U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a final rule imposing a prohibition on U.S. financial institutions from opening or maintaining a correspondent account for, or on behalf of, FBME Bank on March 25, 2016, in place of the rule published on July 29, 2015.

On March 27, 2015, two days after the FinCEN prohibition against FBME Bank, Bank Mutiara published its Fiscal Year End Statutory Audited Financial Statements for December 31, 2014, which first described in Footnote 49(f)(A)(7) a payment made by Bank Mutiara to Quinn Emanuel Urqhardt & Sullivan UK, LLP in the exact amount of GBP 5,000,000/USD 8,000,000 further to a purported "Settlement Agreement" between the Republic of Indonesia LPS (Deposit Insurance Corporation), Bank Mutiara, Quinn Emanual UK LLP and Saab Financial (Bermuda) Limited allegedly regarding a settlement with FBME Bank Cyprus in an LCIA filed claim purportedly involving repurchase ("repo") transactions.

We have set forth in the Charles Manuel Declaration and in this Reply Memorandum that (i) Footnote 49 is clearly a fraud that suggests that the

## C. The Recently Uncovered Evidence
   ## Is Directly Relevant to the Disposition of This Case.

Appellee's relevance argument is unfounded. As discussed in our opening application and in this memorandum, the fraud in Bank Mutiara's financial statements, coupled with the money laundering of $40 million, $8 million of which was paid to Quinn Emanuel, deprived Appellants of the direct source of funds in partial satisfaction of the FGFL and WIARCO judgments. The fraud and money laundering now at issue is, in fact, dispositive of this case, which would have disappeared had Appellants been afforded the opportunity to freeze and obtain the turnover of the $8 million received by Quinn Emanuel while it was seeking expanded contempt and sanctions against Appellants.

---

"settlement" was of a repo case, when (ii) in fact the Brown Report demonstrates unequivocally that Bank Mutiara, FBME Bank and Quinn Emanuel were seeking to mask a massive money laundering scheme, (iii) the $8 million payment to Quinn Emanuel was not to help effect a settlement payment to the claimant, FBME Bank, but (iv) rather the payment was elsewhere buried in Bank Mutiara's financial statement as part of its "legal fees" to unnamed recipients, while (v) in fact the $8 million of the laundered funds was paid to Quinn Emanuel.

FGFL cannot disclose further details regarding the document under Mauritian and U.K. law pending ongoing investigations.

## POINT II

## REMAND IS AVAILABLE IN THIS CASE.

Bank Mutiara and Quinn Emanuel ignore the relief we are seeking, which is governed by the *Korn* case discussed in our opening brief and has nothing to do with a recalculation of damages as in the *Marasa* case cited by Appellee. Under the authority cited in our opening memorandum, this Court need not, and probably should not, adjudicate the factual matters in the first instance. Rather, the case should be remanded for examination by the district court of the laundering by Bank Mutiara of $40 million, $8 million of which was paid to Quinn Emanuel as a "legal fee" which would have been attached and seized in the London arbitration pursuant to FGFL and WIARCO's judgments that, in principal amount alone, totaled $70 million, in courts where counsel would not have blundered and the court would not have erred based upon counsel's mistakes. Since the case is being remanded in any event for further proceedings, which will include additional evidence with respect to the impossibility of payment of the record-setting sanctions imposed here, it is perfect perfectly sensible and, we submit, essential that the recently discovered[4] evidence of theft, money laundering and fraud which precluded FGFL and

---

[4] Appellee has the temerity to suggest that Appellants should have discovered the Brown Report 20 months ago when it was written. Never have we seen an opponent try to bootstrap an argument on its own fraud: Bank Mutiara and Quinn Emanuel contorted reality and equity beyond recognition in their efforts to suppress and hide the Brown Report – extending to outright fraud in Bank Mutiara's financial reports.

WIARCO's receipt of millions of dollars pursuant to their judgments, it is only sensible that the remand should include additional discovery and evaluation of this matter and evidence.

## **CONCLUSION**

Appellants respectfully request that the Court order supplementation of the record to include the expert report of Peter Barrie Brown; and further order the remand of this action for discovery related to the matters regarding the participation of Quinn Emanuel in the money laundering and fraud discussed in the Manuel Declaration; and further order reconsideration of the award of attorneys' fees to Appellee Bank Mutiara and Quinn Emanuel.

Dated:   New York, New York
       July 18, 2016

Respectfully submitted,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Appellants

# Motion to Dismiss and Impose Sanctions

Tab 5

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 16-1178      Caption [use short title]

**Motion for:** Appellee's opposition to Appellants' motion for remand and Appellee's cross-motion

to (a) dismiss the appeal (b) impose sanctions on opposing counsel and

(c) stay Appellee's responsive brief until the instant motions are decided.

Weston Capital Advisors, Inc., Petitioner-Appellant

v.

PT Bank Mutiara, Tbk, Respondent-Appellee

Set forth below precise, complete statement of relief sought:

Appellee PT Bank Mutiara, Tbk, respectfully requests that the Court

(i) deny Weston's motion for remand and supplementation of the record,

**(ii) dismiss Weston's appeal,**

(iii) sanction Weston's attorney, Charles B. Manuel, for his improper filings, and

(iv) stay Bank Mutiara's responsive brief until the motions comprising (i) through

**(iii) have been resolved.**

**MOVING PARTY:** PT Bank Mutiara, Tbk     **OPPOSING PARTY:** Weston Capital Advisors, Inc.

☐ Plaintiff ☐ Defendant

☐ Appellant/Petitioner ☑ Appellee/Respondent

**MOVING ATTORNEY:** Marc L. Greenwald     **OPPOSING ATTORNEY:** Charles B. Manuel, Jr.

[name of attorney, with firm, address, phone number and e-mail]

Quinn Emanuel Urquhart & Sullivan, LLP     Manuel & Associates, LLP

51 Madison Ave. 22nd Floor, New York, NY 10010     1 Penn Plaza, Suite 2527, New York, NY 10119

(212) 849-7000; marcgreenwald@quinnemanuel.com     (212) 792-0044; cbm@manuel-law.net

Court-Judge/Agency appealed from: S.D.N.Y. - Hon. Paul A. Crotty

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☐ Yes ☐ No
Has this relief been previously sought in this Court? ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

Is oral argument on motion requested? ☐ Yes ☑ No   (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No   If yes, enter date: _____

**Signature of Moving Attorney:**

/s/ Marc L. Greenwald    **Date:** 7/11/2016     Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Case Nos. 16-1178

-------------------------------------------------------------

WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,

v.

PT BANK MUTIARA TBK,
Respondent-Appellee.

-------------------------------------------------------------

**APPELLANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**APPELLEE'S MOTION TO DISMISS AND FOR SANCTIONS**

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Appellants

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .......................................................................................................2

I.    THERE IS NO BASIS FOR SANCTIONS IN THIS CASE.........................2

    A.    There Is Nothing Sanctionable About the Application to
        Remand and to Supplement the Record....................................................2

    B.    The Groundless Charge of *Ad Hominem* Attacks and the
        Inapposite Cases Cited by Quinn Emanuel Show That
        Quinn Emanuel's Motion and False Charges Are Frivolous...................5

    C.    Quinn Emanuel's Charge of a Frivolous Appeal Is
        Groundless ..............................................................................................9

        1.    The "Authority" Cited by Quinn Emanuel Completely
            Undermines Its "Frivolous Appeal" Contention.............................9

        2.  Quinn Emanuel Was Assessed a Sanction of Over $2
            Million in a Similar Situation at Exactly the Time of the
            Events in This Case .......................................................................12

    D.    Appellee Has Not Needlessly Delayed the Resolution of
        This Case...............................................................................................17

II.    THE APPEAL SHOULD NOT BE DISMISSED .......................................17

    A.    Appellees Have Not Waived Their Right to Appeal the
        Fee Award .............................................................................................17

    B.    The Law of the Case Does Not Mandate Dismissal ...........................18

    C.    The Grounds for the Fee Appeal Are Valid .......................................18

CONCLUSION..................................................................................................18

EXHIBITS TO MEMORANDUM...................................................................E-1

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Apple, Inc. v. Samsung Electronics Co., LTD.*,
   11-cv-01846 (N.D. Cal. Jan. 29, 2014)............................................................13

*Apple, Inc. v. Samsung Electronics Co., LTD.*,
   11-cv-01846, 2014 WL 2854994 (N.D. Cal. June 20, 2014) ..........................15

*Apple, Inc. v. Samsung Electronics Co., LTD.*,
   11-cv-01846, 2014 WL 4684842 (N.D. Cal. Sep. 19, 2014)...........................15

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011)...............................................................................9

*In re Drexel Burnham Lambert Group Inc.*,
   995 F.2d 1138 (1993)........................................................................................10

*In Re Siemon*,
   421 F.3d 167 (2d Cir. 2005)..............................................................................10

*Matter of Hartford Textile Corp.*,
   613 F.2d 384 (1979).........................................................................................11

*Mayes v. Kollman*,
   560 Fed. Appx 389 (5th Cir. 2014)....................................................................6

*Neitzke v. Williams*,
   490 U.S. 319 (1989).........................................................................................10

*Ransmeier v. Mariani*,
   718 F.3d 64 (2d Cir. 2013).................................................................................7

*Safe–Strap Company, Inc. v. Koala Corp*,
   270 F. Supp. 2d 407 (S.D.N.Y. 2003)...............................................................8

*Thomas v Tenneco Packaging Co.*,
   293 F.3d 1306 (11th Cir. 2002)..........................................................................6

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009)..................................................................................18

*United States v. Young*,
    470 U.S. 1 (1985) ..............................................................................................6

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Case Nos. 16-1178

------------------------------------------------------------

WESTON CAPITAL ADVISORS, INC.,
Petitioner-Appellant,

v.

PT BANK MUTIARA TBK,
Respondent-Appellee.

------------------------------------------------------------

## APPELLANTS' MEMORANDUM OF LAW IN OPPOSITION TO APPELLEE'S MOTION TO DISMISS AND FOR SANCTIONS

### PRELIMINARY STATEMENT

The motion by Bank Mutiara and Quinn Emanuel to dismiss the appeal is wholly lacking in merit. It was agreed in the court below that the issue of legal fees would abide the outcome of the appeal on expanded contempt and sanctions. Only after the briefing on this appeal did a crucial document come to our attention, authored by Bank Mutiara's own expert, showing unequivocally that, at the very same time that the judgment debtor and its counsel were seeking sanctions for the non-return of $3.623 million, they were engaged in money laundering in an arbitration in London and fraud which included the payment of $8 million of the laundered funds to the law firm. These funds were subject to the judgments held

by Appellants FGFL and WIARCO and could within a day have been frozen, allowing them to immediately return the $3.623 million and moot the matter before this Court.  Petitioner WCAI and the Appellants before this Court have every right to address this newly discovered matter going directly to the issue of unclean hands and satisfaction of the court order on a remand to the district court that is taking place in any event.  There is absolutely no basis for sanctions or dismissal of the appeal in these circumstances.

## ARGUMENT

## POINT I

## THERE IS NO BASIS FOR SANCTIONS IN THIS CASE.

### A. There Is Nothing Sanctionable About the Application to Remand and to Supplement the Record.

Appellants are seeking straightforward, well-founded relief on their current applications based upon the recent discovery of a previously undisclosed expert report that, together with other documents, makes a case of unclean hands on the part of Bank Mutiara and Quinn Emanuel.  We have applied for simple relief: a remand to the district court (which will take place in any event to address other matters) with supplementation of the record to include the expert report and discovery that will strongly reinforce the case of unclean hands.

There is absolutely no denial of any of the particulars that Appellants have established based upon the recently disclosed expert report and the other documentation cited by Appellants:

- There is no denial of any of the defalcations cited in the Manuel Declaration in support of our application.

- There is no denial of the nine crucial findings of Bank Mutiara's expert, Peter Barrie Brown, in the London arbitration, which demonstrate conclusively that an arbitration which had been characterized as a "repo dispute" was in fact part of systematic money laundering of a magnitude that Mr. Brown had never seen before in 48 years.

- There is no denial that Bank Mutiara wired $8 million of the laundered funds to the account of Quinn Emanuel at Bank of America in London.

- There is no denial that Bank Mutiara's year-end 2014 financial statements falsely reported a settlement of a "repo case," when in fact its own expert had put the lie to that assertion and had made absolutely clear four months previously that Bank Mutiara was at the center of the laundering of $40 million.

- There is no denial of the fact that, at the time of the money laundering and fraud, FGFL and WIARCO, two of the so-called "Weston entities," were by far the largest creditors of Bank Mutiara.

- There is no denial of the fact that FGFL and WIARCO held judgments totaling nearly $60 million in principal amount (currently over $135 million with interest) against Bank Mutiara, rendered by the respected English common law courts of Mauritius after extensive hearings.

- There is no denial of the fact, documented in one of his declarations in this case, that John Liegey was deceived by the financial statement and that he actually gave a commendation to Bank Mutiara in the belief that Bank Mutiara was in the process of settling creditor claims.

- There is no denial that if FGFL and WIARCO had been informed of what was actually going on in the London Court of International Arbitration, they would instantly have gone to the courts in London to obtain a Mareva order freezing the $8 million payment to Quinn Emanuel, which would have allowed them to pay the $3.623 million ordered to be returned by the district court, which in turn would have mooted the entire matter now before this Court.

Instead of responding to the very specific, documented contentions of the appellants, Bank Mutiara and Quinn Emanuel, in a single page of their memorandum of law (Mem. at 9) have issued a vague, general denial unsupported by anything. As shown by our reply memorandum dated July 18, 2016, the lack of

any genuine denial constitutes an admission of the specific, documented evidence of unclean hands submitted by Appellants.

The only frivolous thing on this record is the completely undocumented, unspecific, vapid denial by Bank Mutiara and Quinn Emanuel of the documented contentions proffered by Appellants. And as this Court will see in the balance of this memorandum, the legal submission by Bank Mutiara and Quinn Emanuel is equally frivolous and sanctionable. As stated below, we do not wish to proceed with sanctions, but we do wish, at long last, to have at least our day in the district court.

### B. The Groundless Charge of *Ad Hominem* Attacks and The Inapposite Cases Cited by Quinn Emanuel Show that Quinn Emanuel's Motion and False Charges Are Frivolous.

Quinn Emanuel makes the utterly groundless assertion that the undersigned has engaged in *ad hominem* attacks that warrant sanctions. Nothing could be further from the truth. At no time has the undersigned engaged in an *ad hominem* attack. And Quinn Emanuel has cited cases that demonstrate beyond cavil the impropriety of the imposition of sanctions against the undersigned in this case. Indeed, this groundless accusation, and the completely inapposite case law submitted by Quinn Emanuel in "support" of the accusation, would strongly suggest that a charge of *ad hominem* attacks should be redirected against Quinn Emanuel for its groundless attack on the undersigned.

Two of the cases cited by Quinn Emanuel did not even involve an application for, let alone a grant of, sanctions. They have nothing to do with sanctions. They appear to be "fillers" for a string citation.

- In *United States v. Young*, 470 U.S. 1 (1985), the prosecutor at a criminal trial vouched for witnesses and expressed personal opinions. The court, of course, frowned on these infractions, but found no reversible error. No sanctions were requested, and none were imposed. It is not a sanctions case.

- In *Mayes v. Kollman*, 560 Fed. Appx 389 (5th Cir. 2014), defense counsel at trial improperly referred in summation to plaintiff's counsel's "promotional advertising." No reversible error was found, and no sanctions were requested or imposed. It is not a sanctions case.

In the two remaining cases, sanctions were granted in circumstances so remote from the case at bar that these cases further underscore the impropriety of an award of sanctions here.

- In *Thomas v Tenneco Packaging Co.*, 293 F.3d 1306 (11th Cir. 2002), the plaintiff's attorney engaged in a course of conduct that would shock the conscience of almost any court:

  - Plaintiff's attorney twice unilaterally stopped plaintiff's deposition without seeking a protective order.
  - During motion practice, plaintiff's attorney described defense counsel as the "white law firm."

o Plaintiff's counsel said the "unusual deposition schedules" were forced upon the "African-American plaintiff" and "African-American counsel" while the "white law firm set its own schedule and proceeded at its own pace."

o In a mandamus petition filed with the court of appeals, plaintiff's counsel made derogatory remarks about the district judge, stating that civil rights attorneys "know the reputation of the Middle District of Georgia" and are not desirous of appearing in that forum.

o Plaintiff's counsel stated that the "tone of the district judge was extremely hostile and combative" . . . "insinuating that the judge was racially biased against the attorney and her client."

o Plaintiff Thomas's declaration in opposition to summary judgment stated that he was "uncomfortable being around that type of white person" (defense counsel) at his deposition. Thomas said that defendant's attorney "spit out and snarled words" at the deposition; he was "a little man spewing venom"; his hair was standing up on his head; he was biting on his pencil; and he was turning red.

o Plaintiff's attorney stated that the defense attorney was "psycho-babbling."

o According to the Court of Appeals, the declarations submitted by plaintiff's counsel "showered opposing counsel with invective."

o Plaintiff's counsel stated that "defense counsel is urging the court to repudiate African-Americans' constitutional rights."

o Plaintiff's attorney agreed with a witness about the "sarcasm" and "racism" of defense counsel.

o Plaintiff's attorney stated that defense counsel's body language reminded her of a "picture of the Grand Wizard of the KKK."

• In *Ransmeier v. Mariani*, 718 F.3d 64 (2d Cir. 2013), cited three times in Appellee's memorandum, the Second Circuit had previously held that an agreement between defendant Mariani and her stepdaughter showed her clear intention and commitment to abandon all of her claims, including the loss of

7

consortium. The Second Circuit had previously held that she had no legal status in federal court, and any loss of consortium claim was properly addressed only in New Hampshire probate court. Thus, Mariani was making arguments that had already been rejected, deemed irrelevant, and lodged in the wrong court. Meanwhile, Mariani had engaged in an escalating series of *ad hominem* attacks upon opposing counsel and the district court, reflecting "anti-Semitism in a raw and ugly form." The motion to supplement in *Ransmeier* "consisted of little more than a series of offensive insinuations, unmistakably anti-Semitic, about Judge Hellerstein and his family." This conduct was found sanctionable. *Ransmeier* bears no relation whatsoever to the case at bar.

In short, Bank Mutiara and Quinn Emanuel have made a false charge against the undersigned of *ad hominem* attacks that has zero basis in fact or law. There is a world of difference between a claim of unclean hands and "*ad hominem* attacks." The false, groundless, factually and legally unsupported charge by Appellee and its counsel of *ad hominem* attacks is sanctionable. "[T]he filing of a motion for sanctions is itself subject to the requirements of [Rule 11] and can lead to sanctions." Fed. R. Civ. P. 11, Advisory Committee's Note (1993 Amendments); *Safe–Strap Company, Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003). However, we believe that Bank Mutiara and Quinn Emanuel have already diverted this case from the very important legal and factual matters that this Court

and the district court need to address. Accordingly, we would prefer to refrain from making a cross-motion for sanctions.

### C. Quinn Emanuel's Charge of a Frivolous Appeal Is Groundless.

As set forth in Point I (A) above, there is nothing frivolous in the current appeal. As we will now show, the frivolous matter consists of Quinn Emanuel's nonexistent legal support for its contention.

#### 1. The "Authority" Cited by Quinn Emanuel Completely Undermines Its "Frivolous Appeal" Contention.

The cases cited by Quinn Emanuel in which the court found – or did not find – that an appeal was frivolous, demonstrate how far from frivolous the appeal at bar actually is. In fact, if these are the cases that set the standard for frivolousness, then the only frivolous application is the one which is brought by Appellee, not by Appellants.

- In *Gallop v. Cheney*, 642 F.3d 364 (2d Cir. 2011), plaintiff sued Dick Cheney, Donald Rumsfeld, and other very senior government officials alleging that they "caused the September 11, 2001 attacks against the United States." As noted by the Court, the complaint "hypothesizes a fantastical alternative history"; "alleges that the United States' most senior military and civilian leaders 'cause[d] and arrange[d] for high explosive charges to be detonated inside the Pentagon, and/or a missile of some sort to be fired at the building'"; and alleges that "these officials knew of the September 11 attacks in advance, facilitated their execution,

and attempted to cover up their involvement." This Court had "no hesitation" affirming the District Court's determination that the allegations were frivolous, holding that "courts have no obligation to entertain pure speculation and conjecture." In contrast to *Gallop*, the appeal at bar is far from "pure speculation and conjecture," does not make remotely "fantastical" accusations, and in fact is documented by Appellee's own expert reports and fraudulent financial statements.

- *In Re Siemon*, 421 F.3d 167 (2d Cir. 2005), pertains to an appeal filed by a plaintiff who failed to timely file a notice of appeal, which is a jurisdictional requirement. Thus, because the court lacked jurisdiction, the appeal was found to be frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), which is not a statutory ground advanced by Appellees here.

- In *Neitzke v. Williams*., 490 U.S. 319 (1989), the Court held that a complaint filed *in forma pauperis* which fails to state a claim under Federal Rule of Civil Procedure 12(b)(6) is *not* automatically frivolous within the meaning of 28 U.S.C. § 1915(d). Again, not applicable here.

- In *In re Drexel Burnham Lambert Group Inc*., 995 F.2d 1138 (1993), a case which pertained to a "$1.3 billion global settlement of civil claims that arose as a result of Michael Milken's illicit activities as head of Drexel Burnham Lambert Group's High Yield and Convertible Bond Department," events which were "well-documented," and "widely known," plaintiff asserted its due process

rights were violated because it did not receive notice of the hearing on the global

settlement. Although the Court concurred that the standard for the imposition of

sanctions is where the appeal taken is found to be groundless, without foundation,

and without merit, it held Appellees *did not* satisfy this standard, and declined to

impose sanctions.

- Finally, in *Matter of Hartford Textile Corp.*, 613 F.2d 384 (1979), the

court took note that:

> Appellant's counsel has filed at least twenty-five motions in the course of
> these proceedings, and undeterred by the Court's remonstrance, went on to
> more than double her output of frivolous filings. [Plaintiffs also] moved
> for an order requiring the President to appoint a Special Prosecutor, moved
> for rehearing *en banc* of the denial of that motion, moved for the recusal of
> three members of this Court, and moved for a rehearing also *en banc* of the
> denial of the recusal motion. Similar motions have been made in the course
> of at least six other appeals at least as meritless as the present one.
> [Plaintiff's actions] necessitated twenty-three *en banc* orders from this
> Court.

*Hartford Textile* is completely inapposite to the case at bar.

If this is the type of legal authority that Appellee and its counsel wish this

Court to rely upon,[1] then the only frivolous motion is the one brought by Appellee

and its counsel, not by Appellants.

---

[1] And, indeed, it is precisely the kind of completely impertinent, misplaced
authority that riddles Appellee's memorandum. (See the review in Point I(B) of
this Reply Memorandum of Appellee's "authority" for its charge of "ad hominem
attacks.")

### 2. Quinn Emanuel Was Assessed a Sanction of Over $2 Million in a Similar Situation at Exactly the Time of the Events in This Case.

Bank Mutiara and Quinn Emanuel cite a sanctions order of $1,500 assessed against the undersigned 20 years ago. But Quinn Emanuel's methods of operation were measured much more recently in a case that eerily bears upon the current application to remand this case and supplement the record. Two years ago – and within one month of the actions by Bank Mutiara and Quinn Emanuel that establish their unclean hands in the case at bar – in the patent and trade dress litigation, *Apple, Inc. v. Samsung Electronics Co*., *Ltd.*, Case No. 5:11-cv-01846 (N.D. Cal. 2014), Quinn Emanuel (jointly and severally with its client, Samsung) was assessed one of the largest sanctions ever awarded against a law firm, over $2,000,000, for extremely serious, reckless, and in some instances deliberate violations of the federal discovery rules and a court protective order. Specifically, Quinn Emanuel, in violation of the court's protective order and the discovery rules, allowed the release of highly confidential licensing agreements, including pricing terms, as well as other confidential data, that its adversary, Apple, Inc., as well as Nokia, Inc., had entered into with other major Samsung competitors. *And the sanctions order was based primarily on Quinn Emanuel's deliberate suppression of adverse information – exactly what it did one month later upon receipt of the Brown Report in the FBME v. Bank Mutiara case.*

Here is the chronology of the court decisions in the *Apple v. Samsung* case, which are appended hereto as Exhibits 1-3, chronologically:

First, Magistrate Judge Paul S. Grewal, in his Order Granting Motion for Sanctions, *Apple, Inc. v. Samsung Electronics Co., LTD., et al.*, Case No. 5:11-cv-01846 (N.D. Cal. Jan. 29, 2014), made clear the enormity of the misconduct by Quinn Emanuel and its client, finding not only that the law firm had been grossly negligent, but also that it had made "conscious and indeed strategic choices" to permit the error to be unaddressed and unchecked for over nine months, revealing "more significant and blameworthy flaws" in Quinn Emanuel's conduct:[2]

A junior associate missing one redaction among many in an expert report is not exactly a historical event in the annals of big-ticket patent litigation. Even if regrettable, these things can happen, and almost certainly do happen each and every day. *But when such an inadvertent mistake is permitted to go unchecked, unaddressed, and propagated hundreds and hundreds of times by conscious – and indeed strategic – choices by that associate's firm [Quinn Emanuel] and client alike, more significant and blameworthy flaws are revealed.* [Sanctions Order, Exhibit 1 hereto, at 1.]

[T]he court must consider Quinn Emanuel's failures to follow the procedures set forth in Section 18(a) of the protective order once it learned of the inadvertent disclosures. That section, entitled "INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER" provides that "[i]n the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, *shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure.*" [*Id*. at 15.]

---

[2] Italics are added in the quotations from the *Apple v. Samsung* sanctions decisions.

. . . On December 21 and 22, 2012, Quinn Emanuel became aware that a document containing Apple and Nokia's confidential business information had been uploaded to a server accessible by many Samsung employees. . . . Yet even though [a] young associate raised his concerns with the senior associate and the partner responsible for guarding against these kinds of errors, Quinn Emanuel did nothing to follow up. . . . [*Id*. at 16.]

*In order to comply with Section 18(a), to which Quinn Emanuel and its client had stipulated, Quinn Emanuel should have "immediately" picked up the phone to call Apple and let them know that there was a problem. Instead, it did nothing. This conduct requires sanctions. . . .* [*Id*. at 17.][3]

[O]n July 1, 2013, Nokia filed a motion for a protective order in the 12-630 case, alerting Quinn Emanuel that somehow, Nokia's confidential license with Apple had gotten through the protective order shield and into Samsung's hands. *Quinn Emanuel, however, did not tell Apple. By July 16, 2013, at the very latest, they had concrete, actual notice that the confidential information had definitely been disclosed. Still, Quinn Emanuel did not tell Apple. Despite the protective order's clear directive to "immediately notify counsel for the Producing Party," Quinn Emanuel kept the information quiet for another fifteen days while independently negotiating with Nokia, as though hoping that would make the problem go away.* Clearly, that hope was misplaced. [*Id*. at 17.]

Second, Magistrate Grewal, issued his Order setting the sanctions at a combined total (in favor of Nokia and Apple) of approximately $2,040,000. *Apple, Inc. v. Samsung Electronics Co., LTD., et al.*, Case No. 5:11-cv-01846, 2014 WL 2854994 (N.D. Cal. June 20, 2014). (See Exhibit 2 hereto.)

---

[3] Quinn Emanuel's unsuccessful defense against sanctions was that its failures were all negligent, not deliberate. Magistrate Judge Grewal rejected this assertion. But equally noteworthy – and less than confidence-inspiring – was Quinn Emanuel's explanation of its negligence defense. The firm's senior partner, John Quinn, testified that Quinn Emanuel is "650 lawyers wide and one lawyer deep. . . . And one lawyer doesn't necessarily know what another lawyer is doing." [Sanctions Order at 16 n.74.]

14

Third, District Judge Lucy H. Koh issued her Order on motions for relief from the sanctions, upholding Magistrate Judge Grewal's upholding the magistrate's findings and virtually the entire amount of his award *Apple, Inc. v. Samsung Electronics Co., LTD., et al.*, Case No. 5:11-cv-01846, 2014 WL 4684842 (N.D. Cal. Sep. 19, 2014). (See Exhibit 3 hereto.) Describing Samsung and Quinn Emanuel's response to the motion as "obfuscation," and in language that could be applied directly to Quinn Emanuel's failure to produce *anything* in support of its current motion for sanctions, Judge Koh stated:

> Judge Grewal found on October 2, 2013, after briefing on Apple's sanctions motion, that the record was "murky" because *Samsung "elected not to provide the court with any sworn testimony* from Dr. Ahn [the Samsung executive at the center of the sanctions inquiry] or anyone else at the meeting," "*failed to supply the court with any evidence at all regarding other uses of the Apple-Nokia license*," and "*repeatedly denied even one violation of the protective order*." . . . Because of this obfuscation, Judge Grewal compelled Samsung to produce documents and witnesses to Apple and Nokia. . . . [*Id*. at 14.]

> This Court denied Samsung's request for relief from this order, finding Judge Grewal's reasoning "well-supported." Nevertheless, he ultimately determined that *Samsung and Quinn Emanuel committed "hundreds of violations" that caused "substantial harm to Apple and Nokia," and failed to timely notify Apple of those violations*. *Id*. at 13-15. Again, Samsung does not contest these conclusions. [*Id*. at 15.]

The final order of Judge Koh in *Apple v. Samsung*, which resolved issues arising from Quinn Emanuel and its client's misuse of an expert report and the suppression by the law firm of their wrongdoing, ***came less than one month after Quinn Emanuel received the Expert Report of Peter Barrie Brown in FBME v.***

15

***Bank Mutiara in London, which alerted the law firm and its client that the "repo" case they were supposedly litigating was in fact a sham and a shroud for the most serious money laundering case Mr. Brown had seen in his 48-year career.*** And what did Quinn Emanuel and its client do in London? Far worse than simply delaying disclosure of the misuse of the report, as in *Apple v. Samsung*, they buried the report and filed a fraudulent financial statement that pretended that they had settled a "repo" case with FBME (directly and falsely suggesting that £5 million/$8 million was the settlement amount for FBME) and secretly paying $8 million of the stolen, laundered money to Quinn Emanuel as a "legal fee."

The motion for sanctions here is so frivolous – and the underlying conduct of Quinn Emanuel and Bank Mutiara is so eerily similar the the conduct of the same law firm and its client in *Apple v. Samsung* (albeit much more egregious in the matter before this Court) – that we may well be in the situation in which a cross-motion for sanctions against the frivolous sanctions motion would be appropriate. (See discussion above.) And the animus to countermove is greater because it is Quinn Emanuel that has personalized this matter with its *ad hominem* attack in this motion seeking to intimidate the undersigned, not the other way around. Nevertheless, we believe it is essential to maintain the focus where it belongs: on the important, serious, substantive issues that we have, at every moment, addressed to this Court in a highly professional manner.

### D. Appellee Has Not Needlessly Delayed the Resolution of This Case.

There has been no undue delay on this appeal. This is a very substantial case, with a long record in the court below, a 2,400-page Joint Appendix/Sealed Joint Appendix, and challenging legal issues with each of the three main briefs going close to the word limits. There have been several motions, including the present ones. The docket in this Court is lengthy. I respectfully submit that my small firm has performed admirably in the process, which of course entails many more tasks for the Appellants. And we have a number of other client matters, also with pressing assignments and deadlines. We may have needed more time on a couple of occasions, but overall we have proceeded with all due speed on this appeal

### POINT II

### THE APPEAL SHOULD NOT BE DISMISSED.

### A. Appellees Have Not Waived Their Right to Appeal the Fee Award.

Bank Mutiara and Quinn Emanuel contend that "Weston failed to oppose the fee award in the district court." This is incorrect. Appellants agreed that the determination of attorneys' fees would abide the determination of the principal appeal of expanded contempt and sanctions. That matter should be addressed again on the remand from this Court, where the district court will consider the

issues of impossibility and unclean hands. This can be done promptly. At that time, the matter will return to this Court on a proper, complete record.

**B. <u>The Law of the Case Does Not Mandate Dismissal.</u>**

The whole point of our current applications is that the issue of unclean hands was addressed before Appellants discovered the Brown Report, which entitles Appellants to supplementation of the record and to remand for proper consideration of that issue. This is precisely the type of "new evidence" that forms the basis for "compelling circumstances" discussed in *United States v. Carr*, 557 F.3d 93 (2d Cir. 2009).

**C. <u>The Grounds for the Fee Appeal Are Valid.</u>**

We adhere to our statements in support of the motion to remand and supplement the record in connection with the present motion.

## <u>CONCLUSION</u>

The motions by Bank Mutiara and Quinn Emanuel to dismiss the appeal and for sanctions should be denied. Appellants take no position on the motion to postpone the filing of Bank Mutiara's brief in Case No. 16-1178.

Dated:   New York, New York
         July 21, 2016

Respectfully submitted,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Appellants

# Exhibits to Memorandum in Opposition
## to Motion to Dismiss and for Sanctions

## Three decisions from the United Stated District Court for the Northern District of California
### *Apple, Inc. v. Samsung Electronics Co., LTD*
### *11-cv-01846 (N.D. Cal. Jan. 29, 2014)*

1.  Order of United States Magistrate Judge Paul S. Grewal dated Jan. 29, 2014 awarding sanctions against Samsung Electronics Co. and Quinn Emanuel.

2.  Order of United States Magistrate Judge Paul S. Grewal dated June. 20, 2014 setting sanctions against Samsung Electronics Co. and Quinn Emanuel totaling approx. $2.04 million.

3.  Order of United States District Judge Lucy H. Koh dated Sep. 19, 2014 upholding sanctions award of the Magistrate Judge.

# Exhibit 1

Order of United States Magistrate Judge Paul S. Grewal dated Jan. 29, 2014 awarding sanctions against Samsung Electronics Co. and Quinn Emanuel.

E-3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| APPLE, INC., a California Corporation, | ) | Case No. 5:11-cv-01846-LHK (PSG) |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR** |
| v. | ) | **SANCTIONS** |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., a | ) | **(Re: Docket Nos. 2374, 2435)** |
| Korean corporation; SAMSUNG | ) | |
| ELECTRONICS AMERICA, INC., a New York | ) | |
| corporation; and SAMSUNG | ) | |
| TELECOMMUNICATIONS AMERICA, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

United States District Court
For the Northern District of California

A junior associate missing one redaction among many in an expert report is not exactly a historical event in the annals of big-ticket patent litigation.  Even if regrettable, these things can happen, and almost certainly do happen each and every day.  But when such an inadvertent mistake is permitted to go unchecked, unaddressed, and propagated hundreds and hundreds of times by conscious – and indeed strategic – choices by that associate's firm and client alike, more significant and blameworthy flaws are revealed.

E-4

To address such flaws in this case, abrogate the harm suffered, and discourage recurrence, the court GRANTS the motion for sanctions by Plaintiff Apple Inc. and non-party Nokia Corporation, as set forth below.

## I. TIMELINE: WHAT HAPPENED TO THE TEECE REPORT?

In July of 2013, Nokia's Paul Melin filed a declaration that launched a thousand accusations.[1] In that document, Melin claims that Samsung's Seungho Aho had recited for him the precise terms of an Apple/Nokia license agreement in the course of a Samsung/Nokia licensing negotiation, that Ahn admitted getting the information through his attorneys, and that Ahn had confidently declared "all information leaks."[2]

At the first hearing on this matter on October 1, 2013, Apple and Nokia argued to the court that it appeared that Samsung had used the information disclosed in violation of Section 6 of this court's protective order to gain an advantage not only in the Samsung/Nokia licensing negotiations, but also in proceedings before the United States International Trade Commission and United States Federal Trade Commission and in litigation around the globe.[3] However, before they could say more, Apple and Nokia prevailed that they needed discovery to find out the details.[4] In light of the scant explanation and evidence proffered by Samsung, the court obliged, authorizing substantial document production and depositions.[5]

---

[1] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

[2] *Id.*

[3] *See* Docket No. 2485 at 5-11.

[4] *See id.* at 23; *see also* Docket No. 2374.

[5] *See* Docket No. 2483. This order was subsequently affirmed by Judge Koh based on her conclusion that it was a "highly appropriate and necessary mechanism for determining answers to basic questions that Samsung has been unable to provide." *See* Docket No. 2538 at 8.

2

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

E-5

United States District Court
For the Northern District of California

By the second hearing on October 22, Apple and Nokia's general allegations were a little more fulsome, but details remained limited.[6] A few months after an initial disclosure by Samsung's attorneys at the Quinn Emanuel firm of various Apple license terms in an expert report by David Teece, an in-house Samsung attorney somehow picked the terms of the Apple/Nokia license out of a redacted spreadsheet and sent those terms to a licensing executive for some unknown purpose.[7] Several months after that, Quinn Emanuel sent another copy of the improperly redacted report to that same Samsung attorney, who was told to delete it.[8] But after several months, the same Samsung attorney circulated yet another copy of the improperly redacted report, casting doubt as to whether the instruction to delete was actually followed.[9] Shortly before the negotiations between Samsung and Nokia began, a document entitled "Nokia-Apple License Memo" was widely circulated within Samsung and sent to another outside law firm.[10] Any one of these events by themselves-and certainly the lot together-would be enough to raise suspicions, but because of Samsung's sweeping privilege assertions,[11] neither Apple nor Nokia had access to enough information to tell a clear and coherent story.

In the interest of getting to the bottom of things, while respecting any valid assertions of privilege that Samsung may have had, the court undertook an in camera review of all the documents identified as relevant but privileged.[12] That review gave the court an outline that filled

---

[6] *See generally* Docket No. 2581.

[7] *See* Docket No. 2557-4 at 4, 11.

[8] *See* Docket No. 2558-29 at 3; Docket No. 2557-4 at 8.

[9] *See id.*

[10] *See* Docket No. 2557-4 at 9-10; Docket No. 2558-29 at 4.

[11] *See* Docket No. 2556-3 at 11.

[12] This review included more than 20,000 pages of documentary evidence, along with over 5500 pages of declarations. This is, of course, in addition to reviewing the 61 briefs submitted by the parties and the deposition transcripts covering over 50 hours of testimony.

3

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-6

in many of the whos, whats, and whens of the information's transmission, but very few whys or

hows:

- March 24, 2012: Quinn Emanuel posted an insufficiently redacted copy of David Teece's Initial Expert Report to an FTP site and emailed more than 90 Samsung employees with instructions for accessing the document, including Seungho Ahn, Clayton Kim, James Kwak, and Indong Kang.[13] The insufficient redactions exposed the terms of several of Apple's confidential license agreements, including those with Nokia and Ericsson.[14] Although the FTP site was apparently taken down within ten days,[15] the tainted document was downloaded and distributed widely within the first two days, creating ample copies for additional dissemination.[16]

- June 29, 2012: "With regard to [a] question [Kim] posed," Daniel Shim, an in-house attorney at Samsung, highlighted for Kim the detailed terms of the Apple-Nokia license from a redacted spreadsheet.[17] The spreadsheet in question had been

---

[13] *See, e.g.,* Tab Nos. 2, 215. The tab numbers in this footnote and those that follow refer to the tabs of the documents submitted by Samsung for in camera review. Because Samsung offered to turn over the vast majority of the documents cited in this order, the court finds that privilege has been waived as to those documents. As to all other documents cited, the court finds that the portions discussed in this order are not privileged.

[14] *See id.*

[15] *See* Docket No. 2883 at 36.

[16] *See, e.g.,* Tab Nos. 3-5 (emails between March and May 2012 attaching and circulating Teece using a downloaded copy); Tab No. 215 (directing the recipients to "[p]lease access the FTP site below, download Teece report, and circulate it.").

[17] Although both Shim and Kim have been deposed and filed declarations in this matter, *see* Docket Nos. 2557-10 (Shim Depo.), 2557-14 (Kim Depo.), 2556-16 (Shim Decl., 10/21/13), 2807-14 (Shim Decl. 11/15/13); 2807-9 (Kim Decl.), at first blush, neither remembered the context of this exchange, *see* Docket No. 2557-10 at 124: 12-15 ("Q: Do you have any memory at all as to why you were sending this spreadsheet to Mr. Kim in June of that year? A: I do not."); Docket No. 2557-14 at 73-75; Docket No. 2807-9 at 2 ("I no longer remember why Daniel and I were emailing each other and our legal counsel on or around June 29, 2012."). Both claimed not to remember what the information was going to be used for or why they were discussing the terms. *See id.* Given just a few days, though, Shim developed a clearer memory as to how he identified the terms, as well as a clearer memory of the context. In a declaration sworn six days after his deposition, Shim swears that it was easy to recognize the terms of the Apple/Nokia license because Nokia was the only party that Apple would be contracting with in Euros. *See* Docket No. 2556-16 at 2-3 ("The spreadsheet disclosed the terms, including the specific financial terms, of various patent licenses that Apple had with other companies. While the spreadsheet was anonymized as to the company, I deduced to a reasonable degree of certainty from one of the entries that it identified the license terms for Apple's license with Nokia, including its specific financial terms. It was the only entry on the spreadsheet listed in Euros and described large amounts that I thought very likely would be paid only by Apple to settle what I had read and heard was a significant litigation claim against Apple by Nokia that at the time posed a serious risk to a large portion of Apple's European business."). This reasoning does not appear, however, anywhere in the June 29 email, nor does he qualify his identification in any way, to indicate that he was less than 100% sure about the identification. *See* Tab Nos. 222, 225.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

prepared in the course of litigation between Apple and Samsung in the Netherlands.[18] It contained the detailed terms of Apple's licenses with other major players in the industry, but the names of the companies had all been redacted.[19] Only nine people in Samsung were authorized to view this spreadsheet, and Shim was one of them.[20] The terms identified match precisely the key terms revealed in the Teece Report.

- <u>July-December 2012</u>: The insufficiently redacted Teece Report continued to circulate within Samsung, and to its outside counsel.[21] Ultimately, over 200 people not authorized by the protective order would receive the document with the confidential license terms.

- <u>December 22, 2012</u>: In response to a request over the holidays, a Quinn Emanuel senior associate emailed Shim a copy of the insufficiently redacted Teece Report.[22] For some unknown reason, a Quinn Emanuel junior associate reviewed the redactions again and identified the incomplete redaction.[23] The junior associate immediately brought it to the attention of the senior associate and a partner,[24] specifically noting that Apple had never approved the redactions to the original Teece Report, which contrasted with their explicit approval of other reports.[25] In response, the senior associate asked Shim to delete the email, which Shim confirmed he did,[26] but nothing more was done to contain or investigate the damage, and neither Apple nor Nokia were notified that there had been a disclosure.

- <u>January 4, 2013</u>: In forwarding Shim a "clean"[27] copy of the Teece Report, the senior associate also forwarded an email chain which highlighted for Shim precisely where the confidential information could be found in older versions of the document.[28]

---

[18] *See* Tab Nos. 8, 221.

[19] *See id.*

[20] *See* Docket No. 2557-10 at 122.

[21] *See, e.g.,* Tab Nos. 17, 18, 216, 225, 258, and 260.

[22] *See* Tab No. 19. Micronuity, a company engaged in a separate litigation with Samsung, used Teece's testimony in the Apple/Samsung litigation against Samsung in their case, and Shim wanted to review the report in order to develop a rebuttal. *See* Docket No. 2557-10 at 138-39.

[23] *See* Tab No. 20. This was the same associate who had prepared the initial redactions for the version of the report to go on the FTP site. *See* Docket No. 2883 at 34.

[24] *See* Tab No. 20.

[25] *See id.*

[26] *See* Docket No. 2807-15, Ex. 4.

[27] This version of the Teece Report still contained unredacted information regarding Ericsson's licenses with Apple, but in a different section of the report.

[28] *See* Tab No. 20.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-8

- <u>February-March 2013</u>:  Samsung referenced and discussed the terms in Apple's license with Ericsson (the same terms that were disclosed in the insufficiently redacted Teece Report) as critical to their upcoming arbitration with Ericsson while simultaneously undergoing extensive discovery to obtain those terms.[29]

- <u>March 31, 2013</u>:  In preparation for Samsung's negotiations with Nokia, the Williams and Connolly law firm delivered a report to Samsung on the terms of the Apple/Nokia license agreement.[30]  This report was prepared in response to a request by Indong Kang in early March and drew its conclusions from an exhaustive review of public financial filings from both companies, as well as selected news reports and predictions.[31]

- <u>May 13, 2013</u>:  Shim emailed Quinn Emanuel a copy of the Teece Report with the confidential license terms still unredacted.  Quinn Emanuel did nothing in response.[32]

- <u>June 4, 2013</u>:  During a negotiation between Samsung and Nokia, Paul Melin proposed a licensing fee far above what the Samsung team believed was appropriate.[33]  According to Ahn, Nokia justified the figure by referencing a similar fee paid by a company of approximately Samsung's size.[34]  Melin says that in response, Ahn recited the terms of Nokia's parallel license with Apple and stated that he had learned the terms from his lawyers because "all information leaks."[35]  Ahn claims that the number he quoted was actually an estimate based on public, not private, information, and he was just "pretending" to be more certain than he was.[36]

- <u>July 1, 2013</u>: Nokia filed a motion for a protective order in the 12-630 case, and the current circus began.[37]

---

[29] *See, e.g.,* Tab Nos. 87, 90, 93, 121, 144, and 239.

[30] *See* Tab No. 56.

[31] *See id.*

[32] *See* Tab No. 272.

[33] *See* Docket No. 2557-8 at 81-82.

[34] *See id.*

[35] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

[36] *See* Docket No. 2557-8 at 94.

[37] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-9

With this outline in mind, on November 8, 2013, the court issued an Order to Show Cause Why Sanctions Are Not Warranted as to three particular violations of its protective order:

1. Samsung's wrongful use of the disclosed sensitive business information in preparing for:
   a. its negotiations and arbitrations with Ericsson between May 2012 and May 2013;
   b. its negotiations with Nokia between March 22, 2012 and June 4, 2013;

2. QE's failure to fully redact sensitive business information from the Initial Expert Report of David Teece, resulting in the pervasive distribution of the SBI to Samsung employees who were not authorized to have access to it; and

3. QE's failure to follow the procedures set forth in Section 18 of the Protective Order after repeated notice of the disclosure of sensitive business information.[38]

The court also authorized Samsung to take its own discovery.[39]

## II. THE GOVERNING LEGAL STANDARDS

In evaluating the record before it, the court is faced with three separate questions. First, has its protective order been violated? Second, if the protective order has been violated, does the court have the authority to issue sanctions for those violations? Finally, if the court has the authority to issue sanctions, what factors should it consider in determining whether sanctions are warranted?

### A. There Is No Intent Requirement To Violate The Protective Order

In order to determine whether or not a protective order has been violated, courts focus on the terms of the order itself.[40] In this case, Section 6(a) of the protective order states that "Protected Material shall not *voluntarily* be distributed, disclosed, or made available to anyone except as expressly provided in this order."[41] Quinn Emanuel and Samsung have argued that this

---

[38] Docket No. 2689 at 5.

[39] *See id.*

[40] *See e.g., Biovail Labs., Inc. v. Anchen Pharm., Inc.,* 463 F. Supp. 2d 1073, 1080 (C.D. Cal.2006); *On Command Video Corp. v. LodgeNet Entm't Corp.,* 976 F. Supp. 917, 922 (N.D. Cal. 1997).

[41] *See* Docket No. 687 at 5 (emphasis added).

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-10

creates an intent requirement to find a violation of the order.[42]  However, in the context of

discovery issues, "voluntarily" is typically interpreted as "absent court compulsion," rather than

"with intent or willfulness."[43]  This interpretation is consistent with how other courts have

addressed protective order violations.[44]  Interpreting "voluntarily" as such in this context, the court

finds that this protective order does not establish a willfulness requirement; absent court order, any

distribution, disclosure, or making available of protected information is a violation, regardless of

the intent of the perpetrator.

**B.      This Court Has The Authority Under Fed. R. Civ. P. 37 To Issue Sanctions For Violations Of Its Protective Order**

While at least one other appellate court disputes the applicability of Rule 37 to Rule 26(c)

protective orders,[45] the Ninth Circuit has repeatedly held that Rule 37 "provide[s] comprehensively

for enforcement of all [discovery] orders, including Rule 26(c) protective orders."[46]  Whatever the

merits of the conclusions of other jurisdictions, when the Ninth Circuit has spoken, this court is

duty-bound to listen. Because the conduct here stems directly from the protective order issued

under Rule 26(c) "to provide or permit discovery," the court has the authority to issue sanctions

---

[42] *See* Docket No. 2556-3 at 2.

[43] *See, e.g., Gifford v. Precision Pallet, Inc.*, Case No. 07-2339-JTM, 2008 WL 4078787, at *4 (D. Kan. Aug. 28, 2008) (contrasting voluntary disclosure with disclosure pursuant to court order); *Hodgson v. Bell Letter Serv., Inc.*, 63 F.R.D. 109, 111 (D. Conn. 1974) (same); *Nat'l Steel Products Co. v. Superior Court*, 164 Cal. App. 3d 476, 482 (1985) (same); *see also* 7 Annotated Patent Digest § 42:79 ("A voluntary disclosure does not occur where a court order has compelled the disclosure. Such disclosure is not voluntarily.").

[44] *See, e.g., Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012) (holding undisputed that inadvertent disclosures violate a protective order).

[45] *See, e.g., Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001) (holding that Rule 26(c) protective orders "do not fall within the scope of Rule 37(b)(2).").

[46] *See Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.*, 992 F.2d 932, 934-35 (9th Cir. 1993); *Flastoff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 704 (9th Cir. 1983) ("Fed. R. Civ. P. 37(a) empowers the courts to impose sanctions for failures to obey discovery orders."); *see also United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 911 (9th Cir. 1986) (affirming Rule 37 sanctions for violation of protective order); *cf. Smith & Fuller*, 685 F.3d at 490 (same).

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-11

and structure remedies for any violations under Rule 37(b)(2)(A).[47]  Such sanctions may be imposed against parties or counsel.[48]

## C. Sanctions Should Be Structured Both To Remedy The Harm Caused And Deter Similar Conduct

Authority, however, is not obligation.  In other words, protective order violations may, but do not necessarily, constitute sanctionable conduct. Rule 37 provides that the court "may issue further just orders" in response to violations of discovery orders, including the judicial establishment of facts, striking certain evidence or defenses, or other appropriate sanctions for various discovery violations.[49]  Because the rule mandates sanctions under certain conditions but only allows for them under others, the court has the discretion to determine whether sanctions are appropriate.

In determining whether to issue sanctions, or what forms the sanctions should take, a court must look to the totality of the circumstances surrounding each violation.  In *Falstaff Brewing Corp. v. Miller Brewing Co.*, the Ninth Circuit explained that "Rule 37(b) sanctions may serve either remedial and compensatory purposes or punitive and deterrent purposes."[50]  Although the court has broad discretion to fashion remedies to the misconduct, the harshest sanctions, such as exclusion of evidence or dismissal, are to be reserved for cases of bad faith or willful misconduct.[51]

---

[47] Because the court finds sufficient authority to issue sanctions under Rule 37, it does not consider any alternative sources such as its inherent authority.

[48] *See* Cal. Prac. Guide Fed. Civ. P. Before Trial Ch. 11(V)-C ("Sanctions may be imposed against the attorneys [or clients] separately or against the attorneys and clients jointly and severally.") (*citing Hyde & Drath v. Baker*, 24 F.3d 1162, 1172 (9th Cir. 1994)).

[49] *See* Fed. R. Civ. P. 37.

[50] 702 F.2d 770, 783 (9th Cir. 1983).

[51] *See United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369 (9th Cir. 1980).  Case-dispositive sanctions are subject to an additional five factor balancing test: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring

9

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

In light of *Falstaff*, the ideal remedy is one that advances both the remedial and deterrent goals of sanctions, as the need for one is not diminished by a need for the other. Thus, sanctions may be warranted where a relatively innocent violation leads great harm, where there is strong evidence of bad faith or willful conduct (even if there is minimal evidence of harm), and certainly where both are present. In all circumstances, an appropriate sanction will stem from the balance of the two.

### III. DISCUSSION: THE CONDUCT AT HAND

With these standards in mind, the court now turns to the instant matter. In this court's order to show cause, the court identified five instances of conduct that may warrant sanctions. Applying the framework above to those instances in light of the evidence presented, the court concludes as follows:

**A.     March 2012-May 2013:  The Court Is Not Persuaded That Samsung Used Information From The Teece Report In Negotiations With Ericsson And Nokia**

In its order to show cause, the court noted that sanctions may be warranted against Samsung for its wrongful use of the insufficiently redacted Teece Report in preparing for negotiations with Ericsson and Nokia.[52] In response, Samsung produced numerous declarations and supporting documents providing alternative sources for the information that had given the court pause.[53] With respect to Ericsson, Samsung explains that Ericsson itself told Samsung the terms of its license with Apple in the course of their mediations,[54] an assertion backed up by the sworn statement of an

---

disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

[52] *See* Docket No. 2689 at 5.

[53] *See* Docket No. 2807.

[54] *See id.* at 14.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

attorney from the Kirkland & Ellis firm.[55]   Given that no representative from Ericsson or anyone

else has come forward to refute that assertion, the court credits the testimony and accepts this

explanation.  With respect to the Nokia terms, however, although Samsung proffers numerous

possible sources for its information, each explanation is tenuous at best.  "It was in published news

sources," Samsung urges.[56]  "I just guessed," Ahn insists.[57]  And then there is the "Apple-Nokia

license memo" prepared by Williams and Connolly.[58]  Although the court finds each one of

Samsung's explanations shaky on its own, together they leave the court unpersuaded that Samsung

used the Teece Report in either the Ericsson or Nokia negotiations.

**B.     March, 2012:  A Quinn Emanuel Junior Associate Failed To Properly Redact The Teece Report, Violating This Court's Protective Order, But Not In A Context Requiring Sanctions**

The court also indicated in its order to show cause that sanctions may be warranted for the

initial failure to redact the Teece report.[59]  It is undisputed that at some point in late March 2012,

a junior associate working late one night failed to fully redact Apple's confidential license terms

from an expert report.[60]  Section 9(a) of the protective order indicates that among the information

that "the Parties agree . . . if non-public, shall be presumed to merit the 'HIGHLY

CONFIDENTIAL-ATTORNEYS' EYES ONLY' designation" are "pricing information . . .

financial data [and] licensing of the Producing Party's intellectual property."[61]  The

---

[55] *See* 2807-13 at 6.

[56] *See* 2481 at 48.

[57] *See* 2557-8 at 16.

[58] *See* Tab No. 246.

[59] *See* Docket No. 2689 at 5.

[60] *See* Docket Nos. 2807, 2835-3 at 11-18.

[61] *See* Docket No. 687 at 11.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

uncontroverted evidence establishes that unredacted portions of the report contained the licensing terms for Apple's intellectual property,[62] and although Samsung attempts to argue that this information was already public, the sources it references all state that the numbers they contain are, at best, estimates, as the parties are keeping the information confidential, and in fact, the terms they disclose do not match those described in the Teece Report.[63]  Based on this evidence, the court finds that the information was non-public, and that the failure to redact this information was a violation of this court's protective order.

That said, every lawyer in this case has acknowledged that these types of mistakes happen.  In a case of this size and scope, it would be completely unreasonable to expect every person on every team to perform perfectly at all times.  As Samsung points out in its brief, if the court begins issuing sanctions every time a document is less than fully redacted, it will quickly lose any bandwidth to deal with any other matters.[64]  The cavalcade that followed did not happen because of this one mistake.  As discussed in more detail below, if the process around this one mistake had been more appropriately engineered to guard the sensitive information it was processing, the missed redaction could have been caught and this entire fiasco avoided.  For the simple error in redaction, however, the court does not find that sanctions can reasonably be imposed; the harm resulting from this error alone is too small and speculative to punish when it is so clear that this act, more than any other before the court, was inadvertent.

---

[62] *See* Docket No. 2485 at 49-53.

[63] *See* Docket No. 2395 at 6 ("Bernstein analyst Pierre Ferragu *estimates* . . . Swedbank AB analyst Jari Honko *estimated* . . . Though the public filing did not disclose the sum it was paid by Apple in their patent deal, *the information would suggest*") (emphasis added).

[64] *See* Docket No. 2835-3 at 22.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

E-15

**C.** **March 23, 2012 – August 1, 2013: The Incompletely Redacted Teece Report Was Widely Circulated Within Samsung In Violation Of This Court's Protective Order, And Those Hundreds Of Violations Merit Sanctions**

One inadvertent mistake resulted in the widespread distribution of confidential information to hundreds of people who were not authorized to have access to it. Each time this information went to a new person who was not authorized to receive it under the protective order, Section 9(b) was violated, and although each individual violation here may have been as inadvertent as the initial missed redaction above, sanctions are warranted here due to the breadth/volume of violations and the fact that Samsung and its outside counsel made a conscious decision to set up a system that would allow violations of that scope to ensue from a mistake that small and, frankly, predictable.

Mr. Quinn himself candidly and tellingly described his firm in court that as "650 lawyers wide and 1 lawyer deep."[65] In cases of this complexity, relying on such a structure to manage highly confidential information from both parties and non-parties is akin to a trapeze artist flying high without a net. 99.99% of the time, no net is required. But in the 0.01% of the time when the trapeze fails, the net is not there, and the fall causes much more damage than it otherwise might.

The information traded by Apple and Samsung in this case was considered sufficiently valuable by both parties to merit an interlocutory appeal to the Federal Circuit to keep it protected from the public,[66] the vast majority of whom have absolutely no interest in it and no ability to use the information even if they were to discover it. It is sufficiently valuable to merit hundreds and hundreds of pages of sealing motions, with thousands of pages more in supporting declarations. If keeping this information from the public is worth all of that, then surely, logically, it would be

---

[65] *See* Docket No. 2581 at 60:24-25.

[66] *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 727 F.3d 1214 (Fed. Cir. 2013).

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

worth a second, or even a third, round of review before producing it to a competitor corporation, who would know exactly how to exploit it. Yet this basic precaution was not put in place. Because of this "1 lawyer deep" structure, a single inadvertent mistake led to confidential information being widely distributed within Samsung. This is unacceptable.

Even with a "1 lawyer deep" structure, the information may yet have been contained if Samsung and its executives had not adopted the practice of downloading and circulating litigation documents to the far corners of the globe. Samsung, however, decided to mine the documents produced in the litigation for all the value they could possibly extract, an understandable position given how expensive the information was, and its legitimate goal of maintaining consistent positions in all its litigation across the world. That said, there is always a risk that something slips through, and Samsung could just as easily have chosen to minimize the individuals exposed to litigation documents in case it did. But it chose otherwise. The Teece Report went to hundreds of people who were in no way involved in the Apple litigation. Given his sudden recollection that it was the currency of the Apple/Nokia terms that allowed him to pluck them out of the redacted spreadsheet, just days after offering no such explanation while testifying under oath, the court does not find Shim's explanation that he never used the insufficiently redacted Teece Report credible. Even if others somehow missed the actual, unredacted information, the fact of the matter remains that they had no right to have the information in the first place. This in and of itself was a substantial harm to Apple and Nokia.[67] Samsung's suggestion to the contrary ignores its own stipulation to a protective order that prohibits "disclosure" even without use.[68]

---

[67] *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 773 (9th Cir. 1983) (affirming the imposition of sanctions where documents were not returned pursuant to the protective order, but there was no evidence of misuse or harm); *cf. Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012) (affirming the imposition of sanctions without discussing harm caused by inadvertent dissemination of confidential information to parties outside the protective order).

[68] *See, e.g.,* Docket No 687 at 24 ("good cause" shall "include an objectively reasonable concern

Having adopted this attitude of share-and-share-alike which allowed the leaked information to spread so far, Samsung is as culpable for this debacle as Quinn Emanuel. Its willful failure to institute sufficient safeguards for the information warrants sanctions when considered in light of the vast distribution of confidential information that occurred because such protections were not in place.

**D.    December 21, 2012-January 4, 2013:  Quinn Emanuel Violated Section 18(a) Of This Court's Protective Order, And That Violation Merits Sanctions**

Finally, the court must consider Quinn Emanuel's failures to follow the procedures set forth in Section 18(a) of the protective order once it learned of the inadvertent disclosures. That section, entitled "INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER" provides that "[i]n the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure."[69]

The first of these failures occurred in December of 2012. On December 21 and 22, 2012, Quinn Emanuel became aware that a document containing Apple and Nokia's confidential business information had been uploaded to a server accessible by many Samsung employees.[70] A junior associate found the information in a redacted version of the Teece Report that he personally had

---

that the Person will, advertently or inadvertently, *use or disclose* Discovery Materials"), 30 ("The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized *disclosure and/or use* thereof is made.") (emphasis added).

[69] Docket No. 687 at 30.

[70] *See* Tab No. 20.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

E-18

prepared, so that it could be circulated within Samsung.[71]  This was sufficient to provide Quinn Emanuel with notice that there was a problem dating back as far as March, 2012.

Yet even though this young associate raised his concerns with the senior associate and the partner responsible for guarding against these kinds of errors, Quinn Emanuel did nothing to follow up.  True, the senior associate addressed the immediate issue of Shim receiving the particular copy of the unredacted report just sent.[72]  If that was the first time the report had ever been circulated, that may have been enough.  But it was not.  That report had gone out to the client nine months earlier, and both associates knew or should have known that.

Quinn Emanuel protests that in reality, it did not know, so it should not be held accountable for the lapse,[73] an argument which fails for a number of reasons.  First, at least one person at Quinn Emanuel-the junior associate who prepared the initial redactions and caught the error in December-actually knew that the report had gone out to the client FTP site in its incompletely redacted form.  Again, Quinn Emanuel's "1 lawyer deep" strategy caused the problem.  In a case of this size with this many resources and this much confidential information floating about, it is only reasonable to expect that a firm's left hand will know what the right hand has been doing with that information.[74]  If no one on the Quinn Emanuel team was responsible for knowing what documents had gone out to the client, such that that person would have been aware that the Teece report had gone out before, that is a flaw for which the firm must be held accountable.

---

[71] *See id; see also* Docket No. 2883 at 34.

[72] *See* Docket No. 2807-15, Ex. 4.

[73] *See* Docket No. 2835-3 at 11.

[74] *See* Docket No. 2581 at 60 ("Mr. Quinn: The reason [for this problem] is that nobody put it together . . . We are 650 lawyers wide and 1 lawyer deep.  And one lawyer doesn't necessarily know what another lawyer is doing.").

16

In order to comply with Section 18(a), to which Quinn Emanuel and its client had stipulated, Quinn Emanuel should have "immediately" picked up the phone to call Apple and let them know that there was a problem.[75]  Instead, it did nothing.  This conduct requires sanctions.

**E.     July 1 – August 1, 2013:  Quinn Emanuel Again Violated Section 18(A) Of This Court's Protective Order, And That Violation Merits Sanctions**

Later, on July 1, 2013, Nokia filed a motion for a protective order in the 12-630 case, alerting Quinn Emanuel that somehow, Nokia's confidential license with Apple had gotten through the protective order shield and into Samsung's hands.[76]  Quinn Emanuel, however, did not tell Apple.  By July 16, 2013, at the very latest, they had concrete, actual notice that the confidential information had definitely been disclosed.[77]  Still, Quinn Emanuel did not tell Apple.  Despite the protective order's clear directive to "immediately notify counsel for the Producing Party," Quinn Emanuel kept the information quiet for another fifteen days while independently negotiating with Nokia, as though hoping that would make the problem go away.[78]  Clearly, that hope was misplaced.

## IV. REMEDIES

Having concluded that its protective order was repeatedly violated and at least some of these violations warrant sanctions, the court must consider what sanctions would be appropriate in this case. Apple and Nokia propose a number of creative sanctions that Quinn and Samsung should face in light of their misconduct, suggesting everything from an injunction against Samsung in the

---

[75] *See* Docket No. 687 at 30.

[76] Quinn Emanuel argues that this motion alone provided Apple with the required notice under the protective order, as it is on the ECF notification list-serve.  *See* Docket No. 2883 at 45-46. However, there is no reason whatsoever that a motion by a third party for a protective order based on unsubstantiated allegations would serve to provide the notice required under Section 18(a). Apple was entitled to a phone call, or at least an email.

[77] *See* Docket No. 2395-3 at 2.

[78] *See id.* at 2-3.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

12-630 case[79] to a ten-year ban from representing any party adverse to Nokia.[80] The vast majority of these are ludicrously overbroad, such as the suggestion that both Samsung and Quinn Emanuel should be banned from any situation in which they might make use of licensing information for the next two years.[81] Although the evidence has shown Quinn Emanuel failed to notify the relevant parties at the relevant times, and that Shim made use of the information, there has been insufficient evidence that this failure to notify or misuse ultimately implicated any issue in this or any other litigation or negotiation. By the final hearing on December 9, 2013, this lack of clear evidence was obvious in the tone of the moving parties. Apple and Nokia's allegations had shifted, acknowledging that the evidence of misuse is "circumstantial,"[82] must overcome facial "inconsistencies,"[83] and that even they could only characterize it as "more likely than not" that the information had been used.[84] In short, what began as a chorus of loud and certain accusations had died down to aggressive suppositions and inferences, and without anything more, Quinn Emanuel and Samsung cannot reasonably be subject to more punitive sanctions.

Quinn Emanuel shall reimburse Apple, Nokia, and their counsel for any and all costs and fees incurred in litigating this motion and the discovery associated with it, as required by Rule 37 in the absence of "substantial justification" or other showing of "harmlessness," neither of which the court finds here. That expense, in addition to the public findings of wrongdoing, is, in the

---

[79] *See* Docket No. 2838-3 at 19.

[80] *See* Docket No. 2836-4 at 24.

[81] *See* Docket No. 2838-3 at 18.

[82] Docket No. 2873-3 at 4.

[83] Docket No. 2872-5 at 1-2.

[84] Docket No 2873-3 at 4.

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

United States District Court
For the Northern District of California

court's opinion, sufficient both to remedy Apple and Nokia's harm and to discourage similar conduct in the future.

For the remainder of the 11-1846 and 12-0630 cases, before distributing or filing redacted documents, Quinn Emanuel and any other firm representing Samsung, shall send the redacted versions to Apple's counsel for their review and approval. Apple and its counsel shall adopt a similar practice.

Finally, with Apple and Nokia's consent, Quinn Emanuel shall be responsible for ensuring that all copies of the Teece report containing confidential information are deleted, erased, wiped, or otherwise permanently removed from Samsung's control within fourteen days of this order.

**IT IS SO ORDERED.**

Dated: January 29, 2014

_____
PAUL S. GREWAL
The United States Magistrate Judge

**United States District Court**
For the Northern District of California

# Exhibit 2

Order of United States Magistrate Judge Paul S. Grewal dated June. 20, 2014 setting sanctions against Samsung Electronics Co. and Quinn Emanuel totaling approx. $2.04 million.

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| APPLE INC., a California Corporation, | ) | Case No. 5:11-cv-01846-LHK (PSG) |
| | ) | |
| Plaintiff, | ) | **ORDER SETTING REASONABLE** |
| v. | ) | **ATTORNEY'S FEES AND COSTS** |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., a | ) | **(Re: Docket Nos. 2958, 2959, 2964, 2998,** |
| Korean corporation; SAMSUNG | ) | **3014)** |
| ELECTRONICS AMERICA, INC., a New York | ) | |
| corporation; and SAMSUNG | ) | |
| TELECOMMUNICATIONS AMERICA, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

With the present quiet on the docket, it is easy to forget the long tumult of this case that once reigned. The ceremonial courtroom has cleared. The fire drills of motions on shortened time have ceased. All that remains for now, at least for the undersigned, is the relatively mundane issue of what makes for reasonable fees.

The fees at issue arise from this court's order awarding sanctions to Apple and Nokia. The sanctions followed the court's finding that Samsung and Quinn Emanuel were responsible for the

unauthorized distribution of Apple and Nokia confidential information.  Samsung and QE object to

certain of the fees Apple and Nokia now claim, which means the court must wade into the billing

entries and make various calls.  So, here goes.[1]

## I. BACKGROUND[2]

On June 4, 2013, Nokia and Samsung met for negotiations over a patent license deal.  At

that meeting, Dr. Seungho Ahn of Samsung told Paul Melin of Nokia that he knew the terms of

Nokia's license agreement with Apple; he then recited the terms and indicated that his lawyers had

told him what they were.  As Dr. Ahn put it, "all information leaks."   On July 1, 2013, Nokia filed

a motion for a protective order in the 12-0630 case to prevent further dissemination of its

confidential information.  Nokia later withdrew that motion after entering into a stipulated

agreement with Samsung, which was supposed to address the problem.

On August 1, 2013, QE finally notified Apple that there had been a breach of the protective

order, resulting in the dissemination of information designated as "attorneys' eyes only" within

Samsung.  In response, Apple filed a motion for sanctions in this case, as well as a motion for

discovery to figure out how far and wide the information had spread.  Because progress had been

essentially non-existent on the stipulated remedial agreement, the court granted Apple's motion for

discovery, which turned out to be extensive.  After reviewing the materials unearthed by discovery,

the court granted Apple's motion for sanctions against Samsung and its counsel on two grounds:

(1) failure to institute sufficient safeguards for third-party confidential information and (2) failure

to comply with the notice and cooperation requirements set forth in Section 18(a) of the protective

order entered in this case.  The court ordered QE to reimburse Apple and Nokia any and all costs

---

[1] For ease of reference, the court will refer to QE alone while intending to encompass both QE and
Samsung.

[2] For direct citations to the record or a more fulsome recitation of the facts, *see* Docket Nos. 2689
and 2935.

United States District Court
For the Northern District of California

and fees incurred in litigating this motion and the discovery associated with it. QE now challenges the reasonableness of the fees requested.

## II. LEGAL STANDARDS

The touchstone of the attorney's fee award is its reasonableness. As such, to determine the award, the court begins with the lodestar: reasonable rates multiplied by reasonable hours expended.[3] The resulting figure is presumptively reasonable.[4] Attorney's fees awards may only include hours "reasonably expended" on the litigation.[5] Hours that are "excessive, redundant, or otherwise unnecessary" must be excluded.[6] The court "must base its determination whether to award fees for counsel's work on its judgment as to whether the work product . . . was both useful and of a type ordinarily necessary to advance the . . . litigation."[7]

Although parties seeking attorney's fees are required only to provide affidavits "sufficient to enable the court to consider all the factors necessary to determine a reasonable attorney's fee award," parties are subject to a reduction in the hours awarded when they fail to provide adequate documentation, notably contemporaneous time records.[8] The court also has the "authority to reduce hours that are billed in block format."[9] Block-billing is "the time-keeping method by which

United States District Court
For the Northern District of California

---

[3] *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Kraszewski v. State Farm General Ins. Co.*, Case No. 3:79-cv-1261-TEH, 1984 WL 1027, at *5-6 (N.D. Cal. June 11, 1984).

[4] *See Hensley*, 461 U.S. at 434.

[5] *See id.* at 433.

[6] *Id.*

[7] *Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003).

[8] *See Ackerman v. W. Elec. Co., Inc.*, 643 F. Supp. 836, 863 (N.D. Cal. 1986) (citing *Williams v. Alioto*, 625 F.2d 845, 849 (9th Cir. 1980)).

[9] *See Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007).

E-26

each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."[10]

      Finally, the Ninth Circuit recognizes that because "awarding attorney's fees to prevailing parties . . . is a tedious business," the trial court "should normally grant the award in full" if the party opposing the fee request "cannot come up with specific reasons for reducing the fee request."[11]  At the same time, nothing in this standard compels a court to overlook ambiguities in a requesting party's supporting materials that it was in a position to argue.[12]

### III. DISCUSSION

      QE raises three broad challenges to Apple's and Nokia's request for costs and attorney's fees, which this order will address in order of escalating merit.

### A.  It Is Not Unjust To Award The Requested Expenses

      First, QE urges the court to "substantially reduce Apple's and Nokia's fee requests because a full award would be unjust in light of newly revealed evidence that Apple and Nokia" failed to adequately protect their own information.[13]  QE refers, of course, to the revelation in February that Apple itself mistakenly failed to redact the terms of its license with Nokia from a document filed on the public docket in October.[14]  The court has already expressed its view that this disclosure is "not [] relevant to either basis for the court's January 29, 2014 sanctions order," so it declines to reduce the fee award on those grounds.[15]

---

[10] *Id.* at 945 n.2 (internal citations and quotations omitted).

[11] *Moreno*, 534 F.3d at 1116.

[12] *See Welch*, 480 F.3d at 948.

[13] *See* Docket No. 3000 at 4.

[14] *See* Docket No. 2958-1.

[15] *See* Docket No. 3111 at 1.

E-27

## B. Apple And Nokia's Work Was Neither Unnecessary Nor Unsuccessful

QE next argues that the requested fees should be reduced to reflect Apple and Nokia's "unnecessary work" and "limited success."[16] After all, QE points out, the material relied on to seek sanctions was "voluntarily provided or offered in August, requiring no litigation, and Samsung stipulated to remedial measures on August 18."[17] However, as the court noted in October, the proposed remedial measures were "insufficient," as was Samsung's progress toward implementing them.[18] The court, not Apple or Nokia, concluded that "letting Samsung and its counsel investigate this situation without any court supervision [was] unlikely to produce satisfactory results,"[19] and on that basis, the court ordered the discovery that QE now argues was "not needed."[20] Apple and Nokia can hardly be faulted for complying with a court order.

QE further asks the court to reduce the fee award in because "Apple and Nokia did not succeed on many claims."[21] This is simply incorrect. Apple moved for sanctions on the grounds that "Apple confidential licensing information was disclosed to Samsung employees and others in violation of the Protective Order," indicating "a broad failure to maintain appropriate procedures to protect the confidential information produced in this case."[22] The court's eventual order noted specifically that Samsung and QE's "willful failure to institute sufficient safeguards for the information warrants sanctions when considered in light of the vast distribution of confidential

---

[16] Docket No. 3000 at 3.

[17] *Id.*

[18] Docket No. 2483 at 4.

[19] *Id.*

[20] Docket No. 3000 at 3.

[21] *Id.* at 4.

[22] Docket No. 2374-2 at 11.

United States District Court
For the Northern District of California

E-28

information that occurred because such protections were not in place."[23]  Apple further moved for

sanctions based on "Samsung's failure to take immediate and thorough action following the

discovery of those breaches to prevent further mishandling of Apple's information,"[24] and the court

granted sanctions based on "Quinn Emanuel's failures to follow the procedures set forth in

Section 18(a) of the protective order once it learned of the inadvertent disclosures."[25]  Finally,

Apple also moved for sanctions because "Samsung executives appear[ed] to have improperly used

the Apple confidential licensing information."[26]  Though the court was ultimately "unpersuaded"

that Samsung had misused the inadvertently disclosed information, it took the full scope of the

discovery tendered to reach that conclusion.[27]  This was not a case where the parties tested a wild

legal theory, or pushed the bounds of a subjective standard in seeking sanctions.  Apple and Nokia

had concrete evidence indicating wrongdoing at the time that the motion was brought.  Two of

their three allegations were eventually confirmed, and though the court rejected the third, it noted

that Samsung's excuses and explanations were "shaky" at best.[28]  Apple and Nokia succeeded on

most of their claims, and the court declines to reduce its fee award to indicate anything less.

QE pushes for additional reductions based on Nokia's inappropriate "scorched earth"

litigation strategy and duplicative work, such as sending multiple attorneys to attend depositions

and hearings.  Just recently, this court declined to hold that, "as a matter of law, it is unreasonably

duplicative to have [multiple] attorneys at mediation sessions, depositions, meetings, and trial;

often, there are numerous moving pieces at each of these events, such that having [multiple]

---

[23] Docket No. 2935 at 15.

[24] Docket No. 2374-2 at 11.

[25] Docket No. 2935 at 16.

[26] Docket No. 2374-2 at 12.

[27] *See* Docket No. 2935 at 11.

[28] *Id.*

**United States District Court**
For the Northern District of California

attorneys present is more or less required to follow everything."[29]   It is disinclined to reach a

contrary conclusion here.  Neither can it fault Nokia for zealously pursuing the relief granted by

this court.  QE's request to make various reductions on these grounds also is denied.

Finally, QE asks the court to strike seven specific sets of costs and fees.[30]

1. *Expenses for an unfiled motion by Nokia*: denied.  The bulk of the work was
   eventually used in a different form, and the court does not wish to create an
   incentive to file unnecessary motions simply because the drafting process has
   begun.

2. *Expenses incurred in depositions of Jeff Rischer, Paul Melin and Eeva Hakoranta*:
   denied.  Failure to discover that Apple/Nokia license terms had been accidentally
   posted on the public docket does not amount to a failure to conduct a "reasonable
   investigation" in preparation for the deposition.

3. *Business or first class airfare:* granted-in-part.  While striking those expenses
   entirely would be extreme, it is appropriate to reduce them to approximately the
   cost of a coach class ticket.  QE suggests a 70% reduction in all business/first class
   airfare to make this adjustment, which seems reasonable to the court.  Apple shall
   recover $3,367.55 of its requested $11,225.15 costs for business and first class
   airfare.  Breaking out Nokia's business class fares is not feasible, as they are
   presented as part of a single trip entry for each of three trips, covering airfare,
   lodging, transportation and food, so the discount will be applied to the entire entry;
   Nokia shall recover $9,436.80 of its requested $31,456 for trips which included a
   business class airfare.

4. *Nokia meals and transportation expenses*: denied.  Subsistence and transportation
   are commonly accepted costs of business travel.

5. *RealTime and video service expenses*: denied.  Again, these are commonly accepted
   costs of conducting discovery.

6. *Expenses incurred for the Ken Korea deposition*: denied.  Having reviewed the Ken
   Korea deposition transcript, he was subject to extensive questioning by both Apple
   and Nokia.[31]

7. *Expenses incurred sending Nokia counsel to Korea*: granted.  Nokia has presented
   insufficient evidence to justify its decision to send counsel to Korea for the
   beginning of the Stroz review despite being told that counsel would not be
   permitted within the premises.

**United States District Court**
For the Northern District of California

[29] *Muan v. Vitug*, Case No. 5:13-cv-0331-PSG, Docket No. 73 at 3 (N.D. Cal. June 18, 2014).

[30] *See* Docket No. 3000 at 4.

[31] *See* Docket No. 2557-10.

**C. With Limited Exceptions, Apple And Nokia's Requests Have Been Sufficiently Supported To Sustain The Requested Award**

In its most persuasive argument, QE argues that the court should reduce the fees and costs requested because the billing records submitted are insufficiently detailed to allow anyone to evaluate their reasonableness. QE argues that Apple and Nokia's billing records in the present matter reflect the same flaws—generic descriptions and block billing—for which the court previously imposed a 20% reduction. The parties in this case are aware that the court takes such allegations seriously and will not reward obtuse billing practices that deprive others of the ability to meaningfully evaluate how the time was spent.[32]

That said, Apple and Nokia's billing records are much clearer than those for which the court previously imposed a 20% penalty. Apple's previous billing included things like 60.7 hours spent "drafting and preparing motion to compel," and 20.8 hours "preparing motion for administrative relief and motion to seal."[33] This time, in the over four hundred pages of correspondence and billing records submitted for review, the court has identified only 19 records that it finds troubling. In each of these entries, partners and senior associates block bill ten or more hours on "drafting," "preparing" "revising" or paying "attention to" various briefs.[34] These are precisely the type of entries that the court condemned in its prior order and are therefore subject to the same 20% reduction.[35] The relevant entries are provided in the table below in both their original and reduced forms. [36]

---

[32] *See Apple Inc. v. Samsung Electronics Co., Ltd*., Case No. 5:11-cv-1846-LHK (PSG), 2012 WL 5451411, at *5 (N.D. Cal. Nov. 7, 2012).

[33] Docket No. 1948-1.

[34] *See* Docket Nos. 2965-20 at 34, 2965-21 at 52-53.

[35] *See Apple*, 2012 WL 5451411, at *8.

[36] For the entries listed below, Nokia originally requested $87,082, but shall be awarded $69,667.20. Apple originally requested $20,498.17 but shall be awarded $16,398.54.

United States District Court
For the Northern District of California

E-31

| Team Member | Task | Original Hours | Reduced Hours |
|---|---|---|---|
| Parker Miller | Draft and revise response to Samsung motions to stay and for relief from Apple and Stipulated Order | 10.2 | 8.2 |
| Ed Bonapfel | Edit and revise Brief in Support of Sanctions and supporting documents related to same | 10.2 | 8.2 |
| Ryan Koppelman | Attention to access to redacted Samsung filings, deposition scheduling, meet and confer status, proposal for potential sanctions, draft Motion for Contempt. | 10.3 | 8.2 |
| Parker Miller | Draft and revise Brief in Support of Sanctions. | 10.3 | 8.2 |
| Andy Tuck | Finalize and file sanctions brief. | 10.3 | 8.2 |
| Parker Miller | Draft, revise and file Supplemental filing on Motion for sanctions. | 10.6 | 8.5 |
| Alex Wuste | Research and draft filings related to Judge Grewal's October 2 | 11.3 | 9.0 |
| Parker Miller | Draft and revise supplemental motion and support ongoing depositions. | 11.7 | 9.4 |
| Parker Miller | Draft, revise and file Supplemental filing on Motion for sanctions. | 11.8 | 9.4 |
| Alex Wuste | Update, cite check, finalize R. Koppelman declaration and final brief | 12.4 | 9.9 |
| Parker Miller | Draft and revise opposition to Samsung motion for privilege | 12.8 | 10.2 |
| Parker Miller | Draft, revise and file Supplemental filing on Motion for sanctions. | 12.9 | 10.3 |
| Ryan Koppelman | Attention to supplemental brief | 13 | 10.4 |
| Parker Miller | Draft and Revise response to Samsung Motion for Leave | 13.1 | 10.5 |
| Parker Miller | Draft and revise brief; respond to Samsung's letter on privilege. | 13.2 | 10.6 |
| Ed Bonapfel | Edit and revise Supplemental Brief and prepare for filing. | 14.7 | 11.8 |
| Parker Miller | Draft and revise supplemental brief | 16.8 | 13.4 |
| Andrew Liao | Prepare, file brief and supporting papers regarding appropriate sanctions for Samsung's protective order | 11.4 | 9.1 |
| Derek Gosma | Draft materials related to sanctions motion, discuss same with team, finalize filing | 12.1 | 9.7 |
| Richard O'Neill | Revise sanctions supplemental brief | 15.1 | 12.0 |

The court notes and appreciates that both Apple and Nokia have applied a series of

discounts to their requests already. However, as the court understands it, theses discounts were

intended to account for potential over-billing or expenditures that were not, strictly speaking,

necessary. The "haircut" now applied to the requests submitted addresses the problem of insufficient record keeping, not "overbilling" or "unnecessary" time spent.

## IV. CONCLUSION

With the limited exceptions described above, the court finds that the remaining costs and fees requested by Apple and Nokia are reasonable and shall be awarded. No later than 30 days from this order, Samsung and QE are to pay Nokia a total of $1,145,027.95 and Apple a total of $893,825.77 in fees and costs.

**IT IS SO ORDERED.**

Dated: June 20, 2014

PAUL S. GREWAL
United States Magistrate Judge

# Exhibit 3

Order of United States District Judge Lucy H. Koh dated Sep. 19, 2014 upholding sanctions award of the Magistrate Judge.

Case 5:11-cv-01846-LHK Document 3291 Filed 09/19/14 Page 57 of 75
Case: 14-1480 Document: 63-7 Page: 175 Filed: 12/09/2016

E-34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

<table>
<tr><td>APPLE, INC., a California corporation,</td><td>)</td><td>Case No.: 11-CV-01846-LHK (PSG)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td>ORDER ON MOTIONS FOR RELIEF</td></tr>
<tr><td>v.</td><td>)</td><td>FROM NONDISPOSITIVE ORDERS</td></tr>
<tr><td></td><td>)</td><td>(ECF NOS. 3134, 3135, 3136)</td></tr>
<tr><td>SAMSUNG ELECTRONICS CO., LTD., A</td><td>)</td><td></td></tr>
<tr><td>Korean corporation; SAMSUNG</td><td>)</td><td></td></tr>
<tr><td>ELECTRONICS AMERICA, INC., a New York</td><td>)</td><td></td></tr>
<tr><td>corporation; SAMSUNG</td><td>)</td><td></td></tr>
<tr><td>TELECOMMUNICATIONS AMERICA, LLC,</td><td>)</td><td></td></tr>
<tr><td>a Delaware limited liability company,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

This Order addresses Magistrate Judge Grewal's January 29, 2014 Order Granting Motion

for Sanctions (ECF No. 2935, "Sanctions Order") and June 20, 2014 Order Setting Reasonable

Attorney's Fees and Costs (ECF No. 3117, "Fees Order"). Samsung and non-party Nokia

Corporation ("Nokia") filed a total of three motions challenging aspects of those orders: (1)

Samsung's motion contesting a finding that Samsung waived privilege as to seven documents

(ECF No. 3135); (2) Nokia's motion for access to Samsung documents submitted *in camera* (ECF

No. 3136); and (3) Samsung's motion to reduce the sanctions award of fees and costs (ECF No.

3134). Having considered the submissions of the parties, the relevant law, and the record in this

case, the Court GRANTS Samsung's motion for relief regarding waiver of privilege (ECF No.

3135), GRANTS IN PART AND DENIES IN PART Nokia's motion for relief regarding *in*

United States District Court
For the Northern District of California

*camera* documents (ECF No. 3136), and DENIES Samsung's motion for relief regarding fees and costs (ECF No. 3134).

## I. PROCEDURAL HISTORY

The present motions involve violations of the protective order in this case by Samsung and its counsel, Quinn Emanuel. Judge Grewal has previously detailed the procedural and factual history of this dispute, so the Court recites only relevant, uncontested portions for purposes of reviewing the current motions. *See, e.g.*, ECF No. 2689 at 2-3; Sanctions Order at 2-7.

In connection with this litigation, Samsung obtained an expert report from Dr. David Teece (the "Teece Report"), which included confidential information regarding the terms of Apple's license agreements with non-parties Nokia and Ericsson. *See* Sanctions Order at 4. In 2012, Quinn Emanuel distributed improperly redacted copies of the Teece Report to Samsung employees. *See id.* Quinn Emanuel claims that it did not discover the improper distribution of this confidential information until December 2012. *See id.* at 5. However, distribution of incorrectly redacted copies of the Teece Report continued after that date. *See id.* at 5-6. On June 4, 2013, during negotiations between Samsung and Nokia, Samsung executive Dr. Seungho Ahn allegedly recited the terms of an Apple-Nokia license described in the Teece Report, saying that "all information leaks." *Id.* at 6.

On July 1, 2013, in Case No. 12-CV-630, Nokia moved for a protective order, alleging that Samsung improperly used Nokia's confidential information during licensing negotiations. *See* Case No. 12-CV-630, ECF No. 647. Then, on August 23, 2013, Apple sought discovery and sanctions against Samsung in the present case, in connection with Samsung's alleged violations of the protective order. *See* ECF Nos. 2374, 2434 (Nokia's joinder to Apple's motion). Following further briefing and hearings, Judge Grewal ordered Samsung to produce allegedly privileged documents for *in camera* inspection. *See* ECF Nos. 2587, 2589. On November 18, 2013, after reviewing Samsung's production, Judge Grewal issued an order to show cause as to why sanctions against Samsung and Quinn Emanuel were not warranted. ECF No. 2689. Judge Grewal explained that he "undertook an in camera review of boxes upon boxes of Samsung's documents," finding that this *in camera* procedure was "necessary because Samsung raised the equally serious

charge that the attorney-client privilege and work-product protections applicable to these documents would otherwise be breached without cause." *Id.* at 1-2. Based on his exhaustive review of the documents, Judge Grewal determined that "an outline does emerge suggesting sanctions should issue" based on protective order violations by Samsung and Quinn Emanuel. *Id.* at 3.

On January 29, 2014, Judge Grewal imposed sanctions, finding that Samsung and Quinn Emanuel violated the protective order by repeatedly distributing the unredacted Teece Report throughout Samsung, and that Quinn Emanuel failed to notify Apple timely of those violations upon discovering them. *See* Sanctions Order. In imposing sanctions, Judge Grewal relied on documents submitted by Samsung for *in camera* review and ruled: "Because Samsung offered to turn over the vast majority of the documents cited in this order, the court finds that privilege has been waived as to those documents." *Id.* at 4 n.13. Judge Grewal decided that "Quinn Emanuel shall reimburse Apple, Nokia, and their counsel for any and all costs and fees incurred in litigating this motion and the discovery associated with it." *Id.* at 18. Judge Grewal subsequently set a briefing schedule for determination of the quantity of costs and fees owed. ECF No. 2941. This Court extended the time for any motions for relief from Judge Grewal's January 29, 2014 Sanctions Order to 14 days following a ruling on the amount of the sanctions. ECF No. 2950.

On February 25, 2014, Nokia moved to compel Samsung to "produce to Nokia all the documents the Court cited in its January 29, 2014 Order Granting Motion for Sanctions for which the court has held privilege was waived (Dkt. No. 293[5] at 4 n.13), and all the documents the Court ordered produced in October 2013." ECF No. 2988 at 9. Following an April 1, 2014 hearing on Nokia's motion to compel, Judge Grewal denied Nokia's motion but ordered that Quinn Emanuel provide a declaration confirming that Samsung no longer possessed Nokia's confidential business information. ECF No. 3061; *see also* ECF No. 3075 (April 1, 2014 hearing transcript). Quinn Emanuel has since submitted two declarations regarding Samsung's efforts to expunge Nokia and Apple confidential information. *See* ECF Nos. 3106, 3190.[1]

---

[1] On September 17, 2014, in Case No. 12-CV-630, Judge Grewal granted an earlier motion by Samsung for a ruling that Samsung complied with the terms of a Samsung-Nokia stipulation in that case by furnishing these declarations. *See* Case No. 12-CV-630, ECF No. 1980.

On June 20, 2014, Judge Grewal issued an order setting the amount of costs and fees owed to Apple and Nokia. *See* Fees Order. Judge Grewal rejected most of Samsung's arguments against Apple's and Nokia's asserted fees and costs, but reduced certain requested attorneys' fees due to block billing, and ultimately ordered Samsung and Quinn Emanuel "to pay Nokia a total of $1,145,027.95 and Apple a total of $893,825.77 in fees and costs." *Id.* at 10.

On July 7, 2014, Samsung and Nokia filed a total of three motions seeking relief from portions of the Sanctions Order and Fees Order. *See* ECF No. 3143 (setting briefing schedule). First, Samsung filed a motion challenging the ruling in the January 29, 2014 Sanctions Order that Samsung waived privilege as to certain documents produced for *in camera* inspection. ECF No. 3135. On July 22, Apple and Nokia filed oppositions. ECF Nos. 3159 (Apple), 3163 (Nokia). On July 29, 2014, Samsung filed a reply. ECF No. 3174.

Second, Nokia moved for relief from the January 29, 2014 Sanctions Order, claiming that Nokia is entitled to see the allegedly privileged documents that formed the basis for Judge Grewal's sanctions rulings. ECF No. 3136. On July 22, 2014, Samsung filed an opposition. ECF No. 3165-3. On July 29, 2014, Nokia filed a reply. ECF No. 3172-4.

Third, Samsung disputed the amount of fees and costs imposed in the June 20, 2014 Fees Order. ECF No. 3134. On July 22, Apple and Nokia filed oppositions. ECF Nos. 3160 (Apple), 3162 (Nokia). On July 29, 2014, Samsung filed a reply. ECF No. 3173-3. In its motion disputing fees, Samsung also requested that the Court extend Quinn Emanuel's payment deadline from July 21, 2014 until 30 days after resolution of this motion. *See* ECF No. 3134 at 2. The Court extended Quinn Emanuel's payment deadline to seven days after the Court issues an order resolving the instant motions. *See* ECF No. 3143.

## II.      LEGAL STANDARDS

The district court may designate any nondispositive pretrial matter to be determined by a magistrate judge, whose ruling on the matter will be modified or set aside only if "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). In reviewing for clear error, the district judge may not simply substitute his or her judgment for that of the magistrate judge. *See Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).

**United States District Court**
For the Northern District of California

E-38

"Clear error is found when a reviewing court has a definite and firm conviction that a mistake has been committed." *Lewis v. Ayers*, 681 F.3d 992, 998 (9th Cir. 2012) (quotation and citation omitted). "[A]ny motion not listed [under § 636(b)(1)(A)], nor analogous to a motion listed in this category, falls within the nondispositive group of matters which a magistrate may determine." *Maisonville v. F2 Am., Inc.*, 902 F.2d 746, 748 (9th Cir. 1990) (citations omitted).

### III.     DISCUSSION

#### A.     Samsung's Motion Regarding Waiver of Privilege (ECF No. 3135)

##### 1.     Procedural History Regarding Privilege

In light of the complicated history of discovery related to Apple's and Nokia's motions for sanctions, and the centrality of that history to Samsung's motion for relief from Judge Grewal's Sanctions Order, the Court begins with a more detailed history of the parties' discovery efforts and Samsung's privilege assertions.

As noted above, on August 23, 2013, Apple filed a motion for sanctions against Samsung for Samsung's apparent violation of the protective order. ECF No. 2374-2. Apple further sought discovery in order to uncover the nature and extent of the violation. *Id.* On September 21, 2013, Nokia partially joined Apple's motion to compel discovery. ECF No. 2434. On October 2, 2013, Judge Grewal granted Apple's and Nokia's requests for additional discovery after finding that Apple, Nokia, and the court lacked even the most basic information regarding how the improperly redacted Teece Report had been transmitted to Samsung, how many Samsung employees had accessed the report, and what steps, if any, had been taken to limit unauthorized access to the confidential information contained therein. ECF No. 2483 ("October 2 Order") at 4-5. Judge Grewal ordered Samsung to produce numerous documents concerning the transmissions of the Teece Report and to make various witnesses available for deposition. *Id.* at 5.

On October 3, 2013, Samsung contacted Apple to inquire whether Apple would be willing to stipulate that production of documents pursuant to the October 2 Order would not constitute a waiver of attorney-client privilege or work-product protection. ECF No. 3135-2. Apple responded on October 5, 2013 that it was unwilling to so stipulate. ECF No. 3135-3. Apple stated that "[t]he issue of privilege was briefed and argued and Samsung has been ordered to produce the documents

United States District Court
For the Northern District of California

identified in the [October 2 Order]." *Id.* On October 4, 2013, Apple wrote separately to request that Samsung produce "unredacted versions" of documents identified in the October 2 Order. ECF No. 3135-4. Samsung responded to that correspondence by asking whether "Apple believes Samsung is required to produce documents in response to the [October 2 Order] . . . without regard for assertions of the attorney-client privilege or attorney work product protections." ECF No. 3135-5. Apple replied that "[t]he parties briefed the privilege issues. The [October 2 Order] obligates Samsung to produce unredacted versions of the documents." *Id.* On October 7, 2013, Samsung appealed the October 2 Order to this Court, raising, among other things, the issue of whether the October 2 Order compelled Samsung to produce documents without regard to assertions of privilege or work-product protection. ECF No. 2495 at 2-4.

Additional exchanges between Apple, Nokia, and Samsung occurred on October 10, 11, 12 and 14, 2013. *See* ECF No. 3135-1 ¶¶ 9-14. In these exchanges, Samsung requested a stipulation that producing documents pursuant to the October 2 Order would not waive attorney-client privilege or work-product protection. *Id.* Both Apple and Nokia declined to so stipulate, and Samsung did not produce any documents. *Id.*

This Court affirmed Judge Grewal's October 2 Order on October 15, 2013. ECF No. 2538. In response to Samsung's argument that the October 2 Order was contrary to law because it "improperly abrogate[d] privilege and work-product protection," the Court found that the October 2 Order had not made a ruling on privilege, and that Samsung remained free to "assert privilege objections during the course of the compelled discovery and follow the normal protocol regarding privilege disputes, as set forth in the protective order." *Id.* at 6-7.

Following this Court's affirmance of Judge Grewal's October 2 Order, Samsung asserted privilege and work-product protection as to numerous documents covered by the October 2 Order, as documented in a privilege log. *See* ECF No. 3135 at 2; ECF No. 3135-1 ¶ 15; ECF No. 3163 at 2. Many of the documents Samsung did produce were heavily redacted, *see, e.g.*, ECF No. 3164-3, and depositions of Samsung witnesses were similarly constrained by assertions of privilege and work-product protection, ECF No. 3163 at 2.

**United States District Court**
For the Northern District of California

On October 22, 2013, Apple, Nokia, and Samsung appeared again before Judge Grewal to discuss disputes concerning Samsung's production and assertions of privilege and work-product protection. ECF No. 2581 (hearing transcript). At the close of the hearing, Judge Grewal ordered Samsung to produce unredacted copies of the documents identified in Samsung's privilege log for *in camera* review. *Id.* at 90:1-11; ECF No. 2589. In his November 8, 2013 Order to Show Cause Why Sanctions Are Not Warranted, Judge Grewal expressed doubt that Samsung had met its burden to establish that privilege and/or work-product protection applied to eleven of the documents produced for *in camera* review.[2] ECF No. 2689 at 4 n.16. However, Judge Grewal afforded Samsung "one further opportunity to demonstrate with specificity how each and every one of the [eleven] documents fall under the protection of either the attorney-client privilege or the work-product doctrine by submitting a brief on the subject." *Id.*

Samsung submitted its public briefing on the eleven documents on November 19, 2013. ECF No. 2807. Apple and Nokia each filed responsive briefs urging Judge Grewal to find either that the documents were not covered by privilege or work-product protection or that Samsung had waived privilege. ECF Nos. 2824, 2825-2.

On November 26, 2013, Samsung sent a letter to Apple and Nokia offering to produce seven of the eleven documents identified in the order to show cause,[3] provided that Apple and Nokia would stipulate that doing so would not constitute a waiver of attorney-client privilege or work-product protection. ECF No. 3135-15. Nokia filed a notice on ECF rejecting Samsung's proposed stipulation on November 27, 2013. ECF No. 2834. Apple responded to Samsung's request via e-mail on December 1, 2013. ECF No. 3135-16. Apple stated that it was willing to enter into the stipulation, but only if Samsung agreed to produce *all* of the documents submitted to

---

[2] In making this observation, Judge Grewal did not indicate that the remaining documents submitted for *in camera* review *were in fact* protected as privileged and/or work product. Judge Grewal merely limited his observation to documents upon which he relied in issuing the order to show cause. *See* ECF 2689 at 4 n.16 ("The court appreciates that neither Apple nor Nokia has seen any of the Samsung documents giving rise to [the order to show cause]. Although Samsung asserts privilege and work product protection over the documents listed [in] footnotes 11-16, the court thus far is unpersuaded that the generic statements in the log meet the burden required to claim that protection.").

[3] The Court follows Judge Grewal and the parties' convention of referring to these documents by the tab number used for each document in the *in camera* submission to Judge Grewal. The seven documents were tab numbers 6, 19, 20, 215.15, 222, 255, and 272. ECF No. 3135-15.

Judge Grewal for *in camera* review. *Id.* Samsung, unwilling to accept Apple's additional terms, did not produce the documents.

Judge Grewal issued his Order Granting Sanctions on January 29, 2014. *See* Sanctions Order. Addressing Samsung's claims of privilege over the documents relied upon in the Sanctions Order, Judge Grewal stated:

> The tab numbers in this footnote and those that follow refer to the tabs of the documents submitted by Samsung for in camera review. Because Samsung offered to turn over the vast majority of the documents cited in this order, the court finds that privilege has been waived as to those documents. As to all other documents cited, the court finds that the portions discussed in this order are not privileged.

*Id.* at 4 n.13.[4] On February 2, 2014, Apple requested that Samsung produce "those documents cited in the [Sanctions Order] that Samsung had offered to turn over to Apple and Nokia." ECF No. 3135-17. Nokia sought production of these documents in a Motion to Compel Information for Remediation filed on February 25, 2014. ECF No. 2988. As discussed above, Judge Grewal denied Nokia's motion on April 1, 2014, ordering instead that Samsung's counsel file a sworn declaration regarding Samsung and Quinn Emanuel's remedial efforts to permanently delete all references to Nokia's confidential licensing information. ECF No. 3061.

### 2. Discussion

Samsung's limited appeal of the Sanctions Order asks the Court to overturn Judge Grewal's finding that Samsung had waived privilege as to five[5] of the documents cited in the Sanctions Order. ECF No. 3135 at 3-4. Samsung contends that Judge Grewal erred as a matter of law in concluding that an unfulfilled *offer* to produce documents waives privilege or work-product protection as to those documents. *Id.* Samsung is correct. The Ninth Circuit has held that "[t]he triggering event [for waiver] is disclosure, not a promise to disclose." *Tennenbaum v. Deloitte &*

---

[4] Of the documents cited in the Sanctions Order, Samsung had previously offered to turn over five, namely tab numbers 19, 20, 215.15, 222, and 272.

[5] The parties do not agree over whether Judge Grewal's waiver finding covers all seven of the documents Samsung offered to produce in its November 26, 2013 letter, or only the five documents actually cited in the Sanctions Order. *Compare* ECF No. 3159 at 1 (Apple identifying all seven documents as the "Waiver Documents"), *and* ECF No. 3163 at 4 (Nokia asserting that Samsung's appeal concerns all seven documents), *with* ECF No. 3174 at 3 n.2 (Samsung contending that the Sanctions Order found waiver only as to the five documents cited in the Sanctions Order). For the sake of clarity, the Court emphasizes that its discussion of waiver extends to all seven of the documents Samsung offered to produce in its November 26, 2013 letter.

United States District Court
For the Northern District of California

E-42

*Touche*, 77 F.3d 337, 341 (9th Cir. 1996); *see also Shared Med. Res., LLC v. Histologics, LLC*, No. 12-612, 2012 WL 5570213, at *3 (C.D. Cal. Nov. 14, 2012) ("Waiver occurs at the time privileged material is actually and voluntarily disclosed.").  Consequently, Samsung's offer to produce the seven documents—an offer that was not even accompanied by an offer to waive privilege as to those documents, given that Samsung expressly conditioned its offer on Apple's and Nokia's stipulation that producing the documents would *not* constitute a waiver of privilege and/or work-product protection—did not waive privilege as to those documents because the documents were not ultimately produced.  The Court therefore finds that there was no waiver of privilege based on the stated rationale for the waiver finding in the Sanctions Order.

In responding to Samsung's motion for relief, neither Nokia nor Apple contends that an unfulfilled offer to produce documents is sufficient to waive privilege.  Apple and Nokia instead assert that Samsung has waived privilege and work-product protection as to these documents for other reasons.  *See* ECF No. 3159 at 2-4; ECF No. 3163 at 7-12.  Specifically, both Apple and Nokia assert that Samsung waived privilege through selective, partial disclosures of the documents' contents, ECF No. 3159 at 2-3; ECF No. 3163 at 7-9, and by placing the documents' contents "at issue," ECF No. 3159 at 2-3; ECF No. 3163 at 10-12.  Both parties further contend that Samsung failed to meet its burden to show that these documents were privileged in the first place.  ECF No. 3159 at 3; ECF No. 3163 at 12-13.  Finally, Apple argues that the crime-fraud exception precludes Samsung from asserting privilege over any of the documents produced to Judge Grewal *in camera*.  ECF No. 3159 at 3-4.

The Court finds that Apple's and Nokia's alternative arguments are not properly before the Court at this time.  The waiver finding contained in footnote 13 of the Sanctions Order provides a narrow rationale for ruling that Samsung waived privilege as to a limited number of documents. The ruling does not purport to address all of Apple's and Nokia's arguments in support of finding waiver,[6] nor does it purport to address the privilege issue as it relates to all of the documents

---

[6] The Court notes that the arguments Apple and Nokia present to the Court in this appeal have all been previously presented to Judge Grewal.  *See* ECF No. 2824 (Nokia arguing that Samsung waived privilege by placing documents at issue and through public disclosure of the documents' contents); ECF No. 2825-2 (Apple arguing that Samsung failed to establish that its documents were privileged and that the crime-fraud exception applied); ECF No. 2988 (Nokia seeking production

United States District Court
For the Northern District of California

submitted *in camera*.  The Court therefore believes that a broad ruling on privilege is not warranted at this time.  Rather, in light of Judge Grewal's knowledge of the documents included in the *in camera* submission, as well as Judge Grewal's more intimate familiarity with the procedural history of the Sanctions Order, the Court concludes that the best course of action is to remand this matter to Judge Grewal so that he may rule on any remaining privilege issues in the first instance.

Accordingly, the Court GRANTS Samsung's Motion for Relief insofar as the Court finds that Samsung's unfulfilled offer to produce documents did not constitute a waiver of privilege and/or work-product protection as to the seven documents that Samsung offered to produce.  Whether Samsung waived or is otherwise not entitled to assert privilege over those documents for any other reason remains to be decided by Judge Grewal upon remand.

**B.      Nokia's Motion Regarding *In Camera* Documents (ECF No. 3136)**

In its motion for relief from the January 29, 2014 Order, Nokia claims that it has not seen the documents that Samsung produced to Judge Grewal for *in camera* privilege review, and that Nokia needs access to those materials to assess the propriety of the sanctions that Judge Grewal imposed.  According to Nokia, the *in camera* review process constituted improper *ex parte* communications that deprived Nokia of the opportunity to review evidence necessary to evaluate the merits of the Sanctions Order.  ECF No. 3136 at 3.  Nokia asks that this Court "order Samsung to produce to Nokia all the documents it submitted in camera to the Court, along with any necessary discovery, and reverse in part Judge Grewal's order because Nokia has not had access to the record." *Id.* at 5.  Nokia also requests reversal of "the finding that there was insufficient evidence to show that Samsung used Nokia's confidential information."  ECF No. 3136-1 at 1 (proposed order).  Nokia further contends that Samsung has explicitly or implicitly waived privilege or work product protections over the materials submitted to Judge Grewal because Samsung put those documents at issue by using them to litigate the scope of the alleged protective order violations.  *See* ECF No. 3136 at 4-5.

of documents submitted *in camera*).  To date, Judge Grewal has not accepted or rejected these arguments.

Samsung responds by arguing that Judge Grewal acted within his discretion by performing *in camera* review to assess the scope of misconduct and appropriate sanctions. ECF No. 3165-3 at 7-8. Samsung also contends that Judge Grewal was not obligated to determine whether each reviewed document was in fact privileged or protected, and that the sanctions rulings were based primarily on "non-privileged facts." *Id.* at 8-9. Furthermore, Samsung asserts that Nokia waived any arguments against Judge Grewal's *in camera* procedure by failing to object at an appropriate time and by neglecting to seek relief from Judge Grewal's denial of Nokia's February 25, 2014 motion to compel production of Samsung's privileged documents. *Id.* at 7-9; *see also* ECF No. 2988 (Nokia motion to compel).

The Court agrees with Nokia that *in camera* review of Samsung's documents in this situation could have unfairly restricted Nokia's evaluation of Judge Grewal's rulings regarding protective order violations and sanctions. Samsung argues that magistrate judges have considerable discretion to review documents *in camera*, citing *Foltz v. State Farm Mutual Automobile Insurance Co.*, 331 F.3d 1122 (9th Cir. 2003), and *In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992). *See* ECF No. 3165-3 at 8 & n.3. However, Samsung's authorities indicate that courts may conduct *in camera* review to assess the scope of privilege or confidentiality claims, but not to rule on the merits of an underlying disputed issue. In *Foltz*, the Ninth Circuit approved of a district court's *in camera* review to determine whether to keep certain documents sealed, in response to a request for disclosure by intervenors. 331 F.3d at 1136. The *Foltz* court noted that "*in camera* inspection is a commonly used procedural method for determining *whether information should be protected or revealed to other parties*." *Id.* at 1136 n.6 (emphasis added). Similarly, in *In re Grand Jury*, the court addressed only the propriety of using an *in camera* procedure to assess the applicability of the crime-fraud exception to allegedly privileged documents—not to evaluate the merits of the case—and ultimately affirmed denial of the government's request for *in camera* review. 974 F.2d at 1075.

While approving *in camera* review for resolving disputes over *access* to documents, the Ninth Circuit has cautioned against using such procedures to resolve issues on the merits. "[T]his court has generally recognized the capacity of a district judge to fashion and guide the procedures

to be followed in cases before him," but "in our judicial system adversary proceedings are the norm and *ex parte* proceedings the exception." *Meridian Int'l Logistics, Inc. v. United States*, 939 F.2d 740, 745 (9th Cir. 1991) (quotation and citation omitted). In *Lynn v. Regents of the University of California*, the district court reviewed personnel files *in camera* and granted summary judgment against the plaintiff on employment discrimination claims. 656 F.2d 1337 (9th Cir. 1981). The Ninth Circuit reversed, admonishing: "The receipt and review by the district court of the tenure review file for the purpose of assisting it to make factual determinations or to evaluate other evidence violated principles of due process upon which our judicial system depends to resolve disputes fairly and accurately." *Id.* at 1346. Other courts have followed this principle. *See Vining v. Runyon*, 99 F.3d 1056, 1057 (11th Cir. 1996) ("Although a judge freely may use *in camera*, *ex parte* examination of evidence to prevent the discovery or use of evidence, consideration of *in camera* submissions to determine the merits of litigation is allowable only when the submissions involve compelling national security concerns or the statute granting the cause of action specifically provides for in camera resolution of the dispute."); *Ibrahim v. Dep't of Homeland Sec.*, No. 06-CV-00545-WHA, 2012 WL 6652362, at *3 (N.D. Cal. Dec. 20, 2012) ("[T]he judge may receive *ex parte* secret communications for deciding ancillary matters, such as discovery privileges, but only in the rarest of circumstances should the judge do so to resolve or to end a case.").

Under the circumstances in this case, Judge Grewal faced the delicate task of balancing Apple's and Nokia's allegations of misconduct against Samsung's "equally serious charge that the attorney-client privilege and work-product protections applicable to these documents would otherwise be breached without cause." ECF No. 2689 at 1-2. As explained above, in balancing these concerns, Judge Grewal conducted a comprehensive review of Samsung's documents *in camera* to determine the scope of Samsung and Quinn Emanuel's violations of the protective order, and the appropriate breadth of sanctions. *See, e.g., id.* However, Nokia has not received access to those materials. While Judge Grewal denied Nokia's motion to compel production of Samsung's allegedly privileged documents, he did not address all of Apple's and Nokia's arguments regarding Samsung's waiver of privilege (other than deciding that Samsung waived privilege as to the seven documents that Samsung offered to produce), nor whether all of the documents submitted *in*

**United States District Court**
For the Northern District of California

*camera* were in fact privileged. Accordingly, the Court finds that the appropriate course is to remand for determination of whether the Samsung documents at issue are privileged and—if so— whether due process requires that Nokia receive access to, or information regarding, those documents. As a result, the Court concludes that Nokia's request for reversal of Judge Grewal's finding that there was insufficient evidence to show that Samsung had used Nokia's confidential information is currently premature.

Accordingly, the Court GRANTS IN PART AND DENIES IN PART Nokia's Motion for Relief and remands for further proceedings consistent with this Order. Upon remand, Nokia may seek determination from Judge Grewal on the questions of privilege as to the Samsung documents reviewed *in camera* and whether Nokia should receive access to any of those materials.

**C.      Samsung's Motion Regarding Fees and Costs (ECF No. 3134)**

Samsung challenges Judge Grewal's award of fees and costs under Federal Rule of Civil Procedure 37(b)(2)(C), totaling $1,145,027.95 to Nokia and $893,825.77 to Apple. "Samsung does not dispute that an award of some fees and expenses is appropriate." ECF No. 3173-3 at 2. However, Samsung argues (1) that expenses should be reduced because Apple and Nokia did not succeed on all of their motions in connection with the sanctions, such that the award includes "mammoth expenses for their scorched-earth discovery expedition and serial motion practice that Judge Grewal ultimately found meritless" (ECF No. 3134 at 1), and (2) that "virtually all the expenses" were "unnecessary" because Samsung disclosed its violation of the protective order before Apple's August 23, 2013 motion for sanctions (*id.* at 5). Samsung submits an attorney declaration asserting that "Apple and Nokia made a number of motions and advanced numerous arguments as to which they were not successful, yet for which they were awarded their associated costs and fees." Becher Decl. (ECF No. 3134-1) ¶ 2. Overall, Samsung characterizes the total award as "virtually unprecedented" and requests reduction "by at least 50%," but without providing specific calculations or a basis for computing a more appropriate amount. ECF No. 3134 at 1.

Apple and Nokia each separately oppose Samsung's motion for relief. Apple contends that there is no legal basis for apportioning the award based on wins and losses of individual motions related to the overall sanctions dispute, and that all of the litigation expenses awarded flowed from

E-47

Samsung's violations of the protective order. *See* ECF No. 3160 at 8, 11. Nokia echoes Apple's arguments, asserting that Nokia's discovery and litigation costs were necessary to investigate the scope of confidential information improperly disclosed, and further arguing that Nokia and Apple in fact prevailed on each of the individual motions that Samsung now disputes. *See* ECF No. 3162.

The Court finds Samsung's arguments unpersuasive. Samsung fails to demonstrate any findings regarding expenses that are "clearly erroneous or contrary to law."

Rule 37(b) provides for sanctions for "failure to comply with a court order." Specifically, Rule 37(b)(2)(C) states that "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Here, Samsung argues that the disputed litigation expenses were not "reasonable" nor "caused by" the failure to comply with the protective order.

Contrary to Samsung's position, the record provides ample evidence that Samsung's transgressions caused the extensive litigation with Apple and Nokia over sanctions. Samsung claims that it voluntarily notified Apple and Nokia on July 16, 2013 about the unauthorized distribution of the Teece Report, and that Apple had "detailed information" about the protective order violations by the time Apple moved for sanctions on August 23, 2013. ECF No. 3134 at 3. However, Samsung's supposedly early and voluntary disclosure occurred only after Nokia sought a protective order in Case No. 12-CV-630, on July 1, 2013. Despite Samsung's insistence that it came forward with information regarding misuse of the Teece Report, Judge Grewal found on October 2, 2013, after briefing on Apple's sanctions motion, that the record was "murky" because Samsung "elected not to provide the court with any sworn testimony from Dr. Ahn or anyone else at the meeting," "failed to supply the court with any evidence at all regarding other uses of the Apple-Nokia license," and "repeatedly denied even one violation of the protective order." October 2 Order at 3. Because of this obfuscation, Judge Grewal compelled Samsung to produce documents and witnesses to Apple and Nokia. *Id.* at 5. This Court denied Samsung's request for relief from this order, finding Judge Grewal's reasoning "well-supported." ECF No. 2538 at 4.

**United States District Court**
For the Northern District of California

Then, after further ordering Samsung to produce documents for *in camera* review (*see* ECF No. 2589), Judge Grewal found that Samsung's privilege assertions were "generic" and "seemingly unwarranted," and that "Samsung significantly burdens not only Apple and Nokia's ability to address the sanctions issue, but also the undersigned's ability to tell the full tale of what he has seen." ECF No. 2689 at 4 n.11. Judge Grewal gave Samsung another opportunity to substantiate its privilege claims. *Id.* In response, Samsung filed an *ex parte* brief for *in camera* review, (*see* ECF No. 2757), prompting Nokia and Apple to file motions to strike the *ex parte* submission (ECF Nos. 2772, 2780). Judge Grewal rejected Samsung's attempt to file its brief in secret, noting that he "explicitly cautioned Samsung that it would not tolerate further undue efforts to deny Apple and Nokia's outside counsel access to the evidence at the center of this dispute." ECF No. 2790 at 2.

After officiating these discovery disputes, Judge Grewal found extensive violations of the protective order—findings that Samsung does not challenge. Judge Grewal disagreed with some of Apple's and Nokia's arguments, finding insufficient evidence that Samsung used the Teece Report in negotiations with Ericsson or Nokia, and rejecting several proposed sanctions as "ludicrously overbroad." Sanctions Order at 10, 18. Nevertheless, he ultimately determined that Samsung and Quinn Emanuel committed "hundreds of violations" that caused "substantial harm to Apple and Nokia," and failed to timely notify Apple of those violations. *Id.* at 13-15. Again, Samsung does not contest these conclusions. Moreover, Judge Grewal considered and rejected Samsung's arguments that Apple's and Nokia's litigation efforts were "unnecessary" and only partially successful, concluding that "Apple and Nokia succeeded on most of their claims" and "[t]hough the court was ultimately 'unpersuaded' that Samsung had misused the inadvertently disclosed information, it took the full scope of the discovery tendered to reach that conclusion." Fees Order at 6.

Samsung argues that Judge Grewal was required to prorate expenses based on the motions and arguments that Apple and Nokia made but lost. For example, Samsung points out Apple and Nokia unsuccessfully opposed depositions of certain witnesses. *See* Becher Decl. ¶¶ 6-7. However, Samsung fails to provide convincing legal support for this proposition. Rule 37(b)(2)(C) requires only that expenses be "reasonable" and says nothing about apportioning fees according to

United States District Court
For the Northern District of California

E-49

relative success on individual arguments within a given dispute. For its apportionment argument, Samsung relies primarily on *Hensley v. Eckerhart*, which Judge Grewal also cited. 461 U.S. 424 (1983); *see also* Fees Order at 3. *Hensley* dealt with fees under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, where the plaintiff succeeded on some but not all legal claims. *See id.* at 428. *Hensley* held that "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* at 440. However, while *Hensley* generally discussed what fees are "reasonable," it did not address the appropriate scope of expenses under Rule 37(b)(2)(C), nor hold that a party must succeed on each and every motion and argument within a claim to obtain fees for the litigation as a whole. Rather, the Supreme Court suggested the opposite: "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.* at 435; *see also id.* at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.").

Samsung notes that other courts have reduced fee awards under certain circumstances. *See, e.g.*, *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, No. 10 Civ. 05256, 2012 WL 5816878, at *9 (S.D.N.Y. Nov. 14, 2012) (finding that "at least some reduction should be made to Petitioner's requested hours" under Rule 37). However, ultimately "[t]he imposition and selection of particular sanctions are matters left to the sound discretion of the trial court." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 784 (9th Cir. 1983) (discussing Rule 37(b)). In light of the scope of the protective order violations and the parties' litigation conduct here, the Court finds no clear error in Judge Grewal's decision on fees.

Even if Samsung had presented convincing reasons for reducing the overall award, Samsung provides no quantitative basis for reducing the total sanctions amount "by at least 50%." Moreover, Judge Grewal reviewed Apple's and Nokia's expense statements in detail—including seven specific items that Samsung challenged—and identified 20 individual billing records that

United States District Court
For the Northern District of California

E-50

warranted partial reductions.  *See* Fees Order at 7-10.  Samsung fails to identify any clear error in these calculations.[7]

Accordingly, the Court DENIES Samsung's Motion for Relief regarding fees and costs.

**IV.     MOTIONS TO SEAL**

Also before the Court are four administrative motions to file under seal various documents associated with the parties' motions regarding sanctions.  On July 22, 2014, Nokia filed a motion to seal four exhibits to Nokia's opposition to Samsung's motion for relief from the Sanctions Order.  ECF No. 3164.  Also on July 22, 2014, Samsung filed a motion to seal portions of its brief in opposition to Nokia's motion for relief from the Sanctions Order.  ECF No. 3165.  On July 29, 2014, Nokia moved to seal portions of its reply in support of Nokia's motion for relief from the Sanctions Order, ECF No. 3172, while Samsung moved to seal portions of its reply in support of Samsung's motion for relief from the Fees Order, ECF No. 3173.

Nokia's July 22, 2014 motion to seal seeks to seal documents, which are already heavily redacted, on the ground that Samsung has designated the documents as confidential.  ECF No. 3164-1.  Samsung has not filed a declaration establishing that these documents are sealable, as required by Civil Local Rule 79-5(e).  Accordingly, Nokia's July 22, 2014 motion to file under seal is DENIED.

The remaining motions to seal seek to seal limited portions of Nokia's and Samsung's sanctions briefs that discuss the confidential terms of the Apple/Nokia license that is at the heart of the sanctions dispute.  The Ninth Circuit has held that licensing information such as "pricing terms, royalty rates, and guaranteed minimum payment terms" is sealable.  *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008).  The Court therefore finds that portions of the parties' briefs that identify specific, non-public licensing terms are sealable.  That said, several of the parties' proposed redactions do not encompass actual licensing terms, but rather concern Dr. Ahn's explanation of how he came up with the licensing terms he allegedly quoted during the June 2013 licensing negotiations with Nokia.  *See*, *e.g.*, ECF No. 3170 at 14:4-6.  These excerpts of Dr. Ahn's

---

[7] The Court's ruling regarding Judge Grewal's order on fees and costs is based on the current record and parties' arguments.

deposition testimony do not discuss specific, confidential licensing terms, and thus are not sealable.

Based on the foregoing explanation, the Court rules on the remaining sealing motions as follows:

| Motion to Seal | Document to be Sealed | Ruling |
|---|---|---|
| 3165 | Samsung's Opposition to Nokia's Motion for Relief from the Sanctions Order (ECF No. 3170) | GRANTED as to highlighted portions of pages 14:17-18; 14:20-22; and 15:1-4.<br><br>DENIED as to highlighted portions of page 14:4-6 and 14:8-10. |
| 3172 | Nokia's Reply in Support of its Motion for Relief from the Sanctions Order (ECF Nos. 3172-4, 3178) | GRANTED as to highlighted portions identified in ECF No. 3178.<br><br>DENIED as to additional highlighted portions identified in ECF No. 3172-4. |
| 3173 | Samsung's Reply in Support of its Motion for Relief from the Fees Order (ECF No. 3183) | GRANTED as to the yellow highlighted portions identified in ECF No. 3183.<br><br>DENIED as to remaining highlighted portions identified in ECF No. 3183. |

## V. CONCLUSION

For the foregoing reasons, the Court rules as follows:

• Samsung's motion for relief regarding waiver of privilege (ECF No. 3135) is GRANTED.

• Nokia's motion for relief regarding *in camera* documents (ECF No. 3136) is GRANTED IN PART AND DENIED IN PART. Upon remand, Nokia may seek determination from Judge Grewal on the questions of privilege as to the Samsung documents reviewed *in camera* and whether Nokia should receive access to any of those materials.

• Samsung's motion for relief regarding fees and costs (ECF No. 3134) is DENIED.

This matter is remanded to Judge Grewal for further proceedings as indicated above.

**IT IS SO ORDERED.**

Dated: September 19, 2014

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No.: 11-CV-01846-LHK (PSG)
ORDER ON MOTIONS FOR RELIEF FROM NONDISPOSITIVE ORDERS (ECF NOS. 3134, 3135, 3136)

United States District Court
For the Northern District of California

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 27</u>

1.      This opposition complies with the type-volume limitation of Fed. R. App. P.

27 because this memorandum is less than 20 pages.

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Times New Roman, 14 point font.


 Dated:    New York, New York
                 July 21, 2016


Respectfully submitted,

## *<u>Charles B. Manuel, Jr.</u>*
Charles B. Manuel, Jr. (CM3020)
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T: (212) 792-0044
F: (212) 563-7108
CBM@Manuel-law.net

Attorneys for Appellants

Tab 6

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

WESTON CAPITAL ADVISORS, INC.,

        Petitioner-Appellant,

        v.

PT BANK MUTIARA, TBK,

        Respondent-Appellee.

No. 16-1178

# RESPONDENT-APPELLEE PT BANK MUTIARA, TBK'S
# REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS
# MOTIONS TO (A) DISMISS THE APPEAL AND
# (B) SANCTION OPPOSING COUNSEL

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................1

ARGUMENT ........................................................................................1

I.    WESTON'S APPEAL SHOULD BE DISMISSED .......................1

    A.    Weston Provides No Basis For Jurisdiction Over WCAI's Interlocutory Appeal..............................................................2

    B.    Weston Has Waived Its Right To Appeal And Provides No Reason To Void That Waiver...............................................2

    C.    Weston Has Failed To Show The "Compelling Circumstances" Necessary To Disregard The Law Of This Case.................................4

II.    THE COURT SHOULD SANCTION WESTON'S ATTORNEY, CHARLES B. MANUEL, JR. ..................................................5

    A.    Mr. Manuel Has Failed To Address Bank Mutiara's Conclusive Showing That The Fee Appeal Is Frivolous .........................5

    B.    Mr. Manuel Has Failed To Provide A Legitimate Basis For His Attacks Against Opposing Counsel ..................................8

    C.    Mr. Manuel Has Failed To Rebut That His Filings Were Made To Delay Resolution Of This Matter ...................................9

CONCLUSION .....................................................................................10

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Gallop v. Cheney*,
  642 F.3d 364 (2d Cir. 2011) .................................................................5

*Phoenix Aktiengesellschaft v. Ecoplas, Inc.*,
  391 F.3d 433 (2d Cir. 2004) .................................................................3

*In re Siemon*,
  421 F.3d 167 (2d Cir. 2005) .................................................................5

*United States v. Carr*,
  557 F.3d 93 (2d Cir. 2009) ...................................................................4

*Weston Cap. Advisors, Inc., v. PT Bank Mutiara, Tbk*,
  No. 15-3158-CV, -- Fed. App'x --, 2016 WL 3472375 (2d Cir. June 24, 2016),
  *reh'g denied* Contempt Appeal Dkt. 185 (Jul. 28, 2016) ....................1, 2, 3, 5, 7

## <u>Statutes</u>

Fed. R. Civ. P. 11(b)(1), (c)(1) ...................................................................9

## <u>Miscellaneous</u>

*Black's Law Dictionary*, 43 (8th ed. 2004)..............................................................9

Respondent-Appellee PT Bank Mutiara, TBK ("Bank Mutiara") respectfully submits this reply memorandum of law in further support of Bank Mutiara's motions to (i) dismiss this appeal, and (ii) sanction Weston's counsel, Charles B. Manuel, Jr.[1]

## PRELIMINARY STATEMENT

Weston has failed to rebut Bank Mutiara's conclusive showing that this appeal should be dismissed. Moreover, Mr. Manuel has not shown that the brief and motion he filed have *any* arguable basis in law or fact. He has also failed to justify his attacks against opposing counsel or refute the clear inference that his filings were improperly motivated by delay. Accordingly, this appeal should be dismissed, and Mr. Manuel should be ordered to pay double Bank Mutiara's costs.[2]

## ARGUMENT

## I.   WESTON'S APPEAL SHOULD BE DISMISSED

Weston's appeal should be dismissed because this Court lacks jurisdiction over WCAI; because Weston has twice waived its right to appeal; and because the

---

[1]   "Mem." refers to Bank Mutiara's opening brief, Fee Appeal Dkt. 62; "Opp." refers to Weston's opposition, Fee Appeal Dkt. 83; and "Marks Decl." refers to the Declaration of Andrew P. Marks, dated July 28, 2016.

[2]   As detailed in its opening brief, this appeal relates to the same district court order recently affirmed by this Court in *Weston Cap. Advisors, Inc., v. PT Bank Mutiara, Tbk*, No. 15-3158-CV, -- Fed. App'x --, 2016 WL 3472375, at *1 (2d Cir. June 24, 2016), *reh'g denied* Contempt Appeal Dkt. 185 (Jul. 28, 2016). Bank Mutiara respectfully requests that the same panel, which is already familiar with the relevant facts, consider the instant motions.

1

law of the case requires dismissal. Weston has failed to respond to any of these arguments in the scant two pages it devotes to this issue. *See* Opp. at 17-18.

**A.    Weston Provides No Basis For Jurisdiction Over WCAI's Interlocutory Appeal**

In its opening brief, Bank Mutiara cited this Court's recent decision dismissing WCAI from the Contempt Appeal because WCAI was a party and its appeal was interlocutory. Mem. at 8 (citing *Weston*, 2016 WL 3472375, at *1). Weston has failed to address why that holding should not also apply here. As a party, WCAI's appeal is interlocutory and this Court lacks jurisdiction over it. Accordingly, WCAI's appeal must be dismissed.

**B.    Weston Has Waived Its Right To Appeal And Provides No Reason To Void That Waiver**

The Fee Appeal must be dismissed in its entirety and as to all the Weston entities because Weston failed to oppose the fee award in the district court. Weston concedes that it cannot present arguments here that it failed to preserve at the district court. *See* Mem. at 12; Opp. at 17-18. Rather, Weston asserts that "Appellants agreed that the determination of attorneys' fees would abide by the determination of the principal appeal of expanded contempt and sanctions." Opp. at 17. This claim is both untrue and a concession that the Fee Appeal should be dismissed.

Although Appellants may have believed that Bank Mutiara's attorneys' fees should depend on resolution of the Contempt Appeal, Weston never "agreed" with Bank Mutiara to preserve Appellants' right to appeal, Marks Decl. ¶ 2. Weston cites no evidence of any "agreement," nor any authority holding that an agreement (if it existed) with an opposing party to preserve an argument for appeal binds the appellate court. Weston never asserted any position at all regarding attorneys' fees at the district court, including in its opposition to Bank Mutiara's motion for contempt. *See* Dist. Ct. Dkt. 119. This dooms Weston's appeal.

Even if there was an "agreement" that the Fee Appeal should "abide the determination of the principal appeal," Weston ignores that this Court already affirmed the district court in the Contempt Appeal, *see Weston*, 2016 WL 3472375, and has rejected a petition for rehearing, Contempt Appeal Dkt. 185. Even by Weston's logic, this Fee Appeal should be dismissed.

Weston's failure to raise any substantive arguments in its opening brief also mandates dismissal. This Court "ordinarily will not consider arguments that an appellant has failed to make in his opening brief." *Phoenix Aktiengesellschaft v. Ecoplas, Inc.*, 391 F.3d 433, 438 n.4 (2d Cir. 2004) (citation and quotation marks omitted). Here, Weston's opening submission merely re-titles its motion to remand as a substantive brief, without once arguing that either the district court's grant of attorneys' fees or the amount of fees granted was inappropriate. *See* Fee

3

Appeal Dkt. 80, at 4 n.4 ("The Argument Herein is the same as that in the concurrently filed [motion to remand]"). As Weston cannot now raise substantive objections to the grant of attorneys' fees, its appeal must be dismissed.

### C. Weston Has Failed To Show The "Compelling Circumstances" Necessary To Disregard The Law Of This Case

Although Weston claims that the evidence it now wishes to add is "precisely the type of 'new evidence' that forms the basis for [disregarding the law of the case]," Opp. at 18, it fails to show the "compelling circumstances" necessary. *See United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("compelling circumstances" are required to disregard a court's prior decision on an issue). The Court already recognized this by rejecting Weston's petition for rehearing in the Contempt Appeal, *see* Contempt Appeal Dkt. 185, which petition lodged identical arguments as Weston's opening brief here. *Compare* Contempt Appeal 178-2 (petition for rehearing), at 2-5 *with* Fee Appeal Dkt. 80, at 3-6 (Weston's opening brief). This alone merits dismissal of Weston's appeal.

The Court's initial decision in the Contempt Appeal also precluded Weston's arguments in this Fee Appeal. In the Contempt Appeal, Weston presented the Court with several examples of Bank Mutiara's alleged past wrongdoing, including purported (though untrue) examples of actions taken during the pendency of these cases. *See* Fee Appeal Dkt. 44-2 ¶¶ 3-4 (citing examples of "corruption, theft and embezzlement" in the record and briefing of the Contempt

Appeal).  This Court nevertheless affirmed the contempt order after "consider[ing] the remainder of the arguments set forth by the Weston Entities and Liegey and find[ing] them to be without merit."  *Weston*, 2016 WL 3472375, at *3.  Weston fails to show how adding to the record another purported (but again untrue) instance of Bank Mutiara's wrongdoing in an unrelated case provides the "compelling circumstances" necessary to disregard this Court's previous rulings.

## II. THE COURT SHOULD SANCTION WESTON'S ATTORNEY, CHARLES B. MANUEL, JR.

Mr. Manuel has failed to rebut Bank Mutiara's showing that he should be sanctioned for submitting the June 30 Filings.

### A. Mr. Manuel Has Failed To Address Bank Mutiara's Conclusive Showing That The Fee Appeal Is Frivolous

Mr. Manuel should be sanctioned for knowingly submitting an appeal "brought without the slightest chance of success," *Gallop v. Cheney*, 642 F.3d 364, 370 (2d Cir. 2011) (citation omitted), which "lacks an arguable basis either in law or in fact," *In re Siemon*, 421 F.3d 167, 169 (2d Cir. 2005) (citation omitted).  Mr. Manuel's Opposition only reinforces that the pleadings he signed lack bases in both law *and* fact, while Mr. Manuel's previous statements show that he was fully aware that the pleadings' bases were deficient.

The accusations Mr. Manuel presents as "facts" are demonstrably untrue.  It is now clear from Mr. Manuel's Opposition that he is citing an expert report

containing the phrase "money laundering"—which report was prepared to defend a claim that Bank Mutiara owed money based on 2006 transactions executed by Bank Mutiara's predecessor—and extrapolating this into an accusation that the 2014 settlement payment in that case somehow constituted "money laundering." But if one actually reads Mr. Brown's expert report, it is clear that there are no allegations of "money laundering" after the former corrupt management was removed by the Indonesian Government. And there was no money laundering in 2014; Bank Mutiara's publicly-available audited financial statements report the payment for what it is, the settlement of an arbitration claim. If Mr. Manuel's client disagrees with that characterization, it may presumably seek relief under Indonesian securities law. But that certainly does not permit Mr. Manuel to accuse either Bank Mutiara or Quinn Emanuel of "money laundering."

Mr. Manuel's appeal similarly lacks a basis in law. As Bank Mutiara demonstrated in its opening brief, Mr. Manuel is and has long been aware that the unclean hands doctrine is inapplicable where the alleged misconduct is unrelated to the claim to which it is asserted as a defense. Mem. at 10-11. Nevertheless, Mr. Manuel signed a brief and a motion in this Fee Appeal which rely entirely on a claim that Bank Mutiara and Quinn Emanuel's purported wrongdoing in matters unrelated to this action establishes a case for unclean hands. *See* Fee Appeal Dkts. 44, 80. While the Opposition repeats these allegations, Opp. at 3-4, 9, it nowhere

addresses the controlling authority that even if true (which they are not), the allegations are *insufficient as a matter of law* to find unclean hands.

Finally, Mr. Manuel has prosecuted this appeal while fully aware of its futility. He previously stated, in a sworn declaration to before this Court, "[i]f the expanded contempt order is sustained, the legal fees follow [and i]f the expanded contempt order is reversed, the legal fees fail . . . ." Contempt Appeal Dkt. 128-2 ¶ 6. Yet more than a month after the Court's decision in the Contempt Appeal, *see Weston*, 2016 WL 3472375, at *1, Mr. Manuel continued to file requests for affirmative relief in this appeal.[3] And when asked if he would withdraw this appeal in light of this Court's denial of his petition for rehearing—which lodged identical arguments as he makes here (*see supra* at 4)—Mr. Manuel replied, "No. The opposition to the fees and our other pending motion relate to additional matters." Marks Decl. Ex. 1. These contradictions undermine Mr. Manuel's credibility in defending the merit of this appeal.

---

[3] To the extent Mr. Manuel wished merely to postpone dismissal of this Fee Appeal until after the Court decided the petition for rehearing in the Contempt Appeal, *see* Contempt Appeal, Dkt. 178, he could have simply sought that relief rather than wasting the Court's and Bank Mutiara's time by prosecuting this appeal and related motion.

**B.     Mr. Manuel Has Failed To Provide A Legitimate Basis For His Attacks Against Opposing Counsel**

The Court should sanction Mr. Manuel for his *ad hominem* attacks against opposing counsel.  Mr. Manuel does not dispute that *ad hominem* attacks can prompt sanctions.  Rather, he claims that his attacks against Quinn Emanuel are not *ad hominem* and that the cases cited by Bank Mutiara concern conduct more serious conduct than his.  Opp. at 5-8.  These arguments fail.

Mr. Manuel's gratuitous attacks against Quinn Emanuel are demonstrably *ad hominem*.  Mr. Manuel has cited no authority, controlling or otherwise, that the participation of a party's *lawyer* in alleged bad acts should affect the determination of unclean hands against the *client*, especially where the purported participation occurred in an *entirely different case*.  Indeed, Mr. Manuel has failed to explain why Quinn Emanuel's purported role in wrongdoing should affect in any way the Court's decision whether to remand to the district court.  Yet Mr. Manuel's sworn declaration before this Court is rife with attempts to implicate Quinn Emanuel in Bank Mutiara's purported wrongdoing, including through outright statements that Quinn Emanuel has committed criminal acts.  *See* Fee Appeal Dkt. 44-2 ¶ 5 ("Bank Mutiara and Quinn Emanuel placed themselves in the middle of a $40 million money laundering scheme"), ¶ 9 ("Quinn Emanuel was a direct participant [in audit fraud and money laundering] as the arranger and recipient of $8 million of the stolen and laundered funds"); *see also* ¶ 1, ¶ 12, ¶ 19.  That some other

8

instances of *ad hominem* attacks have involved name-calling, rather than accusations of criminality is irrelevant; Mr. Manuel has gratuitously and falsely smeared opposing counsel to better his client's position. This sort of "[a]ttack[ on] an opponent's character rather than the opponent's assertions," is the definition of an *ad hominem* attack. *Black's Law Dictionary*, 43 (8th ed. 2004). Such attacks serve no legitimate purpose and merit sanctions.

### C.     Mr. Manuel Has Failed To Rebut That His Filings Were Made To Delay Resolution Of This Matter

Mr. Manuel should be sanctioned for delaying when his client will cure the contempt. Bank Mutiara has demonstrated that Mr. Manuel presented frivolous filings with the improper purpose of delaying the resolution of these actions; it has also showed that these filings are the latest in a pattern of postponing the date when Weston must pay Bank Mutiara what it owes. *See* Mem. at 19-20. Mr. Manuel does not deny these allegations, and appears to argue only that he and his firm have attempted to meet court-ordered deadlines. Opp. at 17. This argument does not respond to Bank Mutiara's demonstration that his submissions to this Court have been made with the improper purpose of delay. *Cf.* Fed. R. Civ. P. 11(b)(1), (c)(1) (sanctions may be imposed against an attorney who falsely certifies that a filing "is not being presented for any improper purpose, such as to . . . cause unnecessary delay, or needlessly increase the cost of litigation").

9

In addition, Mr. Manuel refuses to dismiss this appeal in spite of the Court's rejection of his petition for rehearing in the Contempt Appeal, which makes an identical argument. *See* Marks Decl. Ex. 1. That Mr. Manuel continues to press the same arguments which the Court has now rejected twice only reinforces that they were submitted with the improper purpose of causing delay and increasing costs.

## **CONCLUSION**

Bank Mutiara respectfully requests that the Court (i) dismiss Weston's appeal, and (ii) sanction Weston's attorney, Charles B. Manuel, Jr. for his improper filings.

Dated: July 28, 2016
New York, New York

Respectfully submitted,

/s/ *Marc L. Greenwald*
Marc L. Greenwald
Andrew P. Marks
Daniel R. Koffmann
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

*Counsel for Respondent-Appellee*
*PT Bank Mutiara, Tbk*

10

Tab 7

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

WESTON CAPITAL ADVISORS, INC.,

        Petitioner-Appellant,

        v.

PT BANK MUTIARA, TBK,

        Respondent-Appellee.

No. 16-1178

## DECLARATION OF ANDREW P. MARKS

I, Andrew P. Marks, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an associate at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), counsel for Respondent-Appellee PT Bank Mutiara, Tbk ("Bank Mutiara"), a member in good standing of the bar of New York, and admitted to practice before this Court. I respectfully submit this declaration in support of Bank Mutiara's reply memorandum of law in further support of Bank Mutiara's motions to (i) dismiss this appeal, and (ii) sanction Petitioner-Appellants' (collectively, "Weston's") counsel, Charles B. Manuel, Jr.

2. Bank Mutiara never agreed with Weston to preserve Weston's right to appeal the district court's grant of Bank Mutiara's attorneys' fees incurred seeking contempt. To my knowledge, Weston never proposed any such agreement to Bank Mutiara.

3.     On July 28, 2016, I emailed Charles B. Manuel, Jr., counsel to Weston.  A true and correct copy of that email and Mr. Manuel's response of the same date is attached hereto as Exhibit 1.

Dated:     New York, New York
           July 28, 2016

By: /s/  *Andrew P. Marks*
           Andrew P. Marks

# EXHIBIT 1

## Andrew Marks

| | |
|---|---|
| **From:** | Charles B. Manuel, Jr. <cbm@Manuel-Law.net> |
| **Sent:** | Thursday, July 28, 2016 12:04 PM |
| **To:** | Andrew Marks; Charles B. Manuel, Jr. |
| **Cc:** | Marc Greenwald; Daniel Koffmann; Daniel Goldstein; dan.s.goldstein@gmail.com |
| **Subject:** | RE: Weston v. Mutiara, No. 16-1178-cv (2d Cir.) |
| | |
| **FilingDate:** | 7/28/2016 4:06:00 PM |

Counsel –

No.  The opposition to the fees and our other pending motion relate to additional matters.


*Regards –*

*– Charles B. Manuel, Jr.*

Charles B. Manuel, Jr.
MANUEL & ASSOCIATES, LLP
1 Penn Plaza, Suite 2527
New York, New York 10119
T:  212-792-0044
F:  646-784-1650
M1: 917-699-9559
M2: 561-613-3960
E1:  CBM@Manuel-Law.net
E2:  manueljones93272@aol.com

---

**From:** Andrew Marks [mailto:andrewmarks@quinnemanuel.com]
**Sent:** Thursday, July 28, 2016 11:41 AM
**To:** Charles B. Manuel, Jr. <cbm@Manuel-Law.net>; Charles B. Manuel, Jr. <CharlesM@Shiboleth.com>; Manual Jones <manueljones93272@aol.com>
**Cc:** Marc Greenwald <marcgreenwald@quinnemanuel.com>; Daniel Koffmann <danielkoffmann@quinnemanuel.com>; Daniel Goldstein <DanielG@Shiboleth.com>; dan.s.goldstein@gmail.com
**Subject:** Weston v. Mutiara, No. 16-1178-cv (2d Cir.)


Charlie –

Please let us know if you are planning to withdraw the currently pending fee appeal (16-1178) in light of the Court's denial of Weston's petition for rehearing in the contempt appeal (15-3158).  As our reply is due today, we would appreciate a prompt response.

**Andrew Marks**
*Associate*
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7258 Direct

212-849-7000 Main Office Number
212-849-7100 FAX
andrewmarks@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.