UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

WESTON CAPITAL ADVISORS, INC.,

                                Plaintiff,                  Civ. No. 13-cv-6945 (PAC)

               - against -

PT BANK MUTIARA TBK

                               Defendant,

-------------------------------------------------------------------x

**DECLARATION OF JOHN R. LIEGEY IN OPPOSITION TO BANK MUTIARA'S MOTION TO (1) ELIMINATE AND DESTROY THE VALUE OF OVER $150 MILLION OF THE WESTON COMPANIES' JUDGMENTS AGAINST IT, AND (2) TO RESTRAIN THE TRANSFERABILITY OF WESTON'S LIQUID ASSETS, CLAIMS AND TANGIBLE SECURITIES ISSUED BY AND AGAINST PT BANK MUTIARA TBK**

**INDEX**

**I.     Preliminary Statement**

**II.    Background**

**III.   Argument**

     A. Weston Assets Valuation Declarations and Our Plan to Comply with the Repayment of a Court Ordered

     B. Value of Singapore Proceedings to WICL Assets

     C. Revesting Concept & Request and Authority to Revest

     D. Damage Done By TRO to Value of Assets and Ability to Transfer

     E. Court Additional Authority Pursuant to Equitable Power to do justice

     F. My Permanent Domicile in the United Kingdom.

     G. Other Offsets Recognised by Bank Mutiara and Quinn Emanuel

     H. Settlement Proposal: Repay US$3.322 million – Lift TRO for 90-120 days – Proceeds to SDNY Court

**IV.    Conclusion**

I, John R. Liegey, a permanent domiciled resident of the United Kingdom, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I make this declaration in opposition to the motion by PT Bank Mutiara TBK (A.K.A PT Bank JTrust Indonesia TBK and formerly known as PT Bank Century TBK) to (1) eliminate and destroy the value of over $150 million of the Weston companies' judgments against it, (2) to take ownership of, and permanently terminate the existence of, the Weston entities and (3) to restrain the transferability of Weston's most valuable, liquid tangible assets, summary judgment, claims, physical share certificates and convertible debt, all of which represent claims and funds to be used to repay this Court US$3,322,652.22 on top of US$3,825,592 of irreversible Offset declared in Mauritius and Singapore.

## I. PRELIMINARY STATEMENT

2.      The Plaintiff would like to thank this Court for accepting our last submissions in regards to the Contempt Motion that signify our absolute commitment to pay this Court the US$3,322,652.22 that Bank Mutiara attests and testifies it is owed in various submissions and in its Statutory Audited Financial Statements of FYE December 31, 2015 and updated Unaudited Quarter Ended September 30, 2016. We confirm herein our commitment to honour this debt to the Court through the fund raising from loans, borrowings, asset sale, Summary Judgment assignments but not through the sales of equity of Weston International Capital Limited ("WICL") of any of the Weston entities. We simultaneously certify herein our recognition of a US$3,825 million Debt Set-Off agreement made under the laws of Mauritius as recorded on June 19, 2015 duly served as being satisfied and paid.

3.     For the record, I would like to clarify a number of incorrect allegations, assumption and factual errors that the counsel for PT Bank Mutiara TBK ("Bank Mutiara"), formerly known as PT Bank Century TBK and now known as PT Bank JTrust Indonesia TBK ("Bank JTrust") attested to in the Hearing before this Court held at 3.39pm on January 31, 2017 before the Honorable Paul A. Crotty, District Judge. All references made herein will be to the Court Transcript certified by the Southern District Reporters, P.C. dated January 31, 2017 (Appendix 1).

4.     Mr. Greenwald testifies that he is seeking to acknowledge that compliance is required "*with the Court's order to return the money with interest*". To clarify, is this an order to repay Bank Mutiara with interest the following Accounts Receivable Financial Asset due from Weston Capital Advisors, Inc. shown in Bank Mutiara's Financial Statements as of September 30, 2016 for the nine month period ended (Unaudited) (Indonesian Currency) footnote 50(d), page 194-195 (Appendix 2) which concludes in the paragraph 10 as follows:

a.   *"As of the issuance date of the financial statements, there is a fund that has not returned yet by Weston amounting to USD 3,322,652.33 (equivalent to Rp 43,901 (sic. million) as of June 30, 2016 and Rp 45,803 (sic. million) as of December 31, 2015). The Bank recorded receivable from Weston as part of "Other Assets" account in the statement of financial position (Note 17) (sic. mistake as it should refer to Footnote 18)."*

b.   Note 17 of the same Bank Mutiara Financial Statements on pages 100 and 101 reference only "*Foreclosed Assets*" and state "*Management believes that allowance for impairment losses on foreclosed assets is adequate to cover any possible losses.*" For the record, it is actually Footnote 18 "*Other Assets*" on pages 101 and 102 that clarifies "*Receivables to Weston Capital Advisors, Inc.*" which states as follows:

> *"Receivable to Weston Capital Advisors Inc. amounting to USD 3,322,652.33 (equivalent to Rp 44,058 as of September 30, 2016 and Rp 45,803 as of December 31, 2015). As of December 31, 2014 this represents the Bank's fund which should be returned by Weston Capital Advisors Inc. on related to Decision of Order Vacating Judgment issued by United States District Court Southern District of New York dated November 19, 2013 (Note 50). The Bank has provided allowance for impairment losses on this receivable." (Appendix 2).*

5.    For the sake of clarity, these same Footnotes are repeated almost verbatim every quarter since Fourth Quarter and FYE December 31, 2013 (Audited), December 31, 2014 (Audited), December 31, 2015 (Audited) except each quarter and FYE, they were adjusted for credits paid by and on behalf of the Plaintiff and accrued interest (Appendix 3).

6.    Footnote 3 in each of the Bank Mutiara Financial Statements titled "*Use of Significant Judgements, Estimates and Assumptions by Management*" contains a paragraph titled "*Allowance for Impairment Losses on Financial Assets*" reference, page 66 in the Bank Mutiara Financial Statements as of September 30, 2016.

7.    Footnote 2(d) on page 27 "*Summary of Significant Accounting Policies*", sub-section (2) "*Financial Assets and Liabilities*" states the following:

> *"Financial assets are classified as financial assets at fair value through profit or loss, loans and receivables, held-to-maturity financial assets and available-for-sale financial assets. The classification depends on the purpose for which the financial assets were acquired. Management determines the classification of its financial assets at initial recognition."*

8.     More importantly, the Footnote 2(d) "*Summary of Significant Accounting Policies*", "*Financial liabilities are classified as financial liabilities at fair value through profit and loss and financial liabilities at amortized cost*". This is a direct reference to the "fair value" attributed to USD15,000,000 PT Bank Mutiara/Century/JTrust Indonesia TBK Defaulted Mandatory Convertible Bonds issued June 16, 2006 and "matured" on June 16, 2009 with par value US$100,000 per bond/certificate with 150 certificates issued as referenced to in the Statement of Financial Position of every Quarterly Financial Statements of Bank Mutiara for over 10.5 years or exactly 42 consecutive "fair value" confirmations of these defaulted bonds having a "fair value" of USD15,000,000. I reference this only in relation to Bank Mutiara's counsel referring to these liabilities as "*alleged bonds are assets of the Weston entities that have no value[1]*" (emphasis added). His clients, Bank Mutiara and J Trust Co. have attested under oath that three (3) owners, four (4) management regimes and untold Board of Directors configurations have certified in 42 consecutive quarterly audits the following in their Directors' Statement:

"*The Bank's financial statements do not contain false material information or facts*" and that "*all information has been fully and correctly disclosed in the Bank's financial statements*"

9.     Mr. Greenwald erroneously alleged that "*If they had any value, they could be monetized such that Mr. Liegey should easily be able to obtain a loan of $3.6 million, could have done so from the beginning*". Weston is dealing with the largest criminal banking enterprise in Southeast Asia as convictions of its owners in 2010, 2014 and 2015 have attested to. I do not believe that this Court wants to see these voluminous public Court document convictions, but they firmly establish a bank

---

[1] SDNY Transcripts, Jan 31, 2017, line 5-6, page 2

that remains solvent, has deep pocketed owners, possesses the ability to pay their debts and have in fact honoured other debts since 2008 to creditors subordinated to Weston inclusive of Quinn Emanuel, FBME Ltd and the Saab family, owners of FBME Ltd, all convicted enterprises under US Treasury Financial Crimes Enforcement Network (FinCEN) Notice of Findings as violations of the USA Patriot Act , Section 311 issued on July 17, 2014 and onwards.

10.     We have litigated six (6) lawsuits successfully against Bank Mutiara and now as joint and several obligations against J Trust Co., Ltd and our US$55 million Bank Mutiara bonds, US$15.5 million Bank Mutiara Interbank deposits, US$4.171 million of Bank Mutiara Re-registration and Share Transfer Fee Accounts Payable, US$635,430 Bank Mutiara Capital Call Notices Accounts Payable and US$8.176 million Bank Mutiara Redemption Notice Accounts Payable totalling US$110.539 million (as of Supreme Court of Mauritius Summary Judgment of May 29, 2016) are all recognised as being jointly and severally guaranteed by J Trust Co., Ltd, a Tokyo Stock Exchange Listed entity with a market capitalisation exceeding US$1.2 billion now holding US$800 million of cash (less of course what it owes to the Indonesian LPS for the Conditional Purchase of 99.996% of Bank Mutiara Class A shares that they have yet to pay for pending the outcome of these Weston lawsuits).

11.     Mr. Greenwald's most egregious mistruth (line 8-9) on behalf of Bank Mutiara is his allegation that Weston "*bought these assets for USD 1.00*". That is entirely false and a gross example of how little Bank Mutiara and especially its legal counsel know about Weston's equity and asset value. As Bank Mutiara and its counsel have limited knowledge of international audit laws and market values of their

own liabilities and assets, Weston entities can merely acknowledge the lack of credibility of their analysis and misguided objectives. Weston in fact paid US$14 million in aggregate for its portfolio of US$2.2 billion of securities, assets that were illegally restrained by the Republic of Indonesia in the Court of First Instance of Hong Kong SAR since 2010. Bank Mutiara is named as the 9th Defendant in the same litigation to this day and has over US$4 million of assets restrained and uncontested for six (6) years (Appendix 4) Weston entities own a legal claim in the amount of US$1.3 billion against the Indonesian Government for illegally restraining assets in this lawsuit that has been litigated since 2012 and is now before the United Kingdom Judicial Committee of the Privy Council, the highest English Law Supreme Court in the world.

12.    There is nothing "baseless" in our litigation against Bank Mutiara, J Trust Co., Ltd, the Indonesian LPS, the Republic of Indonesia and others. To date, we have won every suit that we have filed against Bank Mutiara and J Trust and we will soon win against both again in the High Court of Singapore awarding us US$160 million plus interest to date of Summary Judgment which between J Trust Co. and the Indonesian LPS, can be paid that without risk of insolvency to Bank Mutiara. This additional award could bankrupt or render Bank Mutiara with an "on-going concern" clarifications which is why Mr. Greenwald is vigorously pressing the "*creative*" and illegal revesting of Weston's Summary Judgments before this Court. Weston entities are faced with a costly and timely process in the pursuit of fighting a criminal conspiracy committed by the Republic of Indonesia and convicted criminals and we are fighting this war from a small former Commonwealth English law country that exists in the middle of the Indian Ocean, 1,731 miles away from any continent. There are no indications that Weston will fail.

13.    Bank Mutiara's counsel allege that these assets have "*no value to anyone other besides Bank Mutiara*" and that is an outright mistruth. Now that we have litigated these six (6) lawsuits and have Summary Judgments that demand a hand of over US$160 million accruing interest in an amount over US$50 million per year, these assets, securities and Summary Judgments can now be more readily sold and used as collateral for loans which will get Bank Mutiara its US$3.322 million back along with an irreversible offset that was applied in FYE March 31, 2016 under Mauritian law on Weston's Audited Financial Statements in the amount of US$3,825,592. Our counsel has agreed that we will pay another debt of US$3.22 million under such processes I shall outline going forward. Bank Mutiara should consider this as its last chance to negotiate a settlement of debts that will render it, but not J Trust Co. bankrupt.

14.    I can assure Bank Mutiara, buyers of these assets and secured lenders that Weston entities will not stop our litigation quest for collection of debts owed by Bank Mutiara and J Trust Co. to defaulted creditors. Deeper pocketed hedge funds like Elliot Capital, Aurelius Capital, Centerbridge Capital, Oaktree, WL Ross & Co and Apollo have fought longer battles than this to win collection of defaulted debts. In addition, Weston entities have multiple claims against other creditor entities to add value to our company. We have no intention to relent from our war against criminal enterprises like Bank Mutiara and J Trust Co. and have requested the assistance of multi jurisdictional government authorities to assist us in our quest.

15.    Mr. Greenwald testifies that he wants his clients US$3 million

back (line 21, 22, 23 on page 3) and this Court has ruled to press for that compliance after our testimony herein. Weston entities will comply and for the first time since December 30, 2011 when Weston entities bought these assets through several portfolio companies, we have finally attained an extremely high collectible value albeit at a discount to the Summary Judgment values due to Bank Mutiara's owners presence and resident domicile in Singapore.

16.     Weston entities moved to the Courts in Singapore in July 2015 because we knew that Bank Mutiara had moved all of its assets, cash and bank accounts not only from the New York jurisdiction, but also out of the US Dollar due to the US Treasury FinCEN Notices of Findings issued on July 18, 2014 against FBME Bank  Ltd, Cyprus and Fadi, Farid and Michael Norbert Saab, Bank Mutiara's largest money laundering counterparty and lender also a parallel client of Quinn Emanuel in London, Washington D.C. and Paris (circa August 10, 2014). It is known that Quinn Emanuel ordered the commission of a report by one of the world's foremost experts in money laundering by the name of Peter Barrie-Brown (August 15, 2014) (Appendix 5) that concluded in his report evidence of the largest money laundering conspiracy that he had seen in forty (40) years between Bank Mutiara, FBME Bank Cyprus and Saab Financial (Bermuda) Ltd, all entities co-represented by Quinn Emanuel . Is this relevant to this Contempt Motion? Yes, I believe it is, but I will address it later in relation to Weston's separate demands for Quinn Emanuel's re-imbursement to Weston of US$ 8 million. My interest is in raising these points regarding a Defendant, whose hands have become more unclean since its arrival in the SDNY Court in 2013, to this Court.

17.     Weston's "baseless litigation", according to Bank Mutiara's

Counsel, has effectively uncovered over US$14 billion of money laundering, theft, embezzlement, fraud, conspiracy and criminal concealment of Bank Mutiara, J Trust, the Indonesian Government, Quinn Emanuel, FBME Bank Ltd, the Saab family, Nomura Bank International and Standard Chartered Bank, since we arrived before your Honor in October 2013. Upon payment of this US$3 million plus interest to this Court, we hope the global investigative authorities we have asked for assistance will have succeeded in bringing the co-conspirators of this criminal money laundering ring to justice.

18.     This Court has ordered a money judgment payment according to testimony. We are requesting herein final confirmation that it is the same Bank Mutiara WCAI Account Receivable Debt amount confirmed in my paragraph 2 in the amount of US$ 3, 322, 652.22?

19.     For the record and acknowledgment to your Honour, WCAI has invoked a Notice of Voluntary Dismissal pursuant to 41 (a)(I)(A)(I) of the Federal Rules voluntarily and without prejudice in respect to this Court. The Defendants have no cash, no bank accounts, no assets, no surety bond posted in the amount of US$ 19 million and no possibility  of dealing in US Dollars under the US Treasury FinCEN Section 311 of the USA Patriot Act provisions. There is nothing to collect in the SDNY Court and there won't be. It is a tactical decision Weston entities have made to depart the New York jurisdiction and we take responsibility for the decision. Even if this case proceeded upon the payment of the US$3 million, a Summary Judgment from the US would be unenforceable in the jurisdictions that Bank Mutiara and J Trust Co. operate in and have collectible assets in. Weston has incurred legal debts in New York exceeding US$1 million and reputational damage that will be

exonerated upon repayment of the US$3 million and public collection of the US$160 million that we are owed.

        20.    Bank Mutiara's Counsel has pointed us in the direction of litigation lenders to provide the funds due in its Hearing testimony (lines 16-17 on page 10). Quinn Emanuel are experts in litigation funders as they just secured GBP40 million from Burford Capital / Gerchen Keller to sue Mastercard Europe in one of the first UK class action suits ever for GBP 12 billion. As there has historically been little litigation funding money available in Singapore legal proceedings, it is beneficial for Weston's efforts to pay US$ 3.322 million to this Court that the  laws in Singapore have been revised in the last month to allow for litigation funding. Today, the Singapore High Court announced a new bilateral agreement with the US Bankruptcy Court for the District of Delaware to formerly implement communication and cooperation guidelines on cross border insolvency matters. This framework will allow cross border insolvency matters to be better managed for the benefit of debtor companies, banks and other creditors, employees and other stakeholders. This new arrangement subjects Bank Mutiara and J Trust Co. to bankruptcy filings by Weston entities in the U.S and our ability with our U.S. regulators to proceed against Bank Mutiara and J Trust Co. on multiple charges under U.S. law . We commit to this Court a vigorous effort to seek funds from the litigation funders and need the Court to understand that the efforts will require us to transfer the collection rights to the Summary Judgments along with the underlying securities. The existing preliminary TRO if imposed permanently will cripple our ability to do that. We respectfully ask the Court for 90-120 days to proceed without a TRO and will commit proceeds of securities sale immediately to this Court. Any sale of securities of secured lending prospects will be severely tainted by the TRO and add a substantial amount of

documentation hurdles to a fund raising transaction. I will address this later.

## II. BACKGROUND

21.     It is important for the Weston entities to submit factual evidence to this Court under oath that outlines the extend of the illegal conspiratorial money laundering fraud that Weston has uncovered since 2014 in regards to a complicit partnership between Bank Mutiara, J Trust, the Republic of Indonesia, the Indonesian Deposit Insurance Corporation ("Lembaga Penjamin Simpanan" or the "LPS"), FBME Bank Ltd (Cyprus Branch), FBME Bank Ltd (Tanzania), FBME Ltd (previous owner of FBME Bank Ltd), Fadi Saab, Ayoub-Farid Saab, Michael Norbert Saab, Abdel Rahmin Wazzi, Lilit Khachatryan, Saab Financial Ltd (Jersey), Saab Financial (Bermuda) Ltd, Nomura Holdings, Inc, Nomura International Plc, Nomura Bank International Plc and Standard Chartered Bank (Hong Kong, Singapore and United Kingdom).

22.     In late 2014, as 99.996% of Bank Mutiara was being sold for US$368 million / IDR 4.41 trillion to J Trust Co., Ltd (TSE 8505.T), FBME Bank Ltd, FBME Ltd, Saab Financial (Bermuda) Ltd, Robert Tantular (70% former owner of Bank Mutiara), Bank Mutiara, the Indonesian LPS, J Trust Co., Ltd, Michael Nobert Saab, Fadi Saab, Ayoub-Farid Saab and FBME Card Services Ltd were all in deep negotiations as to how to conceal a massive admission of acts of theft, embezzlement, fraud and conspiracy by the above named parties in regards to a famous Expert Witness Report authored by Peter Barrie-Brown, a renowned elder in the anti-money laundering compliance industry here in the United Kingdom (Appendix 5).

23.    The above named parties were made aware by the Brown Report that FBME, Bank Mutiara, the Saab family and FBME Card Services has engaged in multiple acts of money laundering, theft, embezzlement and fraud involving hundred of millions of US Dollars in acts whereby Bank Mutiara would launder funds stolen by the Saabs from FBME Bank Ltd, Cyprus Branch depositors and wire transfer to Bank Mutiara who would then wire the funds through Robert Tantular Special Purpose Vehicles ("SPVs") back to another bank in Lebanon owned by the Saab Brothers known as Federal Bank of Lebanon.

24.    Ahmad Fajar, the recently removed President-Director of Bank Mutiara, testified and gave witness statements as factual evidence of the extent of this money laundering and conspiratorial fraud that was committed from March 2006 up through December 2, 2014. As this Court knows, in the last three (3) years, Bank Mutiara has only provided one (1) affidavit to this Court by Mr. Fajar in support of the multiple erroneous allegations put forth by their counsel in multiple misleading and mis-factual submissions.

25.    The Brown Report to our knowledge and belief has been known to multiple regulators, authorities and judiciaries in the jurisdictions of Cyprus, Tanzania, the United States, Mauritius, Singapore and the United Kingdom after a London Court of International Arbitration (LCIA) case that was settled on December 2, 2014 and subsequently reported in Bank Mutiara's Audited Financial Statements and Unaudited Financial Statements for the FYE December 31, 2014, March 31, 2015 and June 30, 2015 before it was mysteriously removed.

26.     The importance of the Brown Report which we submitted to the Second Circuit Court of Appeals in July 2016 references our Contempt Sanctions issued by this Court and Bank Mutiara's and its parent company, J Trust Co., Ltd's "unclean hands".

27.     The Brown Report concluded on page 56, paragraph 230-234 (Appendix 5) the following in regards to the US$40,000,000 LCIA Arbitration underlying transactions between the parties:

a.   Paragraph 230 on page 54:

> *"On day one Bank Century made a gain of US$8mm as a result of entering into the transaction arrangements. In the event that the transaction arrangements were to have terminated according to the contractual agreements this gain would have disappeared. However, in my opinion, it is possible that the termination of this arrangement was not envisaged and instead the transactions were expected to be rolled ad-infinitum (or at least until the remaining $32 million had been washed back through the system). My opinion in that regard is strengthened by the fact that the one monthly equivalent interest amounts were essentially revenue-neutral for FBME and Saab (Jersey) when considered together (as I explained at Section D8.2 above) – in other words, it appears that Bank Century did not make any margin from these payments. Therefore, unless the US$8 million was intended to be retained by Bank Century (or Mr. Rizvi), then Bank Century did not benefit from the entire scheme in any way. I would find it very surprising if that were the case."*

b.   Paragraph 231 on page 55:

> *"The economic effect of the transaction arrangements was therefore for FBME to pass US$32mm to another entity with the same ownership at a cost to it of US$8mm. In my opinion, the magnitude of the costs involved was not commercial for a party with a legitimate business*

> *motivation and certainly not for the commercial motivation alleged by the Claimants. As such, without further information as to the commercial rationale for the transactions, I am of the opinion that the transaction arrangements were unlikely to have been genuine commercial transactions. As I explained above in Section F3.6, I am not persuaded that the explanation advanced by the Claimants is true."*

c.  Paragraph 232 on page 55:

> *"The likely purpose of the transaction, in my view, was to launder FBME's (or the Saab Brothers') money through bank accounts controlled by Bank Century, including accounts in the US and Switzerland (R-62 and R-64). The fact that all of the monies paid by the Saab Brothers (on behalf of Saab (Jersey)) to the Bank were then passed straight on to FBME (and presumably the Saab Brothers) supports that contention in my opinion."*

d.  Paragraph 233 on pages 55 and 56:

> *"In summary, in my opinion, the transactions bear the following warning signs of money laundering:*
>
> *i) the unnecessary complexity and opacity of the structure, and the number of parties involved;*
>
> *ii) the fact that the actual money flows did not match up with the parties' contractual obligations;*
>
> *iii) the fact that all parties do not appear to have been operating purely on an arm's length basis. This is particularly relevant given the identity of interests between the Saab Brothers, FBME and Saab (Jersey) on the one hand, and Mr. Rizvi, Bank Century, and perhaps the other third parties on the other;*
>
> *iv) the lack of clearly defined purpose, and the inconsistency of the final arrangements with the purpose alleged by the Claimants;*
>
> *v) the circular nature of the arrangements;*
>
> *vi) the fact that it appears that Bank Century did not gain at*

*all from the transactions – or, alternatively, was intended to retain the $8 million, which is out of proportion with the risks it undertook on the face of the documents (and is more in line with the risks it was undertaking in facilitating a money laundering operation);*

*vii) the backdating of documents, and the fact that the transactions were executed before proper contracts were put in place, and after a law firm warned of the risk of facilitating money laundering;*

*viii) the incomplete contractual framework;*

*ix) the involvement of entities from Cyprus, Tanzania, Indonesia and Russia; and*

*x) the established association of both sides to the transaction in other money laundering activities."*

e.  Paragraph 234 on page 56 concludes:

*"In light of the sheer number of warning signs, it is totally implausible that this was a normal, legitimate business structure. I do not believe that the true purpose of the transaction was an honest one. It is my firm opinion that the true intention and practice behind these transactions, shared by all parties, was the laundering of money. As I noted at the outset, these transactions raise more red flags than any other arrangement I have previously encountered in my entire career."*

28.   This factual Expert Witness Report by Mr. Brown emphasized "*these transactions raise more red flags than any other arrangement I have previously encountered in my entire career*" *(emphasis added)*. This Report has been concealed from this Court since it was jointly submitted to Bank Mutiara, J Trust Co., Ltd, the Indonesian LPS and FBME Ltd, Saab Financial (Bermuda) Ltd, Fadi Saab, Ayoub-Farid Saab, Michael Norbert Saab and FBME Card Services Ltd since August 15, 2014 and yet it represents material facts attesting to hundreds of millions of US Dollars of money laundering and fraud. Furthermore, to our knowledge

and belief, it was concealed from the Central Bank of Cyprus, Attorney General of Tanzania, Central Bank of Tanzania, Central Bank of Indonesia, the US Treasury Financial Network Enforcement Network (FinCEN) and the US Department of Justice.

29.   Bank Mutiara and its legal counsel have never denied the existence of the Brown Report and have not denied that they have concealed it from this Court, but it is relevant to the Plaintiffs in our previous and current defenses regarding this Court's contempt sanctions.

30.   An alleged Settlement Agreement was signed on October 16, 2014 between Bank Mutiara, the LPS, Saab Financial (Bermuda) Ltd and Michael Nobert Saab agreeing to further conceal the US$40 million debt claim from FBME Bank Ltd Special Administrator and instead document the "*alleged Settlement*" as a "*Legal Expense*" payable in British Pounds Sterling to Quinn Emanuel, London to pay Saab family personal legal bills to Quinn Emanuel and allegedly Hogan Lovells. The point here is not to emphasize the inherent conflict of Quinn Emanuel representing both Bank Mutiara, its owner at the time, the LPS nor J Trust who ordered the US$8 million payment by wire transfer while simultaneously representing Saab Financial (Bermuda) Ltd, Fadi Saab, Ayoub-Farid Saab, Michael Norbert Saab. The point is to make this Court aware that Bank Mutiara's unclean hands extend beyond the Bank and evidence of that has been concealed from this Court and the US Department of Justice since August 15, 2015.

31.   Quinn Emanuel and Bank Mutiara could have easily repaid those sums to Weston entities owning defaulted Bank Mutiara debts and this

contempt sanction would have been satisfied. Instead, Bank Mutiara defrauded Weston of that payment in order to conceal further acts of money laundering before this Court. A simple diagram provided herein by the Plaintiff synopsizes this for this Court in order to show the Court the complexity of the transactions that the Defendant orchestrated and executed, but also that the very instruments they used as collateral for the fraudulent LCIA Repurchase Agreements were FGFL Preference Share Backed Fund Linked Notes and Weston's 15,000,000 Bank Mutiara Convertible Bonds due June 16, 2009 that were packaged into a US$ 15,000,000 JP Morgan Bank Luxembourg SA Fiduciary Notes due May 5, 2009 (ISIN X50258843969) with a Bank Mutiara recognised value of US$ 15,000,000 identical to the value they carried their MCB's as Senior Liabilities of US$ 15,000,000 on their balance sheet. (Appendix 6 Chart 40 million)

32.    It is my submission that these extreme acts of illegal and criminal activity in violation of global and US anti-money laundering laws orchestrated and executed by Bank Mutiara and J Trust Co. (along with others) represents evidence that must be taken into account in regards to the sanctions imposed in our Contempt orders.

33.    As this will be our last submission to this Court and the Court takes recognition that Weston Entities can no longer collect funds in New York from Bank Mutiara due to the forced closures of their bank accounts at Standard Chartered Bank, HSBC and Wells Fargo in the United States, I respectfully request that our acknowledgement of the Court's sanction to return US$ 3.322 million to this Court and our commitment to do so within 90 to 120 days will be enough of a penalty to compel our compliance.

34.     Weston entities hereby submit to this Court that FGFL and WCAI's offset payment under our Mauritian law in the amount of US$3,825,592 will also remain in effect and will remain permanent and irreversible under Mauritian Law and our Constitution.

35.     Weston entities now recognise that this Court will not review new evidence and will not acknowledge Mauritian offsets executed under Mauritian law in June 2015. However, there has been enough in the way of submissions herein to evidence the legal existence of the "*alleged*" Summary Judgments dated February 13, 2013 and May 29, 2015 as well as the US$120 million Global Mareva Order issued on June 29, 2015. These are <u>NOT</u> "*alleged*" Summary Judgments and Bank Mutiara testifies to them as in existence since their respective dates of issuance. These are NOT "*intangible assets*" but real tangible property under the laws of Mauritius that along with the High Court of Singapore Proceedings have strongly and materially enhanced and supported significantly higher valuations of Weston held US$ 55,000,000 of Bank Mutiara defaulted convertible bonds.

36.     Weston has come a long way since arriving in this Court in 2013. The Summary Judgment Value of the US$55 million Bank Mutiara bonds as of January 31, 2017 is US$114,919,789 and will be worth US$143,485,215.50 by December 31, 2017 when the Singapore Court proceedings should end. Bank Mutiara should take Justice Coomaraswamy's advice in testimony before the High Court of Singapore on September 26, 2016 (Appendix 7) when he advised:

> a. "*The Mauritian judgment represents a judicial determination that the amount of [sic. US$150 million] is due from your client (sic. Bank Mutiara) to the Plaintiffs.*"

> b. "*When the party seeking to resist enforcement does not bring*

*forward even an arguable basis on which to impeach the foreign judgment, and when the foreign judgment is one on the merits, not one by default?"*

c.    *"Because you (sic. Bank Mutiara) are a net debtor"*

d.  *"I think the Plaintiffs would be happier if you paid the judgment debt"*

e.  *"Just because you did not submit to the Mauritian court's jurisdiction does not mean that the debt which the Mauritian court found to be due and payable is not due and payable."*

f.  *"My point again is that if the plaintiffs (sic. Weston entities) chose to sue in Singapore on the underlying claim rather than suing on the Mauritian judgment, the issue of whether your clients (sic. Bank Mutiara) submitted to the jurisdiction of the Mauritian court would be wholly irrelevant. If that is the case, isn't it correct that your success on the submission point will not directly impeach the merits of the Mauritian judgment? Which has determined that your clients owe the plaintiff (sic. US$150 million)?"*

g.  *"I also take into account the fact that Mauritian judgment was a judgment on the merits, has not been appealed against and has not been impeached even informally by the defendant."*

## III. ARGUMENT

## A. WESTON ASSETS VALUATION DECLARATIONS AND OUR PLAN TO COMPLY WITH THE REPAYMENT OF A COURT ORDERED AMOUNT EQUIVALENT TO THE WCAI ACCOUNTS RECEIVABLE AS EVIDENCED IN BANK MUTIARA STATUTORY AUDITED FINANCIAL STATEMENTS FOR FYE DECEMBER 31, 2014 AND FYE DECEMBER 31, 2015

37.    The SDNY Court and Bank Mutiara now acknowledge Contempt sanctions and a value of the Summary Judgment and securities in an amount somewhere between US$3.322 million and US$ 460 million simultaneously to Bank Mutiara testimony before the Court in Singapore that Mauritius was the only jurisdiction that should be allowed to recognise the bonds, deposits, Re-registration

and Share Transfer Fees and Capital Call Notices and Redemption Notice debts as real true declarations of Bank Mutiara's debt. Yet, Bank Mutiara previously lodged their only defense in the High Court of Singapore stating that Mauritius is not a court of competent jurisdiction (Appendix 8). Bank Mutiara has contradicted its own defense. To our knowledge and belief, as far as the SDNY Court is concerned and by their own admission, Mauritius is a court of competent jurisdiction recognised in New York as this Court registered its original garnishment orders against Bank Mutiara but revoked those orders as a matter of law under due process consideration, not a reversal of its recognition of the Republic of Mauritius as a competent jurisdiction.

38.     The Accounts Payable Debts due to FGFL and WIARCO by Bank Mutiara and its owner, J Trust Co., joint and severally, were memorialised as true debt claims in the May 29, 2015 "alleged" Summary Judgments awarded and included the Weston Notice of Offset Letter dated June 8, 2015 which is the very Summary Judgment totalling US$110,539,997 that Quinn Emanuel is asking this Court to revest to Bank Mutiara and clearly carries a WICL Statutory Audited Claim value of US$108,782,296 as of June 8, 2015 and US$153,065,781 as of January 31, 2017 (net of the aforesaid offset). To an outside buyer of these Claims or Lender, that is the value of the Bank Mutiara and J Trust Co., joint and several Summary Judgment Claims which any secured lender, litigation funder or securities purchasor would get first rights of collection on.

39.     Bank Mutiara and J Trust Co. as its 99.996% owner fully recognises their Summary Judgments in Bank Mutiara's Audited Financials in the amount of US$110,539,997 in each of its Quarterly and Yearly Audits since June 30,

2015 contrary to Quinn Emanuel's mistruth that it does not. The Bank Mutiara Audit acknowledgments alone reflect the Set Off Letter date June 8, 2015. Its states as follows in Appendix 3:

I.    June 30, 2015: Note 49(b) on page 198;

II.    September 30, 2015: Note 49(b) on pages 192 and 193;

III.    December 31, 2015: Note 49(b) on pages 192 and 193;

IV.    March 31, 2016: Note 49(b) on pages 200 and 201;

V.    June 30, 2016: Note 49(b) on pages 201 and 202; and

VI.    September 30, 2016: Note 50(b) on pages 191 and 192.

Six audit and legal verifications and acknowledgements by Bank Mutiara, its Statutory Audits, Board of Directors, Board of Commissioners and its owner, J Trust Co., of underlying debts and Summary Judgments Claims owed to Weston entities exceeding US$160 million and the US$120 million Global Mareva Order against Bank Mutiara and its owner, J Trust Co., yet they have thumbed their noses to the Plaintiffs and continue to fabricate gross mistruths to this Court through their legal counsel in a further effort to argue the merits of this case on paper rather than through a Court mandated hearing on the merits.

40.    If the Mauritian Summary Judgments are worth "Zero" as self-declared by Bank Mutiara's legal counsel (who bears no legal authority as Calculation Agent or Auditor), then how can they subsequently place a value of somewhere between US$3.6 million and US$460 million referencing a SDNY Court sanction that may be perceived as clearly punitive, not coercive, and potentially unconstitutional. A sanction of US$460 million to cover US$3.6 million of a WCIA Account Receivable to Bank Mutiara already paid and satisfied under international

law is 92 times of what the SDNY Court ordered Weston to repay. It is more than US$455 million of fines imposed deliberately to benefit Bank Mutiara and reward it for its crimes of theft, embezzlement, money laundering and aiding and abetting violations of the USA Patriot Act Section 311. I do not believe that this Court intentionally intends to acknowledge Bank Mutiara's violations and has intentionally prevented the Plaintiff from ever arguing the merits of this case. However, the Court has left the Plaintiff no other option other than seeking help from regulators and authorities that have jurisdiction over money laundering crimes generation and Bank Mutiara's retention of the Proceeds of Crime for over thirteen (13) years.

41.    The US$15,000,000 Bank Mutiara Convertible Bonds due June 16, 2009 and US$40,000,000 Convertible Bonds due April 14, 2011 have a Summary Judgment Values of 212.7819% of Par Value or US$31,917,278.81 and 207.5063% of Par Value or US$83,002,510.19 respectively as of January 31, 2017 under the terms of the Mauritian Summary Judgments.

42.    These bonds are actively quoted in the Over the Counter bond markets as evidenced on Bloomberg in live daily bid-offer rates and Bond Bid prices of 45.00% of Par Value and Offer Prices 48.00% of Par Value. Bid sizes are for US$5 million Par Value and Offer Price sizes are for US$10 million Par Value (Appendix 9).

43.    The TRO imposed by this Court on January 27, 2017 and associated to these bonds will severely impair their values in the open market and damage the liquidity of the bonds over the next 90 days. We believe that represents an additional unfair sanction intended to punitively damage the Weston entities. A

temporary lifting of the TRO will allow Weston a broad range of Emerging Market distressed investors to acquire these securities and associated Summary Judgment Claims at values that will still generate 400% returns. This is a punitive but realistic sale price to be applied to the Court's sanctions.

44.     The Singapore High Court proceedings against Bank Mutiara and J Trust Co., jointly and severally, have dramatically increased the value of our Bank Mutiara bonds and Summary Judgment claims as the public profile of our lawsuits in Singapore has increased substantially in Europe and Southeast Asia since the High Court of Singapore declared Bank Mutiara to be subject to the jurisdiction of Singapore on May 27, 2016 and Bank Mutiara reply on the defence of the merit of our claims was submitted contesting only the "competency of the Court of Mauritius".

45.     We are nearing a "Discovery Stage" in Singapore and we doubt Bank Mutiara's ability nor willingness to comply with our Discovery Requests over fears of self-indictment of money laundering activities. This will further enhance the Over-The-Counter value of the Bank Mutiara bonds and increase interest of investors on top of interest accruals.

46.     There are two types of buyers that now exist that did not exist before for the Bank Mutiara Bonds, Accounts Payable claims and Interbank Deposit claims at prices from 45.00% to 50.00% of par value in OTC bond and claim trades. These claim values are enhanced by the fact these are not bankruptcy claims, but claims of a solvent financial banking institution in an emerging market country of dubious repute which are guaranteed by a highly solvent, highly liquid and credit

worthy parent known as J Trust Co. The new May 29, 2015 Summary Judgments legally guarantees Bank Mutiara's debt by J Trust unconditionally, jointly and severally. This credit investment is from a Tokyo Stock Exchange listed company with a market capitalisation of US$ 1.2 billion, strong shareholders like Calpers, State Street Bank, Fidelity and Invesco Capital Partners Ltd/WL Ross and Co. through Taiyo Pacific Funds Management LLP and cash in hand estimated at US$ 800 million.

47.    Settlement options available to J Trust include a recognition of the Weston claims and assets and payment of those litigations with J Trust stock, convertible bonds or other forms of new debt obligations. Distressed investors like that.

48.    Secured lenders like the litigation funds Quinn Emanuel suggested we source are interested in the financing of these claims because we can now offer a portfolio of claims inclusive of the Bank Mutiara / J Trust Co. claims of US$160 million that include claims against Robert Tantular (former Singaporean billionaire owner of Bank Mutiara) and claims against the Republic of Indonesia for US$1.3 billion against offset.

49.    In addition, Weston entities have new claims in our portfolio against Nomura entities for US$830 million that support an even larger portfolio of new claims exceeding US$10 billion. These claims are in close to final form.

50.    Weston has targeted 12 litigation funders around the world. Since early January new forms of litigation funding are now permitted in Singapore.

51.      Distressed debt investors had their best year ever in FYE 2016 in the emerging markets, a market that as a bond trader, I just celebrated my 40th year in. The Weston story for these three classes of claims namely Bank Mutiara / J Trust Co. et al, Nomura and Standard Chartered Bank have the added benefit of regulatory infraction components and the possibility of Deferred Prosecution Agreements, something new in the United Kingdom. I have even written White Papers for the Republic of Mauritius Independent Commission Against Corruption ("ICAC") on these enforcement mechanisms.

52.      I have started a large campaign only recently on a large scale basis and for the first time ever, we are seeing bids and offers live on Bloomberg on the Convertible Bonds, Interbank Deposit and Accounts Payable (Appendix 9).

53.      I have been delayed in my litigation funding term sheet submissions since the TRO issue was instituted on January 27, 2017 by this Court. As we remain a small operating team, I have been mandated with affidavit drafting responsibilities for the last seven (7) days as required for this Court and have complied accordingly.

54.      On Monday, February 6, 2017, I resume meetings contained to investors and funds here in London as the TRO substantially depleted our working capital base with unexpected legal costs. Nonetheless, the pressure to close out compliance with this Court has now reached the highest priority despite an overly reaching punitive if not crippling TRO that we are imploring this Court to suspend. Bank Mutiara's counsel is a frequent user of litigation funding as evidenced by their

recent GBP40 million litigation funding loan from Burford Capital/Gerchen Keller in support of London's first mass class action suit against Mastercard for GBP12 billion. Quinn Emanuel negotiated this loan but knows fully well it took over ninety (90) days to close and required them to write Legal Opinions on the merits of their case costing hundreds of thousands of pounds similar to what we have to do.

55.     Weston is finalising negotiations with three separate law firms to represent us on the three separate actions of the Bank Mutiara / J Trust Co. Singapore portfolio and the Nomura and Standard Chartered Bank claims that Bank Mutiara and J Trust Co. will benefit from. Quinn Emanuel's attempts to hinder our ability to sell assets or sign secured loans against them is a deceitful attempt to impair Weston's prospects. We hope the Court knows that and Quinn Emanuel stipulates a ceasing of this tactic in this Settlement (Appendix 17). If Bank Mutiara's counsel continues its behaviour, they may be subject to counterbalancing public testimony.

56.     I hereby testify to a renewed effort and commitment to repay the US$3,322,652.22 to this Court. What has changed is that it has taken us eighteen (18) months of efforts to improve the value of our claims through Summary Judgments, Global Mareva and jurisdictional litigation in meaningful ways to collect money. Our litigation collection efforts will intensify with more litigation filings and compliance with this Court's Order.

57.     We respectfully request a suspension of the TRO for ninety (90) days and will commit to monthly reporting for 90 days on all sales and secured funding efforts. We can also pledge and stipulate first money proceeds to the Court

consistent with funding for our working capital and legal expenses.

58.     If Quinn Emanuel is to be taken at its word in this week's hearing on January 31, 2017, then they must commit to not interfering with our fundraising profit in any way by both themselves, Bank Mutiara, J Trust Co and the LPS.

59.     The Singapore hearings will proceed, the global Mareva Order remains in force and our Mauritian litigation against Nomura, Citibank, the National Australian Bank and others will proceed on schedule with a parallel commitment that this Court will have receive its due proceeds. We also request herein a stipulation that Bank Mutiara ceases instructing Citibank to refuse payment to us of the US$1.7 million in Re-registration and Share Transfer Fees duly owed on Bank Mutiara's FGFL share transfers, all of which would flow to Bank Mutiara on a back to back basis. Bank Mutiara has stifled this payment under instruction to Citibank Hong Kong (David Bone) since October 2016. Bank Mutiara can testify to this impairment of our claim but is unfairly subjecting Citibank, their securities custodian, to massive money laundering charges in Mauritius. Citibank holds FGFL Preference Shares in Hong Kong in the amount of 275,275 shares of Global Finance Recovery fund worth US$ 27.52 million par value that Bank Mutiara instructed Citibank to steal from us.

60.     Assuming Bank Mutiara agrees to our Settlement Proposal as described herein and our punitive TRO is suspended, we can agree to withhold new litigation until these funds are repaid to the Court. Existing litigation will continue and we will continue to reply as required to the authorities in New York, Washington, the United Kingdom, Mauritius and Cyprus as required.

61.     If this settlement proposal is accepted, we can also agree to a standstill on further press releases on both sides. We support the appreciation of J Trust Co. listed stock prices in the meantime. A full settlement of our total claims can only benefit J Trust Co. especially if we are willing to accept J Trust stock as payment for our total claims.

62.     A standstill for 90 days supported by this Court, Bank Mutiara and its counsel should prevent a lot of pain for both sides while causing no irreparable harm. Bank Mutiara is testing the boundaries of its defiance of many fronts. We should be finding solutions on a grander scale before crippling relief sought on both sides.

## B. THE VALUE OF THE HIGH COURT OF SINGAPORE RULINGS AND PROCEEDINGS IN SUPPORT OF SUMMARY JUDGMENTS VALUATIONS OF WESTON ASSETS, SECURITIES, SUMMARY JUDGMENTS, CLAIMS AND ACCOUNTS PAYABLE DEBTS

63.     A trial was held on May 28-29, 2015 before the Presiding Judge, Honorable Paul Lam Shang Leen of the Supreme Court of Mauritius (Commercial Division) and Mauritian Summary Judgments were issued on the merits as tangible hard Claims on debts securities owned by Weston entities owed by Bank Mutiara and J Trust, jointly and severally, in the amount of US$110,539,997.90. Bank Mutiara, through its Singapore Counsel Blackoak LLP (as instructed by Linklaters), submitted to the High Court of Singapore recently that the High Court of Singapore

was not the proper forum (*forum non conveniens*) to declare these Bank Mutiara / J Trust debts as debts under the Common Law of Singapore. This was outright testimony that the Bank Mutiara US$15.5 million interbank deposit, the US$55 million Par Value Bank Mutiara Mandatory Convertible Bonds, the US$4.171 million Re-registration and Share Transfer Fees Accounts Payable, US$635,430 Capital Call Notices Accounts Payable and the US$8.176 million Redemption Notices are recognised as debts under the English law of Mauritius as the proper jurisdiction. This Court does not know that. This is also a recognition that debts exist as tangible property under Mauritian Constitutional law which is a requirement to the acknowledgment of the Notice of Offset executed on June 19, 2015. Two debts have to exist and did exist under Mauritian law in order to effect offset. FGFL's debt to Bank Mutiara called a WCAI Account Receivable in the amount of US$3,825,592 was testified to in Bank Mutiara's Statutory Audited Financial Statements FYE December 31, 2013, December 31, 2014 and December 31, 2015  (Appendix 3) and was acknowledged in Bank Mutiara's and J Trust Co., Ltd's audits as joint and several senior debts to FGFL. WIARCO and other Weston entities entered, acknowledged and legally certified under Mauritian law. FGFL and WIARCO holds those hand debt claims as tangible property assets under the Statutory Audit and Constitutional laws of Mauritius.


## C. ARGUMENTS AGAINST REVESTING


64.    Before this Court ruled on our Notice of Offset of US$3,825,592 to PT Bank JTrust Indonesia TBK ("Bank Mutiara"), the SDNY Court ordered a WCAI Accounts Receivable to be paid to Bank Mutiara in the amount of

US$3,825,592 as of June 19, 2015, In the process the Court refused to recognise and acknowledge Mauritian Regulatory and Audit Law and Mauritian Summary Judgments, Mauritian domiciled securities, claims and Weston's Statutory Audited Financials. It has clearly done so now and as so ordered WCAI herein acknowledges and agrees a debt to this Court of US$3,322,652.22 under the WCAI Accounts Receivable (plus accrued interest at the Statutory rate of 9% until the day of payment) in addition to the US$3,825,592 already legally paid and certified in an offset notice to Bank Mutiara.

65.   An order to re-vest the Mauritian Summary Judgments to Bank Mutiara would violate Mauritian Law and the US$120 million Mauritian Global Mareva awarded by the Supreme Court of Mauritius to Weston entities in June 2015 would award Mauritian tangible assets, physical shares, claims, accounts receivable and securities deliverable in Mauritius to Bank Mutiara in violation of Mauritian anti-money laundering law, regulatory law and criminal law. A revesting order is illegal under the Republic of Mauritius Constitution and Financial Intelligence and Anti Money Laundering Act 2002 of Mauritius.

66.   Bank Mutiara cannot ask for re-vest of Mauritian Summary Judgments without first acknowledging the legal Mauritian offset of US$3,825,592 and previous offsets that it has agreed to in Singapore and United Kingdom inclusive of an illegal payment of US$8,000,000 as Legal Expenses on December 2, 2014. Bank Mutiara's counsel, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") has failed to disclose other accepted offsets by Bank Mutiara, J Trust Co. and the Indonesian LPS to this Court inclusive of its own offset of the illegal US$8 million / GBP 5 million payment it received on December 2, 2014 from Bank Mutiara allegedly paid to Saab

Financial (Bermuda) Ltd as an offset to legal fees owed to Quinn Emanuel under a fraudulent "LCIA Arbitration Claim" Settlement / Legal Expense Offset. Failing an immediate repayment of that US$8 million for the credit of Weston entities to this Court, Weston entities will be forced to pursue Bank Mutiara, J Trust Co. and the Indonesian LPS in additional jurisdictions.

67.    The SDNY Court is considering an Order committing Weston to recognise a type of "offset" called a "revest" which would automatically create a Bank Mutiara recognition of the WCAI offset in Mauritius, Indonesia and the United States. We believe that renders the Summary Judgments and defaulted debt securities, accounts payable of Re-registration and Share Transfer Fees and Capital Call Notices, redemption notices, all valid Summary Judgments in New York. However, this Court has prevented us any chance for three years to argue the merit of these debts and now it is a futile exercise to remain in this Court as Bank Mutiara/J Trust Co. no longer has any bank accounts, cash or property in New York or the United States and this Court has no palpable prospect of ordering the collection of funds from Indonesia.

68.    I must also point out that the revesting of the properties that is being sought by the Defendant and its counsel actually amounts to an *action in rem*. An action "*in rem*" is permitted by a particular Court which has authority over the property or when the Court's jurisdiction extends to cover it. The location of the property is important as the Court can hold the trial only in the jurisdiction under which the property falls (in this case, Mauritius). Furthermore, any judgment rendered in an *action in rem*, can only be against the property, and not its owner. The jurisdiction of the Court can only be exercised after the parties, who are known

to have an interest in the property, are notified of the proceedings, and have been given a chance of presenting their claim to the Court. Therefore, if this Court rules that Bank Mutiara and J Trust are awarded the property revested, Bank Mutiara and J Trust  must file a legal action in the jurisdiction of Mauritius to seize title to the property while submitting to the jurisdiction of Mauritius.   Upon admission to Mauritius, Bank Mutiara will immediately be subject to the Global Mareva Order, Financial Intelligence and Anti Money Laundering Act 2002, and the UK Proceeds of Crime 2002. Any property they secure in Mauritius will be seized immediately.

69.     This testimony is in the public domain and before this court. This testimony has NOT been denied by Quinn Emanuel or Bank Mutiara in any public forum, yet Quinn Emanuel continues to represent Bank Mutiara, J Trust Co., LPS, FBME Bank Ltd, Tanzania and Cyprus, Fadi, Farid and Michael Norbert Saab and others jointly against them in a complicit partnership with Hogan Lovells all parties who have committed direct violations of US Treasury sanctions, the laws of Mauritius, Cyprus, Indonesia, the UK and Singapore.

70.     Any consideration by the SDNY Court to order a revesting of Mauritian tangible assets and property will require Bank Mutiara, J Trust Co. and Quinn Emanuel to come to Mauritius and appear before the Mauritius Courts to enforce the TRO and authorise the revesting of Mauritius properly to them in Mauritius under Mauritian law and before the Mauritian Supreme Court. We confirm that their admission to the jurisdiction of Mauritius as a recognised competent jurisdiction will immediately render their only defense before the High Court of Singapore moot and we will accelerate motions for immediate Summary Judgment and Singapore Mareva and Monetary Authority of Singapore seizure orders.

71.     We address these assets being designated as intangible versus tangible Mauritian assets going forward.

72.     As a reminder to this Court, in April 2015, FGFL and WIARCO started legal proceedings against J Trust Co. and Bank Mutiara for the theft of 777,493 FGFL Preference Shares delivered as physical certificates (i.e., "tangible hard assets") from Mauritius to Jakarta, Indonesia on December 17, 2014 along with Re-registration and Share Transfer Fees, Capital Call Notices and Redemption Notices totalling US$17,858,706, all documented as Bank Mutiara and J Trust Co. Accounts Payable Debt in the Plaintiffs Consolidated Audited Financial Statements Fiscal Year Ending March 31, 2015. Bank Mutiara and J Trust Co. admit to the physical receipt of these hard asset securities in their Fiscal Year Ending 2014 and 2015 Statutory Audited Financial Statement and admit to owing FGFL at least the Re-registration and Share Transfer Fees of US$3,887,465 [Footnote 49(b)]. They further acknowledge for over two (2) years on a quarterly basis these tangible hard debts as follows:

> *"On January 30, 2009, the Bank has executed rights to receive shares with a nominal value of USD 26,000,000 on 181,169 shares series VII of Global Opportunity Fund ("GOF") and shares with a nominal value of USD 16,000,000 on 31,480 shares of Asia Finance Recovery Fund ("AFRF"), 72,796 shares of First Global Resources Fund ("FGRF"), and 34,798 shares of Global Opportunity Fund ("GOF"). GOF, AFRF and FGRF are sub accounts/sub cell funds of First Global Funds Limited PCC ("FGFL"), the Republic of Mauritius. Execution of the rights shares is derived from securities NCDs Banca Populare in Milano London and Nomura Bank International Plc. London which has already matured, but the execution could not be realized until now."*

> *"On December 12, 2014, FGFL sent shares certificates to the Bank totaling 777,493 participating redeemable preference shares of various sub cell funds of FGFL consist of 397,942 shares of GOF, 31,480 shares of AFRF, 72,796 shares of FGRF and 275,275 shares of Global Finance Recovery Fund ("GFRF"). In connection with those share*

*ownership, the Bank is required to pay the amount of USD 3,887,465 by the due date of December 29, 2014 for the payment of re-registration and transfer fee for 777,493 participating redeemable preference shares of various sub cell funds. Up to the due date, the Bank has not yet paid the amount required by FGFL, therefore FGFL sent some Default Payment Notices to the Bank."*

*"On March 3, 2015, FGFL sent a letter to the Board of Directors of the Bank and other parties which offers some settlement options to the Bank."*

*"Subsequently in the mid of March 2015, FGFL together with Weston International Asset Recovery Company Limited ("WIARCI"), Weston Capital Advisors, Inc. ("WCAI") and Weston International Asset Recovery Corporation Inc. ("WIARCO") have filed lawsuits to Supreme Court of Mauritius (Commercial Division), among others, are as follows:*

*"- Claim by FGFL:*
*Default on payment on the re-registration and share transfer fee amounted to USD 4,171,231 (including interest and penalty) and capital calls on reimbursable expenses amounted to USD 635,430 (including interest and penalty)."*

*"- Claim by WCAI and WIARCI:*
*In connection with Decision of Mauritius Court dated February 15, 2013 (see Note 49.e.A.7) among others is Convertible Bond, the Bank has failed to settle the amount of USD 97,556,515 (including interest)."*

*"- Claim by WIARCO:*
*Default on payment on contractual obligation of the redemption of West LB Fund Linked Note Certificate of Deposit amounted to USD 8,176,821 (including interest)."*

*"Based on Decision from Supreme Court of Mauritius (Commercial Division) dated May 29, 2015, the Court issued a decision that the Bank and J Trust Co., Ltd. have to pay amounting to USD 4,806,661 to FGFL with interest until final payment, J Trust Co., Ltd. has to pay totaling USD 97,556,515 with interest until final payment to WCAI and WIACI and USD 8,176,821 with interest until final payment to WIARCO."*

*"On June 30, 2015, Supreme Court of Mauritius (Commercial Division) ordered to restrain and prohibit the Bank and J Trust Co., Ltd., whether directly or indirectly, from disposing of and/or dealing with any money up to the value of USD 120 million."*

*"As of the issuance date of the financial statements, the Bank has not yet received an official notification on the Decision of the Supreme Court of Mauritius."*

*"The Decision of the Supreme Court of Mauritius (Commercial Division)*

*was issued without the presence of the Bank (in-absentia) and may not be directly executed in Indonesia. The Bank will take legal action if the Plaintiff executed the Decision outside the jurisdiction of Indonesia."*

## D. AUTHORITY TO TRANSFER ASSET UNDER RULE 70

73.      The SDNY Court has also issued a Temporary Restraining Order ("TRO") on January 27, 2017 based on an Ex-Parte application against Physical Bond Certificates, Physical Share Certificates and certified Summary Judgments held as Property in rem under the Constitution of the Republic of Mauritius that the Court and Bank Mutiara do not recognise and have continued to refuse to recognise in New York but has recognised them in Singapore. These combined tangible assets have a total Summary Judgment Audited Value of over US$153 million that includes a Notice of Offset in the amount of US$3,825,592 of a FGFL Bank Mutiara Account Payable against a Bank Mutiara WCAI Accounts Receivable created and declared under order of this Court in November 2014. If the SDNY Court does in fact recognise Mauritian Summary Judgments, then ipso facto, the SDNY Court recognises the certified Notice of Offset which is incorporated into those very Summary Judgments and the recognition of a FGFL US$3,825,592.54 Account Payable to Bank Mutiara which was paid, certified and legally satisfied on June 8, 2015 which under Mauritian Law rendered the SDNY Court Contempt Order of September 7, 2015 satisfied. I recognise that under New York Law, this Court does not recognise it. Yet, this Account Payable to Bank Mutiara no longer exists in our Statutory Audited Financial Statements and under Mauritian law has been irreversibly credited to Bank Mutiara.

74.   New York law does not recognise a US$120 million Global Mareva

Order either despite the fact that the Mareva Order itself is in regards to the same Summary Judgments that the SDNY Court is imposing a TRO on. A re-vest of Summary Judgments to Bank Mutiara and a re-vest Global Mareva Order at the same time in violation of Mauritian laws will force Bank Mutiara into recognising the jurisdiction of Mauritius and recognising the Summary Judgments and Global Mareva Order upon the very order to revest. We respectfully request a lifting of the TRO for 90 days in order to sell enough Bank Mutiara Convertible Bonds and pro rata Summary Judgment participation and pursue litigation funding sufficient to repay the US$3,322,652.22 payment to the Court. Please review the documentation that WIARCO and WIARCI uses to effect sales of bonds (Appendix 10). The TRO renders the Bank Mutiara bonds un-saleable under Mauritian law. We will stipulate that Bank Mutiara bond sales proceeds will be paid on a priority basis to this Court.

75.     The SDNY Court has authorised a TRO of assets with an Audited Net Worth of over US$160 million and has damaged FGFL's ability to operate and pay for the legal pursuit of Bank Mutiara in the High Court of Singapore with J Trust Co., Ltd ("J Trust Co.") the only place outside of Japan and Indonesia where Bank Mutiara and J Trust Co. has attachable and seizable money. This appears to us to be a punitive, not a coercive penalty.

76.     The SDNY Court ordered a TRO on an ex-parte application on January 27, 2017 affording Weston no due process and has ordered so before the Mauritian Certified Notice of Offset is acknowledged and ruled on by the SDNY Court which a re-vesting to Bank Mutiara would accomplish. It then wants to consider the order of re-vesting of the very Summary Judgments that incorporate and deduct the return of US$3.816 million as of June 8, 2015 long before punitive amount of

US$460 million in sanctions were imposed causing irreparable damage to our business and partially crippling our efforts to bring Bank Mutiara, an indicted institution of primary money laundering concern to justice.

77.   The SDNY Court ordered TRO and consideration of "re-vest offset" could not be legally assigned from Mauritius without Bank Mutiara's acknowledgement of the Offset Notice and subsequent extinguishment of the SDNY Court Ordered WCAI Accounts Receivables as described in Bank Mutiara's Statutory Audited Financial Statements. The SDNYC Court has no way of valuing the Summary Judgments under re-vest verses the alleged Contemnors' obligations without acknowledging the US$160 million of obligations of Bank Mutiara and J Trust Co., jointly and severally to Weston entities under the May 29, 2015 Mauritian Summary Judgments and US$120 million Global Mareva Order.

78.   The June 8, 2015 Offset Provisions and Final Notice of Declaration were duly served by our attorneys in Mauritius as a Court approved Writ of Final Declaration of Offset to Bank Mutiara and J Trust Co., jointly and severally which Bank Mutiara testifies to in its Statutory Audits. In addition, this Court has received and denied recognition of two (2) Legal Opinions from the two (2) former Chief Justices of the Supreme Court of Mauritius in a dismissal of the international principle of comity.

79.   Weston counsel has advised us that the SDNY Court has chosen not to recognise that a WCIA Accounts Payable Debt from FGFL to Bank Mutiara has been duly paid and legally satisfied in complete denial of international law and IFRS accounting principles. Bank Mutiara has instructed its counsel to delay

and forestall in any means, possible whether legal or illegal and to cause whatever irreparable damage it can to the Plaintiff. The SDNY Court Order of November 14, 2013 established a US$3,623,037.83 debt under Mauritian and New York law. This debt was legally certified and paid on June 8, 2015 under Mauritian law where all Weston entities present Statutory Audits to the Mauritian Financial Services Commission ("FSC") annually as our primary regulator. We hereby declare to the Mauritius FSC that under Mauritian FSC regulatory rules that the SDNY Court has elected not to accept that Mauritian legal fact of law. We would like to be on the record to the FSC as opposing this decision and our rights to have the SDNY Court admit new evidence of money laundering, theft, embezzlement and violation of US Treasury Financial Crimes Enforcement Network Notice of Findings in the SDNY Court proceedings in support of our assertions has failed. We herein notify the Mauritian FSC that the Statutory Audits for Fiscal Year End March 31, 2016 will reflect the Notice of Offset of June 19, 2015 as declared and we are complying with the SDNY Court sanction to return US$3,322,652.22 to the SDNY Court.

## E. COURT ADDITIONAL AUTHORITY PURSUANT TO EQUITABLE POWERS TO DO JUSTICE

80.     Bank Mutiara testified in the High Court of Singapore that the Supreme Court of Mauritius was the court of competent jurisdiction to recognise their debts to Weston entities as true debts under the English law and Civil Code of the Republic of Mauritius, so it would not be necessary to register them as debts under the Common Law of Singapore. Weston's Amended Statement of Claim in the High Court of Singapore dated October 19, 2016 unequivocally registers US$147,456,312

as true securities, accounts payable, Summary Judgments and redemption defaults at an amount accruing at 8% interest which as instructed by the Plaintiffs includes and recognises the June 8, 2015 Notice of Offset Letter amount. The High Court of Singapore is now duly notified and recognises the Notice of Offset in its Summary Judgments and US$120 million Global Mareva Order.

81.     Bank Mutiara and its counsel cannot continue to argue that these Summary Judgment Claims are "intangible property" when they are recognised as tangible assets and property under Mauritian law and audit practices and the WCAI Accounts Receivable to Bank Mutiara has been deducted from the May 29, 2015 Summary Judgment Claim accruals to Bank Mutiara's benefit.

82.     Upon recognition of this Court's Revised Contempt Order in September 2016, FGFL and WIARCO embarked on renewed fund raising efforts in the form of new litigations of US$840 million against Nomura International Plc, Nomura Bank International Plc, Nomura Holdings, Inc., Citibank N.A. and National Australia Bank Limited that may benefit Bank Mutiara as a 13% FGFL Preference Shareholder in an amount exceeding US$100 million under pro-rata FGFL Preference Shareholder collections. Suits were filed against National Australia Bank Limited for US$9,381,651 and against Citibank N.A. for US$1,702,901 that would pro-rata reimburse Bank Mutiara directly. Bank Mutiara has illegally retained without offsetting payment of 777,493 FGFL Preference Shares under receipt from FGFL on December 17, 2014 representing approximately 13.0% of the total FGFL Preference Shares valued by Standard Chartered Bank, Hong Kong in June and July of last year at a combined value over US$500 million (Appendix 11).

83.     In the case of Citibank, Re-registration and Share Transfer Fees and Capital Call Notices claims have been sued for in Mauritius and are in active litigation, collection and settlement that we request Bank Mutiara and the Indonesian LPS to cease trying to stop in the amount of US$1,702,901 as of December 31, 2016.

84.     As FGFL has continued to seek collection on its defaulted debts, Bank Mutiara's final unappealable admission to the jurisdiction of Singapore on May 27, 2016 significantly enhanced the value of our Summary Judgment Claims as we now have recognition that our Summary Judgments are true debt claims under the Common Law of Singapore. The High Court Singapore also recognises the May 29, 2015 Summary Judgment as a debt and not an intangible asset.

85.     This Court imposed a TRO on January 27, 2017 violation of Mauritian Law while not recognising the US$120 million Global Mareva Orders imposed by the Supreme Court of Mauritius over the assets of Bank Mutiara. Bank Mutiara has requested a revesting process under a foreign court order with the intent of forcing the Weston companies to violate their own home country's Court Order in Mauritius. All of this is in direct contradiction to the principle of comity between Courts and against the principle of democracy.

86.     Bank Mutiara wants the very Summary Judgments that recognise those debts as being paid to be re-vested to them and the SDNY Court has granted a TRO to freeze assets in a foreign jurisdiction specifically to deny that this debt was required to be legally repaid by another jurisdiction where Bank Mutiara and J Trust Co. have cash and assets. The SDNY Court is considering an

order double repayment of a debt by a "revesting" procedure order which is a violation of due process laws in the United States and a violation of criminal and anti-money laundering laws and the Civil Code of Mauritius. Revesting orders as penalty for contempt sanctions issued by the SDNY Court cannot be recognised under Mauritian law even if Bank Mutiara wants to admit to our jurisdiction and file for the revesting. The Plaintiffs respectfully suggest herein that a revesting order by this Court may be a final blow for Bank Mutiara under global regulatory and criminal law.

87.     Quinn Emanuel's continuous attempt to induce its client into committing additional acts of fraud, illegal expropriation and theft is a further act of aiding and abetting money laundering and creating in concert liability claims for defrauding creditors in Mauritius for over US$160 million.

88.     On July 17, 2014 FBME Ltd and the Saabs were served with a Notice of Finding by the US Treasury declaring FBME Bank as an institution of primary money laundering concern. Shortly thereafter, on September 12, 2015 Bank Mutiara contractually agreed to be conditionally sold to J Trust Co., Ltd in an agreement signed September 15, 2014 for US$ 368 million/ IDR 4.41 trillion. On October 16, 2014 Quinn Emanuel representing FBME Bank, the Saabs and Bank Mutiara arrived at an "Offset" payment for an LCIA arbitration defined as a Legal Expense payment of exactly US$8 million but payable in GBP at £5,000,000 to deliberately sidestep the US Treasury FinCEN sanctions Bank Mutiara documented this as an Offset Payment and accounts Payable Legal Expense to Quinn Emanuel, their Legal Counsel. It is Weston's position that Bank Mutiara should have made a cash payment to FGFL of US$ 8 million realising US$3.6 million would be immediately credited to Bank Mutiara by FGFL. However, Quinn Emanuel demanded

a priority payment to reimburse itself for legal fees incurred by the third party entity Saab Financial (Bermuda) Ltd and the Saabs as an alternative "Offset". FGFL was robbed of those funds and an opportunity to pay Bank Mutiara back US$3.6 million plus interest on December 2, 2014 event in further Bank Mutiara acts of concealment.

89.    The Offset of US$ 8,000,000 was ordered by J Trust Co. to be executed by wire transfer and documented fraudulently as a Legal Expense payable against Quinn Emanuel generated third party liabilities against the Saabs – i.e. an Accounts Receivable on Quinn Emanuel's books attributable to the Saabs while knowing that a US$40 million debt claim from FBME Bank Ltd Cyprus Branch would not be extinguished [Appendix 12 – FBME Special Administrator letters]. FGFL was denied a partial satisfaction of their Summary Judgments and underlying debts from Bank Mutiara, Quinn Emanuel and Saab Financial (Bermuda) Ltd on the direct orders of J Trust Co. and Quinn Emanuel in the amount of US$8 million as far back as December 2014.

90.    This Offset was criminally concealed to this Court from December 2, 2014 until late June 2016 when it was disclosed by FGFL and WIARCO to the NY Second Circuit Court of Appeals and put in the public domain. It was not disclosed to the Court in the hearing dated June 17, 2015 prior to this Court's rejection of testimony concerning the May 29, 2015 Summary Judgments awarded as tangible claims by the Supreme Court of Mauritius to WCAI, FGFL, WIARCI and WIARCO.

91.    Similarly, the Plaintiffs were denied a chance to submit new

evidence to explain their Notice of Offset certified under Mauritius law and delivered on June 9, 2015 in the June 17, 2015 Hearing before this Court even as Mr. Greenwald on behalf of Bank Mutiara certified and testified to the acknowledgement of the Share Transfer Fees, Capital Call Notices and redemption Notices delivered to Bank Mutiara as Final Notices of Default of Accounts Payable Claims to FGFL and WIARCO on January 13, 2015 and February 3, 2015 in the total amount of US$12,983,482 as lodged on March 13, 2015.

92.    In the June 17, 2015 Hearing before this Court, counsel for Bank Mutiara further admitted to the existence of these debts as debts when in a burst of rage, Mr. Marc Greenwald blurted out to John Liegey who was testifying under oath "*You don't seriously expect Bank Mutiara to pay you money on this share transfer thing so they could fund your lawsuit against them, do you?*" I replied "*We delivered $112.5 million of shares, Mr. Greenwald, to them. They've admitted to owing us this money. Do I expect them to pay that? The answer to that is "absolutely". They are in violation of the Indonesian Penal Code, Mr. Greenwald.*" The SDNY Court heard that testimony confirming that the debts as debts existed and were acknowledged by Mr. Greenwald as existing and ignored in his own act of contempt. The SDNY Court allowed this testimony by Quinn Emanuel and myself that hard debts as tangible assets of FGFL existed in Mauritius, yet Bank Mutiara and J Trust Co. refused to pay them even though the act of repayment could have easily satisfied this Court's contempt order to repay a debt. Instead, Bank Mutiara's Counsel confirmed the existence of the Share Transfer Debts of US$3.8 million as confirmed in Bank Mutiara's Audited Financial Statements for Fiscal Year Ending 2014 and 2015 which in turn is Bank Mutiara's direct acknowledgement of our right to execute an offset.

## F. MY PERMANENT DOMICILE

93.     As shown below, my domicile is United Kingdom, not New York. I will address my personal and business activity in Mauritius, England and New York in the context of domicile.

94.     My residence and tax domicile for the past seven (7) years has been the United Kingdom as recognised by the US Internal Revenue Service since 2010. I have specifically been domiciled in London since January 2010.  I was domiciled at 13 South Eaton Place, London SW1W 9BD from May 2010 to January 31, 2011. Then from February 1, 2011, I was domiciled at to 5 Eaton Place, London until November 30, 2011. From December 1, 2011 to December 31, 2013 I was domiciled  at 95 Eaton Square, London SW1W 9TR and from January 1, 2014 until today, I am domiciled at 45 Eaton Square, London SW1W 9BD. I hereby testify under oath that London is my true domicile and my true home. The United States is my place of birth, but when I die, I will be buried here in United Kingdom. I am domiciled in the UK as a matter of necessity as it is virtually impossible to run the Weston entities businesses from the United States due to global time zones.

95.     I possess a UK Residence Card bearing reference number RE8462401 issued on December 22, 2015 and is valid through December 22, 2020 (Appendix 13). Prior to the UK Residence Card which currently allows me to travel through the European Union, I was granted a UK Entry Clearance Multi Entry Tier 1 Entrepreneur Migrant Visa # 008218519 on June 30, 2012 through October 29, 2015 (Appendix 14). I then applied for a EU Residency Card as a Family Member after

getting married in the United Kingdom on September 15, 2012 in a UK civil ceremony held by the Westminster registry in London. After five (5) years of spending up to 90 days a year in Mauritius, in August 2016, I was awarded an Occupation Permit and Residency Card Ref. # 011N1603588 (Appendix 13) by the Government of Mauritius – Passport and Immigration Office as approved by the Prime Minister's Office which was a requirement as I was starting to spend more than 90 days a year in Mauritius.

**My Business in the United Kingdom**

96.    In 2010, I founded Weston Capital Services Ltd as a Consultancy Firm advising on the restructuring of complex derivative securities and bankruptcies in Europe. Our office address from October 2011 through May 1, 2015 was 118 Piccadilly, London W1J 7NW, United Kingdom. From May 1, 2015 to date, to conserve working capital funds, the domicile corporate and registered address of Weston Capital Services Ltd has been moved to 45 Eaton Square, London SW1W 9BD, United Kingdom.

97.    Since 2010, I have filed my UK tax returns in the United Kingdom with the Her Majesty's Revenue and Customs (HMRC) as a UK domiciled tax resident. My global US federal taxes are filed as a UK resident with ex-Patriot foreign credit relief of US$90,000 per year since 2010. I am accorded tax credits under the Foreign Resident and Ex-Patriot provisions of the US Internal Revenue Service since 2010.

98.    I hold a UK Driving Licence Driver Number LIEGE 512 015

JR9DH issued on January 4, 1992 and valid until November 30, 2025 which I obtained in 1985 when I was domiciled and living in London until late 1992, working as the President of Morgan Stanley Dean Witter International Capital Markets Ltd (Appendix 15)

**Status in the U.S.**

99.     Currently I hold a U.S. passport, which allows me to enter the United States freely.

100.     However, given that my short cumulative annual stay in the United States does not usually exceed 45 days, I am not a U.S. domiciliary for tax purposes and service of process. In 2016, I spent only 34 days in New York.

101.     I do not possess a U.S. Drivers License, nor a New York Drivers License, nor a New York Voting Card, nor do I have a US mobile telephone, nor anything indicating that I own any assets or bank accounts in the United States or New York City. The Weston Capital Advisors, Inc. ("WCAI") registered address for its office is 845 UN Plaza, New York, New York and it has a bedroom that I can sleep in when in New York. It serves as an office only with no one in full time residence other than myself when I am in New York for this litigation. Under US tax law and UK tax law, it is not considered a residence.

**My Temporary Residence in Manhattan**

102.     From 2011 to 2016, I have not spent more than 52 days per year in New York City. On average, I spend of 38 days per year in other U.S. cities on business and visiting my 89 year old mother in Florida.

103.    The Defendant' counsel contend that attending the Court's hearing on June 17, 2015 amounts to maintaining a domicile in New York and further relies on a case called Liegey et al. vs McCormack and a mistaken lawyer's statement of having 2 domiciles in London and New York, which is impossible. Once again, the Defendant's Counsel, without a single declaration from their client, is arguing the case with limited knowledge and alluding to innuendos in order to mislead this Court. I attended the June 17, 2015 hearing on a bona fide basis to demonstrate to this Court our efforts being pursued by myself and Weston entities for compliance of a previous contempt order. I have submitted multiple declarations to this Court for over three (3) years now which I usually have to draft with lawyers in New York and only one was affidavit has ever been submitted by the Defendant.

**My International Business Activities and Interests**

104.    I am President and Chief Executive Officer and hold an equity stake in Weston International Capital Management (Mauritius) Ltd, incorporated in Mauritius, as endorsed by physical share certificates in Mauritius.

105.    I have no other business interests other than in United Kingdom and Mauritius, as mentioned above.

106.    I am a permanent tax resident domicile of the United Kingdom, not New York as recognised under English law.

**G. OTHER OFFSETS RECOGNISED BY BANK MUTIARA**

107.    The Order issued by this Court in November 2013 to return money in the amount of US$3.623 million to Bank Mutiara created an audited confirmed debt in the form of a WCAI account payable to Bank Mutiara in their Statutory Audits as of Fiscal Year End December 31, 2013. It has been carried on FGFL's books as an Accounts Payable debt from December 31, 2013 to June 8, 2015 when as Mauritian companies regulated and audited under the laws of Mauritius and the rules of the Mauritian Financial Services Commission, it was legally, finally and certifiably offset in an irreversible declaration. Therefore, this debt no longer exists in the Statutory Audits of Bank Mutiara under the regulatory audit laws of Mauritius, the Mauritian Financial Services Commission and the Mauritian Revenue Authority.

108.    The SDNY Court sanctions were imposed on September 7, 2015 just before FGFL was made aware that an illegal extortion payment of US$8 million/ GBP 5 million was made by Bank Mutiara through a Singapore Bank to Quinn Emanuel client account UK on behalf of Quinn Emanuel, Saab Financial (Bermuda) Ltd and Michael and Fadi Saab in an alleged settlement of a US$40 million defaulted Repurchase Agreement claim between FBME Bank Ltd (Cyprus Branch) and Bank Mutiara in direct violation of the US Treasury FinCEN Section 311 of the US Patriot Act Notices of Findings. To our knowledge and belief, no Suspicious Transaction Reports (STRs) were ever filed on this in the U.S., United Kingdom, Singapore, Mauritius, Cyprus or Tanzania.

109.    The payment was exactly equal to the amount retained as a

money laundering fee of 20% of US$40 million Repurchase Agreement to Bank Mutiara dating back to 2008 which Michael and Fadi Saab lodged before the London Court of Arbitration as a debt in December 2013 claiming that US$40 million TBMA/ISMA documented Repurchase Agreement Debt was due. The LCIA action was the registration of a legal claim identical to what the Plaintiffs have lodged six times in the Supreme Court of Mauritius inclusive of the Notice of Offset dated June 19, 2015. Our legal claims in Mauritius were converted into Summary Judgments. The LCIA Claim by the notorious Saabs was legally offset and certified under the orders of Quinn Emanuel who represented the Saabs, FBME Ltd, the LPS and Bank Mutiara but not FBME Bank Ltd, Cyprus Branch Special Administrator (Appendix 12). Yet, Quinn Emanuel took the money to pay "legal fees" owed to them by the Saabs instead of ordering Bank Mutiara to truly satisfy the Plaintiffs' executed and satisfied Summary Judgments outstanding in an amount exceeding US$100 million. Quinn Emanuel has aided and abetted Bank Mutiara in executing acts of in-concert liability to defraud creditors, namely the Plaintiffs, of US$8 million and more and should be sanctioned.

110.     A money laundering Expert Witness Report dated August 15, 2014, known herein as the "Brown Report" never disclosed to this Court, fully documented that Bank Mutiara had washed and laundered US$32 million of US$ 40 million received from FBME Bank to the Saabs bank accounts at Federal Bank of Lebanon in a complete violation of US FinCEN money laundering charges that defined these fund transferrals as criminal conspiracy, money laundering, aiding and abetting terrorist financing and acts of criminal conspiracy, all violations of Section 311 of the US Patriot Act.

111.    The SDNY Court created a debt for FGFL in the amount of US$3.623 million under New York and Mauritian IFRS accounting law by direct edict and court order in New York in November 2013. An Order to return US$3.6 million to Bank Mutiara created an Accounts Receivable for Bank Mutiara as documented in the Bank Mutiara FYE Statutory Audits from 2013 to date. Accounts Receivable are defined as "financial assets" not intangible assets under Bank Mutiara's own policies. FGFL is a Mauritian Company that documented the Bank Mutiara WCAI Accounts Receivable as an Account Payable to Bank Mutiara., All of the alleged Contemnors are Mauritian companies under Mauritian law. The Notice of Offset was created and executed properly and legally under Mauritian law and the same Bank Mutiara Offset Policy used when Quinn Emanuel received US$8 million on December 2, 2014 where two debts existed under Mauritian law.

112.    This is the same type of Offset that the Defendant's counsel designed and orchestrated for Bank Mutiara and Saab Financial (Bermuda) Limited in October, 2014 on the alleged LCIA Arbitration Settlement.

113.    One debt of US$160 million by Bank Mutiara, J Trust and the LPS to FGFL and affiliates and one debt of US$3.623 million to Bank Mutiara was created by New York Court Order from FGFL to Bank Mutiara. Bank Mutiara has recorded it as an Account Receivable[2] under Indonesian IFRS audit law and immediately reserved 100% of it over 3 years ago causing no "*irreparable harm*" to Bank Mutiara. Instead, Bank Mutiara has used the Account Receivable from FGFL to reduce its tax debt to the Indonesian Government 100% in a further equal act of

---

[2] Note 17 "Other Assets" in PT Bank Mutiara TBK Audited Financial Statements FYE December 31, 2013. Page 98.

offset.

114.    FGFL kept an Accounts Payable of US$3.6 million to Bank Mutiara in its Statutory Audits until June 19, 2015 when it was required to create an offset under Mauritian law (Appendix 16). To our knowledge and belief, that offset created a reportable gain for Bank Mutiara in Fiscal Year End 2015 which they should have recognised under Indonesian audit law. The SDNY Court has declared that two (2) accounting events evidenced in multiple IFRS Statutory Audits in 2 countries simply do not exist and refuse to accept the Statutory Legal and Audit laws of two (2) foreign countries outside of its knowledge and jurisdiction for over eighteen (18) months.  Bank Mutiara's Counsel has testified and confirmed a complete lack of regard for international legal, statutory, regulatory and audit laws in Indonesia and Mauritius while violating US rules of due process and comity all in an effort to protect Bank Mutiara, J Trust Co., FBME, the Saabs and Quinn Emanuel from money laundering, theft and embezzlement charges, from entities all determined to be institutions of primary money laundering concerns in multiple jurisdictions starting with the US Treasury Financial Crimes Enforcement Network.

115.    FGFL and WIARCO directors and executives will testify to this before the regulatory and criminal authorities in the US, UK, Mauritius, Singapore, Cyprus and Tanzania and any other regulatory bodies that we are requested or required to do so.

116.    Bank Mutiara and Quinn Emanuel have recognised other offsets and now are asking the SDNY Court to re-vest the Summary Judgments by declaring them as "intangible assets" that in fact incorporate and deduct the very

amount ordered to be returned to Bank Mutiara by the SDNY Court. These Summary Judgments are by definition not "intangible assets" under Mauritian Law. This Court cannot impose US audit law on Mauritian incorporated and domiciled companies. Bank Mutiara has testified herein that a Summary Judgment against J Trust Co. is worthless as well. A re-vesting of that Summary Judgment to Bank Mutiara incorporates a J Trust Co. recognised offset and renders full dollar for dollar recognition. J Trust is sitting on over US$ 800 million of cash and has a US$ 1.2 billion market capitalisation on the Tokyo Stock Exchange. This is a clear case of having the ability to pay but not the willingness which is typical of criminal enterprises conspiring together with unclean hands.

117.    Bank Mutiara is asking for real securities and obligations that are recognised as debts on Bank Mutiara's own Statutory Audits. They are supported by Summary Judgments, Global Mareva Orders and incorporate the Mauritian law Notice of Offset. A re-vesting violates money laundering laws in Mauritius and the US$120 million Global Mareva Order issued by the Supreme Court of Mauritius and would allow the Plaintiff to once again seize assets within the borders of Mauritius. As a part time resident in Mauritius (Government of Mauritius Occupation Permit 011N1603588), I spend approximately three (3) months a year there litigating claims for First Global Funds Limited PCC ("FGFL") and Weston International Asset Recovery Company Limited ("WIARCO") that now total over US$2.652 billion and include defendants besides Bank Mutiara and J Trust Co., the likes of the Republic of Indonesia, Nomura International Plc ("NIP"), Nomura Bank International Plc ("NBI"), Robert Tantular, Citibank N.A., National Australia Bank Limited, FBME Ltd, the Saab Brothers and others. A Re-vesting Order forced by the New York courts on Weston entities will force our directors, executives and

shareholders to violate Mauritian laws of money laundering and global Mareva Orders by re-vesting Mauritian property to Bank Mutiara, an institution named as "an institution of primary money laundering concern" in Mauritius.

118.   The SDNY Court has not exercised principles of international comity on issues of recognising the Notice of Offset of June 8, 2015 being introduced as new evidence prior to the imposition of US$460 million of sanctions and the issuance of a TRO based on an ex-parte application, yet, the SDNY Court has authorised a TRO on over US$160 million of tangible assets. Securities debts, claims and equity in FGFL are not "intangible" but in fact very tangible assets with Statutory Audit values that Bank Mutiara and Quinn Emanuel have recognised before. It is absurd that Bank Mutiara's counsel can declare the assets as being of "zero" value in its continued effort to litigate the merits of this case on paper. Furthermore it is an absurd contention by Bank Mutiara's Counsel that "irreparable harm" has or is being done to Bank Mutiara. Bank Mutiara created a WCAI Accounts Receivable as documented in its Fiscal Year End December 31, 2013 Statutory Audits and took a full 100% write off within 45 days in 2013 knowing they in fact owed FGFL over US$85 million in defaulted securities debt as of December 31, 2013 (Appendix 3). Bank Mutiara has an accrued statutory interest rate imposed on the WCAI Accounts Payable by Court Order, payable but has declared impairment and imposed reversible provisions and expenses it has a tax provision in each yearly audit since. It has in fact benefitted Bank Mutiara financially in an act of statutory audit tax fraud while they refrain from accounting for their debts to FGFL and WIARCO.  The irreparable harm is being done to the Plaintiff, US$140 million of other defaulted and unrecognised Bank Mutiara creditors and J Trust Co. public shareholders, not Bank Mutiara. Bank Mutiara has avoided bankruptcy and

declaration of insolvency for three (3) years since their acquisition by J Trust Co. by denying that these Weston entity debts exist as debts and Summary Judgments.

119.    It is true that irreparable harm will be done to Bank Mutiara and J Trust Co. if they are forced by a foreign jurisdiction where they actually have assets to pay debts to the plaintiffs in excess of US$160 million. There are no assets, cash or property left in New York and Bank Mutiara has never posted what should have been a US$ 19 million Surety Bond in November 2013 as this Court forgot to enforce that. Now they cannot get a Surety Bond in the United States because they are identified globally as money launderers.

120.    No harm can be done to Bank Mutiara in the jurisdiction of New York because all of their bank accounts have been closed in the USA and New York due to anti money laundering concerns of HSBC, Standard Chartered Bank and Wells Fargo. This money disappeared last year. In addition, this Court has no ability to order a return of assets to New York from Indonesia under Indonesian law.

## H. REPAYMENT OF US$3.322 MILLION TO COMPLY WITH SDNY COURT ORDERS

121.    I have testified herein our commitment to comply with the Court Ordered sanctions to return US$3,322,652.22 to the Court within 90 to 120 days. However, the existing Temporary Restraining Order will severely hurt our efforts yet again. This Court declared our Bank Mutiara Convertible Bonds as assets of "dubious value" in November 2013 without receiving any testimony on the merits of

that contention. We hereby stipulate to a denial of that allegation.

122.    My testimony herein proves that these bonds, accounts payable, redemption notices and Summary Judgments are not assets of dubious value but are assets who have a debtor with "dubious value", but whose owners (the Indonesian LPS and J Trust Co., Ltd) are creditworthy enough to pay these debts.


## IV. CONCLUSION


123.    I thank the Court for this opportunity to present our offer for compliance and payment and I hereby request the additional time of 90 to 120 days to fully comply.


124.    Weston entities are subject to global "tipping off" laws in regards to money laundering in the jurisdictions we operate in. This testimony observes those laws. I hereby declare under penalties of perjury that the foregoing statements are true and correct.


This 3rd day of February 2017

John R. Liegey