# APPENDIX 4

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 2557 OF 2010

Signed
16 DEC 2010

IN THE MATTER OF THE
MUTUAL LEGAL ASSISTANCE IN
CRIMINAL MATTERS ORDINANCE CAP.525
[Section 27 and Schedule 2 Section 7]
[Order 115A r. 13 of the Rules of the High Court]

AND

IN THE MATTER OF

| | |
|---|---|
| RAFAT ALI RIZVI | 1st Defendant |
| HESHAM TALAAT MOHAMED AL-WARRAQ | 2nd Defendant |
| ROBERT TANTULAR | 3rd Defendant |
| HARTAWAN ALUWI | 4th Defendant |
| GALLERIA RESOURCES LTD. | 5th Defendant |
| ARLINGTON ASSETS INVESTMENT LTD. | 6th Defendant |
| BLUE HARBOUR INVESTMENT LTD. | 7th Defendant |
| CHINKARA CAPITAL MARKETS LIMITED. | 8th Defendant |
| PT BANK CENTURY TBK | 9th Defendant |
| TEXFIELD HOLDINGS PTE LTD. | 10th Defendant |
| FIRST GLOBAL FUNDS LIMITED | 11th Defendant |
| FIRST GULF ASIA HOLDINGS LIMITED | 12th Defendant |
| EXPRESSIVE CONSULTANTS INC. | 13th Defendant |
| JASMIN WORLDWIDE LTD. | 14th Defendant |
| BCIC INTERNATIONAL LTD. | 15th Defendant |
| EVERICH HOLDINGS TRADING LTD. | 16th Defendant |
| METICULOUS OFFSHORE INVESTMENT INC. | 17th Defendant |
| AQUARIUS FINANCE ENTERPRISES LTD. | 18th Defendant |

## ORIGINATING SUMMONS

LET ALL PARTIES CONCERNED attend before the Honourable Mr. Justice  |N|ight  in Chambers (not open to public) at the High Court in Hong Kong on Friday, the 24th day of December 2010 at  9.30  o'clock in the fore/after-noon, on the hearing of an application by Counsel for the Secretary for Justice on behalf of the Government of the Republic of Indonesia for the following order:-

## RESTRICTION ON DEALING WITH PROPERTY

1.      The Defendants, whether by themselves, their servants, agents, attorneys or otherwise, must not remove any of their property in Hong Kong; and in any way dispose of, or deal with, or diminish the value of any of their property in Hong Kong.

2.      Paragraph 1 applies to the Defendants' property whether or not the property is in their own names, and whether the property is jointly or solely owned.  For the purpose of this Order, the Defendants' property includes any property which they have the power, directly or indirectly, to dispose of or deal with as if it was their own.  The Defendants are to be regarded as having such power if a third party holds or controls the property in accordance with their direct or indirect or implied instructions.

3.      This prohibition includes the following property in particular:-

(i)    1st and 2nd Defendants

All monies and other property in account number 20227 at Euroclear Bank held by Citibank (Hong Kong) Limited for the benefit of the 1st and 2nd Defendants.

(ii)   2nd Defendant

All monies and other property held at ING Bank NV in the name of the 2nd Defendant including accounts 712110702860, 712090702860 and securities account(s).

(iii)  5th Defendant

All monies and other property held at EFG Bank AG in the name of the 5th Defendant including accounts 379276 and 379190.

(iv)  6th Defendant

All monies and other property held at the ING Bank NV in the name of the 6th Defendant including accounts 0370006824, 0370006803, 0370006820, 0370006821, 0370006801, 0370012803, 0370012820, 0370012821, 0370012801 and securities account(s) and loan account.

(v)  7th Defendant

All monies and other property held at ING Bank NV in the name of the 7th Defendant including account 712090702963.

(vi)  8th Defendant

All monies and other property held at the Standard Chartered Bank (Hong Kong) Limited in the name of the 8th Defendant including accounts 0101753667 and 44700727275.

(vii)  9th Defendant

All monies and other property held at the Standard Chartered Bank (Hong Kong) Limited in the name of the 9th Defendant including account 44709418178.

(viii) 10th Defendant

All monies and other property held at the Standard Chartered Bank (Hong Kong) Limited in the name of the 10th Defendant including account 44706648547.

(ix)  11th Defendant

All monies and other property held at the Standard Chartered Bank (Hong Kong) Limited in the name of the 11th Defendant including accounts 44706614596, 44700725558, 44700727518,

44700725639, 96093, 96332, 91392, 91500, 101891, 101903, 90451, 92860, 91296, 90636, 96112, 90053 and securities account(s).

(x)   12th Defendant

All monies and other property held at the Standard Chartered Bank (Hong Kong) Limited in the name of the 12th Defendant including accounts 44700727232 and 44706612445 and all monies and other property held at EFG Bank AG in the name of the 12th Defendant including account 379179.

(xi)  13th Defendant

All monies and other property held at the UBS AG in the name of the 13th Defendant including account 217100.

(xii) 14th Defendant

All monies and other property held at the UBS AG in the name of the 14th Defendant including accounts 281925, 207626, 207873 and 312661.

(xiii) 15th Defendant

All monies and other property held at the UBS AG in the name of the 15th Defendant including account 207991.

(xiv) 16th Defendant

All monies and other property held at the UBS AG in the name of the 16th Defendant including account 207623.

(xv)  17th Defendant

All monies and other property held at the UBS AG in the name of the 17th Defendant including account 207598.

(xvi) 18th Defendant

All monies and other property held at Credit Suisse in the name of

the 18th Defendant including account 70088.

## QUALIFICATIONS

4.      Nothing in this Order shall prevent:

(a) any person affected by this Order, including any financial institution, from paying any money restrained by this Order to the party responsible for the enforcement of any external confiscation order which may hereafter be registered and enforced by the Court of First Instance against the Defendants in satisfaction of part or the whole of the said external confiscation order; or

(b) the levy of distress upon any goods subject to this Order for the purpose of enforcement of any external confiscation order which may hereafter be registered and enforced by the Court of First Instance.

## DURATION OF THIS ORDER

5.      This Order shall remain in force unless it is varied or discharged by a further Order of the Court.

## EFFECT OF THIS ORDER

6.      A Defendant who is an individual who is ordered not to do something must not do it himself/herself or in any other way.  He/she must not do it through others acting on his/her behalf or on his/her instructions or with his/her approval or encouragement.

7.      A Defendant which is not an individual which is ordered not to do something must not do it itself or by its directors, governors, officers, partners, employees or agents or in any other way.  It must not do it through others acting on its behalf or on its instructions or with its approval or encouragement.

## THIRD PARTIES

8.      It is a Contempt of Court for any person notified of this Order knowingly to assist in or permit a breach of this Order.  Any person doing so may be imprisoned, fined, and may have his/her property seized.

## CRIMINAL OFFENCES FOR BREACHING THIS ORDER

9. A person who knowingly deals in any realisable property in contravention of this Order commits an offence under the Mutual Legal Assistance in Criminal Matters Ordinance, Cap. 525, and is liable:

(a) on conviction upon indictment to a fine of HK$500,000 or to the value of the realisable property which has been dealt with in contravention of this Order, whichever is the greater, and to imprisonment for 5 years; or

(b) on summary conviction to a fine of HK$250,000 and to imprisonment for 2 years.

## SERVICE

10. As soon as practicable a copy of the Order made herein, is to be served upon:

(a) the 1st Defendant, 2nd Defendant, 3rd Defendant and 4th Defendants and for this purpose, the Secretary for Justice shall have leave to serve the documents on the above Defendants out of jurisdiction, by post to their last known addresses, or with the assistance of the Indonesian and other oversees authorities as necessary; and

(b) the 5th to the 18th Defendants and service of documents on the 5th to the 18th Defendants be treated as effective upon service of the documents on the authorized signatories of their respective bank accounts and for this purpose, the Secretary for Justice shall have leave to serve the documents on the authorized signatories out of jurisdiction, by post to the last known addresses of the authorized signatories or with the assistance of the Indonesian and other overseas authorities as necessary.

11. As soon as practicable, a copy of this Order is to be served on any third party affected by this Order, at such place(s) as he/she/it may be located by an authorised officer.

## VARIATION OR DISCHARGE OF THIS ORDER AND APPOINTMENT OF RECEIVER

12.     The Defendants or anyone affected by this Order, may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must give not less than 2 clear days' notice to the Secretary for Justice before the date fixed for the application.

13.     The Secretary for Justice may apply to the Court at any time to vary or discharge this Order or to appointment of a receiver, but must give not less than 2 clear days' notice to the Defendants before the date fixed for the application.

## REGISTRATION

14.     The Secretary for Justice shall be at liberty to register this Order at the relevant Government registry/registries.

## NAME AND ADDRESS OF COUNSEL FOR THE SECRETARY FOR JUSTICE

15.     Counsel for the Secretary for Justice is:

Susana SIT
Deputy Principal Government Counsel (Ag.)
International Law Division (Mutual Legal Assistance Unit)
Department of Justice
47/F, High Block, Queensway Government Offices
66 Queensway, Hong Kong
Tel. (852) 2867 3403
Fax (852) 2523 7959

## COSTS

16.     The costs of this application be reserved.

## INTERPRETATION OF THIS ORDER

17.     In this Order, "dealing" in relation to property includes:

(a)     receiving or acquiring the property;

(b)     concealing or disguising the property (whether by concealing or disguising its nature, source, location, disposition, movement or ownership or any rights with respect to it or otherwise);

(c)     disposing of or converting the property;

(d)     bringing into or removing from Hong Kong the property;

(e)     using the property to borrow money, or as security (whether by way of charge, mortgage or pledge or otherwise).

18.     Where there are two or more Defendants then (unless otherwise stated), references in this Order to "the Defendants" apply to each and all of them.

Dated this  16th day of  December  2010.

Registrar

(Susana SIT)
Deputy Principal Government Counsel (Ag.)

Estimated time: 20 minutes

This Ex Parte Originating Summons was taken out by the Secretary for Justice, 47th Floor, High Block, Queensway Government Offices, 66 Queensway, Hong Kong.

[For all correspondence please contact Ms Susana SIT , Acting Deputy Principal Government Counsel, Mutual Legal Assistance Unit, International Law Division, Department of Justice, Tel: (852) 2867 3403, Fax: (852) 2523 7959.]

# APPENDIX 5

**LCIA Arbitration No. 132447**

**B E T W E E N**

1.  **FBME BANK LIMITED**
2.  **SAAB FINANCIAL (BERMUDA) LIMITED**

**Claimants**

**-and-**

**PT BANK MUTIARA TBK**

**Respondent**

_____

**EXPERT REPORT**

**PETER BARRIE BROWN**
_____

**15 August 2014**

Tribunal:

Mr. Stephen Bond

Mr. Michael Brindle QC

Mr. Ken MacLean QC

**TABLE OF CONTENTS**

**A. INTRODUCTION**......................................................................................**4**
1   Overview of the Proceedings Between FBME, Saab (Bermuda) and Mutiara..............4
   1.1   Issues Considered in This Report ..................................................5
   1.2   My Expertise and My Duties as an Expert ........................................5
      1.2.1   Current Role ............................................................6
      1.2.2   Previous Roles ..........................................................6
      1.2.3   My Duties as an Expert ..................................................6
**B. EXECUTIVE SUMMARY** .....................................................................**8**
**C. ANTI-MONEY LAUNDERING FUNDAMENTALS**...........................................**10**
1   Overview Of Legislation and Regulations.............................................10
   1.1   English Law ........................................................................10
   1.2   Cypriot and Indonesian Law .......................................................11
2   The Money Laundering Regulations 2007 ............................................11
   2.1   Scope of the Money Laundering Regulations.......................................11
3   The Joint Money Laundering Steering Group (JMLSG)...........................12
4   UK Sanctions Compliance.............................................................13
5   The USA Patriot Act 2001 ............................................................14
6   The 'Money Laundering Process'......................................................14
7   Summary of Money Laundering Warning Signs........................................15
**D. THE TRANSACTION ARRANGEMENTS** ...........................................**17**
1   Overview................................................................................17
2   The Repo Transactions ................................................................21
   2.1   Repo Definition.....................................................................21
   2.2   The BPM Repo Transaction.........................................................22
   2.3   The WLB Repo Transaction........................................................22
   2.4   The NAB Repo Transaction........................................................23
   2.5   The JPM Repo Transaction.........................................................23
3   The Pledge Transaction.................................................................23
4   The Third Party Repo Transactions ...................................................25
   4.1   The CMP Repo Transactions .......................................................25
   4.2   The WWR Repo Transaction.......................................................26
5   The Promissory Note Transactions.....................................................27
6   The Third Party Credit Agreements....................................................28
7   The JPM Repo Transaction.............................................................29
8   Economic Impact of the Contractual  Arrangements For Each Party as at Da y One .29
   8.1   Cash Transfer.......................................................................30
   8.2   Interest Amounts...................................................................30
   8.3   Securities...........................................................................32
**E. ADDITIONAL INFORMATION RELATING TO THE TRANSACTION ARRANGEMENTS**...........................................................................**33**
1   Ongoing Transaction Arrangements ....................................................33
   1.1   Change of Repo Rates..............................................................33
   1.2   Unwind of the WLB Repo Transaction.............................................34
   1.3   Replacement of Matured Securities under the Repo Transactions ................34
2   Information Relating to Actual Cash Movements .....................................34
   2.1   SWIFT Statements.................................................................34
      2.1.1   The Repo Transactions ..................................................34
      2.1.2   The Promissory Note Transactions.......................................35
      2.1.3   Other ...................................................................38

    2.2     Saab (Jersey) Transaction Summary ................................................................38
3     Execution of Documentation ...........................................................................40
    3.1     Back-dating of Sale and Purchase Agreements ................................................41
    3.2     Forward-dating of Sale and Purchase Agreements ..........................................41
    3.3     Back-dating of the Pledge Agreement .............................................................41
    3.4     Back-dating of the Promissory Notes ..............................................................41
    3.5     Lack of Governing Documentation ..................................................................41
**F.     OTHER CONSIDERATIONS................................................................43**
1     Mr. Rizvi ........................................................................................................43
2     Regulatory Interventions .................................................................................43
3     Other Relevant Matters Relating to the Transaction Arrangements .........................44
    3.1     Lack of Evidence Relating to whether the Securities were Actually Held
           in Relation to the Transaction Arrangements ...................................................44
    3.2     Lack of Commerciality in the Positions Entered into by Certain of the
           Relevant Parties ..............................................................................................45
    3.3     Arbitrary Determination of Transaction Economics ........................................45
        3.3.1   Cashflow Payments ...............................................................................45
        3.3.2   The JPM Repo Transaction .....................................................................46
    3.4     Missing Documentation and Documentation Inconsistencies ..........................48
    3.5     The Earlier Proposed Structure of the Transactions and the Adverse Legal
           Opinion ...........................................................................................................50
    3.6     The Purpose Alleged by the Claimants .............................................................51
**G.     MY CONCLUSION IN RESPECT OF THE TRANSACTION
ARRANGEMENTS ..............................................................................................54**
**H.     EXPERT'S DECLARATION .................................................................57**

**I.     Appendix I - Professional Experience and Qualifications....................................58**
**J.     Appendix II - Contracts and Documents Received ................................................61**
**K.     Appendix III - Data Disclaimer ...............................................................................62**
**L.     Appendix IV – Material exhibited with this Report ..............................................63**

## A.  INTRODUCTION

1.  I, Peter Brown, have been retained by Quinn Emanuel Urquhart & Sullivan UK LLP, solicitors acting for PT Bank Mutiara Tbk ("**Mutiara**") (formerly, PT Bank Century Tbk ("**Bank Century**")), as an expert in the field of anti-money laundering compliance, to provide my opinion on matters relating to relevant aspects of certain arrangements between FBME Bank Limited ("**FMBE**"), Bank Century and Saab Financial (Jersey) Limited ("**Saab (Jersey)**") arising out of arbitration proceedings which have been brought by FBME and Saab Financial (Bermuda) Limited ("**Saab (Bermuda)**") against Mutiara in the London Court of International Arbitration (the "**LCIA**").

2.  I set out the scope of this report in detail in Section A1.1 below.

3.  Capitalised terms used but not defined in this report have the meanings given to them in the documents listed in Appendix II.

## 1  OVERVIEW OF THE PROCEEDINGS BETWEEN FBME, SAAB (BERMUDA) AND MUTIARA

4.  FBME and Saab (Bermuda) are together claiming an aggregate payment under three repo transactions entered into between FBME and Bank Century. FBME and Saab (Bermuda) have calculated their claim on the basis that the securities, in respect of which FBME were the initial buyer, were 'held' by Bank Century on FBME's behalf as per the transaction confirmations.

5.  Accordingly, the amount claimed is either:

    i)  US$37,097,064 which corresponds to the aggregate repurchase price owed by Bank Century to FBME under the three repo transactions; or

    ii)  US$38,500,000, adjusted (if necessary) pursuant to the close-out mechanism under the governing master agreement, where US$38,500,000 corresponds to the proceeds of the securities (assuming a redemption price of 100%).

6.  Mutiara's response to the claim states that the transactions are invalid and/or unenforceable on the basis that the repo transactions were entered into as part of a

series of wider transaction arrangements which, in the absence of any explanation as to the commercial rationale, appear to be sham transactions designed to disguise transfers of money from FBME to Saab (Jersey).

## 1.1 Issues Considered in This Report

7. In this report I consider whether the transactions bear the hallmarks of money laundering. I analyse certain aspects of the transaction arrangements entered into between FBME, Bank Century, Saab (Jersey) and other parties detailed further in Sections D and E below from November 2006 until November 2008 when the Indonesian Deposit Insurance Company ("**IDIC**"), an independent agency of the Indonesian Government, took control of Bank Century.

8. In particular I provide my opinion of the following:

    i)   an overview of the nature of money laundering, including a summary of the relevant legal regimes and typical 'warning signs' of a transaction tainted by money laundering;

    ii)  the nature of the transactions (and connected arrangements) which are the subject of this arbitration (including the initial structure and subsequent dealings) to the extent that those matters bear warning signs of money laundering; and

    iii) an analysis of other 'warning signs' of money laundering present in the evidence.

9. I have based my analysis upon the documents that I have seen and which are listed in Appendix II.

10. Based upon the analysis described above, I provide my opinion as to the extent to which the transactions (and connected arrangements) bear the hallmarks of money laundering.

## 1.2 My Expertise and My Duties as an Expert

11. My CV is appended to this report as Appendix I.

### 1.2.1 CURRENT ROLE

12.    I am currently a Senior Consultant at the CCL Partnership ("**CCL**"). CCL is a consultancy and training firm which offers support and training in all aspects of compliance in a regulated regime for firms operating in and beyond the UK's financial services sector. In addition, I am acting as a Senior Advisor to Solum Financial Limited ("**Solum**") in relation to this matter. Solum is a consultancy firm which offers advisory services in all areas of capital markets.

### 1.2.2 PREVIOUS ROLES

13.    Before joining CCL in 2007, I was the Money Laundering Reporting Officer ("**MLRO**") for a Middle Eastern Bank's UK subsidiary company. This role followed working from 2001 for MHA Consulting, a firm with a business model similar in parts to CCL but with a narrower focus specifically on financial crime compliance matters. It was in that capacity that, for a number of years, I provided the help desk facility for a body called the Joint Money Laundering Steering Group ("**JMLSG**"), described in Appendix III.

14.    I began my career in 1968 as a graduate entrant to the bankers Glyn, Mills & Co., and subsequently worked in various other banking and fund management institutions before developing a specialism in anti-money laundering ("**AML**") compliance from the late 1980s. After gaining a broad basic knowledge of banks' services, I spent approximately 25 years undertaking internal audit work for my various employers in their offices in the UK, the Channel Islands, other European countries, the USA and the Bahamas.

15.    I hold a degree in Economics from the University of Essex, having graduated in 1968.

### 1.2.3 MY DUTIES AS AN EXPERT

16.    I have been assisted by members of the Solum team in the preparation of this report. All work has been carried out under my supervision and control and, as such, I can confirm that the opinions and conclusions that I express in this report are my own,

and are based on material facts that I have been made aware of in the course of preparing this report and on my expertise in money laundering compliance matters.

17.     I have, in the preparation of this report, been assisted by Thu-Uyen Nguyen (Partner), Susan Green (Senior Consultant), Kevin Liddy (Senior Advisor), Victoria Whiteman (Senior Consultant) and Dimitrios Giannarakis (Consultant) at Solum.

18.     I confirm that I am aware of my responsibilities to the Tribunal as an expert witness. The following documents regarding the duties and responsibilities of an expert have been provided to me and drawn to my attention and I have read them (although I understand that they are not all strictly applicable to an LCIA Arbitration):

   i)      the Protocol for the Instruction of Experts to give Evidence in Civil Claims;

   ii)     Part 35 of the Civil Procedure Rules;

   iii)    the Practice Direction to Part 35; and

   iv)     the Chartered Instituted of Arbitrators Protocol for the Use of Party-Appointed Expert Witnesses in International Arbitration.

## B. EXECUTIVE SUMMARY

19. In this report I have set out my opinions in relation to the hallmarks of money laundering that I have observed in respect of a series of transactions entered into between FBME, Bank Century and Saab (Jersey) (amongst others) in November 2006.

20. For reference purposes, in Section C of my report, I provide:

    i) an overview of the UK statutes and regulations relevant to money laundering, together with a brief comparison of those rules to the equivalent law in Indonesia and Cyprus;

    ii) a description of the 'money laundering process'; and

    iii) a summary of the obligations on firms and their staff.

21. The UK's AML regime has many aspects to it, including drawing in sanctions compliance. Sources of authority are a mixture of statute, regulations, regulators' rules and market standards of best practice, all supported in the financial services sector by JMLSG Guidance.

22. In my assessments and conclusions I have focused on all aspects of the UK's AML regime including statute law, regulations and best practice. I am not an expert in the equivalent Cypriot and Indonesian rules and regulations. However, on the basis of my brief perusal of those provisions, I believe that my conclusions are likely to be equally applicable in respect of those regimes.

23. The information contained in Section C is referenced throughout my report, where I describe additional aspects relating to the transaction arrangements which support my opinion.

24. In Section D of this report I have set out the facts relating to the contractual arrangements. Section E then deals with matters of an ongoing and operational nature. Together, these two Sections have enabled me to formulate my opinions on the structure and associated transaction and other arrangements.

25. In summary, I have observed the following hallmarks of a money laundering structure (i.e. a structure put in place in order to obscure its real objective) in respect of these transactions:

i) the transaction arrangements are circular in nature and do not reflect genuine commercial transactions between commercial counterparties. The arrangements comprised a series of off-market transactions which did not take account of the underlying risks or otherwise reflect a commercial exchange of risks and rewards. Instead the economic terms of the underlying transactions appear to have been intentionally contrived to produce a particular overall economic impact for the counterparties;

ii) the arrangements are complex, opaque and are not in line with good practice based upon my experience;

iii) the arrangements were subject to missing, incomplete and inconsistent documentation;

iv) certain email exchanges that I have reviewed reference the back-dating and forward-dating of documentation;

v) both parties have been found, by reliable institutions, to have been associated with money laundering (albeit not specifically in respect of these transactions).

26. In summary based upon all of the facts that I have been given, the transaction arrangements make no economic sense and bear all of the hallmarks of a structure that has been put in place in order to obscure the real objective.

27. From what I have reviewed and based upon my experience in the area of anti-money laundering, I conclude that the fundamental arrangements and the ongoing operating arrangements create real suspicions that their true objective was money laundering.

28. Indeed, the number of separate reasons for being suspicious are so many in total that I rate the whole arrangement and its operation to be the greatest collection of suspicious circumstances I have ever encountered in real life.

## C.    ANTI-MONEY LAUNDERING FUNDAMENTALS

## 1    OVERVIEW OF LEGISLATION AND REGULATIONS

## 1.1    English Law

29.    Money Laundering ("**ML**") is a criminal offence in the UK. The definition of money laundering is to be found in s340 (11) of the Proceeds of Crime Act 2002 (as amended) ("**PoCA**"), which establishes:

"*Money laundering is an act which*

*(a) constitutes an offence under section 327, 328 or 329,*

*(b) constitutes an attempt, conspiracy or incitement to commit an offence specified in paragraph (a),*

*(c) constitutes aiding, abetting, counselling or procuring the commission of an offence specified in paragraph (a), or*

*(d) would constitute an offence specified in paragraph (a), (b) or (c) if done in the United Kingdom.*"

30.    Section 7 of the Act embraces all of the basic, ongoing obligations for all persons, the potential offences that can arise, possible defences to them and possible penalties in the event of conviction.

31.    Sections 327, 328 and 329 of the Act each describe a money laundering offence. Because, collectively, they provide the crux of the UK's legal definition of money laundering, they are sometimes referred to informally as the 'three primary offences'. The opinion I reach in this report is therefore achieved against the substance of these three offences; there are other money laundering offences in the UK law which do not come into the definitional scope of s340 (11).

32.    S327 is entitled **Concealing etc** and the offence is defined as follows:

"*A person commits an offence if he:*

*(a) conceals criminal property;*

*(b) disguises criminal property;*

*(c) converts criminal property;*

*(d) transfers criminal property;*

*(e) removes criminal property from England and Wales or from Scotland or from Northern Ireland*".

33.     S328 is entitled **Arrangements** and the offence is defined as follows: "*A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person*".

34.     S329 is entitled **Acquisition, use and possession** and the offence is defined as follows:

"*A person commits an offence if he:*

*(a) acquires criminal property;*

*(b) uses criminal property;*

*(c) has possession of criminal property*".

## 1.2     Cypriot and Indonesian Law

35.     I have been provided with the *Prevention and Suppression of Money Laundering Activities Law 2007* (Cyprus) and the *Law Concerning the Crime of Money Laundering 2002* (Indonesia). I am informed by counsel that both statutes were in force when these transactions were put in place.

36.     I am not an expert in the AML regime in either Cyprus or Indonesia. However, on the basis of my perusal of these statutes, I am of the opinion that they define money laundering in a broadly similar way.

37.     I note that the AML regime in Cyprus is based upon the same Third Money Laundering Directive from the European Union as applies throughout all European Union member countries including the UK.

## 2     THE MONEY LAUNDERING REGULATIONS 2007

## 2.1     Scope of the Money Laundering Regulations

38.     In addition to PoCA, there are the statute-based Money Laundering Regulations 2007 ("**MLR**") which codify the day-to-day responsibilities of management in firms

whose business activities fall within the scope of the MLR; the MLR's scope, inter alia, embraces all financial services activities.

39.     Responsibilities for senior management, as the governing body in any type of firm, include putting in place a regime of risk assessments, policies, procedures and controls for the prevention and detection of money laundering.

40.     Detailed requirements include routine monitoring of the conduct of business for ML reasons and maintaining records of due diligence undertaken on all customers (the MLR use the word 'customer' for all types of business relationships, personal and impersonal, including those who would normally be referred to as clients and counterparties) and no business relationship is exempt from the obligation to undertake Customer Due Diligence to greater or lesser degrees.

41.     Senior management must also put in place, and train staff on, the arrangements whereby any member of staff can report, "*as soon as practicable*", when they have any knowledge or suspicion of money laundering or when there are reasonable grounds whereby they should have known or suspected.

42.     PoCA does not define suspicion; it is generally accepted that it would be impossible to do so for the purposes of law. However, cases precedent have led to industry guidance (see Section C3 below) indicating that suspicion must be more than fanciful or speculation and should be founded on facts. In financial services firms, those having suspicions will rarely be in a position to see and understand the totality of the ML situation. Rather, they will be identifying an incomplete picture, a 'slice' from somewhere in the middle of the money laundering process, described below. The lack of completeness must not prevent or preclude reporting; it would risk breaching the criminal failure to report offence. Staff training should help staff understand that their contribution through the suspicion reporting arrangements may be akin to a critical piece in a jigsaw puzzle, with law enforcement assembling the pieces of the jigsaw.

## 3     THE JOINT MONEY LAUNDERING STEERING GROUP (JMLSG)

43.     The JMLSG is an independent group of trade associations and professional bodies operating in the financial services sector of the UK.

44.    The role of the JMLSG is to produce detailed guidance (**R-89**), written in everyday language, to assist management and staff in relevant firms to comply with all of their statutory and regulatory obligations relating to money laundering and sanctions compliance.

45.    The current JMLSG carries 'approved status', meaning that it has been formally approved by HM Treasury as guidance that must be taken into account by courts and regulators when assessing whether or not firms and/or individuals have acted in a manner compliant with statutory and regulatory obligations.

46.    Sections 7.26 to 7.28 inclusive in Chapter 7 in Part I of the JMLSG Guidance address the sorts of situations that may arise in the course of conducting business and to which staff should be expected to react. Such situations may initially strike a member of staff/management as being merely curious but further probing may move the matter into the realms of ML suspicion and, as such, warranting internal reporting and potential suspension of the business transaction whilst awaiting the granting of consent by law enforcement to allow the business to continue.
The situations illustrated do not constitute an exhaustive list, nor is any reporting obligation limited to circumstances that are illustrated in the three sections.

47.    Customer due diligence and money laundering risk management oblige UK firms to create meaningful money laundering risk assessments of all countries with which there will be dealings or other connections. The research underlying this country risk assessment should be rigorous and comprehensive, bringing in factors like the Financial Action Task Force ("**FATF**") list of high risk jurisdictions, sanctioned jurisdictions and any other relevant information, particulate when of an adverse nature.

## 4    UK SANCTIONS COMPLIANCE

48.    The UK's various anti-terrorist laws create a separate but parallel regime with which all firms must comply. To fail to do so creates a 'strict liability offence'. Funding terrorist activities is also a money laundering offence. So all firms must undertake checks against official lists of all people involved in or connected with all business relationships.

## 5     THE USA PATRIOT ACT 2001

49.    The USA Patriot Act has extra-territorial scope and authority, effectively wherever business activity is being undertaken that involves the US$ as the currency concerned. Consequently, firms worldwide conducting US$ business must be able to demonstrate that they are conducting such business in a manner that is US compliant as well as locally compliant, wherever they may be.

## 6     THE 'MONEY LAUNDERING PROCESS'

50.    The title 'Money Laundering Process' is not to be found in statute or regulation but in ML training material where it is presented as a three-stage ML process with sectional titles of Placement, Layering and Integration.

51.    Placement, the first stage, is seen as the point where the underlying predicate crime has been committed with the proceeds of that crime being criminal assets. At this stage, by committing the predicate, criminal-asset yielding crime, the criminal has also committed a s329 ML offence of acquiring, using or possessing the criminal assets. By whatever means necessary, the criminal has probably 'converted' those criminal assets into a monetary form to make it easier for the layering stage then to be undertaken.

52.    The third and final stage, Integration, is, for the criminal, the objective, such that they can judge themselves to have been successful as money launderers. Reaching this stage does not annul the risk of being charged either with the predicate crime or money laundering since both are criminal offences and therefore not subject to any time limits within which a prosecution need be mounted.

53.    In between, the second, Layering stage is totally in the determination of the criminal money launderer. What happens through this stage is as much or as little, as short term or as long term, as simple or as complex as the criminal determines. This stage of the process concludes when the criminal decides that a stage has been reached where the (criminal) assets can be integrated back into the legitimate economy and respectable society without any suspicion being aroused. Additionally, the criminal will wish that an audit trail so long and complex has been created that law enforcement will either be unable to trail back to prove the provenance of the assets

or will at least be disinclined to attempt to do so even when money laundering is suspected.

54. In financial services sector firms, other than those undertaking retail, cash-based banking business, the likelihood of suspicions arising will normally be when the criminals are already active at the layering stage. Suspicions are therefore likely to be truly only suspicions because it is not possible for those employees to see back to whatever actually was the predicate crime or how the Placement stage has already been accomplished. This reality does not negate the obligation to report suspicion and any stand-alone feature of business being undertaken generating suspicion needs to be recognised for what it is. It may prove to be the critical piece in the jigsaw puzzle being worked on by law enforcement. Nothing that is based at least on some fact(s) should ever be thought to be too insignificant to qualify for the reporting obligation.

## 7  SUMMARY OF MONEY LAUNDERING WARNING SIGNS

55. I set out below, a number of excerpts from the JMLSG Guidance which are recognised warning signs in relation to money laundering and which I am of the opinion have relevance in this matter.

### Excerpts from JMLSG Guidance - Section 7.26

- ➢ *transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity*

- ➢ *the use of non-resident accounts, companies or structures in circumstances where the customer's needs do not appear to support such economic requirements*

- ➢ *where the transaction being requested by the customer, or the size or pattern of transactions, is, without reasonable explanation, out of the ordinary range of services normally requested or is inconsistent with the experience of the firm in relation to the particular customer*

- ➢ *dealing with customers not normally expected in that part of the business*

> ➢ *transfers to and from high-risk jurisdictions, without reasonable explanation, which are not consistent with the customer's declared foreign business dealings or interests*

> ➢ *unnecessary routing of funds through third party accounts*

> ➢ *unusual investment transactions without an apparently discernible profitable motive*

56.    I note that the term 'red flag' is not officially defined but commonly used in the industry to describe any situation or circumstance to which people should be expected to react because of the potential for money laundering. In the following Sections I have highlighted any areas which would raise concern from a money laundering perspective as a potential red flag.

# D.    THE TRANSACTION ARRANGEMENTS

57.    In this Section, I provide:

    i)    a description of the transaction arrangements as per the contractual documentation; and

    ii)    a summary of the economic impact of the transaction arrangements for each party.

58.    As I explained above, these are important preliminary steps in an AML analysis.

## 1    OVERVIEW

59.    In November 2008, FMBE and Bank Century (as they were then known) entered into a series of transactions with each other, Saab (Jersey) and additional third parties including PT. Canting Mas Persada ("**CMP**"), PT. Wibhowo Wadah Rejeki ("**WWR**") and it appears also Mr. Rafat Rizvi ("**Mr. Rizvi**") (along with other entities with which he appears to have been associated), (together the "**Third Parties**").

60.    For the purposes of my analysis in this Section I have analysed the transaction arrangements in place on 'day one' since I believe this to be the most relevant information in determining the overall transaction economics at the outset. Nonetheless, in Section E1 below I also comment upon the ongoing nature of the arrangements and in Sections F and G below I provide my opinions and conclusions in this respect.

61.    My analysis in this Section is based strictly on the terms of the contractual documentation entered into by the relevant parties however, I note that the validity of the relevant documentation is also a matter of uncertainty and I comment on this further in Section E3 and F3 below.

62.    I set out below the individual transactions and accompanying documentation that comprise the transaction arrangements, as I refer to them:

i) the Global Master Repurchase Agreement ("**GMRA**") (between FBME and Bank Century dated 20 November 2006 (**C-1**)), the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (each dated 22 November 2006 between Bank Century and FBME (**C-36**)), (each defined in Section D2 below and together the "**Repo Transactions**");

ii) the Pledge Agreement (between FBME and Bank Century dated 20 November 2006 (**R-2**)) and the Transfer Authorisations (between FBME and Bank Century dated 29 November 2008 (**R-3**)), (together the "**Pledge Transaction**");

iii) the CMP Repo Transactions (each between Bank Century and CMP dated 28 November 2008 (**R-4** and **R-5**)) and the WWR Repo Transaction (between Bank Century and WWR dated 30 November 2008 (**R-6**)), (together the "**Third Party Repo Transactions**");

iv) the CMP Loan (between CMP and Saab (Jersey) dated 22 November 2006 (**R-34**)) and the WWR Loan (between WWR and Saab (Jersey) dated 22 November 2006 (**R-35**)), (each defined in Section D5 below and together the "**Promissory Note Transactions**").

63. As I explain in Section E3 below, however, the dates on the face of these documents cannot be considered to be reliable.

64. In addition, I note that on 3 December 2007, Bank Century entered into credit agreements with WWR and CMP (respectively the "**WWR Credit Agreement**" and the "**CMP Credit Agreement**" and together the "**Third Party Credit Agreements**" **R-7** and **R-8**). I understand that these Third Party Credit Agreements were intended to replace the Third Party Repo Transactions. I describe these further in Section D6 below.

65. The transaction arrangements are summarised in Figure 1 and Figure 2 below with reference to:

i) the day one movement of cash and securities; and

ii) the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison.

66. I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis. However, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis of interest amounts upon a one month equivalent calculation. In my view, this is the best way of analysing the relative economic impact of the contracts despite their different terms. My detailed analysis of the 'day one' relative economic impact of the contracts is at Section D8 below. My analysis of the actual economic impact of the transactions – which is quite different – is at Section E2 below.

*Figure 1: Summary of Day One Cash and Securities Movements as a Result of the Transaction Arrangements*



*Figure 2: Summary of the One Month Equivalent Interest Amounts as a Result of the Transaction Arrangements* (based upon the interest rates and notional amounts set out in the day one documentation but using a one month interest calculation for the purposes of comparison)



67.     I note that I have not been provided with any contractual documentation relating to arrangements involving Mr. Rizvi however for reasons described in Section E2 below, I understand that Mr. Rizvi (and other entities with which he appears to have been associated) was involved in the transaction arrangements.

68.     This is supported by information set out in the Claimants' Request for Arbitration (Paragraph 15.3), the Claimants' Reply (Paragraph 14.3) and a transaction summary provided in relation to Saab (Jersey) showing credits to Saab (Jersey) but involving Mr. Rizvi of US$12,180,000 (**R-50**).

69.     I note that there is some confusion surrounding whether the credit amount of US$400,000 on 22 December 2006 should in fact have been reflected as a debit rather than a credit ( see Paragraph 48 of Mr. Wazzi's Witness Statement). For the purposes of my analysis I have assumed this to be a credit, because that is how it is reflected in the contemporaneous documents (**R-50**), and have therefore reflected an amount of US$12,180,000 in my analysis. The Saab (Jersey) transaction summary is described in more detail in Section E2.2 below.

70. Mr. Rizvi's involvement is opaque and I understand involved numerous other third parties, however for the purposes of my analysis in Figure 1 and Figure 2 I have assumed that Mr. Rizvi's involvement was in a similar capacity to that of CMP and WWR. Such assumptions are highlighted using dotted lines in the relevant figures.

71. I note that Mr. Rizvi's involvement in the arrangements in itself provides a red flag warning from a money laundering perspective, as it is unusual to have personal involvement by a senior official of a bank that is party to an agreement.

72. In the following Sections I describe each of the four components of the transaction arrangements in detail based upon their contractual documentation.

## 2 THE REPO TRANSACTIONS

### 2.1 Repo Definition

73. A repurchase agreement ('*repo*') is a short-term borrowing transaction between two parties comprising an agreement (i) for the seller to sell a security to the buyer (the '*near leg*') and (ii) for the seller to buy back that same security at an agreed price and date in the future (the '*far leg*'). The original buyer (seller) of the security effectively acts as a lender (borrower) of cash, and the underlying security serves as collateral for a secured cash loan for an agreed period of time at a pre-determined rate of interest (the '*repo rate*').

74. The difference between the day one market value of the securities serving as collateral in respect of the borrowing and the amount of cash lent under the repo agreement is referred to as the '*haircut*'. It is typically expressed as a percentage of the day one market value of the securities.

75. The date on which the near leg takes place can be referred to as the '*settlement date*' or the '*sale date*' and the date on which the far leg takes place is typically referred to as the '*repurchase date*'.

76. It is customary under a repo agreement for a physical exchange of the securities to take place on the sale date, either directly to the buyer of securities or, in the case of a tri-party repo agreement, to a third party agent (such as a custodian or clearing

organisation) acting as an intermediary. The original seller of the securities remains the beneficial owner of the underlying securities.

77. The Repo Transactions entered into by FBME and Bank Century comprised the BPM Repo Transaction, the WLB Repo Transaction, the NAB Repo Transaction and the JPM Repo Transaction (defined below), each (allegedly) governed by a GMRA. (I say "allegedly" because, as I will explain below, the first repo transactions appear to have been entered into before the GMRA was put in place).

78. In each case, FBME was the initial buyer and Bank Century was the initial seller of securities.

79. I note that each of the sale confirmations forming part of the Repo Transactions states that the securities would be held by Bank Century on FBME's behalf, as such there was no physical exchange of securities.

## 2.2    The BPM Repo Transaction

80. The "**BPM Repo Transaction**" was in respect of US$15,000,000 of Banco Popolare di Milano variable rate Certificates of Deposit with ISIN XS0179811616 (the "**BPM Securities**").

81. The sale date was 22 November 2006 and the sale price was 98.50%, equal to US$14,775,000.

82. The (re)purchase date was 22 December 2006 and the (re)purchase price was 98.9310%, equal to US$14,839,650, resulting in an equivalent repo rate of 5.25%.

## 2.3    The WLB Repo Transaction

83. The "**WLB Repo Transaction**" was in respect of US$3,000,000 of Westdeutsche Landesbank Plc variable rate Certificates of Deposit with ISIN XS0177710356 (the "**WLB Securities**").

84. The sale date was 22 November 2006 and the sale price was 100%, equal to US$3,000,000.

85.    The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$3,013,125, resulting in an equivalent repo rate of 5.25%.

## 2.4    The NAB Repo Transaction

86.    The "**NAB Repo Transaction**" was in respect of US$7,000,000 of National Australia Bank variable rate Certificates of Deposit with ISIN XS0179785190 (the "**NAB Securities**").

87.    The sale date was 22 November 2006 and the sale price was 100%, equal to US$7,000,000.

88.    The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.4375%, equal to US$7,030,625, resulting in an equivalent repo rate of 5.25%.

## 2.5    The JPM Repo Transaction

89.    The "**JPM Repo Transaction**" was in respect of US$15,000,000 of JP Morgan securities with ISIN XS0258843969 (the "**JPM Securities**").

90.    The sale date was 22 November 2006 and the sale price was 101.5%, equal to US$15,225,000.

91.    The (re)purchase date was 22 December 2006 and the (re)purchase price was 100.994%, equal to US$15,291,600, resulting in an equivalent repo rate of 5.25%.

## 3    THE PLEDGE TRANSACTION

92.    The Pledge Agreement between FBME and Bank Century was dated 20 November 2006 (although as I explain below, it appears to have been executed some time later).

93.    The agreement specified that FBME as pledgor would pledge certain securities to Bank Century, the pledgee, by way of a Participation Agreement. It is stated in the agreement that FBME will simultaneously enter into a "*Bank Facility Agreement*" with Bank Century.

94.    Schedule A to the Pledge Agreement states that:

i) US$15,000,000 Banco Popolare di Milano variable rate Certificates of Deposit due 30 October 2008 and with ISIN XS017981616 will be pledged to WWR for the loan facility of $11,820,000 from Bank Century; and

ii) US$3,000,000 Westdeutsche Landesbank Plc variable rate Certificates of Deposit due 4 November 2008 and with ISIN XS017710356 and US$7,000,000 National Australia Bank variable rate Certificates of Deposit due 3 November 2008 and with ISIN XS178785190 will be pledged to CMP for the loan facility of US$8,000,000 from Bank Century.

95. I note that the Pledge Agreement itself contains a number of inconsistencies.

96. Firstly, I note that I have not seen any documentation in respect of a "*Bank Facility Agreement*" or "*Participation Agreement*" between FBME and Bank Century, and I understand that FBME accepts that neither document exists (Paragraph 50 of Mr. Wazzi's Witness Statement).

97. Secondly, whilst the parties to the agreement are specified as FBME and Bank Century, and the body of the agreement provides that the securities will be pledged to Bank Century, the details of the pledge specified in Schedule A provide that the securities will in fact be pledged to WWR and CMP, companies which are not party to the agreement.

98. Such drafting renders the document potentially confusing and/or misleading which in my experience can be a red flag warning in relation to money laundering. It is particularly concerning because it appears to have been executed in late December 2008 (and then backdated, as I explain below), after the Third Party Repo Transactions had been entered into, and after the securities had been (apparently) transferred to WWR and CMP pursuant to the authorisations I describe below. This is a further red flag, in my view, because in that light it seems very unlikely to me that the parties could have intended to implement the Pledge Agreement on its terms.

99. As I mentioned above, two transfer authorisation letters which were sent by FBME to Bank Century on 29 November 2006, authorising Bank Century to transfer free of payment:

i)      the BPM Securities to WWR; and

ii)     the WLB Securities and the NAB Securities to CMP.

100.    I note two issues with the arrangements above.

101.    Firstly, I note that in order for the terms of the Third Party Repo Transactions to have been fulfilled, CMP and WWR would have needed to be the legal owners of the securities and it is not clear to me that this would have been achieved under the Pledge Agreement, if this was its intended purpose. However, I note that this is a legal point.

102.    Secondly I note that the 'transfer authorisations' appear to be inconsistent with the overall transaction arrangements as they continued (described further in Section E1 below). In particular, FBME and Bank Century do not appear to have entered into any separate agreement governing how the transfer authorisations impact on their rights and obligations under subsequent rolls of the Repo Transactions. In fact, they appear to have continued to enter into rolling repo transactions with respect to these same securities, even though FBME appears to have transferred its interest in them to the Third Parties. This is one of the serious inconsistencies in or uncommercial aspects of the transactions which, in my view, can be a hallmark of money laundering.

## 4       THE THIRD PARTY REPO TRANSACTIONS

103.    In late November, Bank Century entered into additional repo transactions with third parties as described below.

### 4.1     The CMP Repo Transactions

104.    Two repo transactions were entered into between Bank Century and CMP. Under both repo transactions:

i)      Bank Century was the initial buyer and CMP was the initial seller of the securities;

ii)     the initial sale date was 29 November 2006; and

iii) the repurchase date was 29 November 2007.

105. One of the repo transactions specified an initial sale price of US$5,661,250 and a repurchase price of US$6,300,000, giving rise to an effective repo rate of 11.13%.

106. Under Annex 1 of this repo transaction, details of the relevant securities and the associated repo price calculations were provided. The repo price is defined as the price multiplied by one minus the haircut. The securities referenced were the NAB Securities and the price was 100% which I note is consistent with the sale price under the NAB Repo Transaction. The haircut was 10%, giving rise to a repo price of 90% and hence a repurchase price of US$6,300,000.

107. The other repo transaction specified an initial sale price of US$2,426,250 and a repurchase price of US$2,700,000 giving rise to an effective repo rate of 11.13%. No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

i) a notional of US$3,000,000, equivalent to that of the WLB Securities; and

ii) a price of 100%, consistent with the sale price under the WLB Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$2,300,000 which is consistent with the repurchase price specified under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the WLB Securities.

108. I note that the agreements underlying the CMP Repo Transactions provide for a term of one year - they do not provide for monthly payments of interest.

## 4.2 The WWR Repo Transaction

109. A repo transaction was entered into between Bank Century and WWR. The terms of the repo transaction were as follows:

i) Bank Century was the initial buyer and WWR the initial seller of the securities;

ii)  the initial sale date was 30 November 2006;

iii)  the repurchase date was 30 November 2007; and

iv)  the sale price was US$11,949,281.25 and the repurchase price was US$13,297,500 giving rise to an effective repo rate of 11.13%.

110.  No equivalent Annex to that described in Paragraph 106 is attached for this repo transaction however assuming:

i)  a notional of US$15,000,000, equivalent to that of the BPM Securities; and

ii)  a price of 98.5%, consistent with the sale price under the BPM Repo Transaction,

and applying the same haircut of 10% (as per Paragraph 106), the resulting repurchase price is US$13,297,500 which is consistent with the repurchase price under this repo transaction. As such I am of the opinion that the securities referenced under this repo transaction were the BPM Securities.

111.  Under the WWR Repo Transaction, the parties are initially defined as Bank Century and CMP however in the body of the document the parties referred to are Bank Century and WWR. I am of the opinion that the correct parties to the repo transaction should be Bank Century and WWR which is consistent with the Credit Agreement entered into by Bank Century and WWR upon the maturity of the WWR Repo Transaction, described further in Section D6.

112.  As with the CMP Repo Transactions, I note that the agreement underlying the WWR Repo Transactions provides for a term of one year **-** it does not provide for monthly payments of interest.

113.  I note that I have not seen any information in respect of similar arrangements relating to the JPM Securities.

## 5    THE PROMISSORY NOTE TRANSACTIONS

114.  On 22 November 2006, Saab (Jersey) entered into two promissory notes with CMP and WWR respectively (each the "**CMP Loan**" and the "**WWR Loan**"). I note,

however, that there are reasons to believe that the promissory notes were not in fact issued on 22 November 2006 which I discuss further in Section E3.4.

115. Under the CMP Loan between Saab (Jersey) and CMP, Saab (Jersey) was the beneficiary of a loan from CMP for US$8,000,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

116. Under the WWR Loan between Saab (Jersey) and WWR, Saab (Jersey) was the beneficiary of a loan from WWR for US$11,820,000 upon which Saab (Jersey) was required to repay the loan amount, plus an interest rate of 6.75% per annum at the maturity of the loan, 14 May 2007.

117. I note that both the CMP Loan and the WWR Loan provide for interest to be payable upon maturity only – they do not provide for monthly payments.

118. I note that I have not seen any additional information relating to the loans intended to be extended, or extended in respect of the JPM Securities.

## 6    THE THIRD PARTY CREDIT AGREEMENTS

119. The Third Party Credit Agreements appear to have been entered into on 3 December 2007, apparently (as I explain in this section) to replace the Third Party Repo Transactions.

120. The Third Party Credit Agreements extended a credit facility (in Indonesian rupiah) to WWR and CMP, at an interest rate of 12% per annum, in return for security. Based upon a US dollar Indonesian rupiah exchange rate of 0.107181[1] as of 3 December 2007, the credit facilities to WWR and CMP were equivalent to approximately US$13.0mm and US$8.8mm respectively, which are similar in size to the WWR Repo Transaction and the CMP Repo Transactions respectively. I note that the interest rate of 12% under the Third Party Credit Agreements compared to an effective repo rate of 11.13% under the Third Party Repo Transactions.

---

[1] Source: Bloomberg

121.     In the documentation that I have seen there is no explicit reference to the specific securities however, the notional amounts specified in Article 11 of each of the WWR Credit Agreement and the CMP Credit Agreement are US$15,000,000 and US$10,000,000 respectively, which, is consistent with the BPM Securities in respect of the WWR Credit Agreement and the NAB Securities and the WLB Securities in respect of the CMP Credit Agreement.

122.     In my opinion, the relevant securities were therefore, the BPM Securities, the WLB Securities and the NAB Securities.

123.     Given that the Third Party Repo Transactions had repurchase dates of 29 November 2007 and 30 November 2007, and that the economic effect of the Third Party Credit Agreements is similar in effect to the Third Party Repo Transactions, I believe that the Third Party Credit Agreements were executed to replace the Third Party Repo Transactions upon their termination (albeit with a small date mismatch).

## 7     THE JPM REPO TRANSACTION

124.     I note that no documentation has been provided in respect of the arrangements resulting from the JPM Repo Transaction. However, as described in Paragraph 67 above, I am of the opinion that these arrangements involved additional third parties and ultimately Mr. Rizvi (and other entities with which he was associated), who I understand to have been a director and shareholder of Bank Century in addition to numerous other business interests at the relevant time.

125.     Accordingly for the purposes of my analysis in Section D8 below I have focused upon the arrangements involving CMP and WWR however, I assume that similar arrangements to those entered into by CMP and WWR were entered into by Mr. Rizvi.

126.     The very absence of contractual documentation in respect of these arrangements is in itself a red flag warning in relation to money laundering.

## 8     ECONOMIC IMPACT OF THE CONTRACTUAL  ARRANGEMENTS FOR EACH PARTY AS AT DA y ONE

### 8.1 Cash Transfer

127. The overall economic impact of the transaction arrangements appears to have been for FBME, to 'pay' US$8,000,000 in order to transfer US$32,000,000 of its cash to Saab (Jersey). I have shown this diagrammatically in Figure 3 below.

*Figure 3: Overview of Cash Movement as a Result of the Transaction Arrangements*



### 8.2 Interest Amounts

128. In this section, I provide an overview of the impact of the transactions from the point of view of the one month equivalent interest amounts based upon the interest rates and notional amounts set out in the day one documentation, but using a one month interest calculation for the purposes of comparison. I note that in fact under the Third Party Repo Transactions and the Promissory Note Transactions the interest amounts were payable at maturity and not an a monthly basis. However, as I explained above, since there is no common interest payment date for all of the transaction arrangements, I have based my analysis upon a one month equivalent calculation for each leg of the transaction. This enables me to compare 'apples with apples' in order to analyse the relative economic impact of the contractual arrangements for each party. In Section E2 below, I analyse the *actual* economic impact, in terms of actual money flows.

129. I note that the one month equivalent interest amounts due by Saab (Jersey) under the CMP Loan and the WWR Loan, effectively match the one month equivalent interest amounts owed to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and WLB Repo Transaction (corresponding to the WWR Loan). This is shown diagrammatically in Figure 2, and is summarised in Table 1 below.

*Table 1: Summary of One Month Equivalent Interest Amounts from FBME/ Saab (Jersey)'s*

*perspective (US$)*

|  | Repo Transactions | Promissory Notes |
|---|---|---|
| **BPM Repo Transaction / WWR Loan** | 64,641 | (65,577) |
| **NAB and WLB Repo Transactions / CMP Loan** | 43,750 | (44,384) |
| **JPM Repo Transaction / Mr. Rizvi** | 66,609 | (67,574) |

130. Based upon the one month equivalent interest amounts summarised in Figure 2, the net position for each party relating to interest can be summarised as follows:

i) taking FBME and Saab (Jersey) together – because they have common ultimate beneficial owners – the one month equivalent interest amount due by Saab (Jersey) under the CMP Loan and the WWR Loan, is effectively offset by the one month equivalent interest amount payable to FBME under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan). In other words, *all* of the money paid by FBME flows back to Saab (Jersey);

ii) from Bank Century's perspective the one month equivalent interest amount due under the Third Party Repo Transactions (in respect of the CMP Repo Transaction and the WWR Repo Transaction only) and the one month equivalent interest amounts payable under the BPM Repo Transaction (corresponding to the CMP Loan) and the NAB Repo Transaction and the WLB Repo Transaction (corresponding to the WWR Loan) results in an apparent net gain for Bank Century of US$80,003 per month;

iii) from CMP's perspective the one month equivalent interest amount due under the CMP Loan and the one month equivalent interest amount payable under the CMP Repo Transaction results in an apparent net loss for CMP of US$31,658 per month;

iv) from WWR's perspective the one month equivalent interest due under the WWR Loan and the one month equivalent interest payable under the WWR Repo Transaction results in an apparent net loss for WWR of US$46,775 per month; and

<blockquote>
v) the combined impact for CMP and WWR together is an apparent net loss of US$78,433 per month.
</blockquote>

131. The resulting transaction economics described above raise concerns from a money laundering perspective due to the possible lack of commerciality, since FBME/Saab (Jersey) do not appear to have any profit motivation for entering into the arrangements.

132. Furthermore, it appears that Saab (Jersey) actually made monthly payments to Bank Century and a company called PT Kuo Capital Raharja ("**Kuo Capital**") despite neither of these entities having a direct contractual relationship with Saab (Jersey). I have also not seen any evidence of payments from Saab (Jersey) to WWR and CMP, as I would have expected to see at the end of term of the Promissory Notes. This is discussed in Section E2.2 below. In my experience, such an arrangement is a classic example of a red flag situation in relation to money laundering.

## 8.3 Securities

133. Based solely upon the contractual documentation, the securities were initially purchased by FBME under the Repo Transactions however rather than a physical transfer taking place, the securities were held by Bank Century on FBME's behalf.

134. Subsequently, under the Transfer Authorisations, these securities were transferred, free of payment to CMP and WWR.

135. Finally, under the Third Party Repo Transactions, the securities were (re)purchased by Bank Century.

136. The overall effect of the transaction arrangements therefore is that the securities both started off and ended up with Bank Century which I discuss in Section F below.

# E.    ADDITIONAL INFORMATION RELATING TO THE TRANSACTION ARRANGEMENTS

## 1    ONGOING TRANSACTION ARRANGEMENTS

137.    My understanding is that the transaction arrangements in their broad form stayed in place from November 2006, when the transactions were initiated, until November 2008 when Bank Century was taken over by the IDIC, an independent agency of the Indonesian Government.

138.    I understand that certain elements of the underlying transactions changed, however, based upon my analysis, these changes did not affect the broad economic impact for the relevant parties. I describe the changes that I am aware of in Sections E1.1 to E1.3 below.

139.    I note however that in remaining in place until November 2008, the component transactions continued beyond the maturity of the relevant underlying agreements.

140.    I also note that, save for:

i)    sale and purchase confirmations relating to the Repo Transactions and subsequent 'rolls' thereof (**C-101**) (I note that many of the confirmations in C-101 are unreadable and as such I have not been able to verify the complete history of transactions. I also note that I have not seen supporting evidence (for example in the form of email requests) for each of the rolls documented in C-101); and

ii)    the WWR and CMP Credit Agreements described in Section D6 above, with maturities of 3 June 2008 and 3 February 2008 respectively,

I have not seen any documentation to support the roll of the transaction arrangements beyond their respective maturity dates. This absence of documentation is yet another red flag warning in relation to money laundering.

## 1.1    Change of Repo Rates

141. I have reviewed several emails relating to a change of repo rates under the Repo Transactions in light of interest rate changes in the market (**R-73** to **R-77**). I note that each of these emails originate from Mr. Wazzi as opposed to Bank Century.

## 1.2 Unwind of the WLB Repo Transaction

142. Based upon a repayment of US$2,400,000 made by Saab (Jersey) described in Section E2 below, I am of the opinion that the arrangements in respect of the WLB Securities were unwound.

## 1.3 Replacement of Matured Securities under the Repo Transactions

143. On 27 October 2008, just prior to the maturity of the BPM Securities on 30 October 2008, I understand that a replacement repo transaction was entered into referencing US$16,000,000 August 2011 US treasury strips (**C-2**).

144. On 6 November 2008, just after the maturity of the NAB Securities on 3 November 2008, I understand that a replacement repo transaction was entered into referencing US$7,500,000 August 2011 US treasury strips (**C-2**). I note that in this case the replacement repo transaction was subject to a 3 day delay after the maturity of the NAB Securities.

## 2 INFORMATION RELATING TO ACTUAL CASH MOVEMENTS

## 2.1 SWIFT Statements

145. Below I set out the cash movements that I have been able to identify in relation to each of the components of the transaction arrangements.

### 2.1.1 THE REPO TRANSACTIONS

*Principal*

146. In relation to the Repo Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

i)   a payment of US$15,225,000 from FBME to Bank Century on 22 November 2006 (**C-4**). I understand this to be the movement of cash associated with the near leg of the JPM Repo Transaction;

ii)   a payment of US$14,775,000 from FBME to Bank Century on 22 November 2006 (**C-5**). I understand this to be the movement of cash associated with the near leg of the BPM Repo Transaction;

iii)   a payment of US$7,000,000 from FBME to Bank Century on 22 November 2006 (**C-7**). I understand this to be the movement of cash associated with the near leg of the NAB Repo Transaction; and

iv)   a payment of US$3,000,000 (**C-40**) from FBME to Bank Century on 22 November 2006. I understand this to be the movement of cash associated with the near leg of the WLB Repo Transaction.

*Interest*

147.   I have been provided with a series of SWIFT confirmations in respect of payments made by FBME to Bank Century (**R-70**). I have compared the SWIFT payments from January to September 2007 with the interest amounts under the corresponding repo transactions entered into in respect of the relevant dates (**C-101**) and I am able to reconcile these amounts. As such, on the basis of a preliminary analysis, these payments appear to be consistent with the payments of interest due under the relevant repo transactions, however, since I am unable to read certain of the SWIFT confirmations and/or the relevant repo agreements, I have not been able to perform a further analysis.

**2.1.2   THE PROMISSORY NOTE TRANSACTIONS**

*Principal*

148.   In relation to the Promissory Note Transactions, I have reviewed SWIFT confirmations detailing the following cash movements:

i)   a payment of US$8,050,000 from CMP to Kuo Capital on 30 November 2006 (**R-52**); and

ii)   a payment of US$11,882,000 from WWR to Kuo Capital on 1 December 2006 (**R-52**).

149.   I note that Kuo Capital is not a party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

*Interest*

150.   I have reviewed SWIFT confirmations setting out the following cash payments by Saab (Jersey) to various other parties (**R-63**). The amounts are consistent with the notional and interest rates specified under the Promissory Note Transactions however, I note below a series of important inconsistencies.

*Figure 4: Payments between Saab (Jersey) and Various Parties*

| Date | Sender | Beneficiary | Amount (US$) |
|---|---|---|---|
| 19-Jan-07 | Saab (Jersey)[1] | Bank Century | 256,942.50 |
| 21-Feb-07 | Saab (Jersey)[1] | Kuo Capital | 115,203.75 |
| 21-Feb-07 | Saab (Jersey)[1] | First Gulf Asia Holdings | 70,796.25 |
| 21-Mar-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.25 |
| 20-Apr-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.55 |
| 23-May-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 22-Jun-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 24-Jul-07 | Saab (Jersey)[1] | Kuo Capital | 183,333.33 |
| 24-Aug-07 | Saab (Jersey)[1] | Kuo Capital | 201,666.67 |
| 26-Sep-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 26-Oct-07 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 28-Nov-07 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Dec-07 | Saab (Jersey)[1] | Kuo Capital | 171,111.11 |
| 28-Jan-08 | Saab (Jersey)[1] | Kuo Capital | 195,555.56 |
| 27-Feb-08 | Saab (Jersey)[1] | Kuo Capital | 189,444.44 |
| 27-Mar-08 | Saab (Jersey)[1] | Kuo Capital | 177,222.22 |
| 24-Apr-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 27-May-08 | Saab (Jersey)[1] | Kuo Capital | 160,000.00 |
| 27-Jun-08 | Saab (Jersey)[1] | Kuo Capital | 176,000.00 |
| 30-Jul-08 | Saab (Jersey)[1] | Kuo Capital | 165,333.33 |
| 29-Aug-08 | Saab (Jersey)[1] | Kuo Capital | 170,666.67 |
| 25-Sep-08 | Saab (Jersey)[1] | Kuo Capital | 131,733.33 |
| 24-Oct-08 | Saab (Jersey)[1] | Kuo Capital | 152,933.33 |

151.    I note several anomalies relating to the cash movements set out above.

152.    Firstly, as per Paragraph 149 above, I note that Kuo Capital is not party to the Promissory Note Transactions and as such it is unclear as to why Kuo Capital appears to be the beneficiary under the Promissory Note Transactions.

153.    Secondly, the payments appear to have been made from personal accounts of Mr. Farid and/or Fadi Saab as opposed to accounts held in the name of Saab (Jersey).

154.    Thirdly, the payments of interest appear to occur monthly however, according to the terms of the CMP Loan and the WWR Loan, the payment of interest is due at maturity, as opposed to on a monthly basis.

155.    Fourthly, I note that there is a payment directly to Bank Century of US$256,942.50 (highlighted in yellow) on 19 January 2007. Such a payment is not supported by any contractual documentation that I have seen and I note that according to an email dated 25 January 2007 from Bank Century to FBME, Bank Century request that a reference to Kuo Capital be made in the payment instructions in relation to this payment so as to "*comply with procedures*"(**R-61**).

156.    Finally, there is a payment of US$70,796.25 (highlighted in yellow) to First Gulf Asia Holdings Limited. This payment is also not supported by any contractual documentation that I have seen, however, I note that:

    i)      in an email exchange between Mr. Rizvi and Mr. Wazzi dated 21 February 2007, Mr. Rizvi states "*[obscured] interest due to us should be paid to*" and bank details for First Gulf Asia Holdings Limited are detailed below (**R-62**);

    ii)     in a letter to Federal Bank of Lebanon on 21 February 2007, Mr. Fadi Saab authorises the debit of his account to credit First Gulf Asia Holdings Limited for an amount of US$70,796.25 (**R-64**);

    iii)    the amount of $US70,796.25 is equivalent to a one month interest payment (from 21 January 2007 to 21 February 2007) of 6.75% on a notional of US$12,180,000.

157. Based upon the above, it is my opinion that Mr. Rizvi (and other entities with which he appears to have been associated), entered into arrangements similar to those entered into by CMP and WWR.

158. I note that it appears that Saab (Jersey) made monthly payments to Bank Century and Kuo Capital, even though: i) there was no direct contractual relationship between Saab (Jersey) and Bank Century; ii) there was no direct contractual relationship between Saab (Jersey) and Kuo Capital and iii) even under the Third Party Credit Agreements and the Promissory Note Transactions, there was no obligation for Saab (Jersey) to make monthly payments.

159. I consider all of the anomalies that I have noted above to be potential red flag warnings in relation to money laundering.

### 2.1.3 OTHER

160. I have also reviewed SWIFT confirmations related to the following cash movements:

i) a payment of US$2,400,000 from Mr. Farid Saab to Kuo Capital on 22 September 2008 (**C-90**). I understand that this purports to be a partial reimbursement of the CMP Loan in respect of the WLB Repo Transaction;

ii) a payment of US$118,375 from FBME to Bank Century 27 October 2008. I understand that this purports to be a payment of interest on the NAB Repo Transaction (US$27,125) and JPM Repo Transaction (US$58,995) and net proceeds after the redemption of the BPM Securities and purchase of USD$16,000,000 of US Treasuries (US$32,255) (as per email (**C-6**));

iii) a payment of US$71,250 from FBME to Bank Century 7 November 2008. I understand that this purports to be a payment of the net proceeds after the redemption of the NAB Securities and purchase of USD$7,500,000 of US Treasuries (as per email (**C-8**));

## 2.2 Saab (Jersey) Transaction Summary

161. I have reviewed a transaction summary (**R-50**) purportedly setting our debits and credits to the account of Saab (Jersey). I note that the summary is undated and does not have any header relating to any relevant bank. As such I cannot be sure that this is an official reflection of the true accounts of Saab (Jersey), although I note that it was prepared by Mr. Wazzi (as he says at Paragraph 46 of his witness statement). In any case I have provided an analysis of certain of the entries below, where I feel that they may be relevant for the purposes of my report.

162. The transaction summary relating to Saab (Jersey) shows the following credits:

   i)    a credit of US$8,000,000 from CMP on 1 December 2006. This is consistent with a drawdown under the CMP Loan;

   ii)   a credit of US$11,820,000 from WWR on 4 December 2006. This is consistent with a drawdown under the WWR Loan;

   iii)  a series of credits totalling US$12,180,000 from 13 December 2006 until 22 December 2006. The notes in relation to these credits specify the sender as Rafat by which I understand the reference to be to Mr. **Rafat** Rizvi.

163. I note that the comment corresponding to the credit entry of US$400,000 on 22 December 2006 is "*deduction fees arrangement/rafat*". It is therefore unclear whether this has been entered as a credit in error and should in fact have been entered as a debit amount resulting in a total transfer value of US$11,780,000 as opposed to US$12,180,000. In the absence of any confirmation of this, I have assumed that the correct amount is US$12,180,000, however I note that this does not have any significant bearing on my analysis.

164. I note that based upon a series of emails (**R53-R57**) it appears that the payments totalling US$12,180,00 originated from parties otherwise not mentioned in the transaction arrangements, including Mauritius International Trust Co (on behalf of Allied Convertibles) and Mr. Al Warraq. The rationale for certain of such payments, being apparently in respect of monies advanced to Saab (Jersey) is not substantiated and is not consistent with or supported by the remainder of the transaction arrangements. In any case it appears that the ultimate payment of the 'loan amount' of U$12,180,000 was arranged by Mr. Rizvi. Hence as per Paragraph 157 above, for

the purposes of my analysis of the transaction arrangements in Section D, I have assumed that Mr. Rizvi (and other entities with which he was associated) was involved in the transaction arrangements in a capacity similar to CMP and WWR.

165. In addition, I note that there is conflicting information relating to where the proceeds of the CMP Loan and the WWR Loan were paid. According to the Statement of Account, Saab (Jersey) was the beneficiary however, according to a series of emails from Mr. Rizvi to Mr. Wazzi, 27 November 2006 (**R30-R32**) and as set out in Paragraph 14.2 of the Claimants' Reply, the intention was for the loan proceeds to be paid directly to Nature Secret Investment Inc. Furthermore as per Paragraph 148 above, I note that the payments under the Promissory Note Transactions were, in the event, made from CMP and WWR to Kuo Capital and not to either of Saab (Jersey) or Nature Secret Investment Inc.

166. I note that in response to a request by Mutiara (in the context of this arbitration) regarding the final recipients of the US$12,180,000 'loan' to Saab (Jersey), FBME has produced a series of confirmations relating to payments made to various third parties totalling €18,925,470. Given that this is substantially more than the equivalent of US$12,180,000, it is difficult to understand how these are related to the "loan" amount of US$12,180,000.

167. In addition, the third parties involved were Serdale Overseas Limited (with an address in Cyprus), Villa Bay Investments Ltd (with an address in Cyprus) and Pacific Property Investors Inc. (with an address in Russia).

168. I note that the lack of background information in relation to these additional parties means that they must be considered to be red flag warnings, particularly due to the high risk nature of the jurisdictions involved from a money laundering perspective.

## 3    EXECUTION OF DOCUMENTATION

169. I note that based upon certain email exchanges that I have reviewed, it appears that many of the documents themselves were not entered into on a timely basis. This is another red flag warning in relation to money laundering. I provide below a summary of the key issues that I have identified.

## 3.1 Back-dating of Sale and Purchase Agreements

170. I have reviewed certain email exchanges between FBME and Bank Century which reference the rolling of the Repo Transactions however I note that these email exchanges post date the expiry of the previous repo purchase dates and reference agreements being entered into on a back-dated basis (**R-27** and **R-28**).

## 3.2 Forward-dating of Sale and Purchase Agreements

171. In an email exchange dated 1 May 2008, a representative of Bank Century sent across to Mr. Wazzi trade confirmations with trade dates of 31 July 2008 (**R-29**).

## 3.3 Back-dating of the Pledge Agreement

172. I have reviewed a number of email exchanges between FBME and Bank Century relating the execution of the Pledge Agreement. I note that the Pledge Agreement was finally executed on 27 December 2006 however the execution version was back dated to 20 November 2006 (**R-36** and **R-40**).

## 3.4 Back-dating of the Promissory Notes

173. In an email exchange dated 28 November 2006, Mr. Rizvi and Mr. Wazzi were provided with instructions to issue promissory notes with the same details as the Promissory Note Transactions. As such I do not believe that the date of contractual documentation in respect of the Promissory Note Transactions is reliable (**R-33**).

## 3.5 Lack of Governing Documentation

174. I note that the Repo Transactions were entered into without a governing GMRA.

175. The lack of GMRA was only identified and rectified following an enquiry from the Central Bank of Cyprus (**R-42**).

176. Despite the Repo Transactions having been entered into in November 2006, a GMRA governing such transactions was not entered into until 17 January 2007 when it was executed and back-dated to 20 November 2006 (**R-42** to **R-48**).

177. The back-dating of documents can in itself be a red flag of money-laundering. In my view, the warning signs are even stronger in this case because: i) the monies were advanced purportedly pursuant to repo transactions before a GMRA was put in place to govern those arrangements; and ii) the GMRA appears only to have been executed so as to have a document to provide to FBME's regulator to justify or explain the money transfers.

## F.        OTHER CONSIDERATIONS

178.    I have significant concerns from the many unsatisfactory features relating to the original business arrangement and the conduct of it as they manifest themselves during the 2 years of the arrangement's operation.  I have explained some of those concerns above.  Further matters that I have noted and that re-enforce my concerns in relation to the arrangement as it was initially established, include the following items. I consider that these factors increase the likelihood that the transactions were entered into for money laundering purposes.

179.    I note that the matters discussed in Sections F1 and F2 below are of importance when considering the potential money laundering implications of the transaction arrangements. This is because, in circumstances where a party is known to have been engaged in corruption and money laundering (particularly during the period under consideration) it becomes necessary to invoke enhanced monitoring to guard against the risks that the malpractices persisted through other and/or all of the business with which that party was connected.

## 1        MR. RIZVI

180.    I note that in 2010, Mr. Rizvi was convicted of corruption and money laundering. This is obviously relevant when forming an opinion in relation to the matter that is the subject of this report, given the nature and extent of his involvement in this matter.

## 2        REGULATORY INTERVENTIONS

181.    On 15 July 2014, the Financial Crimes Enforcement Network (FINCEN), an Agency of the US Treasury published a finding that "*FBME Bank Ltd.....is a Financial Institution of Primary Money Laundering Concern*". The Notice records the history of the Bank since it was founded in 1982, initially in Cyprus, from 1986 in the Cayman Islands and since 2003 in Tanzania but continuing to undertake more than 90% of its business from its branch in Cyprus.

182.    On 18 July 2014, the Central Bank of Cyprus announced that it had taken over the management of FBME's business in Cyprus.

183.  The Tanzanian Central bank took control of FBME in Tanzania on 24 July (**R-88**).

184.  FBME issued a response to the FIMCEN Notice on 18 July 2014. It claims to have had no forewarning of the notice nor knowledge of the circumstances underlying the allegations in the notice (**R-90**).

# 3    OTHER RELEVANT MATTERS RELATING TO THE TRANSACTION ARRANGEMENTS

185.  In my opinion there are a number of elements of the transaction arrangements which in the absence of any other information to the contrary, lead me to the conclusion that the transaction arrangements were unlikely to have been genuine commercial transactions. I have set these out below.

## 3.1   Lack of Evidence Relating to whether  the Securities were Actually Held in Relation to the Transaction Arrangements

186.  As described in Paragraph 79, the securities were not transferred to FBME under the Repo Transactions as would be typical under a repo transaction, they were instead held by Bank Century on FBME's behalf.

187.  As a result, and in light of the matters I discussed above (in particular the transfer authorisations), it appears that the securities both started and ended up with Bank Century being the legal and beneficial owner as well as the custodian. It is therefore unclear as to whether the securities were actually held by Bank Century in relation to the transaction arrangements as they did not contribute to their theoretical function of being collateral under the Repo Transactions since they did not mitigate any credit risk.  As I observed above, it is also unclear why the parties continued to roll over the Repo Transactions when they had made other arrangements with respect to the same securities.

188.  I also note that according to Paragraphs 116 and 117 of Mr. Fajar's witness statement, Mutiara has found no trace of the JPM Securities or the US treasury strips (which formed part of the later transaction arrangements) being held on account of FBME.

## 3.2 Lack of Commerciality in the Positions Entered into by Certain of the Relevant Parties

189. As set out in Section D8.2 above, based upon the contractual documentation and from the point of view of WWR and CMP, the one month equivalent interest amounts due under the Promissory Note Transactions versus the one month equivalent interest amounts due under the Third Party Repo Transactions resulted in a running loss of $46,775 and $31,658 per month for WWR and CMP respectively.

190. In my opinion this is not commercially reasonable. The loss for WWR and CMP is mirrored by a gain for Bank Century which may indicate a potential connection between Bank Century and the Third Parties.

191. I note that, in the event, no records have been provided to show that in fact WWR or CMP received or made any payments under the Promissory Note Transactions or the Third Party Repo Transactions. Indeed, as I explained in Section E2 above, the money transfers appear to have moved from Saab (Jersey) (or in fact the Saab Brothers) to Bank Century/Kuo Capital directly.

## 3.3 Arbitrary Determination of Transaction Economics

### 3.3.1 CASHFLOW PAYMENTS

192. As discussed in Paragraph 128 above, the one month equivalent interest amounts under the Promissory Note Transactions and the one month equivalent interest amounts under the Repo Transactions appear to have been matched, despite the use of different notionals and interest rates. In other words, it appears that the rates under the Promissory Note Transactions were set intentionally higher (to compensate for the lower cash notional amount under the loans versus the Repos Transactions) so that the one month equivalent interest amounts under each of the arrangements would be the same.

193. Bearing in mind the common ownership of FBME and Saab (Jersey), this means that, essentially, the money entering and exiting the 'system' were in effect the same amounts, and were coming from and going to the same ultimate beneficial owners. Bank Century appears not to have taken a margin of any kind, and the Third Parties

appear to have been cut out of the 'system' altogether, despite their contractual role in it.

194. This matching of cashflow payment amounts supports my opinion that neither the Repo Transactions nor the Promissory Note Transactions was executed for any legitimate commercial purpose, taking into account the risks and benefits associated to each set of transactions. I consider this to be suspicious from a money laundering perspective.

### 3.3.2 THE JPM REPO TRANSACTION

195. In Figure 5 below, I attach a Bloomberg screenshot of the JPM Securities with ISIN XS0258843969 and note that this is described as a pass through of a Nomura Bank International 6.3% bond due 19 May 2009.

*Figure 5: Bloomberg Screenshot of the JPM Securities*



196. Figure 6 below shows a Bloomberg screenshot of the only Nomura Bank International 6.3% bond due 19 May 2009 available on Bloomberg and which it follows is the relevant Nomura Bank International bond. I note that this bond is described as a European medium term note ("**EMTN**") credit linked to a basket of

reference entities (Series 94, Tranche 1). I have been unable to find any additional information in relation to this EMTN however such a description is usually associated with a structured credit transaction.

*Figure 6: Bloomberg Screenshot of Nomura Bank PLC 6.3% Bonds Due 19 May 2009*



197. I note that although repo transactions on structured credit transactions did occur in the market, typically these repo transactions would have been less common since they were less liquid. The terms of such repo transactions, including the haircut and the repo rate would have reflected this illiquidity.

198. I note that each of the Repo Transactions was executed at a repo rate of 5.25%. However, unlike the BPM Securities, the WLB Securities and the NAB Securities, the JPM Securities were structured notes and as such would have been more illiquid and potentially riskier than any of the other securities. Such additional risk should have been reflected in a higher repo rate. The fact that the JPM Repo Transaction was executed at the same repo rate as the other repo transactions indicates to me that they were not on-market transactions (i.e. they were not executed at levels reflecting prevailing market conditions).

199.    As such, in my opinion, the transaction terms did not reflect commercial trades between two commercial and independent parties but rather indicate potential collusion and engineering in order to create the perception of a commercial exchange of risks and rewards where no such exchange was envisaged.

## 3.4    Missing Documentation and Documentation Inconsistencies

200.    In my analysis in Sections D and E above, I noted a series of inconsistencies relating to the contractual documentation underlying the transaction arrangements. I summarise these inconsistencies below:

i)      as per Paragraph 124, I note that no contractual documentation has been provided in respect of the arrangements relating to the JPM Securities and involving Mr. Rizvi (and the other entities with which he appears to have been associated);

ii)     as per Paragraph 95, I note that the Pledge Agreement was fundamentally inconsistent and misleading; and

iii)    the documentation in respect of the Third Party Repo Transactions and the Loan Agreements is incomplete and does not include information with respect to the relevant underlying securities;

iv)     the Third Party Repo Transactions (and the subsequent Third Party Credit Agreements) and the Promissory Note Transactions do not provide for monthly payments to be made, and yet monthly payments were made (albeit by and to different parties).

201.    As described in Section E3 I also note that there are serious issues relating to the timing of the execution of the documentation with certain documents being back-dated and other documents being forward-dated.

202.    In my experience, the extent of the inconsistencies described above and the issues relating to the execution of documents are hallmarks of money laundering. The execution of documentation in an accurate and timely manner is imperative to the operation of any sophisticated commercial arrangements as the risk undertaken is ultimately determined by the contractual documentation.

203. The documentation process within a bank is therefore typically overseen by a middle-office/back-office support function as well as a front office function and a commonly termed '*four-eyes*' verification process is employed in order to ensure that the risk booked by the trader is consistent with the documented risk.

204. In my review of the materials relating to the transaction arrangements I have not seen evidence of any of these standard market functions and validation processes. Indeed, I would be surprised if they occurred at all, because I would expect such processes to have identified the issues I have raised, in which case the transactions would not have gone ahead, or at least would have been thoroughly investigated. The lack of such oversight in respect of the transaction arrangements supports my opinion that the transactions entered into did not reflect real commercial risk for the parties involved, and that the contracts were entered into to disguise the true (and probably illegal) purpose of the arrangement.

205. In addition, as per Section E2 I note that the movement of cash relating to the transaction arrangements does not correspond to the theoretical cash movements set out in the documentation. I would expect a bank to have an operations function responsible for reconciling cashflows. Had the transaction arrangements been subject to the usual control processes of a bank, any divergence between the actual cash movements and the theoretical cash movements booked and documented would have been flagged. The very fact that the cashflows continued for two years suggest that proper controls were not in place and/or operating effectively (or were bypassed in the case of these transactions).

206. In general, I note that many of the email exchanges that I have reviewed make use of personal email addresses. In addition, I note that certain of the SWIFT confirmations that I have seen reference payments from personal accounts of the individuals involved.

207. In my experience this is not standard practice and in my opinion raises suspicion that the arrangements entered did not reflect legitimate commercial banking activity between legitimate commercial counterparties. Furthermore, such a practice is likely to lead to incomplete records of the bank's activities which would be a criminal offence, at least under UK AML law and likely Cypriot law too.

**3.5    The Earlier Proposed Structure of the Transactions and the Adverse Legal Opinion**

208.    I have reviewed certain documents relating to what appears to be a proposed form of the transaction arrangements proposed as set out in (**R-21**), which were not ultimately executed. These proposed transaction arrangements comprised:

    i)      a loan agreement between FBME and Bank Century;

    ii)     a loan agreement between Bank Century and Saab (Jersey); and

    iii)    a guarantee in respect of Saab (Jersey)'s liabilities to Bank Century.

209.    There are elements of the proposed transaction arrangements that appear to me to be unusual:

    i)      each agreement provides for a fixed rate of interest over a potentially indefinite term. However, they do not contain additional terms I would expect in such an arrangement, such as the ability to reset the rate; and

    ii)     the loan agreement between FBME and Bank Century directly references the amounts owed to Bank Century by Saab (Jersey) and allows for their set-off in the repayment terms of that loan, clearly linking the different components of the transaction arrangements, the implication being that the arrangement could have been simpler; and

    iii)    any structure that involves additional parties and thereby creates a more opaque situation is a potential red flag in relation to money laundering.

210.    The effect of the proposed transaction arrangements is that FBME pays Bank Century US$40mm, and receives US$32mm through Saab (Jersey). As I explain below, it appears to me that the $8 million difference was intended to be retained by Bank Century as a fee.

211.    The economic impact of the proposed arrangements is the same as the economic impact of the actual transaction arrangements that were entered into. However for a

reason that is not explicit in the documents that I have reviewed, the ultimate form of the transaction arrangements was as described in Section D.

212. I note that Bank Century received a letter dated 22 November 2006 from an Indonesian law firm, Faisal and Panggabean, providing a legal opinion in relation to the transaction arrangements described in Paragraph 209 above which highlighted several serious issues in relation to these transaction arrangements (**R-23**). An opinion in these terms would have been a very strong red flag for Bank Century. To my mind, the fact that it nevertheless entered into the transactions on the same day it received the opinion (and in fact before the transactions were properly documented) is a strong indicator to me that the transactions were in fact for money laundering purposes.

213. In my opinion, particularly in light of the legal opinion, it is likely that in fact the reason for FBME, Saab (Jersey) and Bank Century not entering into the proposed transaction arrangements as per Paragraph 209 above was because the circularity of the transactions was too transparent under those arrangements.

214. In the event, I believe that FBME, Saab (Jersey) and Bank Century may have instead ultimately adopted a cosmetically more opaque transaction structure which achieved the same end, but using a more complex series of transactions, in order to conceal the real economic impact of the transaction arrangements, being essentially a transfer of US$32mm for a fee of US$8mm, in return for regular repayments of money washed through accounts in the US and Switzerland. Indeed, it may have been the case that the monthly 'interest' payments were simply the return of the original $32 million, in 'clean' instalments.

## 3.6    The Purpose Alleged by the Claimants

215. I understand that the Claimants' explanation for these transactions is that FBME needed to arrange external funding for Saab (Jersey) (an institution effectively in common ownership and control) or its clients, due to its own lending restrictions as a financial institution.

216. I note that it has been claimed that the source of the funds could not be FBME directly due to problems of limits relating to its lending portfolio. This in itself is not

necessarily implausible. It has long been the case that lending bankers have employed strategies in order to operate within exposure limits set. The fact that FBME clearly was not constrained by liquidity problems when the transactions first started does not preclude other limiting factors resulting in the need to enter into the arrangements that it did. These potential limiting factors could include total exposures to (i) a particular customer; (ii) a particular business sector; (iii) a particular currency and/or (iv) a particular maturity horizon. Jurisdictional issues can also be a relevant limiting factor.

217. When good commercial relationships exist between two (or more) banks, it is by no means unknown for the first bank to pass the business opportunity to another 'friendly' institution. This will likely be coupled with the provision of funds at comparatively favourable rates. The bank receiving the opportunity will still undertake all of its own due diligence and credit risk assessments. What will always be the expected norm, both by the participating institutions and their regulator(s), is that the whole arrangement will be conducted on an arm's length basis in a visible and transparent manner.

218. When entered into on a back-to-back basis as per Paragraph 217 above, the funding is likely to be matched to the period of the loan arrangement. Each party would obtain economic benefit from the transaction. The first bank would advance the necessary funds to the second bank and the second bank would ensure that it charged the ultimate borrower of the monies a greater sum in interest than it was liable to pay to the first bank. (It is notable, therefore, that the arrangement appears to have been 'revenue neutral' for Bank Century on an ongoing basis – see Section F3.3.1 above. This strongly suggests to me that transactions were not for the purpose alleged by the Claimants).

219. When, as I note has been claimed in the current matter, there is not specific matching, then the lending institution should expect to enter the inter-bank market for loans and deposits and seek funds, potentially from a number of different sources, to meet their own liquidity requirements.

220. This type of arrangement could have been achieved quite simply, however, in the transaction arrangements described in Section D above, neither of these two

comparatively simple and straight-forward methods were adopted. Instead a complex structure was created, involving repo transactions, and where one party (Bank Century) does not appear to have obtained any economic benefit at all (apart from the $8 million which I have speculated was intended to be its fee). As a result, the alleged relatively simple purpose, was achieved by way of an opaque and complex series of transactions (see Figure 3 in Section D above).

221.    Complexity per se is neither wrong nor unacceptable. However, the very first red flag in JMLSG Guidance Part I, 7.26, of matters to watch for and react to reads: "...*transactions which have no apparent purpose, or which make no obvious economic sense (including where a person makes a loss against tax), or which involve apparently unnecessary complexity;*".

222.    In the case of the transaction arrangements, the need for anything other than a straightforward loan arrangement is not explained, nor the need to bring three intermediary partners into the structure, especially when one is the owner/director of Bank Century who negotiated the arrangement. The very presence of the intermediaries in the structure as illustrated is, of itself, sufficient to raise doubt and suspicion; the declared purpose of the arrangement could normally have been achieved without such involvement and it is consequently difficult to believe that the arrangement has not been deliberately made obtuse and lacking in opacity, across a number of different jurisdictions, in an effort to disguise all that was actually happening.

223.    In summary, although the explanation given by the Claimants is plausible in the abstract, in light of all of the other red flags raised by the transactions, I am not persuaded that the Claimants' explanation is true.

# G. MY CONCLUSION IN RESPECT OF THE TRANSACTION ARRANGEMENTS

224. In this Section I provide my conclusion with respect to the transaction arrangements.

225. In my opinion, a transaction structured in this way should have a clear economic benefit for each party, and any element of circularity should be treated with caution.

226. I note that at the times which are of relevance in this matter, Mr. Farid and Fadi Saab were both co-owners of FBME and Saab (Jersey).

227. I also note that Mr. Rizvi was an ultimate beneficial shareholder of Bank Century. He – or at least other companies with which he was associated – appear to have taken part in the transaction directly.

228. In Section D above, I have set out each of the component parts of the transaction arrangements. Based upon the information available to me I have then summarised what in my opinion appear to be the overall transaction arrangements.

229. Based upon my analysis and the clear relationship between FBME and Saab (Jersey), I believe that the transaction arrangements resulted in an effectively circular transaction.

230. On day one Bank Century made a gain of US$8mm as a result of entering into the transaction arrangements. In the event that the transaction arrangements were to have terminated according to the contractual agreements this gain would have disappeared. However, in my opinion, it is possible that the termination of this arrangement was not envisaged and instead the transactions were expected to be rolled *ad-infinitum* (or at least until the remaining $32 million had been washed back through the system). My opinion in that regard is strengthened by the fact that the one monthly equivalent interest amounts were essentially revenue-neutral for FBME and Saab (Jersey) when considered together (as I explained at Section D8.2 above) – in other words, it appears that Bank Century did not make any margin from these payments. Therefore, unless the US$8 million was intended to be retained by Bank Century (or Mr. Rizvi), then Bank Century did not benefit from the entire scheme in any way. I would find it very surprising if that were the case.

231.    The economic effect of the transaction arrangements was therefore for FBME to pass US$32mm to another entity with the same ownership at a cost to it of US$8mm. In my opinion, the magnitude of the costs involved was not commercial for a party with a legitimate business motivation and certainly not for the commercial motivation alleged by the Claimants. As such, without further information as to the commercial rationale for the transactions, I am of the opinion that the transaction arrangements were unlikely to have been genuine commercial transactions. As I explained above in Section F3.6, I am not persuaded that the explanation advanced by the Claimants is true.

232.    The likely purpose of the transaction, in my view, was to launder FBME's (or the Saab Brothers') money through bank accounts controlled by Bank Century, including accounts in the US and Switzerland (**R-62** and **R-64**). The fact that all of the monies paid by the Saab Brothers (on behalf of Saab (Jersey)) to the Bank were then passed straight on to FBME (and presumably the Saab Brothers) supports that contention in my opinion.

233.    In summary, in my opinion, the transactions bear the following warning signs of money laundering:

    i)     the unnecessary complexity and opacity of the structure, and the number of parties involved;

    ii)    the fact that the actual money flows did not match up with the parties' contractual obligations;

    iii)   the fact that all parties do not appear to have been operating purely on an arm's length basis. This is particularly relevant given the identity of interests between the Saab Brothers, FBME and Saab (Jersey) on the one hand, and Mr. Rizvi, Bank Century, and perhaps the other third parties on the other;

    iv)    the lack of clearly defined purpose, and the inconsistency of the final arrangements with the purpose alleged by the Claimants;

    v)     the circular nature of the arrangements;

vi) the fact that it appears that Bank Century did not gain at all from the transactions – or, alternatively, was intended to retain the $8 million, which is out of proportion with the risks it undertook on the face of the documents (and is more in line with the risks it was undertaking in facilitating a money laundering operation);

vii) the backdating of documents, and the fact that the transactions were executed before proper contracts were put in place, and after a law firm warned of the risk of facilitating money laundering;

viii) the incomplete contractual framework;

ix) the involvement of entities from Cyprus, Tanzania, Indonesia and Russia; and

x) the established association of both sides to the transaction in other money laundering activities.

234. In light of the sheer number of warning signs, it is totally implausible that this was a normal, legitimate business structure. I do not believe that the true purpose of the transaction was an honest one. It is my firm opinion that the true intention and practice behind these transactions, shared by all parties, was the laundering of money. As I noted at the outset, these transactions raise more red flags than any other arrangement I have previously encountered in my entire career.

## H.        EXPERT'S DECLARATION

235.    I, Peter Brown, declare that:

i)      I understand that my duty in giving evidence in this arbitration is to assist the arbitral tribunal decide the issues in respect of which expert evidence is adduced. I have complied with, and will continue to comply with, that duty.

ii)     I confirm that this is my own, impartial, objective, unbiased opinion which has not been influenced by the pressures of the dispute resolution process or by any party to the arbitration.

iii)    I confirm that all matters upon which I have expressed an opinion are within my area of expertise.

iv)     I confirm that I have referred to all matters which I regard as relevant to the opinions I have expressed and have drawn to the attention of the arbitral tribunal all matters, of which I am aware, which might adversely affect my opinion;

v)      I confirm that, at the time of providing this written opinion, I consider it to be complete and accurate and constitute my true, professional opinion.

vi)     I confirm that if, subsequently, I consider this opinion requires any correction, modification or qualification I will notify the parties to this arbitration and the arbitral tribunal forthwith.

**STATEMENT OF TRUTH**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

…………………………………………….

Peter Brown                                                          15 August 2014

# I.    Appendix I - Professional Experience and Qualifications

**PETER B. BROWN**

**Work email: pbrown@cclcompliance.com**
**Work telephone: +44 20 7638 9830**

_____

*SUMMARY OF EXPERIENCE*

A City of London based career that commenced in 1968 in domestic banking with a mixture of work experience until beginning a specialization in Internal Audit in 1976. Internal auditing was followed through domestic and international banks until 1991; experience from 1992 to 1999 in investment management. Experience in establishing a Compliance function in mid-1980s and facilitating Compliance and Internal Audit functions' co-operation and interaction. Qualifications gained in banking in 1970 and as an accountant in 1982.

Between 2000 and 2006, specialist consultant in anti-money laundering compliance, involving various assignments prior to joining MHA Consulting in September 2001. From that date until early 2006, duties included the day-to-day provision of the JMLSG Helpdesk, used by firms in the financial services sector and by members of the public referred on by the FSA. Participated in FSA ID Working Party through mid-2004. In 2006, using knowledge and experience gained, returned to the market as a Money Laundering Reporting Office with National Bank of Kuwait (International) PLC; headhunted back into training/consultancy work in mid-2007 with the CCL Partnership.

_____

**CAREER HISTORY**

*2007 – Present  Senior Consultant, the CCL Partnership, London. Senior Advisor to Solum*
Solum offers advisory services provided by ex-practitioners in all areas of capital markets.
The firm is authorised and regulated by the Financial Conduct Authority. Website: www.solum-financial.com.
The CCL Partnership provides a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors.

*2006 – 2007     NATIONAL BANK OF KUWAIT (INTERNATIONAL) PLC*
*Money Laundering Reporting Officer*

*2001 – 2006     MHA CONSULTING*
*Senior Consultant*
Providing a full range of training and support services to all types and sizes of commercial and professional clients throughout the regulated sectors. Includes lecturing in the UK and Crown Dependencies and for the ICA Diploma in Anti Money Laundering. Provision of the JMLSG Helpdesk facility as used by firms in the financial services sector and by members of the public referred on by the FSA. Assisting firms in remedial action projects and current client reviews.

*2001              NATIONAL BANK OF EGYPT (UK) LTD*
*Consultant*
Consultant on Remedial Action Taskforce for Money Laundering compliance.

*2000 - 2001     HALIFAX plc (now HBOS) - Group Treasury & Wholesale Banking Division*
*Internal Audit and Compliance Functions*
Assisting first in routine internal audit reviews then compliance monitoring work and Money Laundering Regulations training.

*1999 - 2000     HABIB ALLIED INTERNATIONAL BANK*

*Compliance Department*
Providing advice and assistance for extended project to ensure fulfillment of regulatory obligations.

**1998 - 1999    FOREIGN & COLONIAL MANAGEMENT LIMITED**
*Head of Internal Audit*
Responsible for planning, leading and reporting on internal audits in London. Acted as Money Laundering Reporting Officer for F&C Group companies. Implemented Service Standards for Internal Audit Department. Introduced risk assessment basis for planning of Audit review programme and new format for Internal Audit Reports.

**1992– 1997    INVESCO EUROPE LIMITED**
*Head of Internal Audit*
Initially team member in INVESCO on project to review procedures and controls. Project undertaken jointly with KPMG and in conjunction with IMRO. Following appointment as Head of Internal Audit in 1993, responsible for planning, leading and reporting on internal audits in London, Paris and Jersey. Acted as Money Laundering Reporting Officer, establishing the function and meeting training needs.
Established Internal Audit function, developed Audit Programmes, report formats and service standards. Developed risk based planning techniques for use by Internal Audit and Compliance functions. Established good relations with external auditors of main company and of 10 investment trusts; commitments involved five of the then 'big six' firms.

**1991 – 1992    *Sundry temporary assignments, including commission to write booklet***
*"Introduction to Internal Auditing in Banking" (revised and updated 2000).*

**1989 - 1991    COMMONWEALTH BANK OF AUSTRALIA**
*Senior Audit Manager*
Responsible for planning, undertaking and reporting on internal audits in London and Frankfurt. Assisted new Compliance Officer in proper establishment of Compliance function and rectification of earlier errors. Instituted revised operational approach for Audit reviews using a basis approved by the Bank of England.

***1986 – 1989    S.F.E. BANK LIMITED***
*Senior Audit Manager and Compliance Officer*
Established Internal Audit function in London and undertook internal audits in London, Nassau and New York.
Established Compliance function, produced Compliance Manual, undertook annual Compliance reviews and liaised as necessary with Regulator.

***1979 – 1985    BANKERS TRUST COMPANY***
*Audit Manager*
Undertook audits in London and throughout Europe. Experience covered a very wide range of banking activities including FX, Treasury, Money Market, Investment Management, Commercial Lending and Global Custody.

***1968 - 1978    GLYN, MILLS & CO/ WILLIAMS & GLYN'S BANK***
*Graduate entrant*
Broad banking training then specialising in Internal Audit.

---

### *QUALIFICATIONS*

| | |
|---|---|
| **BA (Hons)** | Economics |
| **FCCA** | Fellow of the Association of Chartered Certified Accountants |
| **FCIB** | Fellow of the Chartered Institute of Bankers |
| **FSI** | Fellow of the Securities & Investment Institute |

Accredited by the UK's Financial Services Skills Council as holding Recognised Trainer Status

---

### *OTHER*

Co-author of "Professional Standards for Compliance Officers" (published ACCA 1991) and Money Laundering – Prevention & Compliance 2001/2002 (published ACCA 2002).

**Languages:**    **W**orking knowledge of French and German

---

# J.      Appendix II - Contracts and Documents Received

## 1.      *London Court of International Arbitration Documents*

i)      Claimants' Request for Arbitration under the Rules of the LCIA, 19 July 2013;

ii)     Respondent's Response in the LCIA Arbitration No. 132447, 1 October 2013;

iii)    Claimants' Statement of Case in the LCIA Arbitration No. 132447, 16 December 2013;

iv)     Respondent's Statement of Defence in the LCIA Arbitration No. 132447, 31 January 2014; and

v)      Claimants' Reply in the LCIA Arbitration No. 132447, 3 March 2014.

## 2.      *Witness Statements*

i)      Witness Statement of Ahmad Fajar, 25 July 2014;

ii)     Witness Statement of Fadi Michel Saab, 25 July 2014;

iii)    Witness Statement of Abdel Rahman Wazzi, 25 July 2014; and

iv)     Witness Statement of George Hinis, 25 July 2014.

## 3.      *Claimants' Exhibits*

i)      C-1 to C-104.

## 4.      *Respondent's Exhibits*

ii)     R-1 to R-87.

## K.  Appendix III - Data Disclaimer

The data used in this report is provided "*as is*" and "*as available*". To the maximum extent allowed by applicable law, the relevant data providers, their respective licensors and suppliers make no warranties, express or implied, including without limitation implied warranties of merchantability, fitness for a particular purpose, non-infringement, or any other matter. In no event shall any data provider or their respective licensors and suppliers have any liability (i) for any unauthorised modification of or misuse of any portion of the data, (ii) for any liability resulting from use of the data, (iii) with respect to the results which may be obtained from the use of the data or (iv) for any inaccuracies, errors or omissions in the data.

**L.      Appendix IV – Material exhibited with this Report**

|  | DOCUMENT | EXHIBIT REF |
|---|---|---|
| 1. | Reuters Article, "*Tanzania Takes Control of Bank Accused of Money Laundering*" | **R-88** |
| 2. | Excerpt from Joint Money Laundering Steering Group Detailed Guidance | **R-89** |
| 3. | Response from FBME Bank Limited to FIMCEN Notice | **R-90** |



**APPENDIX 6**



# SAAB FINANCIAL (BERMUDA) LTD/PT BANK MUTIARA TBK/ J TRUST CO., LTD
## MONEY LAUNDERING / THEFT – DIAGRAM #1

**Special Administrator of FBME Bank Ltd (Cyprus Branch) in Administration. Appointed by Central Bank of Cyprus**

**FBME Bank Ltd (Cyprus) Under Special Administration by CBC – Jul 22, 2014**

- Cyprus Receiver: $40m Stolen by Saabs from FBME Cyprus (2006 – 2009).
- Administration appointed by the Resolution Authority of the Central Bank of Cyprus (July 22, 2014).
- HL/QE does not consult with Special Administrator in LCIA US$38.5 claim (July 17, 2014 to Dec 2, 2014).

**US Dept. of Justice**

**Dechers**

**US TREASURY FINCEN (Jul 14, 2014)**

**Bank Mutiara Expert Witness: Peter Brown**
- Confirms & declares FBME as Money Launderers.
- Recommends NO Settlement.
- Advises that it is more Money Laundering. Aug 14, 2014

**LPS**

**(2A)**

**J Trust Co., Ltd**
- Board instructs Mutiara to pay $8m as per QE/HL (No STR).
- Injects Rp. 300 billion into B Mutiara to pay for $8m (Dec 23, 2014).
- Owes FGFL, WIARCO $131,821,396 as at Apr 30, 2016 – Jointly & Severally. Dec 1, 2014

**(1A)**
Instructed by Lipman Karas in HK.
- Negotiates Settlement with QE/HL – Oct 16, 2014
- Instructs J Trust to pay GBP5m to QE, London @ Bank of America (No STR). Nov 20, 2014
- Aiding & Abetting Money Laundering 2004-2008

**(2)**

**PT Bank Mutiara TBK**
- Board instructs UOB, Singapore to convert US$8m to GBP5m (No STR).
- Owes FGFL, WIARCO $131,821,396 as at Apr 30, 2016 – Jointly & Severally. Dec 1, 2014

**UOB Singapore (Correspondent Bank)**
Converts $8m into £5m @ FX 1.60 and wires to QE, BoA London (No STR) – Dec 2, 2014

**(3)**

**Quinn Emanuel**
1. Starts representing Saabs (Aug 14, 2014) & fired by HL by Nov 18, 2014) but re-instituted Jan/Feb 2015.
2. Represents Saabs in FBME vs. Jacob Lewi in US Treasury FinCen suit.
3. Represents Bank Mutiara in SDNYC vs. FGFL. Nov 2013 to now.
4. Receives all LCIA Proceeds £5m/$8m and keeps as designated by Saabs for fees due (theft from FBME Special Administrator) (Funds received @ Bank of America, London (2 King Edward St) – No STR
5. Receives & sends on to Saab Bermuda in act of money laundering – no STR filed. Alleged to be sent to Federal Bank of Lebanon

**FBME / SAAB Jul 17, 2014 US Treasury FINCEN Sanctions**

**LCIA (Filed Dec 2013) FBME/SAAB vs. BANK MUTIARA** TBMA/ISMA Global Re.: Master Repurchase Agreement Nov 20, 2006 US$38.5 million vs. $40m Loan

**FBME Bank Ltd vs. PT Bank Mutiara TBK Jul 17, 2014 US Treasury FINCEN Sanctions**
**$40.0m LCIA/QE Settlement**
GBP5 million/US$8 million
Negotiated by Hogan Lovells International LLP (July 17, 2014 to Oct 16, 2014 / Dec 2, 2014)

**(4)**

**Hogan Lovells**
1. Claims to Advise & represents FBME & Saabs (as FBME Ltd shareholders) in LCIA $38.5m (Jul 17, 2014 to present).
2. No Reporting to FBME Special Receivers in Tanzania and Cyprus – NO STR filed.
3. Sole Advisor to FGFL in HK (Jan 1, 2012 to Feb 26, 2015)
4. Aids and abets money laundering + Theft with QE/HL/Saabs. Sept 22, 2014 letter to FinCen (multiple falsehoods & misrepresentations). LAWSUIT CLAIM $112m

**Saab Financial (Bermuda) Ltd**
Receives GBP5m (No STR)

**Saab Financial Ltd (Jersey)**
Owes FGFL $25.095m

**Defaulted Saab Loan Promissory Note $17.5m to FGFL; $25.1m Due from Saab**

**First Global Funds Ltd PCC (Mauritius)**
Defrauded: $40m

**Summary Judgments**
$131.8 million
Owed to WIARCO/FGFL by B.Mutiara/J Trust (Joint+Several)

**Ayoub-Farid M. Saab**

**Fadi M. Saab**

**Michael Saab (Son)**

**Hong Kong Court of First Instance**
ROI vs. Bank Mutiara, FGFL.

**SD New York Court**
FGFL vs. Bank Mutiara = $22.3m
BM Represented by QE



# FBME / BANK MUTIARA / J TRUST / LPS

## US$40.0m GLOBAL REPURCHASE AGREEMENT LOAN PROCEEDS / US$38.5m LCIA SETTLEMENT FLOW – DIAGRAM #2



FBME / BANK MUTIARA / J TRUST / LPS
US$38.5m LCIA SETTLEMENT DIAGRAM – MONTHLY INTEREST FLOW AMOUNT – DIAGRAM #3
January 1, 2007 to November 30, 2008

**Saab Financial Ltd (Jersey)**
100% Ayoub-Farid Saab & Farid Saab
Dissolved on Feb 25, 2011

US$65,577 — Loan Interest 6.75% **(B-1)**

WWR, CMP, FGAH, Saab Promissory Note Transactions

US$44,384 — Loan Interest 6.75% **(B-2)**

US$67,574 — Loan Interest 6.75% **(B-3)** ?

**PT Wihowo Wadah Rejeki**
WWR: 100% Owned R. Tantular Dissolved

**PT Canting Mas Persada**
CMP: 100% Owned R.Tantular (Dissolved)

**First Gulf Asia Holdings Ltd**
FGAH: 100% Owned Rafat A. Rizvi H. Al Warraq (Dissolved – Oct 16, 2012)

Third Party Repo Transactions

US$112,352 — Repo Interest 11.13% **(A-1)**

US$76,042 — Repo Interest 11.13% **(A-2)**

**PT Bank Mutiara TBK (f.k.a PT bank Century TBK)**
70% – R.A.Rizvi
30% – R. Tantular

Repo Transactions

US$54,641 (WWR) — Repo Interest 5.25% **(C-1)**
US$43,750 (CMP) **(C-2)**
US$66,609 (Mr. Rizvi) **(C-3)**

**FBME BANK LTD (Cyprus Branch)**

(A-1) + (A-2) = $188,394.00
(B-1) + (B-2) + (B-3) = $177,535.00
(C-1) + (C-2) + (C-3) = $175,000.00

**TOTAL: $540,929** (Monthly interest payment – cash & non-cash)