

**APPENDIX 13**



# GOVERNMENT OF MAURITIUS
## OCCUPATION PERMIT
### (Section 9A of Immigration Act)

Ref.: OIIN1603588
Surname: LIEGEY
Other Names: JOHN RICHARD
Date of Birth: 01 DEC 1955    Sex: M
Nationality: AMERICAN
Status:    INVESTOR
Issued on:  19-AUG-2016
Valid Until: 16-AUG-2019
Signature:................................
B.O. SUJEEWON, PS.
f/Passport and Immigration Officer



RESIDENCE CARD    RE8462401

NAME
LIEGEY
JOHN RICHARD
VALID UNTIL
22-12-2020
PLACE AND DATE OF ISSUE
UK 22-12-2015
TYPE OF PERMIT
FAMILY MEMBER - EU
RESIDENCE
REMARKS
WORK PERMITTED

RESIDENCE CARD OF A FAMILY MEMBER OF A UNION CITIZEN

## CONDITIONS

1. This permit is valid for the period indicated overleaf.
2. This permit is personal to the holder and is not transferable.
3. This permit shall be kept by the holder and produced to any authorized person on demand or within three days after demand at such Police Station as may be specified by the authorized person at the time of the demand.
4. The Minister may, at any time, vary or cancel this permit without giving any reason.
5. In the event of any change of circumstances affecting the accuracy of particulars submitted at the time of applying for this permit, the holder shall, within fifteen days notify particulars of such change to the Minister.

* If found, please return to Passport and Immigration Office or nearest Police Station.



```
CRGBRRE84624016<<<<<<<<<<<<<
5512016M2012227USA<<<<<<<<<<0
LIEGEY<<JOHN<RICHARD<<<<<<<<<
```



**APPENDIX 14**

UK ENTRY CLEARANCE
008218419
Place of Issue NEW YORK
Valid from 29/06/12
Valid until 29/10/15
Number of entries MULT
VAF No 692777
Type TIER 1 (ENTREPRENEUR) MIGRANT
Name LIEGEY JOHN RICHARD
Passport No 464688935
M
Date of birth 01/12/55
USA
Other No recourse to public funds.
Work limited to own business
Number of dependants 0
IMMIGRATION OFFICER
(4023)
30 JUN 2012
HEATHROW (4)
19 AUG 2012
8 SEP 2012
25 SEP 2012
(6057)
HEATHROW (5)
16 OCT 2012
17 APR
OCT 2012
1 OCT 2013
20 APR 2011
(3558)
IMMIGRATION OFFICER
Visas
We send thanks to all the Animal life in the world. There are many things to teach us as people.
We are glad they are still here and will always be so
VDGBRLIEGEY<<JOHN<RICHARD<<<<<<<<<<<
4646889351USA5512016M1510298<<<<<<<<

# APPENDIX 15

# Driving Licence (GREAT BRITAIN)

D5?
Rev. Aug./91

**Department of Transport**

**IMPORTANT**
This is your Driver Number

| LIEGE | 512015 | JR9DH |

Please make a written note of it in case you lose your licence. Please quote it if you contact the DVLC about your licence.

Issue No. | 47

B0045747

JOHN RICHARD LIEGEY
14 EATON PLACE
LONDON          SW1X 8AE

You must tell DVLC at once if you change your address or name. Please fill in the form overleaf. If you do not, you could be fined £400.

Usual signature (in ink) _____

Type of licence | PROVISIONAL

**You are licenced to drive vehicles of the categories shown below but you must satisfy the relevant conditions overleaf**

| B,C1,D1,F,G,H,K,L,N,P********* |

and on reaching the ages for driving shown overleaf to drive vehicles of all other categories except A

Date last licence expired

from | 01 04 1992 | to | 30 11 2025 | inclusive | 24 04 1990

XXXXXXXXXXXXXXXX XXXX

Date last category A entitlement expired

from | ********* | to | ********* | inclusive | *********

Date of birth | 01 12 55

● Please check date of birth (if shown).
If it is wrong, please send this licence to DVLC, Swansea SA99 1BN with

Drivers Medical Branch, Swansea SA99 1TU, must be told at once if you **NOW** have any physical or mental disability or condition which affects your fitness as a driver or which might do so **IN THE FUTURE** (you need not tell DVLC if the effect of the disability or condition is not expected to last more than 3 months), OR if you come to know **IN FUTURE** that you have such

045747

| details of your correct date of birth. | a disability or condition. |
|---|---|

ENDORSEMENT DOCUMENT - the "COUNTERPART" referred to in the Road Traffic Acts.

**ENDORSEMENTS** as supplied by convicting Court - see leaflet INS 1 for Offence Codes

| Convicting Court code | Date of conviction DD | M | YY | Offence code | Date of offence DD | M | YY | Fine £ | p | Disqual. period | | Penalty points |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2641 | 24 | 04 | 90 | DR10 | 06 | 04 | 90 | 450 | 00 | 18M | | |

B0045747

| Fee £ ***** | 2751E007 920861270412 |
|---|---|

This is not part of the driving licence. You may remove it by tearing carefully along the line above. You must sign the licence but in doing so it does NOT mean you wish to be a donor. If you wish to become an organ donor you should sign the declaration overleaf.

# Donor Card

OPTION SLIP

***If you would like to help someone to live after your death please complete the donor declaration overleaf.***

# APPENDIX 16



**ENSafrica**

19 Church Street
Port Louis Mauritius
service address: *5th floor Chancery House*
*Lislet Geoffroy Street*
tel +230 212 2215  fax +230 208 2986
mruinfo@ENSafrica.com  ENSafrica.com

| | |
|---|---|
| 19 June 2015 | |
| 15-4280 | Our ref |
| SC/COM/PWS/00243/2015 | Your ref |

Mr. Nobiru Adachi, President Commissioner

Mr. Ahmad Fajar, Managing Director & Member of the Board of Directors

PT Bank JTrust Indonesia TBK (formerly PT Bank Mutiara TBK)

International Financial Centre, Lantai 2,

Jl. Jenderai Sudirman, Kav. 22-23

Jakarta 12920,

<u>INDONESIA</u>

Dear Sir,

**RE: FIRST GLOBAL FUNDS LIMITED PCC & ORS V/S PT BANK MUTIARA TBK**

**(SC/COM/PWS/00243/2015)**

We refer to our letter dated June 8, 2015 referring to the Judgment dated May 29, 2015 issued by the Supreme Court of Mauritius – Commercial Division against you and ordering you to pay the sum required in order to satisfy the said Judgment. Till date, neither our law firm nor our clients, in the present matter, have received any response from you and you have failed to be represented in each of the Court proceedings despite being served with the various Notices and papers.

This letter is to inform you that you cannot plead ignorance of the set-off provisions existing under the laws of Mauritius and that your debt on the Judgment dated May 29, 2015 towards our client, Weston Capital Advisors, Inc., has been reduced by operation of law by way of set-off by an amount of US$3,825,592.54 (as of date of this letter) against the receivable owed to you by Weston Capital Advisors, Inc. Following this set-off, your claims towards Weston Capital Advisors, Inc. have been fully satisfied and settled in its entirety by way of law.

Yours faithfully,

U.K. Ragobur
(For) Thierry Koenig SA
**ENSafrica (Mauritius)**



**APPENDIX 17**



# PRIVATE EYE

No. 1436
27 January –
9 Feb 2017
£1.80

## INAUGURATION ★ SPECIAL ★



## LEGAL NEWS

# Gagging ordure

**A** MIDDLE Eastern-owned private bank, headquartered in Africa and operating out of Cyprus, is the latest to follow the well-trodden corporate path of seeking gagging orders from the UK courts.

The Lebanese owners of FBME bank are seeking to silence the private investigators they hired to contest a blacklisting order imposed by the US government for being a money laundering operation. Court documents seen by the *Eye* show that not only did the private detectives agree with the US authorities, they also claimed to have uncovered a massive credit card fraud and transactions involving child and animal pornography.

In 2014, the US Treasury's Financial Crimes Enforcement Network (FinCEN) alleged that one FBME customer was a front company for Syria's Scientific Studies and Research Centre, said to be involved in developing weapons of mass destruction for President Assad's regime. It also claimed another bank customer had "received a deposit of hundreds of thousands of dollars from a financier for Hezbollah" and that "the head of an international narcotics trafficking and money laundering network" used shell company accounts at the bank.

However, its decision to blacklist the bank has been stayed, pending ongoing legal challenges by Farid and Fadi Saab, the bank's owners, who deny any wrongdoing. They had hired UK-based Dangate Consulting, a private detective agency of former Scotland Yard officers, to investigate FinCEN's findings, but the corporate sleuths say they uncovered even more problems.

According to court documents lodged in Cyprus, where Dangate is suing FBME over alleged unpaid fees, the private detectives produced a detailed internal report of their findings. Their claim says: "We advised the bank and their various advisers, in the strongest possible terms, that the best course of action was to self-report to the relevant regulators in an effort to mitigate their exposure. Despite our advice, which was supported by some of their legal advisers, they dismissed us and failed to pay our outstanding fees and then undertook a cover-up of the evidence produced by us."

Dangate then made what it said were public interest disclosures to the US and Cypriot financial authorities.

In April last year, FBME turned to the high court, claiming the detectives had breached a "duty of confidentiality" to the bank and Saab brothers. It demanded to know what information had been handed to the regulators and sought a gagging injunction to prevent any further disclosure.

Lawyers for the Saabs told the *Eye* that Dangate's allegations were false and were made during a dispute over fees in an attempt to extort more money, and that they had been "disregarded" by the US authorities. The UK high court action, it added, was issued to prevent "further improper disclosure of highly confidential material". Thus the case continues in the US, Cyprus – and now the UK.

## DANIEL MORGAN MURDER

# Back in court

**H**OW ironic that the best chance of finding out why the murder of south London private investigator Daniel Morgan (pictured) remains unsolved after 30 years now lies with a claim of malicious prosecution and malfeasance in public office being brought against the Metropolitan police by the key suspects.

The horrific axe murder has always been mired in allegations of police corruption, links to organised crime and Irish terrorism and, more recently, to tabloid newspaper corruption. Now the high court is hearing claims that the fifth and final investigation was a "fit-up" led by former chief superintendent David Cook, who broke the rules to secure convictions at all costs.

The murder trial collapsed in 2011 after the judge excluded some supergrass evidence and after it emerged that boxes of evidence had not been disclosed. By then, Morgan's business partner Jonathan Rees, brothers Glenn and Garry Vian, James Cook and former policeman Sid Fillery had already served two years in jail on remand.

The actions of David Cook are central to the claim which opened last week. "Between 2005 and 2009, he coached and manipulated the two main witnesses, failed to investigate exculpatory lines of inquiry, suppressed documents, misled his colleagues and lied to the trial judge," said Nicholas Bowen, QC for four of the men.

*Eye* readers will recall that Mr Justice Maddison had concluded Cook had "probably prompted" one of the key supergrass witnesses,

defendants and possibly others. The judge also highlighted an interview with another supergrass, James Ward, in which Cook had offered him a "head start" by giving him the names of three suspects.

Cook is in Scotland, refusing to appear as a witness and leaving it to his colleagues – not least assistant commissioner John Yates, who will have to account for his own apparent lack of oversight. In particular, how it was that after the supergrass scandals of 1998-2002, when Yates was one of the Met's anti-corruption squad (the so-called Untouchables), the same illicit tactics to prevent career criminals as witnesses of truth were still being used years later.

But it is not enough to show serious misconduct by Cook or his colleagues to succeed in the claim. Rees and the other claimants (the Vians and Fillery) have to prove "malice" or "improper motive" on the part of the officers. Jeremy Johnson QC, for the Met, says that while it accepts Mr Justice Maddison's finding about Cook, there remained a proper basis to arrest and prosecute each of the claimants, including "multiple accounts from various of the claimants' associates" of the five's involvement in the murder.

Daniel Morgan's long-suffering family are also still hoping to learn more from the review panel that Theresa May set up in 2013 to look into the murky case – but the review is taking place behind closed doors. It's not known who has given evidence (the panel won't say whether Cook has appeared, for example) – and as *Eye* 1430 reported, chair Baroness (Nuala) O'Loan has links with the case. Former Met "Untouchable" Dave Wood, who ran the third failed investigation into Morgan's death, was O'Loan's chief investigator when she was the Northern Ireland police ombudsman.

## CHILD ABUSE

# Stevenson's rocket

**T**HE second report of the Shirley Oaks Survivors Association (Sosa) into historical child sexual, physical and mental abuse in Lambeth council-run children's homes makes it clear why the council expects to pay out more than £40m redress to thousands of children who were in its "care".

The report, *Looking for a Place called Home*, is the work of businessman Raymond Stevenson, (pictured) who as a child was in the care of Lambeth for 15 years, 11 of them at Shirley Oaks, and his business partner Lucia Hinton.

The hurdles faced in uncovering the truth and exposing those involved in committing physical, mental and sexual abuse of children includes the fact that in 2003, several hundred local archive records had a 100-year long restriction order placed on them. To put that in context, the post-mortem report on the death of former Iraq weapons inspector Dr David Kelly in 2003 is subject to a 70-year restriction order.

For some children who were in Lambeth children's homes, the 100-year restriction is of no relevance. Between 1970 and 1988, an academic study found that 48 children had died in the council's care. The youngest was Sarah Specterman, who in 1974 died four days short of her first birthday. The cause of her death at the Chevington children's home was strangulation. No one has ever been charged over her death, nor has any charge been brought in connection with the other 47 deaths.

Many children who survived their initial ordeal later killed themselves. One such was a popular and outgoing girl, "Elaine", who became increasingly withdrawn the longer she stayed at Shirley Oaks. Several years after she left, she parked her car in the home's grounds and died after connecting a tube to the exhaust.

It has also now been admitted by Lambeth council that thousands of documents containing vital information were deliberately destroyed as recently as 2009.

Shirley Oaks was laid out in the form of a model village, with children housed in "cottages" set among extensive grounds. It looked idyllic. Although not all children there were physically and mentally mistreated. Many residents, especially black children, were denied food or given mouldy or stale food. Staff also encouraged some older white male children to physically and sexually abuse younger girls while they watched. "Pretty white boys" were cherry-picked for abuse.

In 2003, and without explanation, the plug was pulled on a joint Metropolitan Police and Lambeth council investigation into allegations of child sexual abuse. Set up in 1998, the investigation had comprised Operation Middleton, to which the Met assigned 16 officers, and the Children in Lambeth Enquiry (Chile), which 16 agency staff and consultants worked.

When the joint inquiry was axed in 2003, the Met stated that it had been unable to identify many of the alleged paedophiles, yet 13 years later Sosa, with its limited resources, had much greater success. The Met also failed to interview more than 5,000 children who they believed had been victims of abuse – many of whom have recently recounted their stories to Stevenson and Hinton.

Meanwhile Chuka Umunna, the Labour MP for Streatham, wants the Met and the Home Office, organisations he believes are as culpable as Lambeth, to contribute to the £40m-plus the council is to pay out for failing to protect children in its care.

# APPENDIX 18

To:               Weston Bank of Mutiara File

Subj:           Domicile in NY; Attachment in NY

At John's request, I have researched issues regarding domicile in New York. Due to the limited amount of time, my research is not fully complete, but I believe that the following may be useful. Copies of all cases cited in this memo are attached.

John's contacts with New York are limited. He occasionally visits New York as necessary to attend hearings in the case at issue. According to my discussion with him, he spent about 20 to 40 days in the US in 2016, some of which was spent in New York, and approximately 7 to 14 days of which was spent in Florida visiting his mother.

The root case in New York concerning whether someone is domiciled in New York is the case of *In re Newcomb's Estate*, 192 N.Y. 238, 84 N.E. 950 (N.Y., 1908). Quoting extensively from that case, which would hold that John was not a domiciliary of New York:

> As 'domicile' and 'residence' are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning; but they are not identical terms, for a person may have two places of 'residence,' as in the city and country, but only one 'domicile.' 'Residence' means living in a particular locality, but 'domicile' means living in that locality with intent to make it a fixed and permanent home. 'Residence' simply requires bodily presence as an inhabitant in a given place, while 'domicile' requires bodily presence in that place and also an intention to make it one's domicile. The existing domicile, whether of origin or selection, continues until a new one is acquired, and the burden of proof rests upon the party who alleges a change. The question is one of fact rather than law, and it frequently depends upon a variety of circumstances, which differ as widely as the peculiarities of individuals. Less evidence is required to establish a change of domicile from one state to another than from one nation to another. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence, is of no avail. Mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence even for a short time, with the intention in good faith to change the domicile, has that effect. Uno so lo die constitutiur domicilium si de voluntate appareat. Residence is necessary, for there can be no domicile without it, and important as evidence, for it bears strongly upon intention, but not controlling, for unless combined with intention it cannot effect a change of domicile. Dupuy v. Wurtz, 53 N. Y. 556, 561; The Venus, 8 Cranch (U. S.) 253, 278, 3 L. Ed. 553; Carey's Appeal, 75 Pa. 201, 205; Wharton's

Conflict of Law [192 N.Y. 251](2d Ed.) §§ 21, 56, 66. There must be a present, definite, and honest purpose to give up the old and take up the new place as the domicile of the person whose status is under consideration. The subject is under the absolute control of every person of full age and sound mind who is free from restraint, unless it may be that the domicile of a wife is controlled by that of her husband as long as she lives with him. Story's Conflict of Law (7th Ed.) § 46. Subject to the qualifications named, every human being may select and make his own domicile, but the selection must be followed by proper action. Motives are immaterial, except as they indicate intention. A change of domicile may be made through caprice, whim, or fancy, for business, health, or pleasure, to secure a change of climate, or a change of laws, or for any reason whatever, provided there is an absolute and fixed intention to abandon one and acquire another, and the acts of the person affected confirm the intention. McConnell v. Kelley, 138 Mass. 372. No pretense or deception can be practiced, for the intention must be honest, the action genuine, and the evidence to establish both clear and convincing. The animus manendi must be actual with no animo revertendi. A temporary residence for a temporary purpose, with intent to return to the old home when that purpose has been accomplished, leaves the domicile unchanged; but, even if the residence was begun for a temporary purpose, intention may convert it into a domicile. When a new domicile has been actually acquired, it does not necessarily revert, even if not followed by continuous residence. There may be many absences from the new place and protracted sojournings in the old, unless intention and residence unite again, when still another change of domicile is effected.

Since John has lived in London for a considerable period of time and was living there when the instant case was filed, it is clear that he cannot be held to be a domiciliary of New York.

With respect to the domicile of the Weston entities, black letter law in New York is that a business entity is domiciled in the jurisdiction where it has its principal place of business. The instant lawsuit was filed merely to attach funds that were located in New York, based on a judgment that was entered in Mauritius. As such, it is clear that none of the Weston entities have any domicile in New York. *See Dorsey v. Yantambwe*, 276 A.D.2d 108, 715 N.Y.S.2d 566 (N.Y. App. Div., 2000): "The domicile of a corporation for choice-of-law purposes is the State where it maintains its principal place of business (see, *Weisberg v Layne-New York Co.*, 132 AD2d 550, 551-552; see also, *Urlic v Insurance Co.*, 259 AD2d 1, 4-5, lv denied 94 NY2d 763)."

With respect to using the New York courts to attach property, either the property must be located in New York or the party asserting ownership of the property must be domiciled in New York. *See Hotel 71 Mezz Lender v. Falor*, 58 A.D.3d 270, 869 N.Y.S.2d 61, 2008 NY Slip Op 9848 (N.Y. App. Div., 2008):

It is long settled in New York that the fundamental rule in attachment proceedings

is that "the res must be within the jurisdiction of the court issuing the process in order to confer jurisdiction" (National Broadway Bank v Sampson, 179 NY 213, 222 [1904]). Pursuant to that rule and for the following reasons, we reverse and vacate the order of attachment and the appointment of a receiver.

While the situs of the shares of a corporation is either "where the corporation exists" or where the shareholders are domiciled (Matter of Enston, 113 NY 174, 181 [1889]; Sweeney, Cohn, Stahl & Vaccaro v Kane, 6 AD3d 72, 79 [2004], lv dismissed 3 NY3d 751 [2004]), with respect to intangible interests such as debts and interests in corporate stock, the question whether the res is within the jurisdiction of the court issuing the process is less easily determined (Sampson, 179 NY at 223). Nevertheless, an attachment of a debt or other intangible property can only be effected as against the debtor or obligor by service upon him or her when he or she is domiciled within the state (id. at 223-224).

The mere fact that the order of attachment in this case was served upon defendant Mitchell, a resident and domiciliary of Florida, who was in New York temporarily solely to attend his deposition and does not dispute that he is the proper garnishee within the meaning of CPLR 5201 (c) (1), does not establish the situs of the res, i.e., defendants' ownership and/or management interests, if any, in 23 entities, including Delaware, Georgia and Florida limited liability companies and a Florida corporation of which Mr. Mitchell is the sole shareholder, in New York.

Quoting from the same case:

Both CPLR 5225(a) and (b) provide that a judgment creditor may obtain an order from a New York court, requiring a defendant who is in possession or custody of money or other personal property in which a judgment debtor has an interest to turn over the property or pay the money to the judgment creditor. CPLR 5225(a) applies when the property sought is in the possession of the judgment debtor himself. CPLR 5225(b) applies when the property is not in the judgment debtor's possession. The most significant difference between the subdivisions is that CPLR 5225(a) is invoked by a motion made by the judgment creditor, whereas CPLR 5225(b) requires a special proceeding brought by the judgment creditor against the garnishee. The reason for this procedural distinction is that the garnishee, not being a party to the main action, has to be independently subjected to the court's jurisdiction. But both CPLR 5225(a) and (b) contemplate an order, directed at a defendant who is amenable to the personal jurisdiction of the court, requiring him to pay money or deliver property. Neither contemplates the situation in which attachment is typically sought— where it would be impossible or futile to protect a creditor's rights by means of an order issued to defendant (see CPLR 6201). In the attachment scenario, authority is conferred on the court in part or in whole by the situs of property within New York. In post-judgment enforcement, such in rem jurisdiction is not required. Bearing in mind the fundamental differences between enforcement and

attachment discussed above, we hold that a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee.

Page 304

**517 N.Y.S.2d 304**
**132 A.D.2d 550**
**Eugene S. WEISBERG, etc.,**
**Respondent,**
**v.**
**LAYNE-NEW YORK CO., INC.,**
**Appellant.**
**Supreme Court, Appellate Division,**
**Second Department.**
**July 6, 1987.**

Mulholland, Minion & Roe, Williston Park (Glenn J. Matera), for appellant.

Page 305

Fuchsberg & Fuchsberg, New York City (Martin Diennor, of counsel), for respondent.

Before MOLLEN, P.J., and BROWN, RUBIN and KUNZEMAN, JJ.

MEMORANDUM BY THE COURT.

In an action, inter alia, to recover damages for wrongful death, the defendant appeals from an order of the Supreme Court, Nassau County (Levitt, J.), dated May 16, 1986, which determined that the laws of the State of New Hampshire relating to recovery for wrongful death are applicable to this action.

ORDERED that the order is affirmed, with costs.

In December 1983 Keith Weisberg, a 19-year-old student at New England College in Henniker, New Hampshire, was killed when the automobile he was driving collided with a vehicle operated by the defendant's employee in Hopkinton, New Hampshire. At the time of the accident, the decedent was a New York domiciliary residing in the State of New Hampshire. He possessed a New York State driver's license and was operating a vehicle owned by his father, also a New York

domiciliary, who is also the administrator of the estate and the plaintiff herein.

The defendant is a New York corporation with its principal place of business in the State of New Jersey, which conducts business on apparently a limited basis, in New Hampshire. The offending truck was owned by the corporation which, for vehicular registration purposes, was located in Hillsboro, New Hampshire. The driver of the vehicle was a New Hampshire resident licensed to operate a commercial vehicle within that state.

The choice-of-law question which this court is called upon to resolve involves the statutory provisions of both New York and New Hampshire governing recovery in wrongful death actions. While the relevant New York statute allows the decedent's estate to recover "fair and just compensation for the pecuniary injuries resulting from the decedent's death" (EPTL 5-4.3), the New Hampshire law governing recovery for wrongful death is somewhat broader, permitting the finder of fact to "consider", as one of the "elements" of damage, the deceased's "capacity to earn money during his probable working life" (New Hampshire Revised Statutes Annot. § 556:12). The plaintiff urges the application of the New Hampshire law, and the court of first instance so ruled.

Historically, choice-of-law conflicts in tort actions had been resolved by applying the law of the place of the wrong. In Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279), the Court of Appeals abandoned the inflexible rule of lex loci delicti, holding that "controlling effect" must be given "to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" (Babcock v. Jackson, supra, at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279).



In recognition of the uncertainty created by Babcock and its progeny (Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454; Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394; Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.E.2d 877; Dym v. Gordon, 16 N.Y.2d 120, 262 N.Y.S.2d 463, 209 N.E.2d 792), the Court of Appeals, in Schultz v. Boy Scouts of Amer., 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679), refined the interest analysis approach in an attempt to bring to it some predictability. Reiterating that the interest analysis entails a substantive determination of which jurisdiction has the greatest interest in the litigation, the court emphasized that " 'the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict' " (Schultz v. Boy Scouts of Amer., supra, at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679, quoting from Miller v. Miller, supra, 22 N.Y.2d at 15-16, 290 N.Y.S.2d 734, 237 N.E.2d 877). "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort" (Schultz v. Boy Scouts of Amer.,

Page 306

supra, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679).

Initially, we must determine the domicile of the parties for choice-of-law purposes. While the defendant is a New York domiciliary by virtue of its having incorporated in New York (see, Sease v. Central Greyhound Lines, 306 N.Y. 284, 117 N.E.2d 899), for choice-of-law purposes, it must be treated as a New Jersey entity inasmuch as it maintains its principal place of business in that State and thus, it may be said that its corporate presence is much more pronounced in that State than in either New York or New Hampshire (see, Belisario v. Manhattan Motor Rental, 48 A.D.2d 477, 370 N.Y.S.2d 574; Morgan Guar. Trust Co. of N.Y. v. Garrett Corp., 625 F.Supp. 752).

Thus, a "split domicile" situation is presented, i.e., the parties are domiciliaries of different states (see, Schultz v. Boy Scouts of Amer., supra, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679), and the locus of the tort is a separate jurisdiction.

In such situations, as the Schultz court held, the law of the place of the tort will normally apply, unless displacing it " ' "will advance" the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants' " (Schultz v. Boy Scouts of Amer., supra at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679, quoting from Neumeier v. Kuehner, supra, 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454).

The application of this analysis compels the conclusion that no basis exists for displacing lex loci delicti, particularly where the significant interrelationship of the parties was centered in New Hampshire. The policy underlying both states' wrongful death statutes is essentially the same, i.e., to compensate the decedent's estate for loss suffered by his death (see, Odom v. Byrne, 104 A.D.2d 863, 480 N.Y.S.2d 247; Golej v. Varjabedian, 86 N.H. 244, 166 A. 287). New Hampshire has an interest in ensuring that those who conduct business within its borders will be called upon to compensate those whom they have injured while so engaged pursuant to its statutory scheme (see, Morgan Guar. Trust Co. of N.Y. v. Garrett Corp., supra, at 761). Moreover, New Hampshire's law permitting consideration of the decedent's "capacity to earn money during his probable working life" in determining the amount of the award will adequately ensure that New York's interest in "fairly and justly" compensating its domiciliaries will be satisfied (EPTL 5-4.3), without offending any purpose of the New York statute.

Simply put, no purpose of the substantive law of New York would be advanced by the application of its law governing recovery in



wrongful death actions; hence it was properly determined that New Hampshire law would apply in this case.



**26 Misc.3d 670**
**891 N.Y.S.2d 622**
**2009 NY Slip Op 29485**
**In the Matter of SOJITZ**
**CORPORATION, Petitioner,**
**v.**
**PRITHVI INFORMATION SOLUTIONS**
**LTD., Respondent.**
**No. 602511-2009**
**Supreme Court, New York County.**
**December 2, 2009.**

[26 Misc.3d 671]

Lovells LLP, New York City (Andrew M. Behrman and Matthew J. Galvin of counsel), for petitioner.

DLA Piper LLP, New York City (James P. Duffy IV of counsel), for respondent.

### OPINION OF THE COURT

JAMES A. YATES, J.

May a creditor attach assets in New York, for security purposes, in anticipation of an award in arbitration commenced in a foreign jurisdiction when there is no contact with, or connection to, New York by way of subject matter or personal jurisdiction?

Background

Petitioner Sojitz Corporation is a Japanese company with its principal place of business in Tokyo. Respondent Prithvi Information Solutions Ltd. is a company organized under the laws of India and has its principal place of business in Hyderabad, India. There is no claim that either party regularly engages in business, or has transacted business in connection with the present case, in New York State.

On November 29, 2007, Sojitz and Prithvi entered into a contract in Delhi, India, whereby Sojitz agreed to provide telecommunications equipment produced in

China to Prithvi in India. In return, Prithvi would make payments into an escrow account located at the Punjab National Bank in India. After Prithvi made payments into the escrow account, Sojitz was to withdraw the funds to its account in Japan.

The contract also contains choice of law and arbitration clauses. Those clauses provide that the contract is governed by the laws of England, and any disputes arising "out of or in connection with or in relation to" the contract would be settled by arbitration in Singapore.

Pursuant to the contract, Sojitz shipped and delivered equipment to Prithvi over a five-month period, from January 16 to June 18, 2008. Upon each shipment of the goods, Sojitz issued invoices along with bills of exchange to Prithvi. Prithvi accepted delivery of all goods without complaint. The total price of the goods invoiced by Sojitz was $47,483,106.93. On March 15, 2009, the final payment from Prithvi became due under the contract.

[26 Misc.3d 672]

Sojitz claims that to date, Sojitz has only received from Prithvi a sum of JPY 535,860,058 (approximately US $5.6 million). They argue that payments intended for the escrow account were diverted away by Prithvi (transcript, Sept. 17, 2009, at 38-39). Allegedly, Prithvi admitted to Sojitz that it wanted to use the money for "other things" because they had "cash flow problems." (Transcript, Sept. 10, 2009, at 76). In addition, Sojitz alleges that Prithvi owes unbundled interest under article VI (d) of the contract, which amounts to JPY 41,493,547 (approximately US $450,000), plus delayed interest in accordance with article VI (p) of the contract, which amounts to JPY 85,688,540 (approximately US $900,000) as of July 22, 2009. Accordingly, as of July 22, 2009, Prithvi owes Sojitz a total sum of JPY



-1-

4,601,830,481 (approximately US $48.4 million).

On August 13, 2009, Sojitz moved ex parte for an order of attachment against Prithvi for $40 million in this court (verified petition for order of attachment without notice in aid of arbitration, Aug. 13, 2009). The court granted the motion for an order of attachment for $40 million, and also ordered Sojitz to post a $2 million bond (order of attachment without notice in aid of arbitration, Aug. 13, 2009). On August 25, 2009, pursuant to CPLR 6220, Sojitz moved to compel disclosure to aid in the attachment order and to confirm the attachment. Subsequently, after appearance by Prithvi, on October 16, 2009, the order was vacated. Sojitz has attached an accounts receivable from an unrelated party — a debt owed to Prithvi by a New York domiciliary — in the amount of $18,000 and now moves to confirm that attachment.

On August 27, 2009, Sojitz commenced the underlying arbitration against Prithvi in Singapore as required by the terms of their agreement (affidavit of Galvin, Sept. 9, 2009, ¶ 15). As the parties are foreign corporations, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (21 UST 2517, TIAS No. 6997 [1958] [UN Convention, also called the New York Convention]; 9 USC § 201) controls the terms of the arbitration.[1] Prithvi opposes confirmation and opposes the disclosure request.

[26 Misc.3d 673]

Discussion

A. Attachment Generally

"An order of attachment is a device whereby a plaintiff effects a seizure of a defendant's property, with the sheriff taking constructive and sometimes actual hold of it under the terms of the order" (*Heller v Frota*

*Oceanica E Amazonica, S.A.*, 18 Misc 3d 1103[A], 2007 NY Slip Op 52378[U], *4 [Sup Ct, Kings County 2007]). A debt owed to the defendant is property which may be attached (CPLR 6202).

Under CPLR 6201, a plaintiff must meet two requirements for an order of attachment. First, plaintiff's demand must be for a money judgment. Second, the plaintiff must satisfy one of the five numbered subdivisions of CPLR 6201. Subdivision (1) of that section permits attachment, as in the current situation, when "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state" (CPLR 6201 [1]).

Attachment may be used in aid of arbitration proceedings as well as judicial proceedings. Notwithstanding the availability of attachment as a provisional remedy in cases of domestic arbitration, in *Cooper v Ateliers de la Motobecane* (57 NY2d 408 [1982]), the Court of Appeals had determined that the UN Convention did not specifically authorize the use of a provisional remedy such as attachment prior to issuance of an award. As such the Court held that attachment in aid of arbitration under the UN Convention was not available. On the other hand, a panel of the Second Circuit Court of Appeals subsequently interpreted the federal treaty to permit injunctive relief (*Borden, Inc. v Meiji Milk Prods. Co., Ltd.*, 919 F2d 822, 826 [2d Cir 1990], *cert denied* 500 US 953 [1991]). In 2005, the Legislature, apparently agreeing with the Circuit Court reading of the treaty, amended section 7502 of the CPLR to permit injunctive relief regardless of whether the arbitration is governed by the UN Convention (L 2005, ch 703 [eff Oct. 4, 2005]). CPLR 7502 (c) now reads in pertinent part:

> "The supreme court . . . may entertain an application for an order of attachment . . . in connection with an *arbitration*



*that is pending or that is to be commenced inside or outside this state, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards,* but only upon the ground that the award to which the applicant may be entitled may be rendered

[26 Misc.3d 674]

ineffectual without such provisional relief. The provisions of articles 62 and 63 of this chapter shall apply to the application, including those relating to undertakings and to the time for commencement of an action (arbitration shall be deemed an action for this purpose), except that the sole ground for the granting of the remedy shall be as stated above." (CPLR 7502 [c] [emphasis indicating added language in 2005 amendment].)

After the amendment to section 7502 and following the *Borden* decision, courts have recognized that provisional remedies are available in support of pending arbitration under the UN Convention. Since the availability of provisional relief is a matter of federal treaty interpretation, unless the United States Supreme Court overrules *Borden,* provisional relief can now be sought in aid of arbitration under the UN Convention (*see* Alexander, 2006 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, 2009 Pocket Part, CPLR C7502:6 ["(I)t is noteworthy that the amendment, in effect, constitutes the New York legislature's interpretation of one aspect of a body of federal law—the convention—that the U.S. Supreme Court has not yet passed upon"]; *see also Alvenus Shipping Co., Ltd. v Delta Petroleum [U.S.A.] Ltd.,* 876 F Supp 482, 487

[SD NY 1994] [permitting attachment as provisional remedy in aid of foreign arbitration]).

As stated in *Gerling Global Reins. Corp. v Sompo Japan Ins. Co.* (348 F Supp 2d 102, 105 [SD NY 2004]):

"There is one very narrow exception to the jurisdictional limit [of the Convention], but the exception concerns only the issuance of provisional remedies to ensure that an arbitration panel can afford meaningful relief. For example, in *Venconsul* the court held that it had subject matter jurisdiction pursuant to the Convention over a motion for a preliminary injunction; in that case, however, jurisdiction existed because an arbitration proceeding was already pending and exercising jurisdiction over the motion for a preliminary injunction would help `preserve the possibility of recoveries upon [arbitral] awards.'" ([Citations omitted], citing *Venconsul N.V. v TIM Intl N.V.,* 2003 WL 21804833, *3, 2003 US Dist LEXIS 13594, *8 [SD NY 2003]; *China Natl. Metal Prods. Import/Export Co. v Apex Digital, Inc.,* 155 F

[26 Misc.3d 675]

Supp 2d 1174 [CD Cal 2001].)

The amended statute provides that the sole ground to be considered in a case covered by CPLR 7502 (c) is whether a later award would be rendered ineffectual without provisional relief. Thus, without more, a nondomiciliary attachment in aid of arbitration is permissible, once the "ineffectual" requirement of CPLR 7502 (c) is



-3-

met. On the other hand, for domiciliaries, CPLR 6201 (3) requires demonstration that: "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." (CPLR 6201 [3].)

One recent writer opines:

> "Is it not odd that plaintiffs can basically get pre-judgment security interests in the assets of foreign defendants, even though it no longer serves any jurisdictional purpose? With regard to domiciliaries, the plaintiff must first prove the defendant is a crook. *See* N.Y. CPLR 6201 (4) [*sic*] (McKinney 2008). Therefore, CPLR 6201 equates crooks and foreigners . . . .

> "A line of cases . . . holds that courts have discretion to deny orders of attachment against nondomiciliaries who pose no risk of failing to pay a judgment. In *Ames v. Clifford,* 863 F Supp 175, 177 (S.D.N.Y. 1994), the court stated that `New York courts have required an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk to the enforceability of a future judgment.' *Id.* The court went so far as to suggest that, in the absence of such discretion, New York law might violate the constitutional right of non-domiciliaries to equal protection of the laws. *See id.* (citing *Jonnet v. Dollar Sav. Bank of N.Y.,* 530 F2d 1123,

1142 (3d Cir. 1976) (Gibbons, J., concurring)); *see also Thornapple Assocs. v. Sahagen,* No. 06 Civ. 6412 (JFK), 2007 US Dist. LEXIS 17370, at \*17-18 (S.D.N.Y. Mar. 12, 2007); *Elliott Assocs., L.P. v. Republic of Peru,* 948 F Supp 1203, 1211 (S.D.N.Y. 1996) (citing *Incontrade, Inc. v. Oilborn Int'l, S.A.,* 407 F. Supp 1359, 1361 (S.D.N.Y. 1976)); *Reading & Bates Corp. v. Nat'l Iranian Oil Co.,* 478 F Supp 724, 727 (S.D.N.Y. 1979)

[26 Misc.3d 676]

> (quoting *Incontrade,* 407 F Supp at 1361); *Maitrejean v. Levon Props. Corp.,* 45 AD2d 1020, 1020-21, 358 NYS2d 203, 205 (2d Dep't 1974) (reversing supreme court for granting a lien against a foreign corporation, where corporation was highly liquid)." (David Gray Carlson, *Critique of Money Judgment [Part Two: Liens on New York Personal Property],* 83 St John's L Rev 43, 105 n 385 [2009].)

However, the statute, CPLR 7502 (c), may well survive the suggested equal protection challenge since it requires a demonstration that the award may be rendered ineffectual without provisional relief. In most fact situations as a practical matter, this is not fundamentally different from the traditional application of subdivision (3) ("intent to defraud . . . or frustrate enforcement") or the requirement of "irreparable harm" (CPLR 6201 [3]; *Matter of Hill v Reynolds,* 187 AD2d 299, 300-301 [1st Dept 1992]) in cases brought against domiciliaries.



In the case before the court, Sojitz has alleged and documented that Prithvi diverted funds without explanation from an escrow account held for Sojitz's benefit and that a criminal complaint, alleging fraud by Prithvi, has been lodged in India. These uncontested allegations are sufficient to justify confirmation of the attachment of the $18,000 asset in the present case.

Accordingly, in the case before the court, Sojitz meets the requirements of CPLR 7502 and 6201.

B. Due Process: Attachment for Security Purposes Only

New York courts have long recognized that its "nonresident attachment statute is designed to serve two independent purposes: obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state" (*ITC Entertainment, Ltd. v Nelson Film Partners,* 714 F2d 217, 220 [2d Cir 1983]; *see also Ames v Clifford,* 863 F Supp 175, 177 [SD NY 1994]). Arbitration of the contract claims in this case has commenced in Singapore. Sojitz does not seek to litigate the merits of its claims in New York. Sojitz merely seeks attachment for security to preserve assets that would not otherwise be available if it prevails in Singapore. Sojitz contends that so long as the "res" is within the court's jurisdiction, the court may confirm the order of attachment when issued solely for security purposes (*see* petitioner's mem of law, Sept. 9, 2009, at 7). The situs of an intangible asset, such as a debt, is the domicile of the debtor or garnishee (*Hotel 71 Mezz Lender LLC v Falor,* 58 AD3d 270, 273 [1st Dept 2008]).

[26 Misc.3d 677]

> "It is long settled in New York that the fundamental rule in attachment proceedings is that the res must be within the jurisdiction of the court issuing

the process in order to confer jurisdiction . . . [A]n attachment of a debt or other intangible property can . . . be effected as against the debtor or obligor by service upon him or her when he or she is domiciled within the state." (*Id.* [internal quotation marks omitted].)

The situs of a debt for attachment purposes is "the location of the party of whom performance is required by the terms of the contract" (*ABKCO Indus. v Apple Films,* 39 NY2d 670, 675 [1976]). In this case, it is not contested that the account seized is a debt owed by a New York domiciliary to respondent Prithvi.

Prithvi argues that a New York court needs personal jurisdiction over, or a demonstration of some minimum level of contact with, New York State before it may grant an order of attachment even where the attachment is sought solely for security purposes (*see* respondent's mem of law, Sept. 4, 2009, at 1).

Prithvi argues that, in *Shaffer v Heitner* (433 US 186, 212 [1977]), the United States Supreme Court rejected its previous rule that the mere presence of property within a state gave that state jurisdiction to enter a valid judgment against the property's owner. Prithvi maintains that, as a matter of due process and as a result of *Shaffer,* some minimal level of contact between the respondent or the transaction in question is needed before assets in New York may be seized to secure a foreign judgment. However, in *Shaffer,* "the express purpose of the [state's] sequestration procedure [was] to compel the defendant to enter a personal appearance" (*id.* at 209). Significantly, the court was careful to point out that, while mere presence of property "does [not] support jurisdiction to adjudicate the underlying claim . . . a State in which property is located should have jurisdiction to attach that



property, by use of proper procedures, as security for a judgment being sought in a forum where the litigation can be maintained consistently with *International Shoe.* Moreover, we know of nothing to justify the assumption that a debtor can avoid paying his obligations by removing his property to a State in which his creditor cannot obtain personal jurisdiction over him." (*Id.* at 210 [citations omitted].)

As suggested by Prithvi, proof of minimum contacts in a case of foreign arbitration was recently required in *Sole Resort, S.A.*

[26 Misc.3d 678]

*de C.V. v Allure Resorts Mgt., LLC* (450 F3d 100, 101 [2d Cir 2006]). There, foreign corporate litigants conducted arbitration in Florida. Subsequently the Court of Appeals, Second Circuit permitted one of the parties to move to vacate the Florida award in New York but conditioned upon a finding on remand by the District Court of minimum contacts with New York. However, the present case is readily distinguishable since the action in *Sole* attacked the underlying arbitration award and contract claim on the merits. In order to commence litigation against a defendant in New York due process required some level of contact between the defendant and the forum state. Here, neither party seeks to litigate the claims or the validity of an award in this state and personal jurisdiction should not be an issue.

Recently, in *Shipping Corp. of India Ltd. v Jaldhi Overseas Pte Ltd.* (585 F3d 58, 66-71 [2d Cir 2009]), the Second Circuit revisited the issue of attachment in international arbitration in the context of maritime law. Not dissimilar to the facts here, *Shipping Corp.* was "based on a dispute between a company incorporated in India and a company incorporated in Singapore . . . [and] the dispute was to be arbitrated in England" (*id.* at 60). In *Shipping Corp.,* the District

Court vacated plaintiff's ex parte attachment of electronic fund transfers (EFTs)[2] in the temporary possession of an intermediary bank in New York, and the Second Circuit affirmed (*see id.* at 71).

In *Shipping Corp.,* the Second Circuit focused on the nature of the property that the plaintiff sought to attach, while assuming that New York assets of a defendant could be seized, in maritime cases and consistent with due process, for security purposes. The problem for the court in *Shipping Corp.* was

[26 Misc.3d 679]

that the EFTs were not property of the defendant. The Second Circuit noted that on this issue, "New York State does not permit attachment of EFTs that are in the possession of an intermediary bank . . . [T]he New York Uniform Commercial Code states that a beneficiary has no property interest in an EFT because `until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach . . . New York law establish[es] that EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." (*Id.* at 70-71, citing *European Am. Bank v Bank of Nova Scotia,* 12 AD3d 189 [1st Dept 2004] [noting that attachments served on intermediary banks cannot be enforced].)

The net effect of *Shipping Corp.* was to bring federal law governing maritime seizures in line with New York law in nonmaritime cases: assets, whether tangible or intangible may be seized for security, but EFTs are not property of the defendant.

Pursuant to CPLR 7502, 6201, and the relevant case law, this court holds that pre-award attachments in international arbitration cases are proper against



ascertainable property, including but not limited to debts owed to respondent by its obligors domiciled within the State of New York.

## Conclusion

For the reasons stated above, the attachment is confirmed. (*See* order, Oct. 16, 2009.)

---------------

Notes:

1. "Since the parties herein have selected arbitration as the forum in which to resolve their controversies and the instant controversy involves international commerce, the UN Convention is applicable" (*Shah v Eastern Silk Indus.,* 112 AD2d 870, 871 [1st Dept 1985]). The United States, the United Kingdom, Singapore, and India are all signatories to the Convention.

2. "An EFT is nothing other than an instruction to transfer funds from one account to another . . . To more concretely illustrate the circumstances of the instant case, consider the following example: ABC Shipping wants to transfer $100 to XYZ Overseas. ABC has an account at India National Bank, and XYZ has an account at Bank of Thailand. India National Bank and Bank of Thailand do not belong to the same consortium, but each has an account at New York Bank. To begin the transfer, ABC instructs India National Bank to transfer $100 to XYZ's account at Bank of Thailand. India National Bank then debits ABC's account and forwards the instruction to New York Bank. New York Bank then debits India National's account and credits Bank of Thailand's account. Bank of Thailand then credits XYZ's account, thereby completing the transfer." (*Shipping Corp. of India Ltd. v Jaldhi Overseas Pte Ltd.,* 585 F3d 58, 61 n 1 [2d Cir 2009].)

---------------



**192 N.Y. 238**

**84 N.E. 950**

**In re NEWCOMB'S ESTATE.**

**Court of Appeals of New York.**

**May 19, 1908.**

Appeal from Supreme Court, Appellate Division, First Department.

Application for the revocation of ancillary letters testamentary granted in the estate of Josephine Louise Newcomb, deceased. From an order of the Appellate Division (122 App. Div. 920,107 N. Y. Supp. 1139), affirming a decree of the Surrogate's Court dismissing the application, the petitioners appeal. Affirmed.

Josephine Louise Newcomb died in the city of New York on the 7th of April, 1901, at the age of 85, leaving an estate worth more than $2,000,000 and an instrument purporting to be her holographic will, executed at the city of New Orleans on the 12th of May, 1898, of which the material part is as follows:

'First. I have resided of late years in different places, but have made the city of New Orleans my permanent home, because I here witness and enjoy the growth of the 'H. Sophie Newcomb Memorial College,' a department of the Tulane University of Louisiana which I have founded, and has been named in honor of the memory of my beloved daughter. I have implicit confidence that the 'Administrators of the Tulane Educational Fund' will continue to use and apply the benefactions and property I have bestowed and may give for the present and future development of this department of the University known as the H. Sophie Newcomb Memorial College which engrosses my thoughts and purposes, and is endeared to me by such hallowed associations.

'Second. I have no forced heirs, I owe no debts; and I hereby revoke all wills of a date anterior to this. I hereby make the following special legacies and bequests: To the Greenwood Cemetery a corporation organized and existing under and by virtue of chapter 298 [p. 297] of the Laws of the State of New York passed in 1838, the sum of two thousand ($2,000) dollars for the care of lots numbered 17,036 and 17,037 and it is my desire, that at my death, my remains may be placed with the loved ones there at rest. To Alice Bowman of New Orleans Louisiana five thousand ($5,000) dollars. To William Robertson of Charleston South Carolina one thousand ($1,000) dollars.

'Third. With the exception of the special legacies and bequests herein above stated and made, I hereby give and bequeath to the 'Administrators of the Tulane Educational Fund' of New Orleans, the whole of the property, real, personal and mixed of which I am now possessed or which I may leave at the time of my death, and to that end and purpose I do hereby name and constitute the said 'Administrators of the Tulane Educational Fund' to be my universal legatee. I appoint my cousin and friend Joseph A. Hincks and my friend B. V. B. Dixon to be executors giving them seizin and detainer of my estate and requiring no bond from them.

'Thus wholly have I written, dated and signed this my last will and testament at New Orleans Louisiana this 12th day of May, 1898.'

On the 8th of April, 1901, the day after Mrs. Newcomb died, this instrument was admitted to probate as her last will and testament in the civil district court for the parish of Orleans in the state of Louisiana, without notice to her heirs at law or next of kin, and letters testamentary were issued to the executors named therein, both of whom promptly qualified. On the 13th of April, 1901, upon their petition, ancillary letters testamentary were issued to said executors by



the Surrogate's Court of the county of New York, without notice to any one; but the Comptroller of the State voluntarily appeared and, waiving notice, consented that ancillary letters should be issued. The executors forthwith removed the bulk of the assets belonging to the estate from the state of New York to the state of Louisiana. About one year later, or on the 14th of April 1902, the heirs at law and next of kin of Mrs. Newcomb, being nephews and nieces and grand nephews and nieces, four of whom resided in Louisville, Ky., and two in New Orleans, upon their petition setting forth facts tending to show that the decedent resided in the city of New York at the date of her death, that she was not of sound mind, that she was subject to undue influence when she signed said instrument, and that a holographic will cannot be set aside on account of undue influence in the state of Louisiana, procured an order from the Surrogate's Court of the county of New York requiring the executors to show cause why the ancillary letters testamentary should not be revoked and vacated. A citation was issued, and in due course of procedure an answer was filed by one of the executors, raising, among other issues, the question whether Mrs. Newcomb, at the time of her death, resided and had her domicile in the city of New York or in the city of New Orleans. On the 16th of July, 1902, Robert E. Deyo, Esq., was appointed referee to hear the evidence relating to said issue and report the same with his opinion. A long trial followed, and much evidence was taken, both oral and written, which appears in four large printed volumes now before the court. Between 700 and 800 requests to find were presented to the referee and the surrogate, all of which were duly passed upon, and exceptions were filed by the respective parties to such findings as they considered unwarranted by the evidence or by law. The referee, in his report dated March 27, 1905, found: 'That the residence or domicile of Josephine Louise Newcomb, deceased, at the time of her death, was in the city of New Orleans, in the state of Louisiana.' The surrogate confirmed all the findings of fact and law made by the referee, adopted his opinion, and also found specifically: 'That Josephine Louise Newcomb, the decedent, was, prior to and at all times since the death of her husband and daughter down to the time of her own death, in all respects, competent to select, change, acquire, and establish a legal and valid domicile or residence; that previously to the time of her death the said Josephine Louise Newcomb had voluntarily, and without compulsion or restraint exercised upon her, selected and adopted the city of New Orleans, in the state of Louisiana, as her domicile and place of permanent abode and residence, and continued to there reside and have her domicile and permanent place of residence and abode down to and at the time of her death.' He dismissed the application for the revocation of ancillary letters testamentary, and a decree was entered accordingly. On appeal by the petitioners to the Appellate Division the decree was unanimously affirmed, and thereupon they appealed to this court.

[84 N.E. 952]

[192 N.Y. 243]Austen G. Fox, Philip A. Rollins, and F. A. Gaynor, for appellants.

George F. Canfield and [192 N.Y. 244]James McConnell, for respondent.

**VANN, J. (after stating the facts as above).**

While the rule of unanimous affirmance prevents us from reviewing the evidence, a more complete statement of [192 N.Y. 245]the leading facts found by the surrogate, in passing upon the requests presented by the parties, is necessary in order to properly discuss the rulings relating to evidence which it is our duty to review. The decedent, Josephine Louise Newcomb, was born on the 3d of October, 1816, in the city of Baltimore,



where her parents resided. She was of French extraction on the part of her father, and English on the part of her mother. She was partially educated in Baltimore, where she resided until the death of her mother in 1831 or 1837; both evidence and findings leaving the year in doubt. She then removed to New Orleans, La., where she finished her education and resided with Mrs. Henderson, her only sister, until her marriage there in 1845 to Warren Newcomb, a native of Massachusetts. After their marriage she and her husband went to Louisville, Ky., where he acquired a substantial estate, and where they resided until 1862, when, owing to the confusion caused by the Civil War, they removed to the city of New York and resided at the Hoffman House until the death of Mr. Newcomb in 1866. He left, him surviving, Mrs. Josephine Louise Newcomb, his widow, and a daughter named Sophie, then about 10 years of age. All his property, valued at about $500,000, passed by will to his widow and daughter. Mrs. Newcomb never had any child other than Sophie, except a son who lived but a short time. After the death of her husband, she continued to reside with her daughter in the city of New York, living at hotels and boarding houses until December 16, 1870, when Sophie died, and her mother, inheriting from her, thereupon became possessed of the entire estate left by Mr. Newcomb.

The death of her daughter exerted a powerful influence upon the hopes and ambitions of Mrs. Newcomb's life. Shortly after that event she divided $150,000, which was from one-fifth to one-fourth of all her property at that time, among her nearest relatives, ancestors of the petitioners, and formed the plan of devoting the rest of her estate to some kind of a memorial to her daughter. The memorial [192 N.Y. 246]idea, vague at first, took more definite shape in 1886, when she founded the H. Sophie Newcomb Memorial College, an unincorporated branch of Tulane University in the city of New Orleans, and before her death in 1901 she had given about

$1,000,000 to the university for the benefit of that college. Her fortune had increased, however, through the judicious management of her agents in New York, so that she left upwards of $2,000,000 when she died. After the death of her daughter, she continued to reside in the city of New York, not keeping house, but boarding and spending the warm weather in various summer resorts in different states. In 1871 she visited her sister in New Orleans for about one month, but after that she was not in the state of Louisiana again until 1892,

[84 N.E. 953]

when she made another visit of a few weeks, living at a boarding house. She renewed her visit in 1893 for seven weeks, and in 1894 for nine weeks, staying with different friends. In 1895 she made a will by which she left substantially all her property to the memorial college and in which she described herself as of Bayonne, N. J. At about the same time she stated her residence in the same way in a conveyance of real estate, and also, in 1897, in a codicil ratifying her will. In the spring of 1895 she lived for six weeks at the Josephine Louise House, a dormitory of the memorial college erected by her, and returning there on the 10th of December, 1895, she remained until April 30, 1896, living all the time at the dormitory and taking her meals in the students' dining room, except as she was driven out by fire for a few weeks. After spending the summer in the Adirondacks, she went to New Orleans in November, stopping at New York on her way, and lived at the Josephine Louise House until May, 1897. Again spending the summer at various resorts, and about two months in the fall at the Fifth Avenue Hotel, she returned to New Orleans and lived there, as before, from December 10, 1897, until May 31, 1898.

During this period, apprehending, with some reason, that any will she might make would be contested by her relatives, [192 N.Y. 247]she took counsel as to what she should do



in order to become a citizen of New Orleans, and also with reference to making her will so as 'to secure the strength' of her fortune to the memorial college. After making a list of questions to ask relating to these subjects, she consulted Mr. McConnell, an able lawyer of New Orleans, the counsel of the university and one of its officers, who advised her to change her domicile, and that she could do so by making an express declaration in writing to that effect. He suggested a will written, dated, and signed by her own hand, and offered to furnish her, and subsequently at her request did furnish her, a form both for the declaration as to residence and the making of the will. On the 15th of April, 1898, knowing that she had declared herself a resident of New Jersey in several documents, acting under Mr. McConnell's advice, and observing the form furnished by him, she executed at New Orleans certain formal declarations, in one of which she stated: 'I have now concluded to make my permanent home here, because on each succeeding day of my life now drawing to a close, I am the grateful witness of the successful development and steady growth of this noble institution (referring to the memorial college), which now engrosses my thoughts and purposes and is endeared to me by such hallowed associations. In order that there may be no occasion for misapprehension hereafter, especially in any matter touching the settlement of my estate, I desire to have it known by my particular friends that I have elected to make the city of New Orleans my place of domicile and permanent home, although of course I may occasionally visit or reside in other places.' The other declarations contained similar statements. She sent these announcements to various persons, including Mr. Hinck, a relative and now one of her executors, and to Mr. Pomroy, her trusted business manager in New York. About one month later she made the will in question, written in her own hand, but according to the form furnished by Mr. McConnell. She spent the summer of 1898 at watering places in the North, and made preparations to go to New

Orleans in the [192 N.Y. 248]fall, but owing to poor health she remained in New York City, spending the winter at the Fifth Avenue Hotel. In July, 1899, while she was at Richfield Springs, N. Y., acting through the president of a bank in New Orleans, but upon the advice of Mr. McConnell, she purchased a dwelling house in New Orleans for her own use, and paid therefor the sum of $14,000. It was situated near the university and is now a part of it. From January 21 until May 30, 1900, she lived in that house, but went North for the summer, expressing the intention of returning in the fall. She never returned. While making a visit at the house of a friend in New York on her way from Richfield Springs to New Orleans she was taken sick, and on the 7th of April, 1901, she died. The surrogate, adopting the findings of the referee, found that 'subsequent to the spring of 1895 Mrs. Newcomb intended to return every year to New Orleans after spending the summer in the North, and did in fact return to New Orleans every year except when prevented by illness.' During the period of about four years preceding her formal declaration of domicile, she spent upwards of 500 days in the city of New Orleans, as compared with less than 150 in the city of New York. Between the date of the declaration and the date of her death she spent less than 200 days in New Orleans and more than 600 in New York City. The rest of the time during both periods she spent at summer resorts in New York and New England. All her relatives and many of her intimate friends were southern people, and during the last years of her life she spoke and wrote of the South as her country, and of New Orleans as her home. Upon the foundation of the memorial college her interest and affection were absorbed more and more by the memorial idea, which finally became her chief ambition and to a great extent took the place of her deceased husband and daughter. She spoke of it as her 'life's work,' and declared that 'in this college my daughter lives again to me. She does not seem to be dead, but lives again in this college and in



these girs.' [192 N.Y. 249]During all these years her bank account was kept in the city of New York, her estate was managed there, and her only safe deposit box was there, except one in Jersey City during the last year of her life. She left some, but not much, of her clothing there, and her regular physician resided there. She had but

[84 N.E. 954]

few personal belongings, and carried the most of them with her in trunks. During a period of 30 years, and until she was about 80 years of age, her domicile was in the city of New York.

Both referee and surrogate found a multitude of incidental and evidentiary facts bearing in diverse ways upon the ultimate question of her domicile at death, some of which indicate that for many years and with a definite object in view, the authorities of Tulane University paid anxious and assiduous court to this old lady and her fortune. It was argued before the referee, and the argument was repeated before us, that she resided in New York and visited in New Orleans, instead of residing in New Orleans and visiting in New York; that her later visits South Differed in no material respect from those made earlier; and that under the tuition of representatives of the university she sought to become a nominal resident of Louisiana merely for the purpose of making a will to accord with the laws of that state, and not for the purpose of making a permanent home there. These contentions are not open to us, for they are conclusively disposed of by the finding of the surrogate and the unanimous affirmance thereof by the Appellate Division, that the city of New Orleans was at the date of her death her actual and legal domicile. As it is not denied that the findings of the surrogate support his conclusions of law, the only questions calling for discussion are those raised by exceptions to rulings relating to evidence.

By appropriate exceptions the point is raised that the declarations of the decedent relating to her domicile, whether verbal or written, not made in connection with acts done by her, or in explanation thereof, were selfserving and inadmissible. This contention requires a consideration of the principles of law governing the subject of domicile, and in [192 N.Y. 250]discussing those principles we shall consider them simply with reference to the rules relating to succession, either by will or intestacy, as distinguished from those relating to attachments against the property of nonresident debtors, substituted service of process upon nonresidents, matrimonial actions, and the like.

As 'domicile' and 'residence' are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning; but they are not identical terms, for a person may have two places of 'residence,' as in the city and country, but only one 'domicile.' 'Residence' means living in a particular locality, but 'domicile' means living in that locality with intent to make it a fixed and permanent home. 'Residence' simply requires bodily presence as an inhabitant in a given place, while 'domicile' requires bodily presence in that place and also an intention to make it one's domicile. The existing domicile, whether of origin or selection, continues until a new one is acquired, and the burden of proof rests upon the party who alleges a change. The question is one of fact rather than law, and it frequently depends upon a variety of circumstances, which differ as widely as the peculiarities of individuals. Less evidence is required to establish a change of domicile from one state to another than from one nation to another. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence, is of no avail. Mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence even for a short time, with the intention in good faith to change the domicile,



has that effect. Uno so lo die constitutiur domicilium si de voluntate appareat. Residence is necessary, for there can be no domicile without it, and important as evidence, for it bears strongly upon intention, but not controlling, for unless combined with intention it cannot effect a change of domicile. Dupuy v. Wurtz, 53 N. Y. 556, 561; The Venus, 8 Cranch (U. S.) 253, 278, 3 L. Ed. 553; Carey's Appeal, 75 Pa. 201, 205; Wharton's Conflict of Law [192 N.Y. 251](2d Ed.) §§ 21, 56, 66. There must be a present, definite, and honest purpose to give up the old and take up the new place as the domicile of the person whose status is under consideration. The subject is under the absolute control of every person of full age and sound mind who is free from restraint, unless it may be that the domicile of a wife is controlled by that of her husband as long as she lives with him. Story's Conflict of Law (7th Ed.) § 46. Subject to the qualifications named, every human being may select and make his own domicile, but the selection must be followed by proper action. Motives are immaterial, except as they indicate intention. A change of domicile may be made through caprice, whim, or fancy, for business, health, or pleasure, to secure a change of climate, or a change of laws, or for any reason whatever, provided there is an absolute and fixed intention to abandon one and acquire another, and the acts of the person affected confirm the intention. McConnell v. Kelley, 138 Mass. 372. No pretense or deception can be practiced, for the intention must be honest, the action genuine, and the evidence to establish both clear and convincing. The animus manendi must be actual with no animo revertendi. A temporary residence for a temporary purpose, with intent to return to the old home when that purpose has been accomplished, leaves the domicile unchanged; but, even if the residence was begun for a temporary purpose, intention may convert it into a domicile. When a new domicile has been actually acquired, it does not necessarily revert, even if not followed by continuous residence. There may be many absences from the new place and protracted sojournings in the old, unless intention and residence unite again, when still another change of domicile is effected.

[84 N.E. 955]

This discussion shows what an important and essential bearing intention has upon domicile. It is always a distinct and material fact to be established. Intention may be proved by acts and by declarations connected with acts, but it is not thus limited when it relates to mental attitude or to a subject governed by choice. As we have seen, a person may select [192 N.Y. 252]and make his own domicile, and no one may let or hinder. He may elect between his winter and summer residence and make a domicile of either. The right to choose implies the right to declare one's choice, formally or informally, as he prefers, and even for the sole purpose of making evidence to prove what his choice was. Such declarations are not self-serving in an improper sense, unless they are made with intent to deceive. If they are false and made for a sinister purpose, they will meet the fate that falsehood always meets in courts of justice when discovered by the triers of fact. Mrs. Newcomb, for many years domiciled in New York, had the absolute right to change her domicile to New Orleans. As she resided a part of the time in each city, she could select either as her domicile, provided she acted in good faith. She could make the change because she preferred the people, the climate, or the laws of Louisiana to those of New York, or even because she wished to have her will proved and her estate settled there. She could accomplish nothing by merely pretending to change her domicile, while really intending to retain it in New York. If she had made the most formal declaration of intention for the purpose of creating evidence of an apparent change, with no intention of making an actual change, it would have been a fraud and of no effect. The good faith of her declarations, as well as the weight to be given them, was for the referee and surrogate, but they were



competent as evidence. While acts speak louder than words, the words are to be heard for what they are worth. They should have received, and the presumption is that they did receive, the careful scrutiny of the experienced lawyers whose duty it was to weigh them; but it was for them to decide as a fact whether they expressed her honest intention, or were made upon the suggestion of interested parties, to conceal her real intention and circumvent the law.

Only one more class of rulings is pressed upon our attention as erroneous, which is remarkable in view of the length of the trial and the extent of the evidence. Dr. Scratchley was sworn for the appellants and testified [192 N.Y. 253]that off and on for 20 years before the death of Mrs. Newcomb he had been her attending physician. After stating that she was at Dr. Chamberlain's residence in the city of New York continuously from the fall of 1900 until her death in the spring of 1901, he was asked by the counsel for the appellants the following question: 'Was there anything in her physical condition to keep her from going to New Orleans if she wished?' This was objected to as calling for 'answers as her attending physician.' The objection was sustained, and the appellants excepted. The witness then stated: That Mrs. Newcomb never said to him that she desired to return to New Orleans, and that she told him she wanted to die in New York and be buried in Greenwood Cemetery. That while she was living at Dr. Chamberlain's in 1900 and 1901 she discussed with the witness the question of her return to New Orleans. That he saw her socially and professionally both during all his acquaintance with her. 'At that time, too, she wasn't continuously ill at that time. * * * She would tell me that she had received letters from her friends, and that they were urging her to come to New Orleans. That her home was waiting for her. She never expressed a desire to go. She said that she was ill, and that she was comfortable here, and that she was going to die, and she wanted to die, here. When I say here, I refer to New York, at Dr.

Chamberlain's, where she was living.' Dr. Scratchley was then asked the following question: 'Was Mrs. Newcomb's condition such that she could not have gone to New Orleans?' There was the same objection, ruling, and exception. The doctor then stated: 'I saw Mrs. Newcomb in New York in the winter of 1898, December. She remained at the Fifth Avenue Hotel until June, 1899.' He was then asked: 'During that time was she in a condition to go to New Orleans if she had wished to?' He was also asked: 'What was the condition, physical condition, of Mrs. Newcomb from 1898 on?' These questions were excluded upon the same objection and exceptions were duly taken.

[192 N.Y. 254]The object of these questions was to show that Mrs. Newcomb was not prevented by sickness from returning to New Orleans during certain years. They involved her physical condition, with reference to the effect of any disease, ailment, or infirmity that she may have had. There was no attempt to limit the answers of the witness to what he observed when not in attendance upon her as a physician. The questions were general in character, and called for the result of his observation as to the diseases with which his patient was afflicted and for which he had treated her professionally. While a responsive answer to any of the questions would not necessarily have included the mention of any particular disease, it might have included the statement that the decedent was suffering from a disease of such a nature as to prevent her from traveling. That statement might have involved the disclosure of information acquired in a professional capacity and necessary to enable the physician to act in that capacity. Diseases are discovered by a personal examination of the patient in connection with information as

[84 N.E. 956]

to feelings and symptons furnished by the patient. While the question is close, we think the spirit of section 834 of the Code of Civil



Procedure might have been violated if the witness had been allowed to answer. But, assuming that the rulings were erroneous, they do not require a reversal of the order. The trial was of unusual length, and during such a protracted and sharply contested investigation errors of minor importance are apt to creep into the record. We doubt if the matter could be tried over again with a smaller percentage of error. Courts are practical agencies of government for the administration of justice, and theoretical perfection is seldom attained. A close scrutiny of slight errors tends to retard the transaction of judicial business and to hamper the adjustment of legal differences. These remarks are especially applicable to rulings in Surrogate's Court, for the statute directs us not to reverse a decree or order of that court 'for an error in admitting or rejecting evidence, unless it appears to the appellate court that the [192 N.Y. 255]exceptant was necessarily prejudiced thereby.' Code Civ. Proc. § 2545. This section destroys the presumption of injury that might otherwise obtain. Matter of Will of Smith, 95 N. Y. 516, 527. Assuming that the rulings now under consideration were erroneous, they did not constitute reversible error, because the appellants were not necessarily prejudiced thereby. We are convinced from an examination of the evidence that the referee and surrogate would have reached the same conclusion even if the witness had stated that the physical condition of Mrs. Newcomb did not prevent her from going to New Orleans during the years in question.

The order of the Appellate Division should be affirmed, with costs.

**CULLEN, C. J., and GRAY, HAIGHT, WERNER, HISCOCK and CHASE, JJ., concur.**

Order affirmed.



Page 941

**197 N.Y.S.2d 941**
**22 Misc.2d 33**
**Dorothy GROMEL, Plaintiff,**
**v.**
**Walter GROMEL, Defendant.**
**Supreme Court, Special Term, Queens**
**County, Part III.**
**Dec. 28, 1959.**

Page 942

Rothenber, Atkins & Koss, New York City, for plaintiff. Michael B. Atkins, New York City, of counsel.

Joseph P. Marcelle, New York City, for defendant.

NICHOLAS M. PETTE, Justice.

This is an action for separation on the ground of defendant's alleged cruel and inhuman treatment of the plaintiff, his neglect and refusal to provide for the plaintiff and his abandonment of her.

The complaint alleges that the parties were married in New Jersey on May 29, 1948; that there is one child, issue of the marriage; that plaintiff is a resident of New Jersey; and that the defendant for more than one year preceding the commencement of the action, has been and still is a resident of the State of New York. The summons in this action was served on April 25, 1959.

The defendant interposed an answer denying generally the allegations of the complaint, and as a first separate, distinct and affirmative defense

Page 943

asserts that this Court lacks jurisdiction of the subject matter of the action on the ground that plaintiff and defendant were married without the State of New York; that the plaintiff was not a resident of this State when this action was commenced, and that the defendant, was not and has not been a resident of this State for at least one year continuously at any time prior to the commencement of this action.

This action was tried before me on the 14th and 15th days of December, 1959. After hearing the testimony of the plaintiff and the witnesses called in her behalf and the introduction of documentary evidence, plaintiff rested and defendant then moved to dismiss the complaint on the ground that plaintiff has failed to make out a prima facie case pursuant to the requirements of Section 1165-a of the Civil Practice Act. The Court [22 Misc.2d 34] reserved decision on the motion. The defendant then called one witness and rested, and then renewed the motion to dismiss the complaint, and the Court reserved decision thereon.

From all the testimony and proof adduced before the Court, there is no doubt in this Court's mind that the defendant was not a resident of the State of New York for at least one year continuously preceding the commencement of this action. The evidence disclosed that the parties were married in the State of New Jersey; that on April 25, 1959 and at the time of this trial, the plaintiff was and still is a resident of the State of New Jersey, and that the State of New Jersey is the domicile of the parties herein.

It further appears from the evidence introduced by the plaintiff, that in the 1958 Income Tax Withholding Statements of the defendant's employer, that the defendant's residence is stated to be 16-17th Street, Weehawken, New Jersey, where plaintiff also resides. The same residence address is given on the Income Tax Withholding Statements for years prior to 1958, all of which were introduced in evidence by the plaintiff.



The plaintiff has not disputed, but in fact testified that the defendant receives his mail in New Jersey; that his automobile is registered in New Jersey, and that his license to operate the automobile is a New Jersey license.

There is nothing in the record before the Court to establish that defendant's domicile is other than the State of New Jersey, or that defendant intended to change that domicile. The defendant is an aviator employed by Trans Caribbean Airways Inc., and of necessity when his employment required it, he has temporarily resided at different places throughout the country. The fact that on or about March 1, 1959, he took an apartment in Jackson Heights, does not militate against the defendant's contention that his domicile is in the State of New Jersey and that he was not a resident of the State of New York continuously for at

Page 944

least one year prior to the commencement of this action on April 25, 1959.

Without further reviewing the testimony and evidence adduced upon this trial, this Court is satisfied, and finds that the parties were married in the State of New Jersey on May 29, 1948 and have one child, the issue of the marriage; that the plaintiff is domiciled and resides at 16-47th Street, Weehawken, New Jersey, and at the commencement of this action and prior thereto, she was and still is domiciled in and a resident of the State of New Jersey; that the defendant since his marriage was domiciled and a resident of the State of New Jersey; and that he was not a resident of the State of New York [22 Misc.2d 35] for at least one year continuously prior to April 25, 1959, the date of the commencement of this action.

In order to maintain this action for separation, the plaintiff must comply with the requirements of Section 1165-a of the Civil Practice Act, which so far as applicable here states:

'An action * * * for separation may be maintained in either of the following cases:

* * *

* * *

'3. Where the parties were married without the state, and either the plaintiff or the defendant is a resident of the state when the action is commenced, and has been a resident thereof for at least one year continuously at any time prior to the commencement of the action.'

'Residence' as used in this section does not mean mere physical presence but is synonymous with 'domicile', Pignatelli v. Pignatelli, 169 Misc. 534, 8 N.Y.S.2d 10; Finizio v. Finizio, Sup.Ct.Kings Co., 124 N.Y.S.2d 121. And 'residence' means the place of permanent abode. DeMeli v. DeMeli, 120 N.Y. 485, 24 N.E. 996; Ensign v. Ensign, 54 Misc. 289, 105 N.Y.S. 917, affirmed 120 App.Div. 882, 105 N.Y.S. 1114.

The party asserting change of domicile has the burden of proving the same. The plaintiff in the case at bar has failed to meet this burden. There must be a union of residence and intention in order to acquire a new domicile. Residence without intention, or intention without residence is of no avail. Mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence even for a short time with the intention in good faith to change the domicile, has that effect. Matter of Newcomb's Estate, 192 N.Y. 238, 84 N.E. 950; Clapp v. Clapp, 272 App.Div. 378, 71 N.Y.S.2d 354; Mitchell v. United States, 21 Wall. 350, 22 L.Ed. 584.

The plaintiff has failed to prove any intent on the part of the defendant to change



his domicile, and such intent must be firmly established.

Page 945

DeMeli v. DeMeli, supra; Matter of Newcomb, supra; Matter of James, 221 N.Y. 242, 116 N.E. 1010.

Accordingly, the defendnat's motions to dismiss the complaint herein upon the ground that this Court is without jurisdiction over the subject matter of the action, is granted. And since the Court lacks jurisdiction it cannot pass upon the other phases of the plaintiff's case.

The foregoing constitute the Court's findings of fact and conclusions of law upon the question of jurisdiction, and is the Court's decision pursuant to Section 440 of the Civil Practice Act.

Submit order and judgment dismissing the complaint for want of jurisdiction.

